UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE STEINMETZ,

           Plaintiff,

-against-

SHUTTERSTOCK, INC.,

           Defendant.

Case No. 1:21-cv-7100 (AKH)

## DECLARATION OF ARTUR ZAMBROWSKI

ARTUR ZAMBROWSKI declares as follows:

1.    I am employed by defendant Shutterstock, Inc. ("Shutterstock") as an Intellectual Property Agent.  I submit this declaration in support of Shutterstock's Motion for Summary Judgment.  The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as a result of my preparation to serve as Shutterstock's corporate witness at a deposition in this case.

**A.**    **Shutterstock's Website**

2.    Shutterstock operates a leading global online marketplace for photographic images and other content (such as video footage and music) at the website www.shutterstock.com.  There are currently more than 415 million images available for license on Shutterstock's website and 200,000 images are added every day.  Shutterstock also hosts more than 26 million video clips, with 75,000 clips added every week.

**B.**    **Shutterstock's Contributor Platform**

3.    One of the ways that Shutterstock obtains images for license is through its over two million third-party "contributors."  Contributors are not employed by Shutterstock.  Anyone can

sign up to become a Shutterstock contributor by registering an account through Shutterstock's website or mobile app. Shutterstock has safeguards in place to reduce the risk of fraud or sign-ups by those who have been previously terminated.

4. Upon completion of the sign-up, contributors can instantly start to upload their content directly into the Shutterstock online marketplace through Shutterstock's contributor platform. Shutterstock does not select, curate, control, or otherwise substantially influence the images that contributors upload. Nor does it prescreen or edit the content.

5. Shutterstock briefly reviews the images uploaded by contributors for technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website. In other words, Shutterstock rejects images that appear to have obvious issues. Everything else is approved.

6. Shutterstock's customers may license contributor-supplied images on-demand through an entirely automated process on Shutterstock's website on a "royalty-free" basis. "Royalty-free" means that customers pay an up-front, one-time licensing fee, with no ongoing royalties due to Shutterstock in the future. Shutterstock keeps a portion of the licensing fee and pays the rest to the contributor. Since launching the contributor platform nearly twenty years ago, Shutterstock has paid over $1 billion in earnings to its contributors.

C. **Shutterstock's Copyright Policy**

7. Shutterstock takes intellectual property rights very seriously. Copyright infringement not only hurts rights owners, including the rights of Shutterstock's contributors, but it harms the integrity of the digital content marketplace as well. Shutterstock has no motivation to allow infringement; instead, its business depends on being a trusted source for authentic images.

8. Shutterstock's commitment to respecting intellectual property rights is reflected in

its various policies, including, for example, Shutterstock's "Contributor Terms of Service," which all of Shutterstock's contributors must acknowledge and agree to during the sign-up process. Attached hereto as **Exhibit A** is a true and correct copy of Shutterstock's current "Contributor Terms of Service," which is publicly available on Shutterstock's website at https://submit.shutterstock.com/legal/terms. The prior version, effective between July 30, 2015 through February 4, 2020, is attached hereto as **Exhibit B**.

9. Pursuant to the Contributor Terms of Service, every contributor represents and warrants that "the Content [that it submits to Shutterstock] does not infringe the copyright or any other rights of any third party."

10. The contributor also must agree to follow Shutterstock's "Contributor Guidelines," which state that the "[the contributor] must own or control the copyright to all content [it] submit[s] to Shutterstock" and "cannot submit work obtained from other sources (*e.g.*, online image search results or websites), or incorporate such work into [its] content submissions, unless [it has] permission to do so." Attached hereto as **Exhibit C** is a true and correct copy of the Contributor Guidelines, which is publicly available on Shutterstock's website at https://support.submit.shutterstock.com/s/article/Submission-and-Account-Guidelines.

11. Shutterstock relies on its contributors' representations about their content because it could not possibly investigate whether the 200,000 images that contributors submit every day infringe other parties' copyrights, without substantially altering its business model and incurring massive expense that would make it impossible for anyone to operate the platform.

