**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| GEORGE STEINMETZ, <br><br> Plaintiff, <br><br> v. <br><br> SHUTTERSTOCK, INC.; et al., <br><br> Defendants. | Civil Action No.: 1:21-cv-07100-AKH |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR
SUMMARY ADJUDICATION**

i

## **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................... 1

III.   LEGAL STANDARD .......................................................................................... 15

IV.   ARGUMENT ....................................................................................................... 16

   A.   Shutterstock directly infringed Steinmetz's rights in the Subjcet Photograph ............ 16

   1.   Steinmetz owns a valid copyright in the Subject Photograph ......................... 16

   2.   Shutterstock violated Steinmetz's copyrights ................................................ 16

      a.   Shutterstock's unlawful reproduction, display, and distribution of the Subject
      Photograph ....................................................................................................... 17

      b.   Shutterstock created an unlawful derivative .............................................. 20

   B.   Shutterstock has secondary liability ............................................................... 20

   1.   Vicarious liability .......................................................................................... 20

   2.   Contributory liability .................................................................................... 23

   C.   Shutterstock violated 17 U.S.C. § 1202 ........................................................ 23

   D.   Shutterstock's infringement was willful ........................................................ 25

   E.   Shutterstock's defenses fail ............................................................................ 27

   1.   The DMCA "safe harbor" does not protect Shutterstock ............................. 28

   a.   Shutterstock is not a "service provider" ...................................................... 28

   b.   Shutterstock does not qualify for the "safe harbor" under Section 512(i) ................ 31

   i.   Shutterstock did not adopt and implement a "repeat infringer" policy ..................... 32

   ii.   Shutterstock frustrated standard technical measures ................................................ 33

   c.   Shutterstock's safe harbor defense fails under Section 512(c) ..................................... 33

i.    The Infringing Copy was not stored "at the direction of the user" and    does not entirely "reside on a system" controlled by Shutterstock. ................................................. 34

ii.   Shutterstock had notice of the infringement and did not expeditiously disable   access to the infringing content ................................................................................. 35

iii.   Shutterstock financially benefitted from, and had the right and ability to    control, the infringement ............................................................................................ 36

iv.   Shutterstock failed to properly designate a DMCA agent ....................................... 39

v.   The Section 512 safe harbor is precluded due to discovery misconduct .................... 39

V.    SUMMARY ADJUDICATION IS PROPER .................................................. 42

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

# TABLE OF AUTHORITIES

## Cases

*A & M Records, Inc. v. Napster, Inc.*,

239 F.3d 1004 (9th Cir.2001) ........................................................................ 23

*Aaberg v. Francesca's Collections, Inc.*,

2018 WL 1583037 (S.D.N.Y. Mar. 27, 2018) ................................................ 24

*Agence France Presse v. Morel*,

934 F. Supp. 2d 547 (S.D.N.Y. 2013) ........................................................... 28

*Agence France Presse*,

934 F.Supp.2d at 584 (S.D.N.Y. 2013) ......................................................... 29

*APL Microscopic, LLC v. United States*,

144 Fed. Cl. 489 (2019)................................................................................. 18

*Arista Records, LLC v. Doe 3*,

604 F.3d 110 (2d Cir. 2010)........................................................................... 16

*Arista Recs. LLC v. Usenet.com, Inc.*,

633 F. Supp. 2d 124 (S.D.N.Y. 2009) ........................................................... 38

*Beastie Boys v. Monster Energy Co.*,

66 F. Supp. 3d 424 (S.D.N.Y. 2014)............................................................. 27

*Bell v. Wilmott Storage Servs., LLC*,

12 F.4th 1065 (9th Cir. 2021) ....................................................................... 35

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,

No. CV SAG-18-03384 (D. Md. Nov. 17, 2021)............................................ 22

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,

69 F. Supp. 3d 342 (S.D.N.Y. 2014) ............................................................. 17

*BWP Media USA Inc. v. Polyvore, Inc.*,

  922 F.3d 42 (2d Cir. 2019) ................................................................................. 18

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,

  196 F. Supp. 3d 395 (S.D.N.Y. 2016) ................................................................ 26

*Capitol Records, Inc. v. MP3tunes, LLC*,

  821 F.Supp.2d 627 (S.D.N.Y.2011) .................................................................... 32

*Capitol Records, LLC v. Vimeo, LLC*,

  826 F.3d 78 (2d Cir. 2016) ................................................................................. 28

*Capitol Recs., LLC v. Escape Media Grp., Inc.*,

  No. 12-CV-6646 AJN (S.D.N.Y. Mar. 25, 2015) ................................................ 32

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,

  536 F.3d 121 (2d Cir. 2008) ............................................................................... 17

*Cavanaugh v. Shutterstock, Inc., et al*,

  1-21-cv-03796 (S.D.N.Y.) ................................................................................... 14

*Columbia Pictures Inds., Inc. v. Fung*,

  710 F.3d 1020 (9th Cir. 2013) ............................................................................ 37

*Corbis Corp. v. Amazon.com, Inc.*,

  351 F.Supp. 2d 1090 (W.D. Wash. 2004) .......................................................... 30

*Corbis Corp. v. Amazon.com, Inc.*,

  351 F.Supp.2d 1090 (W.D.Wash.2004) ............................................................. 31

*CoStar Grp., Inc. v. LoopNet, Inc.*,

  373 F.3d 544 (4th Cir. 2004) .............................................................................. 16

*Daval Steel Products v. M/V Fakredine*,

  951 F.2d 1357 (2d Cir.1991) .............................................................................. 41

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

*DDAVP Direct Purchaser Antitrust Litigation*,
   585 F.3d 677 (2d Cir. 2009) ................................................................ 25

*Design Strategy, Inc. v. Davis*,
   469 F.3d 284 (2d Cir.2006) ................................................................ 41

*Disney Enterprises, Inc. v. Hotfile Corp.*,
   No. 11-20427-CIV (S.D. Fla. Sept. 20, 2013) .................................... 21

*Dole v. United Steelworkers of Am.*,
   494 U.S. 26, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ........................... 29

*Ebewo v. Martinez*,
   309 F.Supp.2d 600 (S.D.N.Y.2004) ..................................................... 41

*Fallaci v. New Gazette Literary Corp.*,
   568 F. Supp. 1172 (S.D.N.Y. 1983) ..................................................... 27

*FDIC v. Giammettei*,
   34 F.3d 51 (2d Cir.1994) ...................................................................... 15

*Feingold v. RageOn, Inc.*,
   472 F. Supp. 3d 94 (S.D.N.Y. 2020) .................................................... 36

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340, 111 S.Ct. 1282 (1991) ................................................... 16

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
   696 F.Supp.2d 368 (S.D.N.Y.2010) ..................................................... 25

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*,
   507 F. App'x 26 (2d Cir. 2013) ............................................................ 25

*Fitzgerald Pub. Co. v. Baylor Pub. Co.*,
   807 F.2d 1110 (2d Cir.1986) ................................................................ 25

vi

*Fox News Network, LLC v. Tveyes, Inc.*,

    883 F.3d 169 (2d Cir. 2018) .............................................................................. 17

*Gardner v. CafePress Inc.*,

    No. 3:13-CV-1108-GPC-JMA (S.D. Cal. Feb. 26, 2014) ...................................... 30

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,

    443 F.2d 1159 (2d Cir.1971) .............................................................................. 21

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,

    No. 2:16-CV-04587-SVW-KS (C.D. Cal. May 1, 2017) ...................................... 30

*Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al.*,

    1-20-cv-03023 (S.D.N.Y.) .................................................................................. 14

*Hamil Am. Inc. v. GFI*,

    193 F.3d 92 (2d Cir. 1999) ................................................................................. 16

*Hendrickson v. Amazon.com, Inc.*,

    298 F.Supp.2d 914 (C.D.Cal.2003) .................................................................... 30

*Inc. v. Kinko's Graphics Corp.*,

    758 F.Supp. 1522 (S.D.N.Y.1991) ..................................................................... 25

*Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*,

    Nos. 01 Civ. 6600(JSR), 01 Civ. 0877(JSR), 02 Civ. 0138(JSR) (S.D.N.Y. Aug, 11, 2010) ... 40

*Itasca Images, LLC et al v. Shutterstock, Inc., et al*,

    0-21-cv-00287 (D.MN) ...................................................................................... 14

*Johnson Electric North America Inc. v. Mabuchi Motor America Corp.*,

    77 F.Supp.2d 446 (S.D.N.Y.1999) ..................................................................... 41

*Kinsley v. Udemy, Inc.*,

    No. 19-CV-04334-JSC (N.D. Cal. Mar. 31, 2021) .............................................. 36

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

*Lickerish, Ltd. v. Shutterstock Inc.*,

   1-20-cv-05384 (S.D.N.Y.) ................................................................................ 14

*Mango v. BuzzFeed, Inc.*,

   356 F. Supp. 3d 368 (S.D.N.Y. 2019) .............................................................. 24

*Mavrix Photographs, LLC v. Livejournal, Inc.*,

   873 F.3d 1045 (9th Cir. 2017) ........................................................................... 28

*McGucken v. Shutterstock, Inc., et al*,

   1:22-cv-00905 (S.D.N.Y.) ................................................................................. 14

*Michael Grecco Prods., Inc. v. Alamy, Inc.*,

   372 F. Supp. 3d 131 (E.D.N.Y. 2019) .............................................................. 24

*Michael Grecco Prods., Inc. v. Valuewalk, LLC*,

   345 F. Supp. 3d 482 (S.D.N.Y. 2018) .............................................................. 32

*Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*,

   2-20-cv-00787 (C.D.CA) .................................................................................. 14

*Michael Grecco Productions, Inc. v. Shutterstock, Inc., et al.*,

   2-19-cv-01153 (CD.CA) .................................................................................... 14

*New York v. United Parcel Serv., Inc.*,

   253 F. Supp. 3d 583 (S.D.N.Y. 2017) .............................................................. 26

*Obodai v. Cracked Ent. Inc.*,

   522 F. App'x 41 (2d Cir. 2013) ......................................................................... 30

*Obodai v. Demand Media, Inc.*,

   No. 11 CIV. 2503 PKC (S.D.N.Y. June 13, 2012) .......................................... 30

*Omeprazole Pat. Litig.*,

   No. 00 CIV. 4541 BSJ (S.D.N.Y. Nov. 7, 2012) ............................................ 40

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

*Peer Int'l Corp. v. Luna Recs., Inc.*,

    887 F. Supp. 560 (S.D.N.Y. 1995) ...................................................................... 27

*Pehlivanian v. China Gerui Advanced Materials Grp.*,

    Ltd., 153 F. Supp. 3d 628 (S.D.N.Y. 2015) ........................................................ 3