12. Shutterstock does not tolerate abuse of its website or others' intellectual property rights. In the Contributor Terms of Service, Shutterstock advises contributors that "Shutterstock may suspend access to [the contributor's] Content and terminate [the contributor's] account" in

3

the event that Shutterstock "receives a [copyright infringement] complaint about [the contributor's] Content."

13. Shutterstock's "Terms of Use," which govern third-party use of all websites, software, apps, and/or plug-ins made available by Shutterstock, contains similar terms related to copyright ownership and infringement. Attached hereto as **Exhibit D** is a true and correct copy of Shutterstock's Terms of Use, which is publicly available on Shutterstock's website at https://www.shutterstock.com/terms.

14. Shutterstock also has a "DMCA Policy" that sets forth the procedure for submitting notices of copyright infringement (also known as "takedown notices") to a designated agent pursuant to the Digital Millennium Copyright Act (DMCA). Attached hereto as **Exhibit E** is a true and correct copy of Shutterstock's DMCA Policy, which is publicly available on Shutterstock's website at https://www.shutterstock.com/terms/dmca-notice.

15. The name and contact information for Shutterstock's designated copyright agent is registered with the U.S. Copyright Office and listed in its public directory. Attached hereto as **Exhibit F** are true and correct printouts of the Copyright Office's public directory.

16. Shutterstock does not interfere with—and, in fact, supports—copyright owners' ability to issue takedown notices. Shutterstock not only encourages copyright owners to write to Shutterstock if they believe their rights are being infringed, but also encourages non-copyright owners to report any suspected instances of infringement.

17. Shutterstock promptly investigates and responds to takedown notices. Shutterstock carefully evaluates every copyright claim that it receives to ensure that appropriate action is being taken with respect to the content and/or applicable contributor account. On average, in 2021 and 2022, Shutterstock has responded to DMCA-complaint takedown notices within 5.5 days of

receipt. Typically, within one business day of receipt, the takedown notices are put in queue by Shutterstock's software and assigned to a member of the intellectual property team for review and response.

18. In appropriate circumstances, Shutterstock has disabled access to the content and/or terminated the contributor's account due to alleged infringement, and it always will terminate anyone who infringes repeatedly. Indeed, Shutterstock generally terminates the accounts of those who violate its terms of service much faster than the "six strikes" proposed by the motion picture industry around the time Shutterstock's platform launched.

19. Shutterstock does not advise or encourage its users to conceal a work's copyright status. To the contrary, Shutterstock educates its contributors on copyright issues and the importance of obtaining any necessary licenses prior to submitting content to Shutterstock.

20. Shutterstock also utilizes specialized software to detect (and reject) potentially infringing material uploaded by contributors, including tools that identify duplicate images, images that are substantially similar to other images already in Shutterstock's collection, and images that the contributor may have downloaded from a third-party website that provides free images.

21. Shutterstock receives relatively few takedown notices in connection with contributor-supplied images. In 2021, the rate of DMCA takedown notices, valid or not, was approximately 0.005% as compared to the new content uploaded that year. Applying that number to existing content reduces the rate substantially further, to less than 0.001% of the content hosted for contributors.

22. On many occasions, the takedown notices are sent in error and relate to claims such as two photographs sharing the same idea, claims against photographs that the claimant later realizes are not his or hers, and other questions that have nothing to do with copyright infringement

but appear to be sent in order to get someone's attention.

23. Shutterstock does not promote or market infringing activity or content on its website. Indeed, Shutterstock is not incentivized to do so given that the point of the platform is to obtain authorized content for license. Shutterstock's license agreements with all third-party content providers include representations and warranties that the content provided to Shutterstock will not infringe third-party intellectual property rights. Similarly, all acquisition agreements with acquired companies and/or assets have contained similar representations and warranties.