*Penske Media Corporation v. Shutterstock, Inc.*,

    1-20-cv-04583 (S.D.N.Y.) .................................................................................... 14

*Perfect 10, Inc. v. Amazon.com, Inc.*,

    508 F.3d 1146 (9th Cir. 2007) ............................................................................ 21

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,

    213 F.Supp.2d 1146 (C.D.Cal.2002) .................................................................. 32

*Polygram Int'l Publ'g Inc. v. Nevada/TIG, Inc.*,

    855 F.Supp. 1314 (D.Mass.1994) ....................................................................... 21

*Seide v. Level-(1) Glob. Sols., LLC*,

    No. 16 C 2975 (N.D. Ill. Aug. 10, 2016) ........................................................... 36

*Shihab v. Complex Media, Inc.*,

    No. 21-CV-6425 (PKC) (S.D.N.Y. Aug. 17, 2022) ........................................... 25

*Smith v. Mikki More, LLC*,

    21 F.Supp.3d 276 (S.D.N.Y.2014) ..................................................................... 21

*Softel, Inc. v. Dragon Medical & Sci. Commc'ns, Inc.*,

    118 F.3d 955 (2d Cir.1997) ................................................................................ 20

*Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*,

    778 F.2d 89 (2d Cir.1985) .................................................................................. 26

*Tamara Williams v. Shutterstock, Inc., et al*;

    1-21-cv-05784 (E.D.N.Y) ................................................................................... 14

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

*Trombetta v. Novocin*,

    2020 WL 1304120 (S.D.N.Y. Mar. 19, 2020) ....................................................... 24

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*,

    667 F.3d 1022, 1026 (9th Cir.2011) ....................................................................... 29

*Unicolors, Inc. v. Urban Outfitters, Inc.*,

    853 F.3d 980 (9th Cir. 2017) ................................................................................. 26

*Ventura Content, Ltd. v. Motherless, Inc.*,

    885 F.3d 597 (9th Cir. 2018) ................................................................................. 37

*Venus Fashions, Inc. v. ContextLogic, Inc.*,

    No. 3:16-CV-907-J-39MCR (M.D. Fla. Jan. 17, 2017) ........................................ 37

*VHT, Inc. v. Zillow Grp., Inc.*,

    918 F.3d 723 (9th Cir. 2019) ................................................................................. 35

*Viacom Int'l, Inc. v. YouTube, Inc.*,

    676 F.3d 19 (2d Cir.2012) ...................................................................................... 21

*Ward v. The National Geographic Society*,

    No. 99 Civ. 12385(LAK) (S.D.N.Y. Jan.11, 2002) ............................................... 41

*Warner Bros. Entm't Inc. v. RDR Books*,

    575 F.Supp.2d 513 (S.D.N.Y. 2008) ..................................................................... 20

*Warren v. John Wiley & Sons, Inc.*,

    952 F.Supp.2d 610 (S.D.N.Y.2013) ....................................................................... 17

*Wolk v. Kodak Imaging Network, Inc.*,

    840 F.Supp.2d 724 (S.D.N.Y.2012) ....................................................................... 31

*Yi Fu Chen v. Spring Tailor, LLC*,

    2015 WL 3953532 (S.D.N.Y. June 29, 2015) ....................................................... 15

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

*Yurman Design, Inc. v. PAJ, Inc.,*

   262 F.3d 101 (2d Cir.2001) ............................................................................ 27

## Statutes

17 U.S.C. § 1202(a) .......................................................................................... 24

§37(c)(1)(C) ...................................................................................................... 41

17 U.S.C. § 101 ........................................................................................... 18, 20

17 U.S.C. § 106 ........................................................................................... 16, 20

17 U.S.C. § 106(3) ............................................................................................ 19

17 U.S.C. § 106(5) ............................................................................................ 18

17 U.S.C. § 1202(a) .......................................................................................... 24

17 U.S.C. § 1202(c)(2)–(3), (7) ........................................................................ 24

17 U.S.C. § 504 ................................................................................................. 17

17 U.S.C. § 512 ................................................................................................. 28

17 U.S.C. § 512(a) ............................................................................................ 28

17 U.S.C. § 512(c)(1) ................................................................................... 34, 36

17 U.S.C. § 512(c)(1)(A)-(C), (2) ..................................................................... 33

17 U.S.C. § 512(c)(1)(B) ................................................................................... 37

17 U.S.C. § 512(i) ............................................................................................. 31

17 U.S.C. § 512(i)(1)(A) ................................................................................... 32

17 U.S.C. § 512(k)(1) ................................................................................... 28, 31

17 U.S.C. §§ 512(i) ........................................................................................... 32

17 U.S.C. 106(2) ............................................................................................... 20

17 U.S.C. 1202 .................................................................................................. 42

17 U.S.C. 512(i) ................................................................................................ 33

U.S.C. § 512(i)(1)(A) ....................................................................................... 31

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

## **Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 15

Fed.R.Civ.P. 26 ....................................................................................................... 39

Fed.R.Civ.P. 30(b)(6) ............................................................................................. 40

Fed.R.Civ.P. 37(c)(1) .............................................................................................. 41

Rule 26(a) or (e) ....................................................................................................... 41

Rule 37(c)(1) ............................................................................................................ 41

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY ADJUDICATION

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION**</u>

**I.      INTRODUCTION**

Defendant, Shutterstock, Inc. ("Shutterstock"), infringed Plaintiff, George Steinmetz's, copyrights by displaying his original photography on its for-profit website, distributing and offering said photography for commercial license, and including it in its subscription packages. This infringement was willful, continuing even after this lawsuit's filing. Summary adjudication of the issues of liability for copyright infringement and willfulness are appropriate.

**II.     STATEMENT OF FACTS**

Steinmetz is an accomplished photographer who has earned numerous awards for his photography, including three prizes from *World Press Photo*, and whose work has been displayed in myriad publications and exhibitions, including *National Geographic* and *NY Times Magazine*. Statement of Undisputed Fact ("SUF") ¶1. In 2013, Steinmetz created an original aerial photograph expressing his perspective of the burning practices used to convert virgin areas of the Amazon Rainforest into farmland for growing corn and soy beans (the "Subject Photograph"). SUF ¶2, **Ex. 1**. He traveled at great expense to explore the deforestation of the Amazon to create this stunning work that he then published in *National Geographic*, which ran an excellent article about how Steinmetz "spent years hanging from a paraglider, and later operating drones, to get amazing views of the Earth." [1] SUF ¶3; **Ex. 28**.

Steinmetz owns all copyrights in and to the Subject Photograph and duly registered the Subject Photograph with the Copyright Office. SUF ¶5; **Ex. 3**. The Subject Photograph contained metadata identifying Steinmetz as the copyright owner and author. SUF ¶4, **Ex. 2**.

---

[1] See https://www.nationalgeographic.com/science/article/aerial-photos-show-the-human-planet-in-all-its-beauty-and-pain (last visited September 1, 2022).

Shutterstock, Inc. ("Shutterstock") is a for-profit company that owns and operates a commercial website and sells licenses and subscription packages allowing its paying customers to use and exploit Shutterstock's curated collection of photography. SUF ¶ 6; **Ex. 15** at 65:6-15. It offers to its customers full-size[2] photographs in high resolution[3] as part of a subscription package, or individually, or at times as "trial" downloads. SUF ¶7, **Ex. 18**, **Ex. 15** at 179:18 - 180:6; 163:18-23; **Exs. 4, 18, 24**. When visitors view an image on the Shutterstock website, they are first shown an image on a background that implores users to "Buy Now" or sign up for a "Free trial." SUF ¶ 8; **Ex. 18**. Shutterstock also displays a button promising that the user can "Download for free" the photograph being offered, but clicking that button leads visitors to a page where they are required to sign up and, after a free trial period, pay for a subscription allowing download and exploitation of the Shutterstock photographs. SUF ¶9; **Id.**

Shutterstock's clients and licensees pay a monthly rate (currently ranging from at least $29 to $479) to use *all* of Shutterstock's photography, which would have included the Infringing Copy, or an annual per-photograph rate (currently ranging from $29 to $229) to access, copy, and exploit Shutterstock photography.[4] SUF ¶10. A Shutterstock client can only access Shutterstock photographs that have been pre-approved by Shutterstock, including Shutterstock's *own* photographs, as Shutterstock offers all of its photography to its clients as part of its general portfolio for the same price and as part of the same paid packages. SUF ¶11; **Ex. 15** at 73:8-75:5.

Shutterstock's business is thus selling licenses and pre-paid packages of photography and the "breadth and quality of [Shutterstock's] content offerings are critical to [Shutterstock's]

---

[2] SUF ¶11, Ex. 15 at 179:18-180:6.
[3] SUF ¶11, Ex. 15 at 163:18-23.
[4] See https://www.shutterstock.com/pricing (last visited Aug. 29, 2022); SUF  ¶¶ 7-8, **Ex. 27**.

PLAINTIFF'S MEMORANDUM OF LAW

success."[5] Per its "business model," Shutterstock "source[s] high-quality content from contributors, and license [sic] that content to customers worldwide." SUF ¶ 12,; **Ex. 24**. And virtually all of its photographs are sourced from a pre-approved network of verified contributors, each of which provide Shutterstock with photographs for Shutterstock's exclusive review and approval. SUF ¶ 13; **Ex. 13; Ex. 15** at 46:13-18; 48:10-19. Shutterstock recruits these contributors and partners online and then reviews and approves their application before they can even submit photography, which photography must then be independently reviewed and approved.[6] SUF ¶14.

Shutterstock informs its customers and licensees that it owns the right to display and license the photography on its site.[7]  SUF ¶15. It also enters into licenses directly with its clients, who pay for photography usage rights, and receive standard usage terms such as duration, geographic region, and whether the image can be used on merchandise. SUF ¶16; **Ex. 20** (a representative exemplar of those terms). Shutterstock claims that it will only offer "images that are appropriately licensed for commercial and editorial use. [Its] review process is designed to ensure that every image is appropriately licensed for its intended use."[8] SUF ¶17; **Exs. 13, 24.**

---

[5] See https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393, pg. 7 of Shutterstock's U.S. S.E.C. Form 10-K(last visited September 1, 2022). The court can take judicial notice of this filing. *See Pehlivanian v. China Gerui Advanced Materials Grp.*, Ltd., 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015) ("The Court may also take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission[.]" (internal quotation marks omitted). All such websites and public documents subject of Plaintiff's concurrently-filed Request for Judicial Admission.