24. Shutterstock would not and does not knowingly distribute infringing content, let alone charge more for such content than its other content. In fact, Shutterstock represents and warrants to its licensees that "Shutterstock's contributors have granted Shutterstock all necessary rights in and to the Content to grant the rights set forth [therein]," and that the licensee's proper use of the licensed content "will not infringe a third party's copyright." Shutterstock also agrees to indemnify its licensees for damages arising from a third-party claim directly attributable to any breach of such representations and warranties. Attached hereto as **Exhibit G** is a true and correct copy of the "Shutterstock License Agreement(s)," which is publicly available on Shutterstock's website at https://shutterstock.com/license. Shutterstock would not stand behind its content and offer such indemnification—up to $10,000 per image, even though the licensee may have paid as little as $0.26—if it did not believe in the integrity of its contributors' content.

25. In light of all of the above, it is little wonder that Shutterstock's contributor platform has operated for nearly twenty years without a single lawsuit being filed against it. Only recently has a small group of frequent-filing attorneys sued over the platform, but considering that Shutterstock has continued to follow standard DMCA protocols, I cannot understand why this has occurred.

D.    **The Contributor Image**

26.    On or about November 26, 2019, a third-party contributor located in India by the name of "Arun Lodhi" (the "Contributor") uploaded the image shown below ("Contributor Image") to Shutterstock's website to be offered for license. Attached hereto as **Exhibit H** is a document from Shutterstock's records related to the Contributor Image.



Contributor Image

27.    The Contributor signed up to be a Shutterstock contributor on November 26, 2019, selected the username "Arun RaJpuT6621," and agreed to Shutterstock's Contributor Terms of Service. Attached hereto as **Exhibit I** is a document from Shutterstock's records providing details regarding the Contributor's Shutterstock account.[1]

---

[1] The document attached as Exhibit I has been redacted to protect the privacy of the Contributor. Shutterstock has contemporaneously filed a letter motion for approval to redact and/or seal this document, and filed an unredacted copy under seal with the proposed redactions highlighted.

28.     Following a brief review for technical and quality issues, Shutterstock passively stored and made the Contributor Image available for license through its website.  In order to identify and offer the Contributor Image for license, Shutterstock displayed a low-resolution, watermarked copy of the Contributor Image on its public-facing website at the URL https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026.

29.     Consistent with industry practice, Shutterstock's system puts a "Shutterstock" watermark on every image for license displayed on its website in order to prevent third parties from using the image without a license.[2]  Shutterstock only provides an unwatermarked, high-resolution copy of the image to a customer who has licensed it.  Attached hereto as **Exhibit J** are examples of watermarks currently being used by other online content licensing companies (*e.g.*, Getty Images, Adobe Stock, Associated Press).  The watermark for certain larger-size thumbnails automatically populates with both "Shutterstock" and the contributor's username for informational and recordkeeping purposes.  Shutterstock's watermarking is intended and understood to identify the source or distributor of the image, and not necessarily the author or copyright owner.

30.     The Contributor did not convey any "copyright management information" to Shutterstock in connection with the Contributor Image and the Contributor Image itself did not display or otherwise contain any such information when Shutterstock received it.  The Contributor added his own preferred display name and metadata consisting of the Contributor's preferred image title and keywords for searchability in the licensing system.  Attached here as **Exhibit K** is a report of the metadata embedded in the contributor's image file.

---

[2] Very small thumbnails may not include a watermark, but their size and quality is so small that there is no risk that any third party would be able to use the thumbnail.

8

E.     **Plaintiff's Takedown Notice**

31.    I understand that the plaintiff in this lawsuit, George Steinmetz ("Plaintiff"), claims to own the image shown below ("Image"), and sent a takedown notice to Shutterstock on April 1, 2021. (A copy of Plaintiff's takedown notice is attached as Exhibit W to the accompanying Declaration of Eleanor M. Lackman.)



Plaintiff's Image

32.    Plaintiff's full Image has never been posted, displayed, or otherwise used on Shutterstock's website. The one URL identified in Plaintiff's takedown notice merely displayed a low-resolution, watermarked copy of the Contributor Image, which is a heavily cropped copy of Plaintiff's Image. The higher-resolution, unwatermarked copy of the original Contributor Image that was uploaded to Shutterstock's platform would not be accessible or provided to anyone unless a customer licensed the image (and even then, it would still be cropped). However, this never occurred because no customer selected the Contributor Image for license.