[6]  https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 83 of Shutterstock's U.S. S.E.C. Form S-1 (last visited September 1, 2022).

[7] https://www.shutterstock.com/blog/protecting-your-content-what-you-need-to-know-about-licensing-your-copyright (last visited Aug. 29, 2022); see also https://submit.shutterstock.com/legal/terms (last visited Aug. 29, 2022)

[8] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 78, 86 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022).

PLAINTIFF'S MEMORANDUM OF LAW

Shutterstock does not make any photographs publicly viewable on its licensing site unless and until it first reviews and approves the photographs. SUF ¶18; **Ex. 15** at 49:17-50:13. This review process is thorough – Shutterstock uses its discretion to scrutinize the work's subject matter, commercial appeal, and technical quality before deciding whether to approve the work. SUF ¶19; **Id.**, and at 107:5 – 108:10. And the review is wholly "subjective" to ensure that the work's "quality is up to par."[9] SUF ¶20 Indeed, the photography on Shutterstock' site is vetted by its "specialized team of reviewers to ensure that it meets [Shutterstock's] standards of quality and licensability[,]" before it is published to Shutterstock's site and offered for license, and that contributors must meet Shutterstock's "robust quality standards."[10] SUF ¶21.

Shutterstock regularly rejects photographs for stylistic and aesthetic reasons, such as when Shutterstock dislikes a photograph's lighting,[11] or blurriness,[12] or composition[13] or framing.[14] SUF ¶22. This rigorous process results in the rejection of **most** contributor applicants and images submitted to the platform: "[l]ess than 20% of contributor applicants who applied in 2011 were approved as contributors to shutterstock.com, and less than 60% of images uploaded by approved contributors in 2011 satisfied our rigorous acceptance requirements."[15] SUF ¶23.

---

[9] https://player.vimeo.com/video/134351620  (ShutterTalk Live: 5 Most Common Photo Rejection Reasons – and How to Avoid Them)(last visited September 1, 2022)
[10] See https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393, pg. 7 (last visited September 1, 2022)
[11] https://www.shutterstock.com/blog/rejection-reasons-poor-lighting-and-lighting-problems (last visited on September 1, 2022)
[12] https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Focus?language=en_US (last visited September 1, 2022)
[13] https://www.shutterstock.com/blog/rejection-reason-composition (last visited on September 1, 2022); https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Composition?language=en_US (last visited on September 1, 2022)
[14] Id.
[15] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 77 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022)

PLAINTIFF'S MEMORANDUM OF LAW

Indeed, Shutterstock regularly rejects photographs that it does not find valuable or otherwise up to its aesthetic and commercial standards. SUF ¶ 24; **Ex. 15** at 109:11-19.

Shutterstock's entire business model depends on the "high quality" of the photography that it curates, and that quality is crucial to Shutterstock's business model. SUF ¶25; **Ex. 15** at 156:15 -157:3. It advertises that "unlike the significant majority of free images available online, our rigorous vetting process enables us to provide confidence and indemnification to our users that the images in our library have been appropriately licensed for commercial or editorial use."[16] It is beyond dispute that Shutterstock has complete control over the photographs that it offers for licensure. It is solely responsible for reviewing, approving, and publishing the photographs to its publicly viewable licensing website. SUF ¶27; **Ex. 15** at 107:5-108:10; 118:13-119:12. Shutterstock has final say as to what it displays and licenses and can *remove* any photograph from its site at any time. SUF ¶28; **Id**. at 119:14-120:4. Simply put, if Shutterstock does not subjectively believe that a particular photograph has aesthetic appeal, commercial value, and is likely draw traffic, it will reject the photograph and that photograph will not appear on its site. SUF ¶29; **Ex. 15** at 49:17 - 50:13; 93:17 - 95:14. Once Shutterstock approves a photograph, it will create a dedicated "Asset Detail Page," which is a licensing page with details about the work, for the photograph and offer it for licensure to its customers. SUF ¶30; **Ex. 4.**

Shutterstock worked with one of its carefully vetted and verified contributors, who was based in India and used the Shutterstock account name "ArunRaJpuT6621," to obtain an unauthorized copy of the Subject Photograph ("Infringing Copy"). SUF ¶31; **Ex. 23**. The below chart reflects true and correct copies of (a) the Subject Photograph, in full and as it appears on

---

[16]  https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 1 ("Prospectus Summary") (last visited September 1, 2022)

the site of Steinmetz licensee *National Geographic*; and (b) the Infringing Copy, as it appears at various Shutterstock URLs:

**SUBJECT PHOTOGRAPH:**



PLAINTIFF'S MEMORANDUM OF LAW

**INFRINGING COPY:**

**<u>SHUTTERSTOCK ASSET DETAIL PAGE:</u>**



<u>Enlarged Shutterstock URL</u>:

PLAINTIFF'S MEMORANDUM OF LAW

## **SHUTTERSTOCK DEDICATED ASSET PAGES:**

SHUTTERSTOCK DEDICATED ASSET PAGE #1:



https://image.shutterstock.com/shutterstock/photos/1571786026/display_1500/-stock-photo-1571786026.jpg

STEINMETZ000021

Enlarged Shutterstock URL:

https://image.shutterstock.com/shutterstock/photos/1571786026/display_1500/-stock-photo-1571786026.jpg

PLAINTIFF'S MEMORANDUM OF LAW

## SHUTTERSTOCK DEDICATED ASSET PAGE #2:



www.shutterstock.com · 1571786026

 https://image.shutterstock.com/image-photo/-600w-1571786026.jpg

STEINMETZ000017

### Enlarged Shutterstock URL:

https://image.shutterstock.com/image-photo/-600w-1571786026.jpg

PLAINTIFF'S MEMORANDUM OF LAW

SHUTTERSTOCK DEDICATED ASSET PAGE #3:



shutterstock.com · 1571786026

 https://image.shutterstock.com/image-photo/-260nw-1571786026.jpg                    STEINMETZ000016

Enlarged Shutterstock URL:

https://image.shutterstock.com/image-photo/-260nw-1571786026.jpg

See **Exs. 1, 4, 8, 9, 10**; https://www.nationalgeographic.com/science/article/aerial-photos-show-the-human-planet-in-all-its-beauty-and-pain (last visited September 1, 2022).

The Infringing Copy is identical to the Subject Photograph aside from its cropping. And Shutterstock published and displayed *at least four* copies of the Infringing Copy on four different URLS on its publicly facing website. SUF ¶32; **Exs. 4, 8, 9, 10**.

Shutterstock onboarded the Infringing Copy from its verified contributor and then reviewed the work for quality, subject matter, aesthetics, and the numerous other factors described above. SUF ¶ 33; **Exs. 13-14**. Shutterstock, after completing its review of the content

PLAINTIFF'S MEMORANDUM OF LAW

and commercial appeal of the Infringing Copy, expressly approved the Infringing Copy. SUF ¶ 34; **Exs. 8-12**. After approving the Infringing Copy, Shutterstock made its own copies of the Infringing Copy, added its logo to the copies to claim it as *its own* intellectual property, published these copies on its public website at its own Dedicated Asset Page as well as three other URLs, and began offering it to its customers in high-resolution[17] as part of its licensing and subscription programs. SUF ¶ 35; **Exs. 8-12, Ex. 15** at 43:17-23.

Shutterstock also distributed copies of the Infringing Copy to third-party partners including TinEye, HelloRF (which Shutterstock owns in part),[18] and StockFresh. SUF ¶ 36; **Exs. 11-12, 21, 25, 26**. Shutterstock works with these partner sites by providing to them Shutterstock photography and directing them to display the photography, advertise licenses, promote the Shutterstock brand, and direct viewers to Shutterstock's site. SUF ¶37; **Exs. 11-12**; **Ex. 15** at 240:12-241:18. Shutterstock's broad distribution of its photography across the internet via these sites is an important aspect of its business plan.

Each of these sites, using Shutterstock computer code (referred to as Application Programming Interface, or "API") and a link provided by Shutterstock to a copy of the Shutterstock computer file for the Infringing Copy, further displayed the Infringing Copy on each of their sites and encouraged viewers to visit Shutterstock to purchase a license to use the Infringing Copy.[19] SUF ¶38; **Ex. 15** at 160:10-17. Shutterstock's API terms require its partners to "incorporate the Shutterstock watermark" when displaying Shutterstock-provided photography and include a conspicuous indication that the photograph is "Powered by Shutterstock."[20] SUF

---

[17] Ex. 15 at 163:18-23.
[18] See Ex.26, announcing Shutterstock's purchase of HelloRF parent company, ZCool.
[19] https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022)
[20] https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022)

¶39. Shutterstock, TinEye, and HelloRF all participate in this program and are Shutterstock partners. SUF ¶40; **Exs. 11-12, 21, 25, 15** at 177:25-179:17, 240:12-241:18.

Moreover, Shutterstock has a partnership agreement with TinEye under which TinEye displays Shutterstock photography (including the Infringing Copy) alongside Shutterstock branding and advertisements. SUF ¶41; **Ex. 15** at 28:6 - 29:23. Shutterstock used the Infringing Copy to advertise its 15% off sale on the TinEye website under this partnership. SUF ¶ 42; **Ex. 11**. TinEye, due to its use of the code and API provided by Shutterstock, can only display Shutterstock photographs so long as the photographs are "live" and are currently being actively promoted through Shutterstock's site. SUF ¶43; **Ex. 15** at 33:14 - 34:15.

Steinmetz's counsel sent a cease-and-desist demand to Shutterstock demanding that it cease all use of the Subject Photograph on April 1, 2021. SUF ¶ 44; **Ex. 6**. A Shutterstock employee, using the fake name [redacted],[21] responded on May 11, 2021 and represented that the Infringing Copy had been "removed."  SUF ¶ 45;, **Ex. 7, 14 Ex. 15** at 57:3-58:11**.** At the time [redacted] sent that message, he had only discussed the matter with colleagues and had not confirmed that the message was true. SUF ¶47; **Ex. 15** at 57:3 - 58:11. At the time he sent the message, Shutterstock had not investigated its partner's sites to confirm that they also removed the Infringing Copy. SUF ¶48; **Ex. 15**. 44:8-15. At most, at that time, Shutterstock "suspended" only one of Shutterstock's copies of the Infringing Copy at this time, meaning that it suspended access to only the copy displayed on its Asset Detail Page, which offered the work part of its licensing packages, but maintained and contributed to display copies of the Infringing Copy on *three other URLS* on its publicly available website and another copy on its internal system. SUF

---

[21] His real name was Artur Zambrowski. See SUF ¶46; **Ex. 15** at 10:3-8. Shutterstock's putative DMCA agent, Sejal Patel Richbourg, instructed the employee to use this fake name when responding to DMCA infringement notices. **Id.** at 12:18-13:3.