33.    Shutterstock had no knowledge or awareness of the Image at issue or the alleged infringement prior to Plaintiff's takedown notice.

34.    Plaintiff's takedown notice was the first complaint that Shutterstock had ever received in connection with the Contributor.

35. Upon review of Plaintiff's takedown notice, Shutterstock acted expeditiously to remove the Contributor Image from the identified URL and to de-index and withdraw it from licensing. Due to a software error affecting a small number of takedown notices received in March and April of 2021, Plaintiff's takedown notice was first assigned to a Shutterstock team member on May 5, 2021; Shutterstock responded to Plaintiff and removed the Contributor Image within four business days. Attached hereto as **Exhibit L** is a copy of Shutterstock's correspondence with Plaintiff, including a May 11, 2021 email from Shutterstock confirming that the Contributor Image had been removed.

36. As of May 11, 2021, the Contributor Image was not visible at the identified URL or in the contributor platform, nor searchable on Shutterstock's website. Even if it was somehow located by someone with a copy or a direct link to another URL where a record copy might reside, it could not be "added to cart" or otherwise licensed by a customer. The asset details for the Contributor Image (attached hereto as Exhibit H) show that it was removed per Plaintiff's DMCA takedown notice on May 11, 2021.

37. The Contributor Image was not licensed after receipt of Plaintiff's takedown notice or at any time. In addition, Shutterstock's records show that it was not viewed even once at the identified URL between the date of Plaintiff's notice and the takedown. Attached hereto as **Exhibit M** is a report showing page views of the URL identified in Plaintiff's takedown notice.

38. Because the Contributor Image was never licensed, Shutterstock did not earn any revenue therefrom, and the high-resolution, unwatermarked copy of the Contributor Image was never accessible or provided to anyone.

39. As shown in the analytics report (attached as Exhibit M), the Contributor Image was viewed on Shutterstock's website at the identified URL a total of four times by a mere two

unique visitors, at least one of whom was likely Plaintiff's counsel given Plaintiff's lack of involvement in the preparation of the case.

F.  **Lingering Thumbnails of Contributor Image**

40. Shutterstock had no knowledge or awareness that any other copy of the Contributor Image may be stored on its website elsewhere, nor any obligation to investigate.

41. I understand that, in or around September 2021, Plaintiff's counsel vaguely suggested to Shutterstock's counsel that the Contributor Image was still available on Shutterstock's website, but refused to provide the URL or any other information reasonably sufficient to permit Shutterstock to find where it may be located within its vast collection of images. Shutterstock proceeded to conduct its own internal investigation and located small-sized, low-resolution, watermarked copies (also known as "thumbnails") of the Contributor Image available on its edge cache servers.

42. The lingering thumbnails were not visible on Shutterstock's website or indexed for searches; they could only be found by someone who had preserved a copy of the Contributor Image and used specialized software to conduct a reverse-image search, or by someone who had a copy of the Shutterstock image ID number and identified the directory and file-naming convention used on Shutterstock's servers to reverse-engineer the link to the unindexed thumbnail file. This is not how the public searches for images to license. Shutterstock keeps these types of thumbnails for informational, recordkeeping, and matching purposes to help flag and prevent potential fraud. In furtherance of these purposes, the watermark on some of these lingering thumbnails displayed both "Shutterstock" and the name supplied by the contributor (in this case, "Arun RaJpuT6621").

43. As of September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from its website and servers, including the lingering thumbnails.

44. Shutterstock also contemporaneously investigated the Contributor based on its own volition, and terminated the Contributor's Shutterstock account as of September 22, 2021.

45. I understand that Plaintiff has also complained about a preserved copy of the Contributor Image on TinEye, an image search and recognition company that crawls the webs and copies and archives all images. As demonstrated by the document attached hereto as **Exhibit N**, one would need a copy of the thumbnail in order to find this copy of the Contributor Image through TinEye. In any event, Shutterstock does not control TinEye and cannot require it to expunge its records of what existed on the internet at a particular time.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: September 2, 2022

DocuSigned by:

*[signature]*

5F3551C731FE491...

Artur Zambrowski