¶49; **Exs. 8-10; 15** at 174:3-10. Shutterstock's copies of the Infringing Copy were not "locked," or removed from those three publicly facing pages of the Shutterstock website, until September 20 or 21, 2021[22] at the earliest. SUF ¶ 50;. ¶ 5, **Exs. 8-10; 15** at 172:2-7. In other words, Shutterstock continued to display and distribute three copies of the Infringing Copy to the public until at least September 20 or 21, 2021. SUF ¶ 51; **Exs. 8-10, 14**. Shutterstock conceded that its failure to ensure that the Infringing Copy was not visible to the public was a violation of Shutterstock's DMCA policy. SUF ¶52; **Ex. 15** at 198:22 - 199:18.

Shutterstock continued to exploit the Infringing Copy *beyond even that September 2021 date*, using the Infringing Copy to advertise Shutterstock's 15% off sale on TinEye until at least July 14, 2022. SUF ¶53; **Ex. 11**. It also continued to display the work on HelloRF, which it partly owns, until at least July 14, 2022. SUF ¶54; See **Ex. 21**. Shutterstock concedes that it did not take any steps to contact TinEye, HelloRF, or its other partner sites, each of which had obtained the Infringing Copy directly from Shutterstock, to direct those partners to "lock" or remove the Infringing Copy. SUF ¶55; **Ex. 15** at 128:19 – 129:19; 132:20 – 133:17. As of July 14, 2022, Shutterstock also continued to maintain a copy of the Infringing Copy on its own, internal website but averred that that copy was for company purposes and not available to the public. SUF ¶56; **Ex. 15** at 58:12 – 59:9. It has no policy as to how long it keeps a copy of an infringing work on its internal website. SUF ¶57; **Id.** at 75:23 – 76:17.

///

---

[22] Shutterstock first testified that this took place in September of 2022 but later clarified that he intended to reference September of 2021, as part of his admission that Shutterstock had no basis to only remove the Infringing Copy from its licensing portfolio while keeping the Infringing Copy active on three URLs on its publicly facing site. **Ex. 15** at 175:20 – 176:2.

Shutterstock does not have a DMCA agent and was unable to testify as to whether it followed its DMCA protocol[23] in responding to Steinmetz's notice of infringement. SUF ¶58; **Ex. 15** at 85:13-16, 214:5 - 216:12. However, it is undisputed that Shutterstock received Steinmetz's notice of infringement on April 1, 2021 and the Infringing Copy remained online until at least July 14, 2022. Shutterstock has conceded, though, that its failure to "lock" or remove the Infringing Copy after receiving Steinmetz's notice of infringement was a "glitch" and that the Infringing Copy "should have been removed" from all publicly facing pages of Shutterstock's website and partner sites months earlier. SUF ¶59; **Id**. at 200:14 – 201:17.

Shutterstock's business has been riddled with allegations of copyright infringement similar to those at issue. Indeed, Shutterstock has been sued for copyright infringement *at least nine times* since 2019, far more than its competitors.[24] SUF ¶60. In one of those actions, Shutterstock is alleged to have attempted to "exploit the COVID-19 pandemic to walk away from its contractual obligations" and infringed the plaintiff's rights in at least 2,300 photographs in doing so. SUF ¶61; See *Penske Media Corporation*, 1-20-cv-04583, Dkt. No. 29. And, Shutterstock has received no fewer than 260 complaints to the Better Business Bureau. SUF ¶62; **Ex. 16**. In the photography community, it is known that Shutterstock's entire business model is suspect.[25] SUF ¶63. Shutterstock seems to agree, in part, with the foregoing, as it has admitted

---

[23] **Ex. 15** at 214:5 – 216:12
[24] See *Tamara Williams v. Shutterstock, Inc., et al*; 1-21-cv-05784 (E.D.N.Y); *McGucken v. Shutterstock, Inc., et al*, 1:22-cv-00905 (S.D.N.Y.); *Cavanaugh v. Shutterstock, Inc., et al*, 1-21-cv-03796 (S.D.N.Y.); *Itasca Images, LLC et al v. Shutterstock, Inc., et al*, 0-21-cv-00287 (D.MN); *Lickerish, Ltd. v. Shutterstock Inc*., 1-20-cv-05384 (S.D.N.Y.); *Penske Media Corporation v. Shutterstock, Inc*., 1-20-cv-04583 (S.D.N.Y.); *Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al*., 1-20-cv-03023 (S.D.N.Y.); *Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*, 2-20-cv-00787 (C.D.CA); *Michael Grecco Productions, Inc. v. Shutterstock, Inc*., et al., 2-19-cv-01153 (CD.CA).
[25] See, e.g., https://brutallyhonestmicrostock.com/2019/01/27/update-why-shutterstocks-copyright-infringement-problems-should-concern-you/. Ironically, the Shutterstock forum

that it has "been subject to a variety of third-party infringement claims in the past and will likely be subject to similar claims in the future[,]"[26] and that "policing our intellectual property rights is difficult, costly and **may not always be effective**."[27] SUF ¶64.

### III.   LEGAL STANDARD

The Court may summarily adjudicate issues where "there is no genuine dispute as to any material fact" and that a party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) (citation omitted). That "opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment" unless it "lead[s] to a different legal outcome." *Yi Fu Chen v. Spring Tailor, LLC*, 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (citation omitted). And if "a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense—on which the defendant bears the burden of proof at trial—a plaintiff 'may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element] of [the non-moving party's case].'" *Nw. Mut. Life Ins. Co. v. Fogel*, 78 F.Supp.2d 70, 73–74 (E.D.N.Y. 19990), quoting *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994). Steinmetz meets this burden.

---

referenced in this article was *deleted* by Shutterstock because the content made clear the scope of Shutterstock's copyright infringement and poor business practices.
[26] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 15 (last visited September 1, 2022)
[27] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 19 (last visited September 1, 2022)(emphasis added)

## IV.    ARGUMENT

Shutterstock infringed Steinmetz's exclusive rights in his proprietary artwork and cannot evade liability under any of its alleged defenses, as follows.

### A.    Shutterstock directly infringed Steinmetz's rights in the Subject Photograph

Shutterstock committed copyright infringement when it exploited Steinmetz's Subject Photograph without consent. To establish infringement, Steinmetz need only establish the two required elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991). It is settled that the "Copyright Act does *not* require that the infringer know that he is infringing" to be liable. *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004)(emphasis added). Infringement will be proven.

### 1.    Steinmetz owns a valid copyright in the Subject Photograph

As to the first element, a "certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). Steinmetz has produced his certificate of registration for the Subject Photograph, which establishes his ownership. Steinmetz Decl. ¶6, **Ex. 3**. He has also proffered uncontroverted testimony that he created and owns the Subject Photograph. See Steinmetz Decl. ¶4; **Ex. 1**. And the Infringing Copy is an identical copy of the Subject Photograph that has been clumsily cropped. See **Exs. 1, 10**. This prong is met.

### 2.    Shutterstock violated Steinmetz's copyrights

Steinmetz, as the "owner of a copyright," has the "exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010), citing 17 U.S.C. § 106. And a "party who violates the exclusive rights of the copyright

- 16 -

owner is an infringer, liable for damages pursuant to 17 U.S.C. § 504." *Warren v. John Wiley & Sons, Inc.*, 952 F.Supp.2d 610, 616 (S.D.N.Y.2013). Shutterstock violated Steinmetz's copyrights by (a) reproducing, displaying, and distributing cropped copies of the Subject Photograph to its paying customers licensees, partners, and the public; (b) preparing "derivatives" of the Subject Photograph by adding false watermarking; (c) distributing the Infringing Copy in multiple sizes to its customers as part of subscription packages; (d) licensing the Infringing Copy to partners like TinEye, HelloRF, and StockFresh; and (e) offering access to and licenses for the Infringing Copy to users of its website and paying customers.

      a.      **Shutterstock's unlawful reproduction, display, and distribution of the Subject Photograph**

      Shutterstock violated three of Steinmetz's exclusive Section 106 rights, as follows.

      **Reproduction**: Shutterstock violated Steinmetz's exclusive reproduction right by reproducing the Infringing Copy – which is a clumsily cropped, identical copy of the Subject Photograph – in multiple sizes for use on its site and it third-party partner sites. Steinmetz Decl. ¶7, **Ex. 4**; Burroughs Decl. ¶5-6, **Exs. 8-12**. Infringement occurs when a reproduction is created without the artist's consent. *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008). Here, Shutterstock reviewed and approved the Infringing Copy, added its "shutterstock" watermark to the work, made multiple reproductions, and published them on multiple Shutterstock URLs and its internal server, all of which violated Steinmetz's copyrights. *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 181 (2d Cir. 2018) (infringer liable that selects content, copies that content, and offers it to paying customers); see also **Exs. 4, 8-12, 21.**

      Shutterstock violated this right when it "reproduced [Steinmetz's] copyrighted photographs and created thumbnail copies of those photographs." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 355 (S.D.N.Y. 2014). And when it "strip[ped] its

resized images of their metadata and hous[ed] them at separate URLs where they were able to be viewed by anyone[.]" *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d 42, 52 (2d Cir. 2019). And when it made "additional copies of the same images" and those copies" appeared in varying sizes at distinct URLs[.]" Id., 922 F.3d 51–52 (citation omitted). Shutterstock stripped the metadata from the Infringing Copy[28] and reproduced the Infringing Copy in various sizes on at least *four different* Shutterstock URLs,[29] on its server, and on its third-party partner sites, including TinEye, HelloRF, and StockFresh. See **Exs. 4, 8-12, 21**. Thus, Shutterstock, "separate from its users," certainly "committed an infringing act" in creating these reproductions. See *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d at 52. Shutterstock repeatedly violated Steinmetz's exclusive reproduction right.

**Display**: Shutterstock also violated Steinmetz's exclusive display right by displaying the work on four different Shutterstock URLs and directing third parties to display the work on their websites. See **Exs. 4, 8-12, 21.** The "Copyright Act unambiguously states that [']t]o 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process[.]'" *APL Microscopic, LLC v. United States*, 144 Fed. Cl. 489, 498 (2019), quoting 17 U.S.C. § 101. "Public display occurs, and § 106(5) is violated, each time an individual computer user accesses the relevant page on a website that displays the protected work." *Id.*, 144 Fed. Cl. at 498 (2019); see also 17 U.S.C. § 106(5).

Shutterstock concedes that it displayed the Infringing Copy to its customers. **Ex. 15** at 225:6-23; **Ex. 22**.[30] It displayed the Infringing Copy on its website at four URLs and provided

---

[28] **Ex. 15** at 95:24 - 96:22
[29] As seen in the illustrative chart above.
[30] Shutterstock's records reflecting how many of its customers viewed the Infringing Copy do not include any customers who viewed the Infringing Copy on the Shutterstock mobile app or through Shutterstock partners like TinEye and Stockfresh. **Ex. 15** 234:7 - 22.

the Infringing Copy to others, including without limitation TinEye, HelloRF, and StockFresh, while authorizing their respective displays of the Infringing Copy. This violated Steinmetz's exclusive display right, which protects both his right to display his work and to "authorize" others to do so. 17 U.S.C. §106 ("exclusive rights to do and **to authorize**")(emphasis added).

**Distribution**. Shutterstock also violated Steinmetz's exclusive distribution right, which includes the right to "distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). A "distribution" of a work occurs when the work is publicly disseminated. *Hotaling*, 118 F.3d at 203, quoting 17 U.S.C. § 106(3). Thus, "the act of transmitting the webpage—and the Work therein—to a user would infringe on this right." *APL Microscopic, LLC*, 144 Fed. Cl. at 498.

Shutterstock transmitted its webpages – and the Infringing Copy therein – to the public. **Ex. 15** at 225:6-23; **Ex. 22.** And, it distributed the Infringing Copy to its paying customers, the public, and third-party sites including TinEye, HelloRF, and StockFresh, while authorizing its partners to further distribute the Infringing Copy to the public. Exs. 11, 12, 21, 25, 26. Shutterstock distributed the Infringing Copy to the computers of at least four viewers, which is sufficient to establish a violation. **Ex. 22.** And Shutterstock refused to provide a full report detailing how many times it distributed the Infringing Copy to the public and its partners, identifying such data for only *one* of the four URLs at which it published the Infringing Copy, www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026. But, as reflected in **Exhibits 4, 8, 9, and 10,** Shutterstock made the Infringing Copy available through *at least four* URLs, its mobile application, APIs, and third-party partners, none of which was reflected in Shutterstock's report for this single URL. The court can draw its own inferences based on that failure. Shutterstock also distributed the Infringing Copy to TinEye, HelloRF, and

Shutterstock, using Shutterstock code and API, with each distribution being a separate violation of the distribution right. **Ex. 15** at 177:20 - 179:17; 240:12 - 241:18; **Exs**. 11, 12, 21, 25.

Shutterstock has violated Steinmetz's reproduction, display, and distribution rights.

### b.  Shutterstock created an unlawful derivative

Works that include annotations, elaborations, or other modifications while still representing the "original work of authorship" are derivatives. *Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513 (S.D.N.Y. 2008); 17 U.S.C. § 101. An author of a work has the exclusive right to create and authorize the creation of derivatives. 17 U.S.C. 106(2). Here, Shutterstock added a "shutterstock" watermark to the Infringing Copy, changing its aesthetic and thus creating a derivative, which it distributed in multiple sizes and high-resolution. This violated Steinmetz's exclusive right to create and authorize derivative works.

***

Shutterstock is liable for copyright infringement because it violated Steinmetz's exclusive 17 U.S.C. § 106 rights as set forth above.

### B.  Shutterstock has secondary liability

Shutterstock is also vicariously and contributorily liable for the infringement of the third parties to which it distributed the Infringing Copy.

### 1.  Vicarious liability

Shutterstock is liable for vicarious infringement because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d at 357, citing *In re Cellco*, 663 F.Supp.2d at 370, quoting *Grokster*, 545 U.S. at 930, 125 S.Ct. 2764) (brackets omitted); see also *Softel, Inc. v. Dragon Medical & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir.1997). This liability attaches when "the right and ability to supervise coalesce with an obvious and direct financial interest in

- 20 -

the exploitation of copyrighted materials—even in the absence of actual knowledge that the

copyright monopoly is being impaired." Id., citing *Smith v. Mikki More, LLC*, 21 F.Supp.3d 276,

281 (S.D.N.Y.2014), quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir.2012).

And "the vicarious liability standard requires *neither* that a defendant have knowledge of the acts

of infringement *nor* that the defendant receive substantial financial benefit from infringement."

*Disney Enterprises, Inc. v. Hotfile Corp.*, No. 11-20427-CIV, 2013 WL 6336286, at *39 (S.D.

Fla. Sept. 20, 2013)(emphasis added).

Here, Shutterstock had the right and ability to supervise TinEye, HelloRF, and

StockFresh's exploitation of the Infringing Copy, because it distributed that copy, partially owns

HelloRF, and has partnership agreements with TinEye and StockFresh. Courts interpret the

"right and ability" to control "expansively, finding that service providers have the capacity to

control the activities of their users simply by virtue of providing the means to commit direct

infringement." *Id.*, 2013 WL 6336286, at *40, citing *Gershwin Publ'g Corp. v. Columbia Artists

Mgmt., Inc.*, 443 F.2d 1159, 1173 (2d Cir.1971); *Polygram Int'l Publ'g Inc. v. Nevada/TIG, Inc.*,

855 F.Supp. 1314, 1328 (D.Mass.1994) (reviewing case law, quoting the legislative history of

the Copyright Act, and concluding that a defendant has "control" if they "either actively operate

or supervise the operation of the place wherein the performances occur, or control the content of

the infringing program"). Here, Shutterstock solely controls the actions of its third-party partners

in relation to its photography, as well as the users and the content on its site, and "the means of

infringement by among other things mandating user registration and hosting the infringing

materials on its own servers." Id*.*, 2013 WL 6336286, at *41, citing *Perfect 10, Inc. v.

Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007).

Shutterstock directly distributed the Infringing Copy to its third-party partners, each of

which continued to exploit it well into this litigation. Shutterstock could have removed the

- 21 -

Infringing Copy from the third-party sites by deleting those sites' link to its API, which distributed the Infringing Copy, or contacting the sites to ensure removal, but it failed to take those steps. Shutterstock certainly had the right to remove content from TinEye, HelloRF, and StockFresh at any time "for any reason," yet it "declin[ed] to exercise" that right. *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d at 357; **Ex 15** at 119:21 – 120:4.

 Shutterstock also had an obvious financial interest – it used and authorized the use of the Infringing Copy on its site and third-party sites to draw traffic to its site and sell licenses and subscription packagers to those viewers. This meets the low threshold, as the "dominant view is that any for-profit enterprise could be found vicariously liable for copyright infringement however remote, unquantifiable, and unidentifiable the benefit it receives from copyright infringement may be." *Disney Enterprises, Inc.,* 2013 WL 6336286, at *39 (citation omitted).

Shutterstock concedes that it is a for-profit company that uses photographs like the Infringing Copy to obtain buyers for paid licenses and packages. **Ex. 15** at 70:25-71:13. This is more than sufficient, as "a direct financial interest arises where the infringing activity is a 'draw' for customers and significant financial benefits 'flow directly' from the infringing activity that the defendant helps to facilitate." *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. CV SAG-18-03384, 2021 WL 5359671, at *24 (D. Md. Nov. 17, 2021), quoting *Goldstein v. Metropolitan Regional Information Systems, Inc.*, No. TDC-15-2400, 2016 WL 4257457, at *5 (D. Md. Aug. 11, 2016). Here, the Infringing Copy, like the other photographs in Shutterstock's rigorously curated portfolio, are the primary draw for Shutterstock's customers.

Shutterstock also used the Infringing Copy to draw customers from TinEye, HelloRF, and StockFresh. Shutterstock even bought advertising on TinEye, which TinEye displayed alongside the Infringing Copy, to market Shutterstock's site, and offered 15% off to those who visited the Shutterstock site and bought a subscription to use its photography, including the Infringing

PLAINTIFF'S MEMORANDUM OF LAW

Copy. See **Ex. 11**. And Shutterstock offers coupons through StockFresh as well while also authorizing it to display its portfolio. See **Ex. 25**.

Shutterstock is vicariously liable for the infringement of its partners.

**2.      Contributory liability**

One "who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer[.]" *Arista Recs., LLC v. Doe 3*, 604 F.3d at 117–18, citing *Gershwin Publishing Corp*, 443 F.2d at 1162. "To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another." *Gershwin Publ'g Corp.*, 443 F.2d at 1162 (internal quotation marks omitted). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement." *Arista Recs., LLC v. Doe 3*, 604 F.3d at 118, quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir.2001) (emphasis omitted). Here, it is undisputed that Shutterstock knew as of April 1, 2021 that its exploitation of the Infringing Copy was infringing. Yet, it failed to advise TinEye, HelloRF, and StockFresh of this infringement until sometime after July 14, 2022, and continued to make the Infringing Copy available to them via its API, which resulted in those TinEye and HelloRF displaying and distributing the Infringing Copy for *over a year* after Shutterstock's knowledge of the infringement, and materially contributed to those sites' infringement. Shutterstock is thus contributorily liable.

**C.      Shutterstock violated 17 U.S.C. § 1202**

Shutterstock violated 17 U.S.C. § 1202 by adding false copyright management information to the Infringing Copy in the form of a "shutterstock" watermark and making multiple copies of that work. Section 1202(a) of the DMCA makes it unlawful to "knowingly,

and with the intent to 'induce, enable, facilitate, or conceal infringement,' either 'provide' or 'distribute' ... false 'copyright management information' or 'CMI.'" *Aaberg v. Francesca's Collections, Inc.*, 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018), quoting 17 U.S.C. § 1202(a). A Section 1202(a) claim exists when "the defendant both knew that the CMI was false, and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement." *Trombetta v. Novocin*, 2020 WL 1304120, at *4 (S.D.N.Y. Mar. 19, 2020) (internal citations and quotation marks omitted). Shutterstock (a) "stripped" or removed the metadata from the Infringing Copy; (b) added false CMI, in the form of its corporate watermark[31] to said work to claim it as its own intellectual property; and (b) and distributed the false CMI with the intent to "conceal" Steinmetz's authorship and ownership and "enable and facilitate" infringement.

And Shutterstock certainly knew, at least as of April 1, 2021, that the CMI was false. Yet it failed to remove the watermarked Infringing Copy from either its own site or the sites of its partners, each of which it knew to be exhibiting the false CMI to the public. This violates this Section. See *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 378 (S.D.N.Y. 2019), aff'd, 970 F.3d 167 (2d Cir. 2020)(added "a false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement.").

Shutterstock knowingly added its watermark to the Infringing Copy. An infringer acts "with knowledge and intent in placing watermarks on the Copyrighted Works in order to conceal copyright infringement." *Michael Grecco Prods.*, 372 F. Supp. 3d at, 139. While, in most cases,

---

[31] The addition of a "watermarked corporate name or symbol may refer to the author or copyright owner when displayed on a copyrighted work in connection with the marketing of that work for sale or license," so "such watermarks do constitute CMI for the purpose of stating a violation of § 1202(a). *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 138 (E.D.N.Y. 2019), citing 17 U.S.C. § 1202(c)(2)–(3), (7).

PLAINTIFF'S MEMORANDUM OF LAW

scienter is more "appropriate for resolution by the trier of fact," here it is beyond dispute that Shutterstock knowingly added its watermark to the Infringing Copy and continued to distribute, and authorize the distribution of, the watermarked Infringing Copy after learning of the infringement – this satisfies this requirement. Id., citing *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 693 (2d Cir. 2009)(remaining citation omitted); see also *Shihab v. Complex Media, Inc.*, No. 21-CV-6425 (PKC), 2022 WL 3544149, at *4 (S.D.N.Y. Aug. 17, 2022)("scienter is satisfied based on a defendant's awareness that distributing copyrighted material without wrongful CMI "will conceal *his own* infringing conduct[.]") (emphasis in original), citing *Mango*, 970 F.3d at 171. Here, at least as of April 1, 2021, Shutterstock's continued distribution and display of the Infringing Copy facilitated and concealed its infringement and violated Section 1202.

### D.    Shutterstock's infringement was willful

Shutterstock's infringement was willful.[32] "Willfulness" means "(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software & Computer Serv., Inc.,* 413 F.3d at 263. Willfulness may also be found even when an infringer had only "constructive knowledge" of the infringement, *Fitzgerald Pub. Co. v. Baylor Pub. Co*., 807 F.2d 1110, 1115 (2d Cir.1986); "should have known" of the infringement, *Basic Books, Inc. v. Kinko's Graphics Corp*., 758 F.Supp. 1522, 1543 (S.D.N.Y.1991); or "fail[ed] to investigate because [he] was afraid of what the inquiry would yield[.]" *Fendi Adele S.R.L. v. Filene's Basement, Inc*., 696 F.Supp.2d 368, 393 (S.D.N.Y.2010). Here, Shutterstock recklessly

---

[32] Willfulness may be established on summary judgment, so long as the court draws all reasonable inferences in the Defendant's favor. See, e.g., *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc*., 507 F. App'x 26, 31 (2d Cir. 2013).

disregarded Steinmetz's rights, had constructive knowledge of its infringement, and "failed to investigate" by, *inter alia*, refusing to contact its third-party partners that continued to display and distribute Steinmetz's photography to the public.

The court "need not find that an infringer acted maliciously to find willful infringement." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 411 (S.D.N.Y. 2016), citing *Fitzgerald Pub. Co.*, 807 F.2d at 1115 (remaining citations omitted). To the contrary, "a party may act recklessly by refusing, as a matter of policy, to even investigate or attempt to determine whether particular [works] are subject to copyright protections." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 992 (9th Cir. 2017). And "reckless disregard" is based on the knowledge and experience of Shutterstock as an entity, as the general is that "[a] corporation[33] is considered to have acquired the collective knowledge of its employees." *New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 670 (S.D.N.Y. 2017).

Shutterstock had knowledge of the infringement since at least April 1, 2021. At that time, a Shutterstock employee using the fake name [redacted] advised that Shutterstock had "removed" the Infringing Copy. Yet, he admitted in deposition that the Infringing Copy had only been "suspended," despite Shutterstock's knowledge that its exploitation of the Infringing Copy was infringement on April 1, 2021. **Ex. 15** at 200:14 - 201:17; **Ex. 14** (reflecting that work was not removed until September 2021). In actuality, Shutterstock had not "removed" the Infringing Copy, and continued to exploit it on its own site at three different URLs until September of 2021 and on its partner sites until a date on or after July 14, 2022. Burroughs Decl. ¶6, **Exs. 11, 14, 12, 21**. This lawsuit was filed on August 23, 2021, so the infringement continued for almost a year

---

[33] When, as here, the defendant is a corporation, it is liable for acts of willful infringement committed by its employees within the scope of their employment or for its benefit. See *Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir.1985)(citation omitted).

after it was filed. Shutterstock was at least reckless by failing to comply with the cease-and-desist demand, continuing to display the Infringing Copy, and failing remove the Infringing Copy from its partner sites.

Courts do not hesitate to find willful infringement when the infringer "continued to [infringe], even some several months after this action was commenced." *Peer Int'l Corp. v. Luna Recs., Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995). This is particularly true where, as here, the infringer is in the business of publishing content. See *Fallaci v. New Gazette Literary Corp.*, 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983)("as the publisher of a copyrighted newspaper, the defendant was or should have been aware that its unauthorized republication of a Washington Post article constituted copyright infringement."). Willfulness should be found on this basis.

Shutterstock also conceded that it did not engage in due diligence by contacting its partners that were exploiting the Infringing Copy and ensuring its removal, and this "failure to investigate the possibility of intellectual property violations" suffices for a finding of infringement, especially when considered in concert with the other indicia of willfulness set forth herein. *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 442 (S.D.N.Y. 2014), citing *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2d Cir.2001) (finding willful infringement based on defendant's failure to investigate). Shutterstock further conceded that its continued exploitation of the Infringing Copy violated its *own* policies, which is further indicia of willfulness. Shutterstock's infringement was willful.

### E.    Shutterstock's defenses fail

Shutterstock violated the Copyright Act and has no meritorious defense that would allow it to evade liability for its infringement. It produced evidence only in regard to its "safe harbor" defense, which is meritless, as follows.

1.      **The DMCA "safe harbor" does not protect Shutterstock**

Shutterstock bears the burden of proof in establishing each element of the safe harbor

defense under the Digital Millennium Copyright Act ("DMCA"). *BWP Media USA Inc. v.*

*Polyvore, Inc*., 922 F.3d at 54–55 ("DMCA safe harbors are affirmative defenses, a defendant

generally has the initial burden of establishing that it meets the statutory requirements."), citing

*Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016). And given the effect of the

safe harbor, the infringer must discharge the heavy burden of establishing "beyond controversy

every essential element, and failure to so will render the [defendant] ineligible for the § 512(c)

safe harbor's protection." *Mavrix Photographs, LLC v. Livejournal, Inc*., 873 F.3d 1045, 1052

(9th Cir. 2017)(citations and internal quotations omitted). Shutterstock cannot meet this burden.

a.      **Shutterstock is not a "service provider"**

Under 17 U.S.C. § 512, a "service provider" is a company "offering the transmission,

routing, or providing of connections for digital online communications, between or among points

specified by a user, of material of the user's choosing, without modification to the content of the

material as sent or received" or a "provider of online services or network access, or the operator

of facilities therefor, and includes an entity described in subparagraph (A)." 17 U.S.C. §

512(k)(1). The latter definition – provider of online services or network access – is inapplicable

to 17 U.S.C. § 512(a). See 17 U.S.C.A. § 512. A typical "service provider" is a company like

AT&T that provides internet access to consumers or, arguably, Facebook, to which users can

freely and instantly upload text or photographs for immediate display. Shutterstock does not

come close to meeting the definition of "service provider."

Indeed, it is settled that an "entity that is directly licensing copyrighted material online is

**not** a 'service provider.'" *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 566 (S.D.N.Y.

2013)(emphasis added), citing *Dole v. United Steelworkers of Am*., 494 U.S. 26, 35, 110 S.Ct.

929, 108 L.Ed.2d 23 (1990). Shutterstock directly licensed copyrighted material, and sold

subscription packages, including the Infringing Copy, to the public. It was not a service provider

because, *inter alia,* it provided no services; it existed to sell licenses and make money.

Indeed, "every case" reviewed by the *Agence France* court revealed that "a party was a

held to be a 'service provider' only when it was 'doing something useful' for 'other entities or

individuals, such as providing a file hosting or file sharing platforms, rather than itself selling or

licensing copyrighted material.'" *Id.*, 934 F. Supp. 2d at 567, citing *Viacom Int'l*, 676 F.3d at 28;

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022, 1026, 1035 (9th

Cir.2011). Here, Shutterstock is a for-profit platform that is exploiting photography to make

money for itself and its stockholders. No company that directly sells licenses and subscriptions

has been granted the safe harbor for the content related to that conduct.

Moreover, even if Shutterstock could prove that the Infringing Copy was "a user-

generated post," which it cannot do given that it reviews and must approve every photograph that

appears on its site, "this fact would not preclude liability for alleged instances where

[Shutterstock], rather than a user of the [Shutterstock] website, displayed the [subject]

photograph and offered copies for prospective license. *Michael Grecco Prods., Inc. v. Alamy,

Inc.*, 372 F. Supp. 3d at 140, citing *Agence France Presse*, 934 F.Supp.2d at 566 ("[A]n entity

that is directly licensing copyrighted material online is not a 'service provider.'"), reconsidered

on other grounds by *Agence France Presse*, 934 F.Supp.2d at 584 (S.D.N.Y. 2013) (remaining

citation omitted). So, even if the Shutterstock contributor had directly posted the Infringing Copy

to Shutterstock's website without Shutterstock's approval – which it undisputedly didn't do –

Shutterstock still could not avail itself of the safe harbor because Shutterstock offered to sell and

sold the licenses and subscriptions.

PLAINTIFF'S MEMORANDUM OF LAW

Indeed, while the safe harbor may protect "commercial websites that allow users to market and sell their products," it does not protect companies that sell or license their own products. *Greg Young Publ'g, Inc. v. Zazzle, Inc*., No. 2:16-CV-04587-SVW-KS, 2017 WL 2729584, at *6 (C.D. Cal. May 1, 2017), citing *Corbis Corp. v. Amazon.com, Inc*., 351 F.Supp. 2d 1090, 1100 (W.D. Wash. 2004). Here, Shutterstock used its site to directly sell its own products in the form of subscriptions and licenses. **Exs. 18, 24, 15** at 70:25 - 71:13. It thus cannot qualify as a service provider: "an online service that directly sells, rather than facilitates the sale of, products likely falls outside the definition of a 'service provider.'" *Gardner v. CafePress Inc.*, No. 3:13-CV-1108-GPC-JMA, 2014 WL 794216, at *5 (S.D. Cal. Feb. 26, 2014), citing *Hendrickson v. Amazon.com, Inc.,* 298 F.Supp.2d 914, 915 (C.D.Cal.2003) (finding copyright plaintiff had "no viable evidence establishing that Amazon was not merely an internet service provider ..., but rather was the direct seller of the infringing item")(remaining citation omitted). Here, there is no third party involved in the sales at issue – Shutterstock solely and directly sells its licenses and subscriptions to the public.

A service provider *can* be a site that "offers a site that hosts and allows online sharing ... **at the direction of users**[.]" *Obodai v. Demand Media, Inc.*, No. 11 CIV. 2503 PKC, 2012 WL 2189740, at *3 (S.D.N.Y. June 13, 2012)(emphasis added), *aff'd sub nom. Obodai v. Cracked Ent. Inc.*, 522 F. App'x 41 (2d Cir. 2013), citing *Wolk,* 2012 WL 11270, at *17. But, here, it is undisputed that Shutterstock's contributors submit photographs, and Shutterstock alone reviews, approves, publishes to its public site, copies, distributes and licenses its photographs. See, e.g., **Exs. 13-14**, **Ex. 15** at 46:13-18, 48:10-19, 107:5-108:10; 118:13-119:12. Indeed, Shutterstock's "vetted" and "verified" contributors are not "users," they are paid partners, and they do not do any "sharing" of any kind with Shutterstock's customers. Illustratively, Shutterstock terminated the "user" that contributed the Infringing Copy on September 1, 2021, yet it continued to display

- 30 -

the Infringing Copy to the public until at least September 16 or 21, 2021 and provided its

partners with the Infringing Copy until July of 2022, further establishing the lack of any link

between the user and the Infringing Copy. **Exs. 14, 23.**

For the above reasons, it is now settled law that when a website like Shutterstock, "rather

than a user of the" website, displayed the photograph and "offered copies for prospective

license," that website is not a "service provider." *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372

F. Supp. 3d at 140, citing *Agence France Presse,* 934 F.Supp.2d at 566 ("[A]n entity that is

directly licensing copyrighted material online is not a 'service provider.'")(citation omitted). It is

undisputed that Shutterstock does not "merely provide[] a file hosting service; to the contrary, it

actively offers to license and licenses  the photography on its site, and is thus cannot prove the

"safe harbor" defense. *Agence France Presse*, 934 F. Supp. 2d at 567. Shutterstock is not an

"internet service provider" under 17 U.S.C. § 512(k)(1). This alone is fatal to the defense.

### b.     Shutterstock does not qualify for the "safe harbor" under Section 512(i)

Even if it could prove it was a "service provider," Shutterstock would still need to "meet

a set of threshold criteria" to take advantage of the "safe harbor." *Viacom Int'l*, 676 F.3d at 27.

Per 17 U.S.C. § 512(i), Shutterstock "must" show that it "(i) adopt[ed] a policy that provides for

the termination of service access for repeat copyright infringers; (ii) inform[ed] users of the

service policy; and (iii) implement[ed] the policy in a reasonable manner." *Wolk v. Kodak*

*Imaging Network, Inc.*, 840 F.Supp.2d 724, 744 (S.D.N.Y.2012), citing *Corbis Corp. v.*

*Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1100 (W.D.Wash.2004). The infringer must prove that it

informed *both* "subscribers and account holders" of its termination policy. U.S.C. § 512(i)(1)(A).

It must also establish that it "accommodate[d] standard technical measures used by copyright

owners to identify or protect copyrighted works." *Michael Grecco Prods., Inc. v. Valuewalk,*

*LLC*, 345 F. Supp. 3d 482, 509 (S.D.N.Y. 2018), citing 17 U.S.C. §§ 512(i). Shutterstock cannot make this showing.

### i.      Shutterstock did not adopt and implement a "repeat infringer" policy

Shutterstock has adduced no evidence of a sufficient "repeat infringer" policy, as is its burden. Shutterstock may avail itself of the safe harbor only if it has proven that it "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Companies claiming the safe harbor must be given "strong incentives" to implement such a policy. *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1178 (C.D.Cal.2002). Shutterstock, in continuing to distribute and display the Infringing Copy on its own site for at least five months after receiving notice of the infringement, and on its partner sites until July of 2022, and in failing to terminate ArunRaJpuT6621 as a contributor for five months after notice, cannot argue that it has "reasonably implemented" a qualifying policy. **Exs. 6, 8-12, 14, 21, 23.**

Because the "[t]he purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights," courts have recognized that "service providers that purposefully fail to keep adequate records of the identity and activities of their users and fail to terminate users despite their persistent and flagrant infringement are not eligible for protection under the safe harbor." *Capitol Recs., LLC v. Escape Media Grp., Inc.*, No. 12-CV-6646 AJN, 2015 WL 1402049, at *6 (S.D.N.Y. Mar. 25, 2015), citing *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F.Supp.2d 627, 637 (S.D.N.Y.2011) (citations omitted); see also *Disney Enters. v. Hotfile Corp.*, *67, 2013 WL 6336286 *67 ("[A] reasonable policy must be capable of tracking infringers."). A website must "design its system so as to be able to ascertain the identity

of the users responsible for those files, and make some effort to record infringing users." *Disney Enterprises, Inc.*, 2013 WL 6336286, at *21. Numerous artists have sued Shutterstock for copyright infringement, with the claims relating to a *massive* number of photographs, evidencing policy failure. And Shutterstock uses fake names to obfuscate its DMCA policies and failed to follow its own protocol in addressing the Infringing Policy. It has failed to discharge its burden.

  **ii.**  **Shutterstock frustrated standard technical measures**

  Shutterstock admits that it strips the metadata – a standard technical measure in the context of digital photography – from every photograph that it procures and approves for use on its site, which stripping obscures important author and copyright information. Id. at 95:24 – 96:22. This further disqualifies it from the safe harbor.

***

  Shutterstock's "safe harbor" defense fails under 17 U.S.C. 512(i).

  **c.**  **Shutterstock's safe harbor defense fails under Section 512(c)**

  If Shutterstock establishes that it is a "service provider" that meets all of the above "service provider" requirements (which it cannot do), then "the safe harbor additionally requires showings as to the service provider's lack of knowledge of infringement, its receipt of no direct financial benefit from the infringing activity, its compliance with DMCA takedown requests, and the designation of an agent for such requests." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d at 358, citing 17 U.S.C. § 512(c)(1)(A)-(C), (2). Shutterstock knew of the infringement, financially benefitted from the infringement, and refused to comply with DMCA takedown requests. Its defense thus fails.

  The statutory requirements are further set forth in Section 512(c), which states:

- 33 -

A service provider shall not be liable ... for infringement of copyright by reason of the **storage at the direction of a user** of material that r**esides on a system or network controlled or operated by or for the service provider**, if the service provider—

(A)(i) does not have **actual knowledge** that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from **which infringing activity is apparent**; or (iii) upon obtaining such knowledge or awareness, **acts expeditiously to remove, or disable access to, the material**;

(B) does not receive a **financial benefit** directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds **expeditiously to remove, or disable access to, the material** that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(emphasis added). Shutterstock cannot meet these requirements.

**i.      The Infringing Copy was not stored "at the direction of the user" and does not *entirely* "reside on a system" controlled by Shutterstock.**

As a threshold matter, Shutterstock cannot prove that the Infringing Copy appeared on its website and its partner sites "at the direction of a user."  This is fatal, as the "§ 512(c) safe harbor is only available when the infringement occurs 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.'" *Viacom Int'l*, 676 F.3d at 38, quoting 17 U.S.C. § 512(c)(1).

The defense fails if Shutterstock had any involvement in selecting, supervising, approving or modifying the photographs. *Mavrix Photographs, LLC*, 873 F.3d at 1056 (defense available only "if the service provider played *no role* in making that infringing material accessible on its site" or "carried out activities that were "narrowly directed" towards enhancing the accessibility of the posts.")(emphasis added). That was not the case here – Shutterstock played a *major role* in reviewing, selecting, approving, modifying and publishing the photography on its publicly available site, and thus cannot claim the safe harbor. Its own records establish that it, and it alone, "approve[d]" the image on November 26, 2019, before it was displayed to the public as part of Shutterstock's licensing portfolio. **Ex. 14.**

Shutterstock concedes that it is a curator and reviews every single contributor photograph for quality and composition, lighting, subject matter, and other unique concerns to ensure that the work is "high quality" before displaying the photograph to its licensees. Indeed, it is beyond peradventure that Shutterstock, not the contributor, "exercised control" and "selected" the material at issue. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021), quoting *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019).

Moreover, Shutterstock cannot establish that infringing copy "the resides on a system or network controlled or operated by or for the service provider," as is required because it concedes that it distributed the Infringing Copy to other networks and systems controlled by HelloRF, TinEye, and Stockfresh. The defense fails.

### ii. Shutterstock had notice of the infringement and did not expeditiously disable access to the infringing content

Shutterstock knew or "was aware of facts or circumstances from which infringing activity" was apparent and did not expeditiously "remove or disable access to" the Infringing Copy. Courts "have determined that response times to remove infringing material from entities'

websites or systems ranging from 5 to 14 days are expeditious." *Kinsley v. Udemy, Inc.*, No. 19-CV-04334-JSC, 2021 WL 1222489, at *5 (N.D. Cal. Mar. 31, 2021), citing *Seide v. Level-(1) Glob. Sols., LLC*, No. 16 C 2975, 2016 WL 4206076, at *5 n.5 (N.D. Ill. Aug. 10, 2016) (collecting cases).

At least as early as April 1, 2021, Shutterstock had notice of Steinmetz's notice that Shutterstock's exploitation of the Infringing Copy was infringing. The safe harbor for "an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe. *Disney Enters., Inc.*, 2013 WL 6336286, at *26-27 (internal quotation marks and citations omitted). Yet, Shutterstock did not "suspend" access to the Infringing Copy until May 11, 2021, and did not "lock" or fully disable public access to the Infringing Copy on its own site until September 2021, over five months after it first received notice. Burroughs Decl. ¶5, **Exs. 8-10, 14**. And it displayed and distributed the Infringing Copy on its partner sites, like TinEye, HelloRF, and StockFresh, until at least July 13, 2022, over fifteen months *after* it first received notice. Burroughs Decl. ¶6, **Exs. 11-12, 21**. This was not expeditious, and Shutterstock lost any safe harbor protection it may have been able to claim. See *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 102 (S.D.N.Y. 2020)(holding that 18 and 23 days between notice and removal "cannot be considered expeditious."). Shutterstock was not expeditious in addressing the infringement.

### iii.    Shutterstock financially benefitted from, and had the right and ability to control, the infringement

Shutterstock cannot claim the safe harbor because it "receive[d] a financial benefit directly attributable to the infringing activity," and had "the right and ability to control such activity[.]" 17 U.S.C. § 512(c)(1). A service provider is "eligible for the § 512(c) safe harbor only if it 'does not receive a financial benefit directly attributable to the infringing activity, in a

- 36 -

case in which the service provider has the right and ability to control such activity.'" *Venus Fashions, Inc. v. ContextLogic, Inc.*, No. 3:16-CV-907-J-39MCR, 2017 WL 2901695, at *28 (M.D. Fla. Jan. 17, 2017), citing *UMG Recordings, Inc.*, 718 F.3d at 1026, quoting 17 U.S.C. § 512(c)(1)(B).

The fact that Shutterstock sells licenses and subscription packages for the photographs offered on its site makes clear that it receives a "financial benefit directly attributable to its use of the photography." Id. Additionally, Shutterstock "directly profits from its use of the infringing Images by contracting with third party providers such as [TinEye, HelloRF, and StockFresh], and by reproducing the allegedly infringing Images in its own promotional materials in an effort to draw customers to its website and "app." Id., citing *Columbia Pictures Inds., Inc. v. Fung*, 710 F.3d 1020, 1045 (9th Cir. 2013). This "disqualifies [Shutterstock] from asserting the § 512(c) safe harbor defense." Id.

As mentioned above, "a direct financial interest arises where the infringing activity is a 'draw' for customers and significant financial benefits 'flow directly' from the infringing activity that the defendant helps to facilitate." *Brittney Gobble Photography, LLC*, No. CV SAG-18-03384, 2021 WL 5359671, at *24 (citation omitted). Shutterstock exploited the Infringing Copy to draw customers, both directly and through third parties like TinEye, on which it placed Shutterstock advertisements, HelloRF, and StockFresh. Shutterstock's financial benefits flowed directly from its exploitation of its photography portfolio, which included the Infringing Copy.

Shutterstock also had the "right and ability" to control the infringing activity. A company has the "right and ability to control infringing activity" where it "t[ells] its users what to upload ... or curate[s] uploaded content in any meaningful way[.]" *Kinsley*, No. 19-CV-04334-JSC, 2021 WL 1222489, at *4, quoting *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018). Shutterstock does both. It tells its users what to upload and heavily curates the

PLAINTIFF'S MEMORANDUM OF LAW

material that is uploaded, rejecting over half of the submitted photographs before making the

accepted photographs available to its customers for licensure. In fact, it has the "unfettered

ability to control access to" the photographs on its site, which has been "found to be "total

dominion" over a company's servers. *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124,

157 (S.D.N.Y. 2009)(citation omitted).

Right-and-ability also exists here "based on [Shutterstock's] ability to remove the

Photos–at–Issue from its system" and block access. *Agence France Presse*, 934 F. Supp. 2d at

575; see also *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 157, ("Defendants

likewise have the right and ability to block access to articles stored on their own servers[.]").

Indeed, a defendant need not have "formal power to control" where a user "depend[s] upon [the

defendant] for direction." *Arista Recs. LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 157, citing

*Gershwin*, 443 F.2d at 1163. That is the case here – Shutterstock provides the entirety of the

direction when it comes to approving photographs for public viewing, and removing those

works. **Ex. 15**. 107:5 – 108:10. The discretion is total, and its ability to block users "for any

reason whatsoever is evidence of the right and ability to supervise." Id. (citation omitted).

Here, as in *Arista*, the evidence is "undisputed that Defendants expressly reserve the

right, in their sole discretion, to terminate, suspend or restrict users' subscriptions, thereby

limiting their access to uploading or downloading content to or from Defendants' servers." Id.

Shutterstock has complete control over the review, selection, approval, and publication of the

photography to its public site and can remove material at any time. It did not just have the "right

and ability" to control its exploitation of the Infringing Copy, it had the sole, unfettered right to

do so.  The safe harbor is unavailable.

### iv.     Shutterstock failed to properly designate a DMCA agent

Shutterstock "has the burden of proving that it properly designated a copyright agent and that it responded to notifications as required." *Disney Enterprises, Inc.*, 2013 WL 6336286, at *26, citing *Perfect 10, Inc.*, 2009 WL 1334364, at *8. Lack of a registered designated agent to receive copyright infringement notices disqualifies the service provider from using the safe harbor shield. *BWP Media USA, Inc. v. Hollywood Fan Sites LLC*, 115 F. Supp. 3d at 402. Moreover, a service provider does not "retroactively" qualify for the safe harbor defense for copyright infringement that occurred prior to registering a designated agent. Id. at 400. Shutterstock admitted that it does **not** have a DMCA agent. **Ex. 15** at 85:13 - 16; 84:12 - 85:7. And as discussed below, Shutterstock refused to provide evidence regarding this defense.

And even if Shutterstock had a designated agent, it did not "respond to" Steinmetz's "notifications as required." As required would include Shutterstock's expeditious deletion of the Infringing Copy from all sites, servers, and partner sites.  But Shutterstock admits that it maintained a copy of the Infringing Copy on its own site for months and its partner sites for almost a year after receiving Steinmetz's notification. Burroughs Decl. ¶9, **Ex. 15** at 201:5-17. This fails to meet the requirements.

### v.     The Section 512 safe harbor is precluded due to discovery misconduct

Shutterstock must prove its right to the Section 512 safe harbor. In discovery, though, it consistently refused to provide evidence in this regard. Shutterstock failed to identify any witnesses in its Fed.R.Civ.P. 26 disclosures to testify in regard to this defense and refused access to significant testimony regarding the defense. The defense should be precluded or limited.

First, Shutterstock must prove that it had a properly registered DMCA agent and that agent reasonably implemented its policies. To challenge this burden of proof, Steinmetz subpoenaed Sejal Patel Richbourg, the individual that Shutterstock claimed was its DMCA agent

and was responsible for implementing its DMCA policies. Shutterstock and its counsel, who also represent Ms. Richbourg, defied the subpoena and refused to produce her on the basis that she no longer worked for Shutterstock. This was particularly improper given that Shutterstock admitted that Ms. Patel was responsible for the putative DMCA policy and instructed the DMCA department to use fake names. **Ex. 15** at 12:18 - 13:3; 89:9 - 15; 190:14 - 18. Refusing to produce the DMCA agent despite a proper subpoena is grounds to preclude this defense.

Further denying Steinmetz the opportunity to investigate the defense, Shutterstock also refused to allow its Fed.R.Civ.P. 30(b)(6) witness to testify as to how it reviewed content or implemented its DMCA policy. See, e.g., **Ex. 15** at 113:10 - 114:16; 186:4 - 188:8. When he was allowed the testify, Shutterstock's Fed.R.Civ.P. 30(b)(6) witness confirmed that Shutterstock does *not* have a DMCA agent. See **Ex. 15** at 85:13-16.

Shutterstock limited access to the only other potential DMCA witness as well. Steinmetz and Shutterstock agreed to forego the deposition of Shutterstock employee Alexandra Zusman, who was also involved in implementing the DMCA policy, on the condition that Shutterstock produce the Zusman transcript from a related copyright action involving similar claims of infringement against Shutterstock. Shutterstock, though, failed to produce the entire transcript, producing only the written portion of the document and the index but *refusing* to produce the exhibits referenced in the transcript. Burroughs Decl. ¶14, **Ex. 19**. This was wholly improper, as "exhibits are a necessary part of an original deposition transcript." *In re Omeprazole Pat. Litig.*, No. 00 CIV. 4541 BSJ, 2012 WL 5427791, at *4 (S.D.N.Y. Nov. 7, 2012); see also *Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, Nos. 01 Civ. 6600(JSR), 01 Civ. 0877(JSR), 02 Civ. 0138(JSR), 2010 WL 3290965, at *8 (S.D.N.Y. Aug, 11, 2010).

PLAINTIFF'S MEMORANDUM OF LAW

Shutterstock also refused to produce the DMCA-relevant guidelines and policies. Its corporate representative testified that "content review guidelines" and other relevant documents existed. **Ex. 15** 51:23 - 52:10. Still, they were not produced in response to discovery requests.

Shutterstock should be precluded from offering any Section 512 defense because it obstructed Steinmetz's access to that evidence and his ability to challenge that evidence in discovery. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that: "If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). A court "may impose other appropriate sanctions" as well for misconduct. Id. at §37(c)(1)(C). The purpose of Rule 37(c) is to prevent the practice of "sandbagging" an adversary. *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y.2004); *Johnson Electric North America Inc. v. Mabuchi Motor America Corp.*, 77 F.Supp.2d 446, 458–59 (S.D.N.Y.1999). Despite the "self-executing" nature of Rule 37(c)(1)'s sanction, "courts in this circuit have recognized that 'the imposition of sanctions under Rule 37(c)(1) is a matter within the trial court's discretion." *Ward v. The National Geographic Society,* No. 99 Civ. 12385(LAK), 2002 WL 27777, *2 (S.D.N.Y. Jan.11, 2002) (internal quotation and citation omitted).

Moreover, a showing of "bad faith" is not required for preclusion to be ordered under Rule 37(c), but a party's bad faith "can be taken into account" by the Court in considering the party's explanation for its discovery failures. *Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir.2006).* And in ascertaining bad faith, we look to the "party's conduct in the case as a whole. See *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1366 (2d Cir.1991) (upholding preclusion of evidence sanction because conduct of counsel at deposition, combined with repeated refusal to produce demanded documents "evince[d] a willful frustration" of discovery)(remaining citation omitted). Here, Shutterstock attempts to "sandbag" Steinmetz by refusing him access to evidence relating to this defense. It took every step to impede discovery into its DMCA defense by refusing to produce its putative DMCA agent for deposition,

instructing its corporate designee not to respond to DMCA-related questions, refusing to produce the Zusman exhibits, and refusing to produce its reviewer guidelines and DMCA policy evidence. Shutterstock should be precluded from offering this defense.

## V.    SUMMARY ADJUDICATION IS PROPER

Shutterstock willfully violated Steinmetz's copyrights, persisted in its infringement long after receiving notice, and violated its own internal policies. It is respectfully submitted that Shutterstock should be adjudged liable for copyright infringement, violation of 17 U.S.C. § 1202, and willful infringement. The case can then proceed to trial solely on the issue of damages.

Respectfully submitted,


Dated: September 2, 2022         By:      */s/ Scott Alan Burroughs*
New York, New York                        Scott Alan Burroughs, Esq.
                                          Laura M. Zaharia, Esq.
                                          DONIGER / BURROUGHS
                                          247 Water Street, First Floor
                                          New York, New York 10038
                                          (310) 590-1820
                                          *Attorneys for Plaintiff*