**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Civil Action No.: 1:21-cv-07100-AKH

GEORGE STEINMETZ,

Plaintiff,

v.

SHUTTERSTOCK, INC.; et al.,

 Defendants.

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

DEFENDANTS MOTION SHOULD BE DENIED ..................................................................1

I.   Background facts ...............................................................................................................1

II.  Legal standard .................................................................................................................15

III. Shutterstock has no defense to Steinmetz's copyright infringement claims .....................16

A.  The DMCA "safe harbor" does not protect Shutterstock ....................................................16

   1. Shutterstock is not a "service provider" .........................................................................17

   2. Shutterstock does not qualify for the "safe harbor" under Section 512(i).....................22

      a. Shutterstock did not adopt and implement a "repeate infringer" policy ...................22

      b. Shutterstock frustrated standard technical measures ..................................................23

   3. Shutterstock's safe harbor defense fails under Section 512(c) .......................................23

      a. The Infringing Copy was not stored "at the direction of the user" and does not entirely "reside on a system" controlled by Shutterstock ...........................................24

      b. Shutterstock had notice of the infringement and did not expeditiously disable access to the infringing content.......................................................................................26

      c. Shutterstock financially benefited from, and had the right and ability to control, the infringement ...............................................................................................................30

      d. Shutterstock failed to properly designate a DMCA agent ...........................................33

B.  Shutterstock's volitional conduct also precludes a safe harbor defense.............................34

C.  Shutterstock's commercial exploitation of the Subject Photograph was not "fair use".....36

   1. The "purpose and character" of the use militates against a finding of fair use .............37

a. Shutterstock used the Subject Photograph for the same purpose as Steinmetz and failed to transform the disputed image in any way ........................................37

b. Shutterstock's bad faith weighs against the first factor ................................41

c. Shutterstock's commercial use weighs against "fair use"............................42

2. The creative nature of the Subject Photograph favors Steinmetz ...................43

3. Shutterstock displayed the majority of the Subject Photograph ....................44

4. Shutterstock cannot establish that its infringement did not result in market harm or would not result in mark harm if allowed to become widespread .................................45

D.  Steinmetz has established his claims of secondary copyright infringement against Shutterstock................................................................................................................50

1. The evidence supports Steinmetz's claim for vicarious infringement against Shutterstock..........................................................................................................50

2. The evidence supports Steinmetz's claim for contributory infringement against Shutterstock..........................................................................................................52

E.  Steinmetz has established Shutterstock's Section 1202 violation .....................54

IV. Conclusion ...............................................................................................................56

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

Page(s)

Cases

*A & M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)................................................................................53

*Aaberg v. Francesca's Collections, Inc.*,
  2018 WL 1583037 (S.D.N.Y. Mar. 27, 2018) ......................................................54

*Abramson v. Pataki*,
  278 F.3d 93 (2d Cir. 2002)....................................................................................15

*Agence France Presse v. Morel*,
  934 F. Supp. 2d 547 (S.D.N.Y. 2013)........................................................17, 18, 20

*Am. Broad. Cos. v. Aereo, Inc.*,
  573 U.S. 431, 134 S.Ct. 2498 (2014)....................................................................35

*Am. Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994)....................................................................................36

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...............................................................................................15

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  992 F.3d 99 (2d Cir. 2021)...............................................................37, 43, 45, 47

*Arica Inst., Inc. v. Palmer*,
  970 F.2d 1067 (2d Cir. 1992)................................................................................44

*Arista Recs., Inc. v. Mp3Board, Inc.*,
  2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ......................................................31

*Arista Recs., LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010)..................................................................................53

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)..................................................................................37

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)......................................................................40, 41, 45

*Baraban v. Time Warner, Inc.*,
  2000 WL 358375 (S.D.N.Y. Apr. 6, 2000)...........................................................43

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*,
  297 F. Supp. 3d 339 (S.D.N.Y. 2017)............................................................38, 49

*Bell v. Wilmott Storage Servs., LLC*,
  12 F.4th 1065 (9th Cir. 2021)......................................................26, 34, 35, 36

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)..................................................................................44

*Brittney Gobble Photography, LLC v. Sinclair Broad. Grp.*,
  No. SAG-18-03403, WL 5359671 (D. Md. Nov. 17, 2021) ................................52

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
  196 F. Supp. 3d (S.D.N.Y. 2016)....................................................................36, 38

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
  69 F. Supp. 3d 358 (S.D.N.Y. 2014).....................................................................23

*BWP Media USA, Inc. v. Hollywood Fan Sites LLC*,
  115 F. Supp. 3d 402 (S.D.N.Y. 2015).....................................................................34

iv

*BWP Media USA Inc. v. Polyvore, Inc.*,
   922 F.3d 54-55 (2d Cir. 2019) ...................................................................16

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994) ...............................................................45, 46, 47

*Capitol Records, Inc. v. MP3tunes, LLC*,
   821 F. Supp. 2d 627 (S.D.N.Y. 2011) ...............................................29

*Capitol Records, LLC v. Vimeo, LLC*,
   826 F.3d 78 (2d Cir. 2016) ...................................................................16

*Capitol Recs., Inc. v. MP3tunes, LLC*,
   48 F. Supp. 3d 703 (S.D.N.Y. 2014) ...............................................31

*Capitol Recs., LLC v. ReDigi Inc.*,
   910 F.3d 649 (2d Cir. 2018) ...............................................38, 40

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...................................................................15

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ...............................................31

*Corbis Corp. v. Amazon.com, Inc.*,
   351 F.Supp.2d 1090 (W.D.Wash.2004) ...............................19, 20, 22

*Disney Enters., Inc. v. Hotfile Corp.*,
   798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...............................................32

*Disney Enterprises, Inc. v. Hotfile Corp.*,
   2013 WL 6336286 (S.D. Fla. Sept. 20, 2013) ...............................27, 33, 51, 52

*Dole v. United Steelworkers of Am.*,
   494 U.S. 26, 110 S.Ct. 929 (1990) ...............................................17

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*,
   983 F.3d 443 (9th Cir. 2020) ...............................................44, 46, 49, 50

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
   844 F.3d 79 (2d Cir. 2016) ...............................................30, 31

*FDIC v. Giammettei*,
   34 F.3d 51 (2d Cir. 1994) ...................................................................36

*Feingold v. RageOn, Inc.*,
   472 F. Supp. 3d 94 (S.D.N.Y. 2020) ...............................................27

*Ferdman v. CBS Interactive Inc.*,
   342 F. Supp. 3d 515 (S.D.N.Y. 2018) ...............................................38

Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co.,
   807 F.2d 1115 (2d Cir. 1986) ...............................................42

*Fox News Network, LLC v. Tveyes, Inc.*,
   883 F.3d 169 (2d Cir. 2018) ...............................................Passim

*Gardner v. CafePress Inc.*,
   2014 WL 794216 (S.D.Cal. Feb. 26, 2014) ...............................................21

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir.1971) ...............................................33, 51, 53

*Google LLC v Oracle America, Inc.*,
   141 S. Ct. 1183 (2021) ...................................................................50

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
   2017 WL 2729584 (C.D. Cal. May 1, 2017) ...............................................20

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Hendrickson v. Amazon.com, Inc ,*
   298 F. Supp. 2d 914 (C.D. Cal. 2003)................................................................20, 21

*Hendrickson v. eBay, Inc.,*
   165 F.Supp.2d 1082 (C.D.Cal.2001)........................................................................18

*In re Cellco,*
   663 F. Supp. 2d 363 (S.D.N.Y. 2009).......................................................................50

*In re DDAVP Direct Purchaser Antitrust Litigation,*
   585 F.3d 677 (2d Cir. 2009)......................................................................................56

*Infinity Broad. Corp. v. Kirkwood,*
   150 F.3d 104 (2d Cir.1998)................................................................................44, 46

*Kienitz v. Sconnie Nation LLC,*
   766 F.3d 756 (7th Cir. 2014)....................................................................................37

*Kinsley v. Udemy, Inc.,*
   2021 WL 1222489 (N.D. Cal. Mar. 31, 2021) ...................................................26, 32

*LLC v. Usenet.com, Inc.,*
   633 F. Supp. 2d 124 (S.D.N.Y. 2009).................................................................32, 33

*Magnum Photos Int'l v. Houk Gallery Inc.,*
   2018 WL 4538902 (S.D.N.Y. Sept. 21, 2018)...................................................39, 40

*Mango v. BuzzFeed, Inc.,*
   356 F. Supp. 3d 368 (S.D.N.Y. 2019).................................................................55, 56

*Mango v. BuzzFeed, Inc.,*
   970 F.3d 167 (2d Cir. 2020)......................................................................................56

*Mavrix Photographs, LLC v. Livejournal, Inc.,*
   873 F.3d 1045 (9th Cir. 2017)...........................................................................16, 24

*McGucken v. Newsweek LLC,*
   2022 WL 836786 (S.D.N.Y. Mar. 21, 2022) ..........................................................37

*McGucken v. Pub Ocean Ltd.,*
   42 F.4th 1149 (9th Cir. 2022)..........................................................................43, 44, 46

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
   545 U.S., 125 S.Ct. 2764 (2005) .............................................................................50

*Michael Grecco Prods., Inc. v. Alamy, Inc.,*
   372 F. Supp. 3d 140 (E.D.N.Y. 2019)..........................................................18, 21, 55

*Michael Grecco Prods., Inc. v. Valuewalk, LLC,*
   345 F. Supp. 3d 482 (S.D.N.Y. 2018).................................................................22, 45

*Obodai v. Demand Media, Inc.,*
   2012 WL 2189740 *3 (S.D.N.Y. June 13, 2012)....................................................21

*Otto v. Hearst Commc'ns, Inc.,*
   345 F. Supp. 3d 412 (S.D.N.Y. 2018).................................................................37, 49

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.,*
   153 F. Supp. 3d 628 (S.D.N.Y. 2015)........................................................................3

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   508 F.3d 1146 (9th Cir. 2007)..................................................................................52

*Perfect 10, Inc. v. Giganews, Inc.,*
   847 F.3d 657 (9th Cir. 2017).............................................................................34, 36

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   2009 WL 1334364 (C.D. Cal. May 12, 2009) ........................................................33

*Polygram Int'l Publ'g Inc. v. Nevada/TIG, Inc.*,
  855 F.Supp. 1314 (D.Mass.1994) ........................................................51

*Robinson v. Random House, Inc.*,
  877 F. Supp. 830 (S.D.N.Y. 1995)........................................................42

*Sands v. What's Trending, Inc.*,
  2021 WL 694382 (S.D.N.Y. Feb. 23, 2021) ....................................46, 49

*Seide v. Level-(1) Glob. Sols., LLC*,
  2016 WL 4206076, n.5 (N.D. Ill. Aug. 10, 2016)...................................27

*Shihab v. Complex Media, Inc.*,
  2022 WL 3544149 (S.D.N.Y. Aug. 17, 2022) ........................................56

*Sid Avery & Assocs., Inc. v. Pixels.com, LL*C,
  2020 WL 6114918 (C.D. Cal. Aug. 18, 2020) ........................................35

*Smith v. Mikki More, LLC*,
  21 F.Supp.3d 276 (S.D.N.Y.2014)........................................................51

*Softel, Inc. v. Dragon Medical & Sci. Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir.1997)..................................................................51

*Sony Corp. of Am. v. Universal City Studios*, Inc.,
  464 U.S. 417, 104 S. Ct. 774 (1984) .....................................................42

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016).................................................................47

*Trombetta v. Novocin*,
  2020 WL 1304120 (S.D.N.Y. Mar. 19, 2020) .......................................54

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*,
  667 F.3d 1022 (9th Cir.2011)...............................................................17

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
  718 F.3d 1006 (9th Cir. 2013)..............................................................30

*Ventura Content, Ltd. v. Motherless, Inc.*,
  885 F.3d 597 (9th Cir. 2018)................................................................32

*Venus Fashions, Inc. v. ContextLogic, Inc.*,
  2017 WL 2901695 (M.D. Fla. Jan. 17, 2017) ...................................30, 31

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019)...............................................26, 34, 35, 36

*Viacom Int'l Inc. v. YouTube, Inc.*,
  940 F. Supp. 2d 110 (S.D.N.Y. 2013)...............................................18, 19

*Viacom Int'l v. YouTube, Inc.*,
  718 F. Supp. 2d 514 (S.D.N.Y. 2010).....................................................19

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19, 36 (2d Cir.2012).................................................17, 22, 24, 51

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26, 50 (2d Cir. 2021).............................................48, 49, 50

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir.1989)................................................................42

*Wolk v Kodak Imaging Network. Inc.*,
  840 F. Supp. 2d 724 (S.D.N.Y. 2012)...................................... Passim

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ................................................................................42
*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991) ..................................................................................50

Statutes

17 U.S.C. § 106 ...........................................................................................................16
17 U.S.C. § 106(2) ......................................................................................................38
17 U.S.C. § 107 ...........................................................................................................37
17 U.S.C. § 1202 ..................................................................................................54, 56
17 U.S.C. § 1202(a) ..............................................................................................54, 55
17 U.S.C. § 1202(c)(2)–(3), (7) .................................................................................55
17 U.S.C. § 512(c) .............................................................................23, 24, 30, 32
17 U.S.C. § 512(c)(1) ...........................................................................................24, 30
17 U.S.C. § 512(c)(1)(A)-(C), (2) ..............................................................................23
17 U.S.C. § 512(c)(1)(B) .............................................................................................30
17 U.S.C. § 512(c)(3)(A)(iii) ......................................................................................28
17 U.S.C. § 512(i) .................................................................................................22, 23
17 U.S.C. § 512(i)(1)(A) .............................................................................................22
17 U.S.C. § 512(k)(1) ..................................................................................................22
17 U.S.C. § 512(k)(1)(b) .............................................................................................17

Rules

Fed. R. Civ. P. 56(c) ...................................................................................................15

Other Authorities

Patry, William. *3 Patry on Copyright § 9:5* (2007) ....................................................34

**<u>DEFENDANT'S MOTION SHOULD BE DENIED</u>**

Shutterstock, Inc. ("Shutterstock") unlawfully exploited George Steinmetz's ("Steinmetz") photography and infringed his copyrights. The arguments in Shutterstock's motion are readily and easily rebutted by Shutterstock's own deposition testimony and public statements. This summary judgment motion should be denied and Steinmetz's motion should be granted, for the reasons set forth in Steinmetz's motion and as follows.

### I.      Background facts

Steinmetz is an accomplished photographer who has earned numerous awards for his photography, including three prizes from *World Press Photo*, and whose work has been displayed in myriad publications and exhibitions, including *National Geographic* and *NY Times Magazine*. See Dkt. #64, Plaintiff's Statement of Undisputed Fact ("SUF") ¶1. In 2013, Steinmetz created an original aerial photograph expressing his perspective of the burning practices used to convert virgin areas of the Amazon Rainforest into farmland for growing corn and soybeans (the "Subject Photograph"). SUF ¶2, **Ex. 1**. He traveled at great expense to explore the deforestation of the Amazon to create this stunning work that he then published in *National Geographic*, which ran an excellent article about how Steinmetz "spent years hanging from a paraglider, and later operating drones, to get amazing views of the Earth." [1] SUF ¶3; **Ex. 28**.

Steinmetz owns all copyrights in and to the Subject Photograph and duly registered the Subject Photograph with the Copyright Office. SUF ¶5; **Ex. 3**. The Subject Photograph contained metadata identifying Steinmetz as the copyright owner and author. SUF ¶4, **Ex. 2**. Steinmetz has licensed the Subject Photograph numerous times including for promotional and

---

[1] See https://www.nationalgeographic.com/science/article/aerial-photos-show-the-human-planet-in-all-its-beauty-and-pain (last visited September 1, 2022).

editorial uses, and such licenses have often included use of watermarked copies of the Subject Photograph. Steinmetz Decl. ¶4, Burroughs Decl., ¶19; **Ex. 5.**

Shutterstock is a for-profit company that owns and operates a commercial website and sells licenses and subscription packages allowing its paying customers to use and exploit Shutterstock's curated collection of photography. SUF ¶ 6; **Ex. 15** at 65:6-16. It offers to its customers full-size[2] photographs in high resolution[3] as part of a subscription package, or individually, or at times as "trial" downloads. SUF ¶7, **Exs. 18**, **15** at 179:18-180:6; 163:18-23; **Exs. 4, 18, 24**. When visitors view an image on the Shutterstock website, they are first shown an image on a background that implores users to "Buy Now" or sign up for a "Free trial." SUF ¶ 8; **Ex. 18**. Shutterstock also displays a button promising that the user can "Download for free" the photograph being offered, but clicking that button leads visitors to a page where they are required to sign up and, after a free trial period, pay for a subscription allowing download and exploitation of the Shutterstock photographs. SUF ¶9; **Id.**

Shutterstock's clients and licensees pay a monthly rate (currently ranging from at least $29 to $479) to use *all* of Shutterstock's photography, which would have included the Infringing Copy, or an annual per-photograph rate (currently ranging from $29 to $229) to access, copy, and exploit Shutterstock photography.[4] SUF ¶10, **Ex. 27**. A Shutterstock client can only access Shutterstock photographs that have been pre-approved by Shutterstock, including Shutterstock's *own* photographs, as Shutterstock offers all of its photography to its clients as part of its general portfolio for the same price and as part of the same paid packages. SUF ¶11; **Ex. 15** at 73:8-75:5.

---

[2] SUF ¶11, **Ex. 15** at 179:18-180:6.
[3] SUF ¶11, **Ex. 15** at 163:18-23.
[4] See https://www.shutterstock.com/pricing (last visited Aug. 29, 2022); SUF ¶¶ 7-8, **Ex. 27**.

Shutterstock's business is thus selling licenses and pre-paid packages of photography and the "breadth and quality of [Shutterstock's] content offerings are critical to [Shutterstock's] success."[5] **Ex. 29** at 7. Per its "business model," Shutterstock "source[s] high-quality content from contributors, and license[s] [sic] that content to customers worldwide." SUF ¶ 12; **Ex. 24**. And virtually all of its photographs are sourced from a pre-approved network of verified contributors, each of which provide Shutterstock with photographs for Shutterstock's exclusive review and approval. SUF ¶ 13; **Ex. 13; Ex. 15** at 46:13-18; 48:10-19. Shutterstock recruits these contributors and partners online and then reviews and approves their application before they can even submit photography, which photography must then be independently reviewed and approved.[6] SUF ¶14, **Ex. 30** at 83.

Shutterstock informs its customers and licensees that it owns the right to display and license the photography on its site.[7] SUF ¶15. It also enters into licenses directly with its clients, who pay for photography usage rights, and receive standard usage terms such as duration, geographic region, and whether the image can be used on merchandise. SUF ¶16; **Ex. 20** (a representative exemplar of those terms). Shutterstock claims that it will only offer "images that are appropriately licensed for commercial and editorial use. [Its] review process is designed to

---

[5] See https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393, pg. 7 of Shutterstock's U.S. S.E.C. Form 10-K (last visited September 1, 2022). The court can take judicial notice of this filing. *See Pehlivanian v. China Gerui Advanced Materials Grp.*, Ltd., 153 F. Supp. 3d 628, 642 (S.D.N.Y. 2015), **Ex. 29**.

[6]  https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 83 of Shutterstock's U.S. S.E.C. Form S-1 (last visited September 1, 2022), **Ex. 30.**

[7] https://www.shutterstock.com/blog/protecting-your-content-what-you-need-to-know-about-licensing-your-copyright (last visited Aug. 29, 2022); see also https://submit.shutterstock.com/legal/terms (last visited Aug. 29, 2022)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ensure that every image is appropriately licensed for its intended use."[8] SUF ¶17; **Exs. 13, 24**.

Shutterstock does not make any photographs publicly viewable on its licensing site unless and until it first reviews and approves the photographs. SUF ¶18; **Ex. 15** at 49:17-50:13. This review process is thorough – Shutterstock uses its discretion to scrutinize the work's subject matter, commercial appeal, and technical quality before deciding whether to approve the work. SUF ¶19; Id., and at 107:5 – 108:10. And the review is wholly "subjective" to ensure that the work's "quality is up to par."[9] SUF ¶20. Indeed, the photography on Shutterstock's site is vetted by its "specialized team of reviewers to ensure that it meets [Shutterstock's] standards of quality and licensability[,]" before it is published to Shutterstock's site and offered for license, and that contributors must meet Shutterstock's "robust quality standards."[10] SUF ¶21, **Ex. 29** at 7.

Shutterstock regularly rejects photographs for stylistic and aesthetic reasons, such as when Shutterstock dislikes a photograph's lighting,[11] or blurriness,[12] or composition[13] or framing.[14] SUF ¶22. This rigorous process results in the rejection of **most** contributor applicants and images submitted to the platform: "[l]ess than 20% of contributor applicants who applied in 2011 were approved as contributors to shutterstock.com, and less than 60% of images uploaded

---

[8] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 78, 86 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022), **Ex. 30**.
[9] https://player.vimeo.com/video/134351620  (ShutterTalk Live: 5 Most Common Photo Rejection Reasons – and How to Avoid Them)(last visited September 1, 2022)
[10] See https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393, pg. 7 (last visited September 1, 2022), **Ex. 29**.
[11] https://www.shutterstock.com/blog/rejection-reasons-poor-lighting-and-lighting-problems (last visited on September 1, 2022).
[12] https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Focus?language=en_US (last visited September 1, 2022).
[13] https://www.shutterstock.com/blog/rejection-reason-composition (last visited on September 1, 2022); https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Composition?language=en_US (last visited on September 1, 2022).
[14] Id.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

by approved contributors in 2011 satisfied our rigorous acceptance requirements."[15] SUF ¶23, **Ex. 30** at 77. Indeed, Shutterstock regularly rejects photographs that it does not find valuable or otherwise up to its aesthetic and commercial standards**. SUF ¶ 24; Ex. 15** at 109:11-19.

Shutterstock's entire business model depends on the "high quality" of the photography that it curates, and that quality is crucial to Shutterstock's business model. SUF ¶25; **Ex. 15** at 156:15-157:3. It advertises that "unlike the significant majority of free images available online, our rigorous vetting process enables us to provide confidence and indemnification to our users that the images in our library have been appropriately licensed for commercial or editorial use."[16] **Ex. 30** at 1. It is beyond dispute that Shutterstock has complete control over the photographs that it offers for licensure. It is solely responsible for reviewing, approving, and publishing the photographs to its publicly viewable licensing website. SUF ¶27; **Ex. 15** at 107:5-108:10; 118:13-119:12. Shutterstock has final say as to what it displays and licenses and can *remove* any photograph from its site at any time. SUF ¶28; Id. at 119:14-120:4. Simply put, if Shutterstock does not subjectively believe that a particular photograph has aesthetic appeal, commercial value, and is likely to draw traffic, it will reject the photograph and that photograph will not appear on its site. SUF ¶29; **Ex. 15** at 49:17-50:13; 93:17-95:14. Once Shutterstock approves a photograph, it will create a dedicated "Asset Detail Page," which is a licensing page with details about the work, for the photograph and offer it for licensure to its customers. SUF ¶30; **Ex. 14**.

Shutterstock worked with one of its carefully vetted and verified contributors, who was based in India and used the Shutterstock account name "ArunRaJpuT6621," to obtain an unauthorized copy of the Subject Photograph ("Infringing Copy"). SUF ¶31; **Ex. 23**. The below

---

[15] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm#da47301_business, pg. 77 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022).
[16] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 1 ("Prospectus Summary") (last visited September 1, 2022).

chart reflects true and correct copies of (a) the Subject Photograph, in full and as it appears on the site of Steinmetz licensee *National Geographic*; and (b) the Infringing Copy, as it appears at various Shutterstock URLs:

**SUBJECT PHOTOGRAPH:**



PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT



**INFRINGING COPY:**

**SHUTTERSTOCK ASSET DETAIL PAGE:**

Enlarged Shutterstock URL:

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SHUTTERSTOCK DEDICATED ASSET PAGES:**

SHUTTERSTOCK DEDICATED ASSET PAGE #1:



https://image.shutterstock.com/shutterstock/photos/1571786026/display_1500/-stock-photo-1571786026.jpg                STEINMETZ000021

Enlarged Shutterstock URL:

https://image.shutterstock.com/shutterstock/photos/1571786026/display_1500/-stock-photo-1571786026.jpg

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## SHUTTERSTOCK DEDICATED ASSET PAGE #2:



www.shutterstock.com · 1571786026

 https://image.shutterstock.com/image-photo/-600w-1571786026.jpg

<span style="color:red">STEINMETZ000017</span>

## Enlarged Shutterstock URL:

https://image.shutterstock.com/image-photo/-600w-1571786026.jpg

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SHUTTERSTOCK DEDICATED ASSET PAGE #3:



shutterstock.com · 1571786026

 https://image.shutterstock.com/image-photo/-260nw-1571786026.jpg                    STEINMETZ000016

Enlarged Shutterstock URL:

https://image.shutterstock.com/image-photo/-260nw-1571786026.jpg

See **Exs. 1, 4, 8, 9, 10, 28**.[17]

The Infringing Copy is identical to the Subject Photograph aside from its cropping. And Shutterstock published and displayed *at least four* copies of the Infringing Copy on four different URLs on its publicly facing website. SUF ¶32; **Exs. 4, 8, 9, 10**. At a minimum, three of those copies were publicly available in full-size and high-resolution. See **Exs. 4, 9, 10**.

Shutterstock onboarded the Infringing Copy from its verified contributor and then reviewed the work for quality, subject matter, aesthetics, and the numerous other factors described above. SUF ¶ 33; **Exs. 13-14**. Shutterstock, after completing its review of the content

---

[17] https://www.nationalgeographic.com/science/article/aerial-photos-show-the-human-planet-in-all-its-beauty-and-pain (last visited September 1, 2022).

and commercial appeal of the Infringing Copy, expressly approved the Infringing Copy. SUF ¶ 34; **Exs. 8-12**. After approving the Infringing Copy, Shutterstock made its own copies of the Infringing Copy, added its logo to the copies to claim it as *its own* intellectual property, published these copies on its public website at its own Asset Detail Page as well as three other URLs, and began offering the photograph to its customers in high-resolution[18] as part of its licensing and subscription programs. SUF ¶ 35; **Exs. 8-12**, **Ex. 15** at 43:17-23.

Shutterstock also distributed copies of the Infringing Copy to third-party partners including TinEye, HelloRF (which Shutterstock owns in part),[19] and StockFresh. SUF ¶ 36; **Exs. 11-12, 21, 25, 26**. Shutterstock works with these partner sites by providing to them Shutterstock photography and directing them to display the photography, advertise licenses, promote the Shutterstock brand, and drive viewers to Shutterstock's site. SUF ¶37; **Exs. 11-12**; **Ex. 15** at 240:12-241:18. Shutterstock's broad distribution of its photography across the internet via these sites is an important aspect of its business plan.

Each of these sites, using Shutterstock computer code (referred to as Application Programming Interface, or "API") and a link provided by Shutterstock to a copy of the Shutterstock computer file for the Infringing Copy, further displayed the Infringing Copy on each of their sites and encouraged viewers to visit Shutterstock to purchase a license to use the Infringing Copy.[20] SUF ¶38; **Ex. 15** at 160:10-17. Shutterstock's API terms require its partners to "incorporate the Shutterstock watermark" when displaying Shutterstock-provided photography and include a conspicuous indication that the photograph is "Powered by Shutterstock."[21] SUF

---

[18] **Ex. 15** at 163:18-23.
[19] See **Ex. 26**, announcing Shutterstock's purchase of HelloRF parent company, ZCool.
[20] https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022).
[21] https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022)

¶39. Shutterstock, TinEye, and HelloRF all participate in this program and are Shutterstock partners. SUF ¶40; **Exs. 11-12, 21, 25, 15** at 177:25-179:17, 240:12-241:18.

Moreover, Shutterstock has a partnership agreement with TinEye under which TinEye displays Shutterstock photography (including the Infringing Copy) alongside Shutterstock branding and advertisements. SUF ¶41; **Ex. 15** at 28:6-29:23. Shutterstock used the Infringing Copy to advertise its 15% off sale on the TinEye website under this partnership. SUF ¶ 42; **Ex. 11**. TinEye, due to its use of the code and API provided by Shutterstock, can only display Shutterstock photographs so long as the photographs are "live" and are currently being actively promoted through Shutterstock's site. SUF ¶43; **Ex. 15** at 33:14-34:15.

Steinmetz's counsel sent a cease-and-desist demand to Shutterstock demanding that it cease all use of the Subject Photograph on April 1, 2021. SUF ¶ 44; **Ex. 6**. A Shutterstock employee, using the fake name [redacted],[22] responded on May 11, 2021 and represented that the Infringing Copy had been "removed."  SUF ¶ 45; **Ex. 7, 14 Ex. 15** at 57:3-58:11**.** At the time [redacted] sent that message, he had only discussed the matter with colleagues and had not confirmed that the message was true. SUF ¶47; **Ex. 15** at 57:3-58:11. At the time he sent the message, Shutterstock had not investigated its partners' sites to confirm that they also removed the Infringing Copy. SUF ¶48; **Ex. 15**. 44:8-15. At most, at that time, Shutterstock "suspended" only one of Shutterstock's copies of the Infringing Copy at this time, meaning that it suspended access to only the copy displayed on its Asset Detail Page, which offered the work as part of its licensing packages, but maintained and continued to display copies of the Infringing Copy on *three other URLS* on its publicly available website and another copy on its internal system. SUF

---

[22] His real name was [redacted]. See SUF ¶46; **Ex. 15** at 10:3-8. Shutterstock's putative DMCA agent, Sejal Patel Richbourg, instructed the employee to use this fake name when responding to DMCA infringement notices. **Id.** at 12:18-13:3.

¶49; **Exs. 8-10; 15** at 174:3-10. Shutterstock's copies of the Infringing Copy were not "locked," or removed from those three publicly facing pages of the Shutterstock website, until September 20 or 21, 2021[23] at the earliest. SUF ¶ 50; ¶ 5, **Exs. 8-10; 15** at 172:2-7. In other words, Shutterstock continued to display and distribute three copies of the Infringing Copy to the public until at least September 20 or 21, 2021. SUF ¶ 51; **Exs. 8-10, 14**. Shutterstock conceded that its failure to ensure that the Infringing Copy was not visible to the public was a violation of Shutterstock's DMCA policy. SUF ¶52; **Ex. 15** at 198:22-199:18.

Shutterstock continued to exploit the Infringing Copy *beyond even that September 2021 date*, using the Infringing Copy to advertise Shutterstock's 15% off sale on TinEye until at least July 14, 2022. SUF ¶53; **Ex. 11**. It also continued to display the work on HelloRF, which it partly owns, until at least July 14, 2022. SUF ¶54; See **Ex. 21**. Shutterstock concedes that it did not take any steps to contact TinEye, HelloRF, or its other partner sites, each of which had obtained the Infringing Copy directly from Shutterstock, to direct those partners to "lock" or remove the Infringing Copy. SUF ¶55; **Ex. 15** at 128:19-129:19; 132:20-133:17. As of July 14, 2022, Shutterstock also continued to maintain a copy of the Infringing Copy on its own, internal website but averred that that copy was for company purposes and not available to the public. SUF ¶56; **Ex. 15** at 58:12-59:9. It has no policy as to how long it keeps a copy of an infringing work on its internal website. SUF ¶57; **Id.** at 75:23-76:17.

Shutterstock does not have a DMCA agent and was unable to testify as to whether it followed its DMCA protocol[24] in responding to Steinmetz's notice of infringement. SUF ¶58;

---

[23] Shutterstock first testified that this took place in September of 2022 but later clarified that he intended to reference September of 2021, as part of his admission that Shutterstock had no basis to only remove the Infringing Copy from its licensing portfolio while keeping the Infringing Copy active on three URLs on its publicly facing site. **Ex. 15** at 175:20 – 176:2.
[24] **Ex. 15** at 214:5 – 216:12

**Ex. 15** at 85:13-16, 214:5-216:12. However, it is undisputed that Shutterstock received Steinmetz's notice of infringement on April 1, 2021, and the Infringing Copy remained online until at least July 14, 2022. Shutterstock has conceded, though, that its failure to "lock" or remove the Infringing Copy after receiving Steinmetz's notice of infringement was a "glitch" and that the Infringing Copy "should have been removed" from all publicly facing pages of Shutterstock's website and partner sites months earlier. SUF ¶59; **Id**. at 200:14-201:17.

Shutterstock's business has been riddled with allegations of copyright infringement similar to those at issue. Indeed, Shutterstock has been sued for copyright infringement *at least nine times* since 2019, far more than its competitors.[25] SUF ¶60. In one of those actions, Shutterstock is alleged to have attempted to "exploit the COVID-19 pandemic to walk away from its contractual obligations" and infringed the plaintiff's rights in at least 2,300 photographs in doing so. SUF ¶61; See *Penske Media Corporation*, 1-20-cv-04583, Dkt. #29. And, Shutterstock has received no fewer than 260 complaints to the Better Business Bureau. SUF ¶62; **Ex. 16**. In the photography community, it is known that Shutterstock's entire business model is suspect.[26] SUF ¶63. Shutterstock seems to agree, in part, with the foregoing, as it has admitted that it has "been subject to a variety of third-party infringement claims in the past and will likely

---

[25] See *Tamara Williams v. Shutterstock, Inc., et al*; 1-21-cv-05784 (E.D.N.Y); *McGucken v. Shutterstock, Inc., et al*, 1:22-cv-00905 (S.D.N.Y.); *Cavanaugh v. Shutterstock, Inc., et al*, 1-21-cv-03796 (S.D.N.Y.); *Itasca Images, LLC et al v. Shutterstock, Inc., et al*, 0-21-cv-00287 (D.MN); *Lickerish, Ltd. v. Shutterstock Inc.*, 1-20-cv-05384 (S.D.N.Y.); *Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583 (S.D.N.Y.); *Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al.*, 1-20-cv-03023 (S.D.N.Y.); *Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*, 2-20-cv-00787 (C.D.CA); *Michael Grecco Productions, Inc. v. Shutterstock, Inc.*, et al., 2-19-cv-01153 (CD.CA).

[26] See, e.g., https://brutallyhonestmicrostock.com/2019/01/27/update-why-shutterstocks-copyright-infringement-problems-should-concern-you/. Ironically, the Shutterstock forum referenced in this article was *deleted* by Shutterstock because the content made clear the scope of Shutterstock's copyright infringement and poor business practices.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

be subject to similar claims in the future[,]"[27] and that "policing our intellectual property rights is difficult, costly and **may not always be effective**."[28] SUF ¶64, **Ex. 30** at 15, 19.

Steinmetz's ability to license his original photography is integral to his business as a photographer. His business and reputation in the industry have been substantially harmed by Shutterstock's unauthorized exploitation of his copyrighted work. Steinmetz Decl. ¶10.

## II.     Legal standard

Summary judgment is appropriate only where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to establish the lack of any factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When determining whether there is a genuine issue of material fact, "the court must 'examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002). Here, Shutterstock has not established that it is shielded from liability under the "safe harbor" provision of the Digital Millennium Copyright Act, that it did not engage in volitional conduct amounting to copyright infringement, that its exploitation of the Subject Photograph amounts to fair use, that it did not commit secondary copyright infringement, and that it did not violate Section 1202 of the DMCA.

---

[27] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 15 (last visited September 1, 2022)
[28] https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 19 (last visited September 1, 2022)(emphasis added)

### III.     Shutterstock has no defense to Steinmetz's copyright infringement claims

Notably, Shutterstock does not challenge Steinmetz's copyright ownership of the Subject Photograph, nor does Shutterstock deny that Steinmetz's proprietary artwork was displayed and published on its commercial website and platform, in violation of his exclusive rights under 17 U.S.C. § 106. Thus, it concedes that it has committed copyright infringement. Shutterstock argues only that it should be allowed to evade liability for its infringement based on two of its putative affirmative defenses. Both defenses are wholly unsupported and without merit.

### A.     The DMCA "safe harbor" does not protect Shutterstock

Shutterstock cannot invoke the "safe harbor" to avoid liability for its infringement. It bears the burden of proof in establishing each element of the safe-harbor defense under the Digital Millennium Copyright Act ("DMCA"). *BWP Media USA Inc. v. Polyvore, Inc.*, 922 F.3d at 54–55 ("DMCA safe harbors are affirmative defenses[]"), citing *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 94 (2d Cir. 2016). Given the effect of the safe harbor, Shutterstock must discharge the heavy burden of establishing "beyond controversy every essential element [of the defense], and failure to so will render the [defendant] ineligible for the § 512(c) safe harbor's protection." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017)(citations and internal quotations omitted). Shutterstock cannot meet this burden.

### 1.     Shutterstock is not a "service provider"

Shutterstock is not a "service provider." A "service provider" can be a "provider of online services or network access, or the operator of facilities therefor[,]" but a typical "service provider" in this context is a site like Facebook, to which users can freely and instantly upload text or photographs, without approval and for immediate display and sharing. See 17 U.S.C. § 512(k)(1)(b). Shutterstock does not come close to meeting this definition.

Indeed, it is settled that an "entity that is directly licensing copyrighted material online is **not** a 'service provider.'" *Agence France Presse v. Morel*, 934 F. Supp. 2d 547, 566 (S.D.N.Y. 2013)(emphasis added), citing *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 35, 110 S.Ct. 929 (1990). Shutterstock directly licenses copyrighted material, and sold subscription packages, including the Infringing Copy, to the public. It cannot be considered a service provider because, *inter alia,* it provides no public services; it instead exists to sell licenses and make money. Shutterstock concedes that the "majority of [its] revenue is earned from the license of digital content." See **Ex. 32**, pg. 50.[29] It is thus not a "service provider."

Indeed, "every case" reviewed by the *Agence* court revealed that "a party was a held to be a 'service provider' only when it was 'doing something useful' for 'other entities or individuals, such as providing a file hosting or file sharing platforms, rather than itself selling or licensing copyrighted material.'" *Id.*, 934 F. Supp. 2d at 567, citing *Viacom Int'l*, 676 F.3d at 28; *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 667 F.3d 1022, 1026, 1035 (9th Cir.2011). Here, Shutterstock is a for-profit platform that is licensing and otherwise exploiting photography to make money for itself and its stockholders. There is no "sharing" on its platform because Shutterstock stands between its contributors and its customers. And Shutterstock cites **no case** in which a company that directly sells licenses and subscriptions was granted the safe harbor.

Moreover, even if Shutterstock could prove that the Infringing Copy was "a user-generated post," which it cannot do given that it must review and approve every photograph that appears on its site, as discussed below, "this fact would not preclude liability for alleged instances where [Shutterstock], rather than a user of the [Shutterstock] website, displayed the [subject] photograph and offered copies for prospective license." *Michael Grecco Prods., Inc. v.*

---

[29] See https://investor.shutterstock.com/static-files/d4f871ab-0ecd-4970-9bb1-b1dafb4bcb32, (last visited September 14, 2022).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Alamy, Inc.*, 372 F. Supp. 3d at 140 ("*Alamy*"), citing *Agence* at 566 ("[A]n entity that is directly licensing copyrighted material online is not a 'service provider.'"), reconsidered on other grounds by *Agence* at 584 (remaining citation omitted). So, even if the Shutterstock contributor had directly and immediately posted the Infringing Copy to Shutterstock's website without Shutterstock's approval – which it undisputedly did **not** do – Shutterstock **still** could not avail itself of the safe harbor because Shutterstock is the party that "offered copies for prospective license."

      Shutterstock concedes that it "recognize[s] revenue gross of contributor royalties because **we are the principal in the transaction as we are the party responsible for the performance obligation and we control the product or service** before transferring it to the customer. We also license content to customers through third-party resellers. Third-party resellers sell our products directly to customers as the principal in those transactions. Accordingly, we recognize revenue net of costs paid to resellers."[30] **Ex. 29** at 50 (emphasis added).

      Shutterstock's admission that it is the "principal" party that sells and licenses precludes the safe harbor, which is unavailable to companies like Shutterstock that are "actively involved in the listing, bidding, sale and delivery of any item[.]" *Viacom Int'l Inc. v. YouTube, Inc*., 940 F. Supp. 2d 110, 118 (S.D.N.Y. 2013), quoting *Hendrickson v. eBay, Inc*., 165 F.Supp.2d 1082, 1094 (C.D.Cal.2001).[31] Here, Shutterstock is the "principal" and alone lists the photographs that comprise its subscription and license packages, sets the prices for those products, and delivers the photography to its users via download. Finally, the safe harbor is also unavailable to Shutterstock because Shutterstock "preview[s] the products prior to their listing" or "suggest[s]

---

[30] See https://investor.shutterstock.com/static-files/d2f143a4-78de-44ee-be18-1e982abb017e , pg. 50 (last visited September 14, 2022)(emphasis added).
[31] To argue to the contrary, Shutterstock relies on *Viacom Int'l v. YouTube, Inc*.,718 F. Supp. 2d 514 (S.D.N.Y. 2010), a prior decision, which was remanded.

prices" or provides product descriptions "or otherwise involve[s] itself in the sale." Id. at 118-119, citing *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1110 (W.D.Wash.2004). Shutterstock does not just "involve itself" in the sale, it is the **sole** seller.

Shutterstock's cited authority is clearly distinguishable. For example, Shutterstock relies heavily on *Wolk v Kodak Imaging Network. Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012) *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 569 F. App'x 51 (2d Cir. 2014) to argue that it qualifies as a service provider because it hosts and allows the online sharing of photographs. But Shutterstock admits that it does not allow **any** sharing on its site – it reviews and approves **every** photograph and then offers to license them for a fee. This is far afield from the Photobucket service at issue in *Wolk*, which allowed the public to upload, display, and share photographs on the Photobucket site instantly without other Photobucket users and without any form of review by Photobucket. And, unlike Shutterstock, Photobucket immediately makes publicly uploaded photographs available to the public for free. *Wolk* does not save Shutterstock.

*Wolk* and subsequent cases make clear that the safe harbor is **only** available if the service provider's control or influence does not "take the form of prescreening content, rendering extensive advice to users regarding content and editing user content[.]" *Viacom Int'l Inc.,* 940 F. Supp. 2d at 118 (S.D.N.Y. 2013), quoting *Wolk,* 840 F.Supp.2d at 748.[32] Here, it is undisputed that Shutterstock prescreened photography; rendered extensive advice to its users regarding photography; and edited photography by stripping metadata and adding its own watermarks. It has sole control over every photograph that it displays and offers for license on its platform, which plainly bars Shutterstock from the safe harbor. And while the defendants in *Wolk* and

---

[32] *See also Agence at* 567 (holding that every case reviewed by this Court in which a party was held to be a service provider involved an entity providing a useful service to others "rather than itself selling or licensing copyrighted material.").

*Viacom* did not directly control, sell, or license the content on their platforms, Shutterstock actively engages in all three activities, including actively "previewing" the photography it offers before displaying and listing those works, setting prices, and being solely responsible for its subscription sales and licensing. The cases are inapposite.

Shutterstock is similarly unaided by *Hendrickson v. Amazon.com, Inc* 298 F. Supp. 2d 914 (C.D. Cal. 2003). There, the court found that Amazon could be considered a service provider only because "all evidence points to the fact that [the third-party seller], not Amazon, was the actual seller" of the items available on Amazon's platform. *Id.* at 915. Here, Shutterstock's contributors, including Arun Lodhi, the alleged Shutterstock contributor for the Infringing Copy, do not sell anything. Shutterstock **alone** sells the licenses and subscriptions for the photography on its site directly to Shutterstock customers, excluding it from the service-provider purview.

The safe harbor may protect "commercial websites that allow users to market and sell their products," but it does not protect companies that sell or license their own product, even if those products incorporate copyrighted material sourced from contributors. *Greg Young Publ'g, Inc. v. Zazzle, Inc.*, 2017 WL 2729584, at *6 (C.D. Cal. May 1, 2017), citing *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp. 2d 1090, 1100 (W.D. Wash. 2004). Shutterstock directly sells its own subscriptions and licenses. **Exs. 18, 24, 15** at 70:25-71:13. It is thus "an online service that directly sells, rather than facilitates the sale of, products" and cannot be a service provider. *Gardner v. CafePress Inc.*, 2014 WL 794216, at *5 (S.D.Cal. Feb. 26, 2014), citing *Hendrickson* at 915  (the "direct seller of the infringing item" would not be covered by the safe harbor)(remaining citation omitted). Here, there is no third party involved in the sales at issue – Shutterstock solely and directly sells its photography licenses and subscriptions to the public.

A service provider *can* in limited instances be a site that "hosts and allows online sharing ... **at the direction of users**[.]" *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *3

(S.D.N.Y. June 13, 2012)(emphasis added), *aff'd sub nom. Obodai v. Cracked Ent. Inc.*, 522 F. App'x 41 (2d Cir. 2013), citing *Wolk,* 2012 WL 11270, at *17. But, Shutterstock's content is not displayed "at the direction of users" and it does not allow sharing. Shutterstock contributors submit photographs that Shutterstock alone reviews, approves, publishes to its public site, copies, distributes and directly licenses to third parties and the public. See, e.g., **Exs. 13-14**; **15** at 46:13-18, 48:10-19, 107:5-108:10; 118:13-119:20. Indeed, Shutterstock's "vetted" and "verified" contributors are not "users," but rather paid partners, and they do not do any "sharing" of any kind with Shutterstock's customers.

Illustratively, Shutterstock terminated the "user" that contributed the Infringing Copy on September 1, 2021, yet it continued to display the Infringing Copy to the public until at least September 16 or 21, 2021 and provided its partners with the Infringing Copy until July of 2022, further establishing the lack of any link between the Shutterstock contributor and the Infringing Copy. **Exs. 14, 23**. When a company like Shutterstock, "rather than a user of" its website, displayed the photograph and "offered copies for prospective license," that company is not a "service provider." *Alamy* at 140, citing *Agence* at 566 ("[A]n entity that is directly licensing copyrighted material online is not a 'service provider.'")(citation omitted); see also *Agence* at 56 (safe harbor available only to those who "merely provide[] a file hosting service"). Shutterstock is not an "internet service provider" under 17 U.S.C. § 512(k)(1). This alone is fatal to the defense.

### 2.    Shutterstock does not qualify for the "safe harbor" under Section 512(i)

Even if Shutterstock could prove it was a "service provider," which it cannot do, it would still need to "meet a set of threshold criteria" to take advantage of the "safe harbor." *Viacom Int'l*, 676 F.3d at 27. Per 17 U.S.C. § 512(i), Shutterstock "must" show that it "(i) adopt[ed] a policy that provides for the termination of service access for repeat copyright infringers; (ii)

inform[ed] users of the service policy; and (iii) implement[ed] the policy in a reasonable manner." *Wolk v. Kodak Imaging Network, Inc*., 840 F.Supp.2d 724, 744 (S.D.N.Y.2012), citing *Corbis Corp. v. Amazon.com, Inc*., 351 F.Supp.2d 1090, 1100 (W.D.Wash.2004). The infringer must prove that it informed *both* "subscribers and account holders" of its termination policy. U.S.C. § 512(i)(1)(A). It must also establish that it "accommodate[d] standard technical measures used by copyright owners to identify or protect copyrighted works." *Michael Grecco Prods., Inc. v. Valuewalk, LLC*, 345 F. Supp. 3d 482, 509 (S.D.N.Y. 2018)("*Valuewalk*"), citing 17 U.S.C. §§ 512(i). Shutterstock cannot meet these requirements.

### a.    Shutterstock did not adopt and implement a "repeat infringer" policy

Shutterstock has adduced no evidence of a sufficient "repeat infringer" policy, as is its burden. Shutterstock may avail itself of the safe harbor only if it has proven that it "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). While Shutterstock claims a policy to exist, its continuing and prolonged exploitation of the Infringing Copy on its own site for at least five months after receiving notice of the infringement, and on its partner sites until July of 2022, and its failure to terminate "ArunRaJpuT6621" as a contributor for five months after notice, makes clear that it has not "reasonably implemented" a qualifying policy. **Exs. 6, 8-12, 14, 21, 23**.

Numerous artists have sued Shutterstock for copyright infringement, with the claims relating to a massive number of photographs, evidencing a failure to implement a reasonable policy.[33] And Shutterstock uses fake names to obfuscate its DMCA policies and failed to follow

---

[33] See fn. 25, *supra*.

its own protocol in addressing the Infringing Copy. It has failed to discharge its burden of proving that it reasonably implemented a sufficient policy.

### b.    Shutterstock frustrated standard technical measures

Contrary to Shutterstock's assertions, Shutterstock strips the metadata – a standard technical measure in the context of digital photography – from every photograph that it procures and approves for use on its site, which stripping obscures important author and copyright information. **Ex. 15** at 95:24-96:22. This further disqualifies it from the safe harbor. Shutterstock's "safe harbor" defense fails under 17 U.S.C. § 512(i).

### 3.    Shutterstock's safe harbor defense fails under Section 512(c)

If Shutterstock establishes that it is a "service provider" that satisfies all of the above "service provider" requirements (which it cannot do), then "the safe harbor **additionally** requires showings as to the service provider's lack of knowledge of infringement, its receipt of no direct financial benefit from the infringing activity, its compliance with DMCA takedown requests, **and** the designation of an agent for such requests." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d at 358, citing 17 U.S.C. § 512(c)(1)(A)-(C), (2)("*Hollywood*") (emphasis added). Shutterstock knew of the infringement, financially benefitted from the infringement, and refused to comply with DMCA takedown requests. Its defense thus fails.

The statutory requirements are further set forth in Section 512(c), which states:

> A service provider shall not be liable ... for infringement of copyright by reason of the **storage at the direction of a user** of material that **resides on a system or network controlled or operated by or for the service provider**, if the service provider—
>
> (A)(i) does not have **actual knowledge** that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from **which infringing activity is apparent**; or (iii) upon obtaining such knowledge or awareness, **acts expeditiously to remove, or disable access to, the material;**

(B) does not receive a **financial benefit** directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds **expeditiously to remove, or disable access to, the material** that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(emphasis added). Shutterstock cannot meet these requirements.

a.     **The Infringing Copy was not stored "at the direction of the user" and does not entirely "reside on a system" controlled by Shutterstock**

As a threshold matter, Shutterstock cannot prove that the Infringing Copy appeared on its website and its partner sites "at the direction of a user."  This is fatal, as the "§ 512(c) safe harbor is only available when the infringement occurs 'by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.'" *Viacom Int'l*, 676 F.3d at 38, quoting 17 U.S.C. § 512(c)(1).

The defense fails if Shutterstock had **any** involvement in selecting, supervising, approving, or modifying the photographs. *Mavrix Photographs, LLC*, 873 F.3d at 1056 (defense available only "if the service provider played **no role** in making that infringing material accessible on its site" or "carried out activities that were "narrowly directed" towards enhancing the accessibility of the posts.")(emphasis added). That was not the case here – Shutterstock played a **major if not sole role** in reviewing, selecting, approving, modifying and publishing the photography on its publicly available site, and thus cannot claim the safe harbor. Its own records establish that it, and it alone, "approve[d]" the image on November 26, 2019, before it was displayed to the public as part of Shutterstock's licensing portfolio. **Ex. 14.**

Incredibly, Shutterstock asserts that it did not engage in any volitional conduct in reviewing and displaying the Infringing Copy. But that is demonstrably false, as discussed *infra*. To be sure, Shutterstock concedes that it "performs a detailed review of the digital imagery

before accepting it into its collection to ensure it is of high quality before it may be purchased by customers[.]"[34] **Exs. 32** at 50, **30** at 83. This is volitional.

Shutterstock admits in its motion that it "reviews all contributor-supplied images for technical and quality issues," but it fails to acknowledge the breadth and depth of its review and approval process. See Dkt. #51, fn 2. Shutterstock played a significant role in making the Infringing Copy available to its users and the public. Shutterstock curates and approves every photograph that it offers for licensing through its highly selective processes, as it admitted both in discovery and in its public guidelines. Indeed, Shutterstock's "reviewers inspect each image at 100% full-resolution view"[35] to ensure an image is high-quality, examining every photograph for focus, noise, exposure,[36] quality, composition, lighting, subject matter, and other unique concerns before displaying the photograph to its licensees. **Exs. 29** at 7, **15** at 93:17-95:14. And Shutterstock concedes that it reviews each and every submission and has sole discretion in accepting or rejecting contributor content.[37]

---

[34] See https://investor.shutterstock.com/static-files/d4f871ab-0ecd-4970-9bb1-b1dafb4bcb32 pg. 50 (last visited Sept. 14, 2022).

[35] See https://www.shutterstock.com/blog/how-to-avoid-an-editing-rejection, last visited Sept. 11, 2022.

[36] See e.g., https://www.shutterstock.com/blog/rejection-reasons, last visited Sept. 11, 2022 ("Shutterstock has high standards and only accepts a portion of the images submitted to be included in our collection. Here are some of the common reasons images get rejected, and tips on how contributors can maximize their chances of success"); see also https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Focus?language=en_US, last visited Sept. 11, 2022; see also https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Noise-Artifacts?language=en_US, last visited Sept. 11, 2022; https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Exposure?language=en_US, last visited Sept. 11, 2022.

[37] See https://www.shutterstock.com/blog/qa-with-a-shutterstock-reviewer-photo-submission-advice, last visited Sept. 13, 2022 ("This explosion of submissions has really forced [Shutterstock] to be a little pickier with [its] acceptance rate but [certain contributors] try to maintain a balance of accepting enough images that a newer photographer does not get too discouraged.").

Finally, Shutterstock cannot establish that the Infringing Copy "resides on a system or network controlled or operated by or for the service provider," as is required because it concedes that it distributed the Infringing Copy to other networks and systems controlled by HelloRF, TinEye, and StockFresh. It is beyond peradventure that Shutterstock, not the contributor, "exercised control" and "selected" the photography it offers for licensure. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021), quoting *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 732 (9th Cir. 2019). The safe harbor is thus unavailable.

> **b.      Shutterstock had notice of the infringement and did not expeditiously disable access to the infringing content**

Shutterstock knew or "was aware of facts or circumstances from which infringing activity" was apparent and did not expeditiously "remove or disable access to" the Infringing Copy. Courts "have determined that response times to remove infringing material from entities' websites or systems ranging from 5 to 14 days are expeditious." *Kinsley v. Udemy, Inc.*, 2021 WL 1222489, at *5 (N.D. Cal. Mar. 31, 2021), citing *Seide v. Level-(1) Glob. Sols., LLC*, 2016 WL 4206076, at *5 n.5 (N.D. Ill. Aug. 10, 2016) (collecting cases).

At least as early as April 1, 2021, Shutterstock had notice of Steinmetz's notice that Shutterstock's exploitation of the Infringing Copy was infringing. The safe harbor for "an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe." *Disney Enters., Inc.*, 2013 WL 6336286, at *26-27 (internal quotation marks and citations omitted). Yet, Shutterstock did not "suspend" access to the Infringing Copy until May 11, 2021 and did not "lock" or delete or disable public access to the Infringing Copy on its own site until September 2021, over five months after it first received notice. Burroughs Decl. ¶5, **Exs. 8, 9**. Shutterstock even concedes that "a software error delayed the time in which Steinmetz's takedown notice was

assigned to a Shutterstock team member for review and response." (Dkt. #51, fn. 3.) But there is **no** evidence of any "software error" and that position appears to have been invented out of whole cloth. In reality, Shutterstock simply refused to delete the Infringing Copy from its site for at least five months.

To make matters worse, Shutterstock displayed and distributed the Infringing Copy on its partner sites, like TinEye, HelloRF, and StockFresh, until at least July 13, 2022, over fifteen months *after* it first received notice. Burroughs Decl. ¶6, **Exs. 11, 12, 21**. This does not reflect an expeditious removal, and Shutterstock lost any safe harbor protection it may have been able to claim. See *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 102 (S.D.N.Y. 2020) (holding that 18 and 23 days between notice and removal "cannot be considered expeditious."). Shutterstock was not expeditious in addressing the infringement.

Shutterstock incorrectly contends that "Plaintiff's takedown notice did not trigger an obligation for Shutterstock to remove anything other than the one Contributor Image located at the identified URL" (Dkt. #51, p. 11), and its reliance on *Wolk* is misplaced. First, Steinmetz's notice to Shutterstock was sufficient to trigger Shutterstock's obligation under the standard set forth in Section 512 of the DMCA. As stated in *Wolk*, "Section 512(c)(3)(A)(iii) and 512(c)(3)(A)(v) require a DMCA-compliant take-down notice to provide '[i]dentification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.'" *Wolk,* 840 F. Supp. 2d at 746–47 (S.D.N.Y. 2012). The court in *Wolk* further explained that "[a]n example of such sufficient information would be a copy or description of the allegedly infringing material and the so-called 'uniform resource locator' (URL) (i.e. web site address) which allegedly contains the infringing material." *Id*. at 747. Here, Steinmetz's takedown notice to Shutterstock contained copies of both the Subject

Photograph and an exemplar of the Infringing Copy, as well as a specific URL at which the Infringing Copy was located. **Ex. 6**. Steinmetz's notice was thus sufficient to allow Shutterstock to reasonably locate the infringing material.

Additionally, the URL that Steinmetz provided also contained Shutterstock's "unique image identification number" that Shutterstock assigned to the Infringing Copy. And Shutterstock's internal platform makes clear that it identifies infringing content not by URL but by photograph or identification number when they decide whether to "suspend" or "remove" content. See **Ex. 15** at 177:5-180:6. Indeed, Shutterstock's own documents reflect that when the Infringing Copy was allegedly deleted from Shutterstock's public server on September 20, 2021, the "photo" was "deleted":

| Ex. 14 – Shutterstock's Review of the Infringing Copy | | |
|---|---|---|
| 2021-09-20 16:09:00 | deletion | submitter deleted photo |

**Ex. 14.** As seen above, there is no reference to any "URL" relevant to the deletion.

Shutterstock had the ability to conduct a search for the Infringing Copy and its identification number across its entire platform, but when it did so it removed only one of the four copies that it had published on four sites and continued to display the Infringing Copy on three of those sites. And when Shutterstock finally decided to "remove" the Infringing Copy, well after receiving notice, it used this internal platform to do so. Id.

Indeed, Steinmetz's takedown notice provided Shutterstock with sufficient information to locate all of its uses of the Infringing Copy, which Shutterstock itself created and displayed at other URLs and through its third-party partners. Shutterstock asserts that under *Viacom*, it had no obligation to remove the Subject Photograph from URLs that were not identified in Steinmetz's notice, but its argument is unavailing. Although the court in *Viacom* did not require an infringer

to locate additional copyrighted works which had been infringed, courts have nevertheless held that a party given notice of infringement is obligated to remove infringements when such notice, like Steinmetz's notice, provides sufficient information to locate copies of the infringements on the defendant's platform. *See Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 642–43 (S.D.N.Y. 2011), on reconsideration in part, 2013 WL 1987225 (S.D.N.Y. May 14, 2013). In *Capitol Records*, the court held that the defendant was obligated to search for and remove infringing copies of the work at issue when the defendant kept track of "the source and web address" for the songs on their platform. Here, Shutterstock was not only aware of the source of the Infringing Copy on its platform, but also of its unique identifier for the Infringing Copy. It also had access to an internal platform that allowed it to remove all copies of the Infringing Copy and prevent the display of additional infringing copies across multiple URLs and through its third-party partners. Burroughs Decl. ¶¶5-6, 9; **Exs. 8-12**, **Ex. 15** at 43:17-23; 163:18-23;  178:17-179:17. Shutterstock also maintains detailed accounts of the submission activity of its contributors which include histories of each of the images uploaded and displayed on its platform. **Exs. 14, 23**. Accordingly, Steinmetz provided Shutterstock sufficient notice to allow the location and deletion of all copies of the Infringing Copy. Shutterstock failed to discharge this obligation until well after this case was filed.

> **c.**      **Shutterstock financially benefitted from, and had the right and ability to control, the infringement**

Shutterstock also cannot claim the safe harbor because it "receive[d] a financial benefit directly attributable to the infringing activity," and had "the right and ability to control such activity[.]" 17 U.S.C. § 512(c)(1). A service provider is "eligible for the § 512(c) safe harbor only if it 'does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'" *Venus*

*Fashions, Inc. v. ContextLogic, Inc.*, 2017 WL 2901695, at *28 (M.D. Fla. Jan. 17, 2017), citing *UMG Recordings, Inc.*, 718 F.3d at 1026, quoting 17 U.S.C. § 512(c)(1)(B).

Shutterstock's claim that it "received no 'financial benefit directly attributable to the infringing activity'" is patently false. An "obvious and direct financial interest ... may be established where infringing material acts as a 'draw' to attract subscribers to a defendant's business, even if it is not the primary, or even a significant draw." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016). Shutterstock's photography portfolio, which included the Infringing Copy, is the primary "draw" for Shutterstock subscribers and licensees. And the "majority of [Shutterstock's] revenue is earned from the license of digital content."[38] **Ex. 32** at 50. Shutterstock offered the Infringing Copy, and the photographs at issue in the numerous other infringement cases against Shutterstock, to prospective licensees and customers as part of this business practice and drew customers as a result.

Notably, a "profit need not be realized to satisfy the standard for financial benefit,"[39] and conduct that "increases a defendant's user base or otherwise acts as a draw for customers constitutes a direct financial interest." *Arista Recs., Inc. v. Mp3Board, Inc*., 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002). And for infringers "who **charge for their services**," […] there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1044 (9th Cir. 2013)("*Fung*")(emphasis added). Shutterstock markets its photography portfolio to the public to increase its user base and draw customers. And Shutterstock "charges for its services," selling licenses and subscription

---

[38] See https://investor.shutterstock.com/static-files/d4f871ab-0ecd-4970-9bb1-b1dafb4bcb32, pg. 50 (last visited September 14, 2022).
[39] *Capitol Recs., Inc. v. MP3tunes, LLC*, 48 F. Supp. 3d 703, 712 (S.D.N.Y. 2014), aff'd in part, rev'd in part and remanded sub nom. EMI Christian Music Grp., Inc. v. MP3tunes, LLC

packages for the photography, inclusive of the Infringing Copy, thus making clear that it receives a financial benefit directly attributable to its use of the photography. Id.[40]

Shutterstock also "directly profits from its use of the infringing Images by contracting with third party providers such as [TinEye, HelloRF, and StockFresh], and by reproducing the allegedly infringing Images in its own promotional materials in an effort to draw customers to its website and 'app.'" *Venus Fashions, Inc. v. ContextLogic, Inc.*, 2017 WL 2901695, at *28 (M.D. Fla. Jan. 17, 2017),  citing *Fung* at 1045 (9th Cir. 2013); see also **Ex. 29** at 50 (Shutterstock "also license[s] content to customers through third-party resellers. Third-party resellers sell [Shutterstock's] products directly to customers as the principal in those transactions."). This "disqualifies [Shutterstock] from asserting the § 512(c) safe harbor defense." Id.

Shutterstock also had the "right and ability" to control the infringing activity. A company has the "right and ability to control infringing activity" where it "t[ells] its users what to upload ... or curate[s] uploaded content in any meaningful way[.]" *Kinsley*, 2021 WL 1222489, at *4, quoting *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 613 (9th Cir. 2018).[41] Shutterstock does both – it "has control in establishing the product's price, performs a detailed review of the digital imagery before accepting it into its collection to ensure it is of high quality before it may be purchased by customers, can reject contributors' images in its sole discretion, and has credit risk."[42] **Ex. 32** at 50. Shutterstock directs its users as to what to upload and heavily curates the material that is uploaded before it is displayed and offered for licensure, rejecting

---

[40] *See also Agence* at 567 (stating that those entities which qualified for safe harbor protections were those "doing something useful…rather than itself selling or licensing copyrighted material").

[41] Shutterstock's own cited authority concedes that the right and ability to control takes "the form of prescreening content, rendering extensive advice to users regarding content, and editing user content[.]" *Wolk*, 840 F. Supp. 2d at 748.

[42] See https://investor.shutterstock.com/static-files/d4f871ab-0ecd-4970-9bb1-b1dafb4bcb32 at pg. 50 (last visited September 14, 2022).

over half of the submitted photographs. As reflected in Shutterstock's various guidelines, Shutterstock reviews, accepts, and rejects contributor content after an extensive review based on several factors, such as subject matter, lighting, exposure, and aesthetics. And as previously highlighted, Shutterstock has rendered extensive advice to users regarding content. Finally, Shutterstock spends much of its time curating the content it licenses. See **Exs. 15** at 49:17-50:13; 107:5-108:10, **30** at 77.

So owing, Shutterstock has the "unfettered ability to control access to" the photographs on its site, and its employees are heavily involved in the review process, each of which establishes volition and precludes the safe harbor. *Arista Recs. LLC v. Usenet.com, Inc*., 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009)(citation omitted) ("*Usenet*"); see also  *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) ("courts have repeatedly held that the automated conduct of software, **unaided by human intervention**, is not 'volitional'")(emphasis added). Shutterstock asserts that it uses an "automated process" that "simply rejects [materials] that contain obvious problems," but these assertions are demonstrably false per the above.

Right-and-ability also exists here because Shutterstock had the "ability to remove the Photos–at–Issue from its system." *Agence* at 575; see also *Usenet* at 157. Indeed, a defendant need not have "formal power to control" where a user "depend[s] upon [the defendant] for direction." *Arista* at 157, citing *Gershwin*, 443 F.2d at 1163. That is the case here – Shutterstock provides the entirety of the direction when it comes to approving photographs for prospective licensing and displaying and removing those works. **Ex. 15**, 107:5-108:10. The discretion is total, and its ability to block users "for any reason whatsoever is evidence of the right and ability to supervise." Id. (citation omitted).

Here, as in *Arista*, the evidence is "undisputed that Defendant[] expressly reserve[d] the right, in [its] sole discretion, to terminate, suspend or restrict users' subscriptions, thereby

limiting their access to uploading or downloading content to or from Defendant[]'[s] servers." Id. Shutterstock has complete control over both the review and approval of its contributors and the review, approval, display, and removal of the photography to its public site. It did not just have the "right and ability" to control its exploitation of the Infringing Copy, it had the **sole**, unfettered right to do so.  The safe harbor is unavailable.

### d.     Shutterstock failed to properly designate a DMCA agent

Shutterstock "has the burden of proving that it properly designated a copyright agent and that it responded to notifications as required." *Disney Enterprises, Inc.*, 2013 WL 6336286, at *26, citing *Perfect 10, Inc.*, 2009 WL 1334364, at *8. Lack of a registered designated agent to receive copyright infringement notices disqualifies the service provider from using the safe harbor shield. *BWP Media USA, Inc. v. Hollywood Fan Sites LLC*, 115 F. Supp. 3d at 402. Moreover, a service provider does not "retroactively" qualify for the safe harbor defense for copyright infringement that occurred prior to registering a designated agent. Id. at 400. Shutterstock admitted that it does **not** have a DMCA agent. **Ex. 15** at 84:12-85:7; 85:13-16; see also **Ex. F**, p. 3 (from October 9, 2020 to present, Shutterstock has failed to identify an individual as their designated agent).

### B.     Shutterstock's volitional conduct also precludes a safe harbor defense

Shutterstock's conduct was volitional. As noted above, and as it concedes, Shutterstock actively directs its contributors in their submission of photography, reviews that photography in great detail for numerous sets of criteria, approves every photograph it displays on its site, hosts copies of that photography, and offers that photography for license. See, e.g., **Ex. 31** (Shutterstock concedes that it reviews and approves the content displayed on its site). This constitutes volitional conduct, for the reasons discussed above, and as follows.

The "word 'volition' in [the copyright] context does not really mean an 'act of willing or choosing' or 'an act of deciding,'" but merely "the unremarkable proposition that proximate causation historically underlies copyright infringement liability no less than other torts." *Bell v. Wilmott Storage Serves., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021), citing *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657, 666 (9th Cir. 2017), quoting 4 Nimmer on Copyright § 13.08[C][1]). To be sure, copyright infringement is a strict liability tort. See 3 Patry on Copyright § 9:5; 4 Nimmer on Copyright § 13.08[B][1] (explaining that "the innocent intent of the defendant constitutes no defense to liability"). Thus, one who "exercised control" or "selected any material for upload, download, transmission, or storage" has acted volitionally. Id, citing *VHT, Inc. v. Zillow Grp., Inc*., 918 F.3d 723, 732 (9th Cir. 2019), quoting *Giganews*, 847 F.3d at 670. And those who directly display or distribute infringing works have committed a volitional act.  See *Am. Broad. Cos. v. Aereo, Inc*., 573 U.S. 431, 438–39, 134 S.Ct. 2498(2014) (defendants that transmit infringing material, as opposed to just providing the means of connection, are liable for infringement).

To demonstrate volitional conduct, Steinmetz must simply "provide some evidence showing [that] the alleged infringer exercised control (other than by general operation of its website); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution" of copyrighted content. *VHT, Inc.,* 918 F.3d at 732. Shutterstock selected and approved the Infringing Copy for upload; copied and stored the Infringing Copy on its server and at least four of its URLs; and distributed the Infringing Copy to its customers and the public. And a Shutterstock employee "confirms on a computer screen that the image will not appear blurry" or otherwise offend Shutterstock's particular aesthetics before an image will be displayed on the site. *Sid Avery & Assocs., Inc. v. Pixels.com, LL*C, 2020 WL 6114918 at 866 (C.D. Cal. Aug. 18, 2020). In "other words, an individual employee reviews

every image for every order [and this] human touch" establishes that Shutterstock's distribution of the images to the public is not "automatic." Id., cf. *Wolk*, 840 F. Supp. 2d at 742 (finding no volition because use of work was via "**an automated process with no human intervention** by any employee of the Kodak Defendants")(emphasis added). This is textbook volition.

Shutterstock's hosting of the Steinmetz "photo on its servers in a manner that was accessible to the public" is also sufficient to establish volitional conduct, even if the public could not access the image without the relevant URLs and Shutterstock did not know that the content was infringing. *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1081 (9th Cir. 2021). Shutterstock's website does "not merely function as an online platform where third-party users independently upload and share materials," but is instead a tightly controlled marketplace where Shutterstock reviews, approves, hosts, and makes public every work on its site. Id., citing *Giganew*s, 847 F.3d at 666, cf. *VHT*, 918 F.3d at 734. There is no question that Shutterstock's control and operation of its site and server are clearly "the most important cause[s]" of the public display of the Infringing Copy and its conduct is thus "plainly volitional for purposes of copyright infringement." Id. at 1081-1082, citing *Giganews*, 847 F.3d at 666 (citation omitted).

Shutterstock's "safe harbor" argument fails for the multiple reasons set forth above.

## C.    Shutterstock's commercial exploitation of the Subject Photograph was not "fair use"

"Fair use is an affirmative defense," so Shutterstock "bears the burden of proving it." *Fox News Network, LLC v. Tveyes, Inc*., 883 F.3d 169, 176 (2d Cir. 2018)("*Tveyes*"), citing *Am. Geophysical Union v. Texaco, Inc*., 60 F.3d 913, 918 (2d Cir. 1994). And Steinmetz "is entitled to the view of the evidence most favorable to [him] with respect [to the infringer's] contention that [their use] is transformative, as it is on all other aspects of that defense." *Tveyes*, fn. 38, citing *FDIC v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) ("whatever evidence there is to support

an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant") (emphasis in original, remaining citation omitted). But Shutterstock has proffered **no** evidence that its exploitation of the Infringing Copy was fair.

Shutterstock thus cannot establish that its approval, copying, distribution, modification, and commercialization of the Subject Photograph should be adjudged "fair." Indeed, "a judicial determination that [a defendant]'s inclusion of [a plaintiff's] [i]mage on its website was fair use would promote wholesale circumvention of copyright law." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d at 406. When, as here, a commercial entity proffers a groundless fair-use defense, courts have routinely rejected same at the summary judgment stage. See, e.g., *Valuewalk, LLC* at 509.(granting motion, finding "no reasonable trier of fact could find in favor of the Defendants on the issue of fair use."); *Otto v. Hearst Commc'ns, Inc*., 345 F. Supp. 3d 412, 433 (S.D.N.Y. 2018)(same).

Four nonexclusive factors inform the "fair use" analysis: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. All favor Steinmetz.

1.      **The "purpose and character" of the use militates against a finding of fair use**

The first factor in determining fair use is the purpose and character of the use. In evaluating the purpose and character of an allegedly infringing use, courts consider three sub-factors: (i) whether the use was transformative, (ii) whether it was commercial in nature, and (iii) whether the defendant acted in bad faith. *McGucken v. Newsweek LLC*, 2022 WL 836786, at *10 (S.D.N.Y. Mar. 21, 2022)("*Newsweek*"). These subfactors favor Steinmetz.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

a.     **Shutterstock used the Subject Photograph for the same purpose as Steinmetz
and failed to transform the disputed image in any way**

In analyzing the purpose and character of the use, "the primary inquiry is whether the use
'communicates something new and different from the original or [otherwise] expands its utility,'
that is, whether the use is 'transformative.'" *Tveyes* at 176, quoting *Authors Guild v. Google,
Inc.*, 804 F.3d 202, 214 (2d Cir. 2015). In reviewing for transformation, however, even
secondary works that add "new expression, meaning, or message" should not be declared fair use
as that would risk "crowding out statutory protections for derivative works." *Andy Warhol
Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 111 (2d Cir. 2021), *citing Kienitz v.
Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) ("To say that a new use transforms the
work is precisely to say that it is derivative and thus, one might suppose, protected under [17
U.S.C.] § 106(2).").

Here, Steinmetz created the Subject Photograph so that he could display it and offer to
license it to his customers. And, indeed, he licensed the Subject Photograph to *National
Geographic* and others. **Exs. 5, 28**. Shutterstock likewise displayed and offered to license the
Infringing Copy to its customers. This establishes that Shutterstock's use was not fair because
"[u]sing a photo for the precise reason it was created does not support a finding that the nature
and purpose of the use was fair." *BWP Media USA, Inc.* at 407. Because Shutterstock used the
Subject Photograph for the same purpose as Steinmetz and did not add anything new or different
to the work, there was no transformation.

Shutterstock simply displayed the Infringing Copy on its website to draw paying
customers and "the use of an image solely to present the content of that image…is not
transformative." *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 534 (S.D.N.Y. 2018)
(citations omitted); s*ee also Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339,

- 37 -

352 (S.D.N.Y. 2017) (work not transformative where images are used simply as "illustrative aids" depicting a subject). Here, Shutterstock exploited Steinmetz's photography without his consent, reproduced the work in full and additional formats on its website, distributed the work to third parties, and offered it to its own customers. The use was not fair.

And contrary to Shutterstock's assertions, its display of the Infringing Copy was not transformative. It is not transformative when the infringing user "makes no change in the copyrighted work" and "provides neither criticism, commentary, nor information about it" and does not "deliver the content in more convenient and usable form to one who has acquired an entitlement to receive the content." *Capitol Recs., LLC v. ReDigi Inc*., 910 F.3d 649, 661 (2d Cir. 2018)("*ReDigi*"). Shutterstock made no changes to the Infringing Copy aside from adding its watermark, and provided no criticism, commentary, and information about the Infringing Copy (in contrast to the *National Geographic* article, which adroitly comments on Steinmetz's work).

Shutterstock contends that its use of "a low-resolution, watermarked copy and thumbnails of the Contributor Image" was transformative in that its purpose was "to facilitate searching" and that "the thumbnails are kept for informational, recordkeeping, and matching purposes, whereas Plaintiff's Image is ordinarily used to illustrate the rainforest." Dkt. #51, p. 17. This is demonstrably false and no evidence supports the claim. See Ex. 4, 9, 10 (Shutterstock's full-size, high resolution uses). Indeed, Shutterstock offers its photographs in "large" or even "custom" sizes and emphasizes that the quality meets the industry standard for print use and greatly exceeds the industry standard for use of photography online.[43] It offered the Infringing Copy in a "[l]arge" size and at "300 DPI," which is professional resolution–not a "thumbnail" or "low resolution," as Shutterstock claims. **Ex. 4**. In actuality, Shutterstock created and publicly

---

[43] See https://support.shutterstock.com/s/article/Images-resolution-DPI-and-sizes?language=en_US

displayed multiple unauthorized copies of the Infringing Copy in full-size and resolution at multiple URLs for the purpose of licensing the photograph, just as Steinmetz offers his photograph for licensing to the public. **Exs. 4, 5, 9, 10.** And Shutterstock's licenses authorize its customers to then use its photography in news, entertainment, or general interest stories (which would compete with *National Geographic* and Steinmetz's other licensees), on merchandise, and as a substitute for Steinmetz's work. See **Exs. 18, 28**. The secondary use is not transformative.

Shutterstock relies on *Magnum Photos Int'l v. Houk Gallery Inc.*, 2018 WL 4538902 (S.D.N.Y. Sept. 21, 2018) but that case is readily distinguishable. In *Magnum Photos*, the defendant was not a licensing company but an art gallery, and the court held that the gallery had "lawful rights to ultimately sell the [i]mages [at issue], and only posted thumbnail copies of those images to point to the availability of the Images for viewing and/or purchase and not sell the thumbnail copies." Id., at *3 (S.D.N.Y. Sept. 21, 2018). In light of this authorization, the court held that the gallery's use of thumbnails to illustrate the works for sale was transformative because "the Gallery used the Images in a different manner and for a different purpose than that of the original Cartier-Bresson photographs: to identify the photographs online to viewers interested in the fine art photography market." Id.

In contrast, Shutterstock did **not** have a license to use the Subject Photograph at all. This alone distinguishes the case. And Shutterstock displayed, marketed, and offered for licensing the Infringing Copy in full-size, high-resolution, and multiple formats, not just thumbnails. See **Exs. 4, 8-10**. And Shutterstock was not using the "thumbnails" to advertise a lawful sale, it was selling licenses and subscriptions for full-size copies of the photography. The case is inapposite.

Shutterstock also admits that it (a) made no modifications to the Subject Photograph other than adding its watermark (in violation of Section 1202, as discussed, *infra*); (b) did not criticize or comment on the work; (c) or prove that its infringement was in any way beneficial to

the public. In sum, Shutterstock provides "a market for the resale of [photography], which resales compete with sales of the same [photographs] by the rights holder[,]" all of which disfavors transformative use. *ReDigi* at 661 (2d Cir. 2018).

The decision in *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014), in which "the panel authorized Defendant's display of low-resolution, watermarked copies of the Copyrighted Works on its website under the fair-use doctrine," also supports a finding that Shutterstock's infringement is not fair use. Notably, *Authors Guild* does not address the infringer's use of the watermarked images alleged in the complaint; it merely approves of an Internet search engine's display of "low-resolution versions of copyrighted images in order to direct the user to the website where the original [can] be found." *Alamy* at 139, citing *Authors Guild, Inc* 755 F.3d at 95. Shutterstock is not a search engine and does not offer low-resolution images and does not direct users to other websites.

Moreover, the court "constrained its fair-use holding in *Authors Guild* in an important way, stating that even if a particular use of the copyrighted work could fall under the fair-use doctrine, that use 'must not excessively damage the market for the original by providing the public with a substitute for that original work.'" Id., citing id. This "market competition damage is precisely what Plaintiff complain[ed] of" in that case and what Steinmetz complains of here. Id. Accordingly, "even if the placement of watermarks on low-resolution copies of the Copyrighted Works could, under some circumstances, constitute a fair use, *Authors Guild* does not shield" Shutterstock, who offered the Infringing Copy to licensees, from liability. Id.

*Tveyes* is instructive. The infringer there was "a for-profit media company" that offered a service allowing "its clients to efficiently sort through vast quantities of" of content to locate content of interest to them. *Tveyes,* 883 F.3d at 174. The facts at issue in that case were actually **more** favorable to the infringer in that case because its clients were required to "sign a contract

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

that limits their use of clips to 'internal purposes only' and were] warned upon downloading a clip that it is to be used for only 'internal review, analysis or research.'" Id. at 175. Here, Shutterstock licenses verbatim copies of photographs to its clients to be used in numerous contexts – external or internal and commercial – and allows downloading for a wide range of external purposes. Indeed, Shutterstock "does little if anything to change the content itself or the purpose for which the content is used[.]" *Tveyes* at 181. Like the Infringer in *Tveyes*, Shutterstock simply offered Steinmetz's photograph "unchanged (one might say untransformed) on cracked ice for the inspection of its patrons." *Id.* at 184. This favors Steinmetz.

b.      **Shutterstock's bad faith weighs against the first factor**

Shutterstock's bad faith must also be considered in analyzing the first factor. Courts have held that "the propriety of the alleged infringer's conduct is relevant to a determination of the character of the subsequent use." *Robinson v. Random House, Inc.*, 877 F. Supp. 830, 841 (S.D.N.Y. 1995), modified, 1995 WL 502525 (S.D.N.Y. Mar. 26, 1995). Courts also consider a defendant's experience in an industry in their analysis of bad faith. See *Fitzgerald Pub. Co.,* 807 F.2d at 1115 (finding that simply being an experienced publisher provides constructive notice of one's own willful copyright infringement). The evidence establishes that Shutterstock acted willfully and in bad faith, as set forth at length in Steinmetz's Motion for Summary Judgment. This sub-factor also weighs against Shutterstock.

c.      **Shutterstock's commercial use weighs against "fair use"**

Shutterstock profited from its infringement of the Subject Photograph, and its unauthorized exploitation of Steinmetz's proprietary artwork was a commercial use. Commercial use is a "factor that tends to weigh against a finding of fair use" because "the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc.* at 562. The Supreme Court has held that "every commercial use of

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

copyrighted material is **presumptively** an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of Am. v. Universal City Studios*, Inc., 464 U.S. 417, 451, 104 S. Ct. 774, 793 (1984)(emphasis added). To determine commercial use, courts consider "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc.* at 562. In analyzing whether the purpose of the infringing work was "profit," "monetary gain is not the sole criterion ... particularly in [a] ... setting [where] profit is ill-measured in dollars." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) (alteration in original), quoting *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir.1989) (professor's verbatim copying of an academic work was not fair use, in part because a professor can "profit" by gaining recognition among his peers and authorship credit). Here, Shutterstock exploited the Infringing Copy on its site to build its portfolio of "high-quality" photography and draw customers and sell licenses and packages. It also exploited the Subject Photograph on third-party sites to advertise Shutterstock's products and services. Shutterstock is simply not "entitled to monetize" Steinmetz's photograph without paying him the "'customary price' for the rights to h[is] work[.]'" *Warhol*, 992 F.3d at 117.

### 2. The creative nature of the Subject Photograph favors Steinmetz

The second factor, the nature of the Subject Photograph, favors Steinmetz as well. The inherent creativity of photography is sufficiently to tip this fair use factor weigh in favor of photographer-plaintiffs. *Baraban v. Time Warner, Inc.*, 2000 WL 358375, at *4 (S.D.N.Y. Apr. 6, 2000). Indeed, "photographs are 'generally viewed as creative aesthetic expressions of a scene or image' and have long received thick copyright protection[,] ... even though photographs capture images of reality." *Warhol*, 992 at 124 (citations omitted). Here, Steinmetz invested significant financial and creative resources traveling to the remote area of the Amazon, including

20 hours of flying and chartering a small plane with special equipment that would allow Steinmetz to fly without a door, which was necessary for him to be able to capture the Subject Photograph. Steinmetz Decl. ¶ 11, **Ex. 34**, 32:21-33:6, 34:21-36:17. He also made many artistic decisions, including composition, angles, choice of lens, lighting, and setting, to create the Subject Photograph. And "[a]lthough they document a real event, [plaintiff]'s photos are creative because they were the product of many technical and artistic decisions." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1161 (9th Cir. 2022) ("*Pub Ocean*").

Shutterstock's cited authority is distinguishable. Shutterstock argues the Subject Photograph was published before the alleged infringement, which somehow makes the image less creative under both *Kelly* and *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992). But, "[w]hile [plaintiff]'s photos had been published on Instagram and in online articles, that does not weigh in favor of fair use." *Pub Ocean* at 1161, citing *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 456 (9th Cir. 2020), cert. denied, 210 L. Ed. 2d 933, 141 S. Ct. 2803 (2021)("*Seuss*") (explaining that, while a work's unpublished status would weigh against fair use, "the converse is not necessarily true"). The fact that a work is published does not weigh in favor of fair use. *Seuss* at 456. Shutterstock's reliance on *Bill Graham* and *Yang* similarly fails. Both cases found that the transformative use of a creative photo, among other factors, could be considered fair, but Shutterstock's use was not transformative. This factor favors Steinmetz.

### 3.    Shutterstock displayed the majority of the Subject Photograph

The amount and substantiality of the portion used militates against fair use because Shutterstock used virtually the entirety of the Subject Photograph. It is settled that "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir.1998). Shutterstock copied and exploited almost the entire Subject Photograph and in multiple forms and "a finding of fair use is [less] likely ... when the

copying is extensive, or encompasses the most important parts of the original." *Tveyes* at 179. While the Infringing Copy is slightly cropped, its substance is identical to the Subject Photograph, and the overall aesthetics remain virtually the same.

Shutterstock argues that "copying [the entire work] does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006). But its own cited authority held that "[n]either [the Second Circuit] nor any of our sister circuits has ever ruled that the copying of an entire work **favors** fair use." *Id.* (emphasis in original).

Here, Shutterstock has exploited the Subject Photograph in a slightly cropped format without anything new added. When an infringer uses "the photo in its entirety without substantial changes to the purpose of using the photo, the third factor weighs against a finding of fair use." *Michael Grecco Prods., Inc.*, 345 F. Supp. 3d at 508. While Shutterstock maintains that it "displayed only a small portion of Plaintiff's Image, and did so in the form of lower-quality and often small thumbnail versions," as noted above, this is false and unsupported by any evidence. And while Shutterstock claims that it "reasonably needed to display as much as it did in order to accomplish its transformative purpose of correctly identifying the Contributor Image[,]" it in reality exploited the full photograph in high resolution and in multiple formats for the purpose of displaying, licensing, selling it to prospective customers.

Shutterstock's reliance on *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87 (2d Cir. 2014) is misguided. There, the court found that the  digitalization of copyrighted works to permit full-text searching of works was fair. In analyzing the third factor, the court held that "[t]he extent of permissible copying varies with the purpose and character of the use." Id. at 98, citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586–87, 114 S.Ct. 1164.  Here, Shutterstock offered the

Infringing Copy for precisely the same purposes as Steinmetz and, as discussed above, the Infringing Copy was not transformative. This factor also favors Steinmetz.

4.    **Shutterstock cannot establish that its infringement did not result in market harm or would not result in market harm if allowed to become widespread**

Shutterstock cannot carry its burden of proving that its commercial use of Steinmetz's Subject Photograph did not harm the market for Steinmetz's work, and the market for photography licensing in general, as is required. *Warhol*, 992 F.3d at 121 ("the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user"). Shutterstock proffers **no** evidence in this regard and instead tries to improperly shift the burden to Steinmetz by relying wholly on unsubstantiated and demonstrably false assertions and conjecture. This is fatal because Shutterstock, "as the proponent of the affirmative defense of fair use, 'must bring forward favorable evidence about relevant markets.'" *Pub Ocean* at 1163, quoting *Seuss* at 459. And the defense fails if the infringer fails to discharge its burden of "showing that his use does not" usurp the market for the primary work. *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998). No such evidence was produced, or could possibly exist, given the obvious damage that would be caused if Shutterstock's practice of licensing of artist content without their consent was declared "fair use."

Shutterstock's burden cannot be discharged here given that the Court **presumes** market harm "when a commercial use amounts to mere duplication of the entirety of an original[,]" and Shutterstock exploited a "mere duplication" of the Subject Photograph on its commercial website and third-party sites to market and sell licenses for, and subscription packages including, the Infringing Copy. *Sands v. What's Trending, Inc.*,  2021 WL 694382, at *4 (S.D.N.Y. Feb. 23, 2021), quoting *Campbell*, 510 U.S. at 591, 114 S. Ct. 1164, 1177 (1994)(remaining citations

omitted); see also *Newsweek* at 609. Shutterstock, by offering Steinmetz's photography to Shutterstock clients, as part of paid packages and licenses, without payment to Steinmetz, is in "effect depriving [Steinmetz] of licensing revenues from [Shutterstock] or from similar entities." *Tveyes* at 180. Shutterstock's exploitation of the Subject Photograph "was both commercial and a mere duplication of the original, as opposed to constituting a transformative use[,]" and, as such, the "presumption" of market harm applies. *Newsweek* at 609.

Even without the benefit of the presumption, market harm is obvious here. The primary consideration of this element is "whether the copy brings to the marketplace a competing substitute for the original ... so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Tveyes* at 179. This analysis addresses both the "market harm caused by the particular actions of the alleged infringer" **and** the "market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" Id. (citation omitted). The potential market effect of allowing Shutterstock's business model to be labeled a "fair use" is crucial here, as that consideration is "undoubtedly the single most **important** element of fair use." *Harper & Row Publishers, Inc.* at 566 (emphasis added).

Moreover, "in assessing harm posed to a licensing market, a court's focus is not on possible lost licensing fees" related solely to a defendant's infringing use, but instead looks at "the challenged use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 186 (2d Cir. 2016) (citations and quotations omitted); see also *Warhol*, 992 F.3d at 121 ("we must also consider whether unrestricted and widespread conduct of the sort engaged in by [alleged infringer] would result in a substantially adverse impact on the potential market for the [] Photograph.") (quotations and citations omitted).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Shutterstock offered for license the Infringing Copy, which was an obvious "competing substitute" for license for the Subject Photograph. And if Shutterstock and others were allowed to freely license photographers, illustrators, animators, and other artists' work without their consent, the licensing markets, existing and potential, would be destroyed. Shutterstock, for its part, concedes that the "majority of [its] revenue is earned from the license of digital content." Burroughs Decl. ¶25, **Ex. 32** at 50.[44] Steinmetz and other photographers earn the majority of their revenue in the exact same way – by licensing their work to clients.

While Steinmetz does not bear the burden of establishing harm to the relevant markets, the harm is obvious. The relevant market is that for licensing quality photography. Given that "there is no material dispute that both [Steinmetz and Shutterstock] have sought to license (and indeed have successfully licensed) their respective" photographs, this is established. *Warhol,* 11 F.4th at 49. And both photographs depict the same subject matter (indeed, Shutterstock's is a mere duplication) and were offered to the same customer base, customers looking to license quality photography, which is sufficient to establish market harm. *Id.* ("both [works] are illustrations of the same famous musician with the same overlapping customer base. Contrary to [the infringer's] assertions, that is more than enough.")(internal citation omitted); *see also* Steinmetz Decl. ¶10.

Specifically, Steinmetz offers his photographs for licensing to news, entertainment, and general interest websites, publications, and media outlets. Steinmetz Decl. ¶10 Indeed, Steinmetz licensed the Subject Photograph to *National Geographic* and others. Steinmetz Decl. ¶9, **Ex. 28**. Shutterstock likewise licenses its photographs to news, entertainment, and general interest websites, publications, and media outlets. Steinmetz Decl. ¶10. And photographers like

---

[44] See also https://investor.shutterstock.com/static-files/d4f871ab-0ecd-4970-9bb1-b1dafb4bcb32, pg. 50 (last visited September 14, 2022).

Steinmetz earn their livelihood licensing photographs to clients – this livelihood would be destroyed if Shutterstock and companies like it could openly license artists' work without artists' consent. Id.

It is self-evident that "[p]ublishing [a] Photograph without permission essentially destroys the primary market for its use." *Otto*, 345 F. Supp. 3d at 432. Indeed, "if this Court were to deem Defendant's use to be fair, it would allow other companies to do the same, effectively destroying Plaintiff's business and the freelance photography market, as a whole." *Sands v. What's Trending, Inc*., 2021 WL 694382, at *4 (S.D.N.Y. Feb. 23, 2021). And on a larger scale, permitting Shutterstock to freely license artists' work without artists' consent "would effectively destroy that broader market, as, if artists 'could use such images for free, there would be little or no reason to pay for [them].'" *Warhol*, 11 F.4th 26, 50 (2d Cir. 2021), cert. granted, 212 L. Ed. 2d 402, 142 S. Ct. 1412 (2022), quoting *Barcroft Media, Ltd. v. Coed Media Grp.*, LLC, 297 F. Supp. 3d 339, 355 (S.D.N.Y. 2017); see also *Seuss*, 983 F.3d at 461 (holding that the unrestricted and widespread conduct of the sort defendant engaged in could result in anyone being able to produce their own similar derivative works based on plaintiff's work, which is contrary to the goal of copyright). And allowing Shutterstock to freely exploit artists' work without consent "risks disincentivizing artists from producing new work by decreasing its value – the precise evil against which copyright law is designed to guard." Id.

Shutterstock cannot prove that Steinmetz's, and other photographers', ability to further monetize their work or engage in reasonable or "likely to be developed markets" for photography licensing was not prejudiced by Shutterstock's infringement. Shutterstock exploited the Subject Photograph, which Steinmetz had licensed to select media outlets for publication, in the same way that Steinmetz and his licensees used his work. Indeed, "the harm to the market for licensing [Steinmetz's] photos would be immense" if Shutterstock was permitted to license Steinmetz's

photographs, and include them in paid subscription packages, without his consent and at any price Shutterstock saw fit. *Pub Ocean*. There "is no dispute that a market exists to republish" Steinmetz's photographs – indeed, he licensed the Subject Photograph to *National Geographic* and others – and if "carried out in a widespread and unrestricted fashion, [Shutterstock's] conduct would destroy [Steinmetz's] licensing market." Id.

Steinmetz offers to license his photographs and Shutterstock offered to license his photograph – as courts "have recognized, an infringing use would destroy a derivative market when the infringing work is of the same type as existing works by licensed users." Id. Because Shutterstock's exploitation of the Infringing Copy, "if widespread, would destroy the market to license [Steinmetz's] works, the fourth factor weighs against fair use." *Pub Ocean* at 1164.

Finally, the fourth factor analysis also "take[s] into account the public benefits the copying will likely produce." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 50 (2d Cir. 2021), cert. granted, 212 L. Ed. 2d 402, 142 S. Ct. 1412 (2022), citing *Google LLC v Oracle America, Inc.*, 141 S. Ct. at 1206; see also *Wright v. Warner Books, Inc.*, 953 F.2d at 739 ("Analysis of this factor requires us to balance the benefit the public will derive if the use is permitted ....")(internal quotation marks omitted). Here, there is no public benefit because Shutterstock is a for-profit company that requires that its users pay money to Shutterstock in connection with the use of the photography on its site. There was no fair use here.

**D.      Steinmetz has established his claims of secondary copyright infringement against Shutterstock**

Shutterstock is also vicariously and contributorily liable for the infringement of the third parties to which it distributed the Infringing Copy.

**1.      The evidence supports Steinmetz's claim for vicarious infringement against Shutterstock**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Shutterstock is liable for vicarious infringement because it "profit[ed] from direct infringement while declining to exercise a right to stop or limit it." *Hollywood* at 357, citing *In re Cellco*, 663 F.Supp.2d at 370, quoting *Grokster*, 545 U.S. at 930, 125 S.Ct. 2764) (brackets omitted); see also *Softel, Inc. v. Dragon Medical & Sci. Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir.1997). This liability attaches when "the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright monopoly is being impaired." Id., citing *Smith v. Mikki More, LLC*, 21 F.Supp.3d 276, 281 (S.D.N.Y.2014), quoting *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir.2012). And "the vicarious liability standard requires *neither* that a defendant have knowledge of the acts of infringement *nor* that the defendant receive substantial financial benefit from infringement." *Disney Enterprises, Inc. v. Hotfile Corp.*, 2013 WL 6336286, at *39 (S.D. Fla. Sept. 20, 2013)(emphasis added).

Here, Shutterstock asserts that it "had no right or ability to supervise the alleged infringing activity by the Contributor." This is false, as Shutterstock conducts a thorough review of each photograph that is uploaded to its platform. Additionally, Shutterstock had the right and ability to supervise TinEye, HelloRF, and StockFresh's exploitation of the Infringing Copy, because it distributed that copy, partially owns HelloRF, and has partnership agreements with TinEye and StockFresh. Courts interpret the "right and ability" to control "expansively, finding that service providers have the capacity to control the activities of their users simply by virtue of providing the means to commit direct infringement." *Id.*, 2013 WL 6336286, at *40, citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1173 (2d Cir.1971); *Polygram Int'l Publ'g Inc. v. Nevada/TIG, Inc.*, 855 F.Supp. 1314, 1328 (D.Mass.1994) (reviewing case law, quoting the legislative history of the Copyright Act, and concluding that a defendant has "control" if they "either actively operate or supervise the operation of the place

wherein the performances occur, or control the content of the infringing program"). Here, Shutterstock solely controls the actions of its third-party partners in relation to its photography, as well as the users and the content on its site, and "the means of infringement by among other things mandating user registration and hosting the infringing materials on its own servers." *Id.*, 2013 WL 6336286, at *41, citing *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007).

Shutterstock directly distributed the Infringing Copy to its third-party partners, each of which continued to exploit it well into this litigation. Shutterstock could have removed the Infringing Copy from the third-party sites by deleting those sites' link to its API, which distributed the Infringing Copy, or contacting the sites to ensure removal, but it failed to take those steps. Shutterstock certainly had the right to remove content from TinEye, HelloRF, and StockFresh at any time "for any reason," yet it "declin[ed] to exercise" that right. *Hollywood* at 357; **Ex. 15** at 119:21 – 120:4. This renders it secondarily liable.

Shutterstock also had an obvious financial interest – it used and authorized the use of the Infringing Copy on its site and third-party sites to draw traffic to its site and sell licenses and subscription packagers to those viewers. This meets the low threshold, as the "dominant view is that any for-profit enterprise could be found vicariously liable for copyright infringement however remote, unquantifiable, and unidentifiable the benefit it receives from copyright infringement may be." *Disney Enterprises, Inc.,* 2013 WL 6336286, at *39 (citation omitted).

Shutterstock concedes that it is a for-profit company that uses photographs like the Infringing Copy to obtain buyers for paid licenses and packages. **Ex. 15** at 70:25-71:13. This is more than sufficient, as "a direct financial interest arises where the infringing activity is a 'draw' for customers and significant financial benefits 'flow directly' from the infringing activity that the defendant helps to facilitate." *Brittney,* 2021 WL 5359671, at *24 (citation omitted). Here,

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

the Infringing Copy, like the other photographs in Shutterstock's rigorously curated portfolio, was used as a draw for Shutterstock's customers.

Shutterstock also used the Infringing Copy to draw customers from TinEye, HelloRF, and StockFresh. Shutterstock even entered into an advertising agreement with TinEye, under which TinEye displayed alongside the Infringing Copy to market Shutterstock's site and offered 15% off to those who visited the Shutterstock site and bought a subscription to use its photography, including the Infringing Copy. See **Ex. 11**. And Shutterstock offers coupons through StockFresh as well while also authorizing it to display its portfolio. See **Ex. 25**. Shutterstock is vicariously liable for the infringement of its partners.

### 2.    The evidence supports Steinmetz's claim for contributory infringement against Shutterstock

Shutterstock is also liable for contributory infringement, despite its claims that it "merely provid[ed] the means to accomplish an infringing activity." One "who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer[.]" *Arista Recs., LLC v. Doe 3*, 604 F.3d at 117–18 ("*Doe 3*"), citing *Gershwin*, 443 F.2d at 1162. "To establish a claim for contributory copyright infringement, a plaintiff must allege that the defendant with knowledge of the infringing activity, induced, caused, or materially contributed to the infringing conduct of another." *Gershwin*, 443 F.2d at 1162 (internal quotation marks omitted). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know or have reason to know' of the direct infringement." *Doe 3* at 118, quoting *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir.2001) (emphasis omitted).

Shutterstock again relies on *Wolk* to establish that it is not a contributory infringer, but unlike the defendant in *Wolk*, Shutterstock had knowledge of the infringing activity and

substantially participated in the infringing activity. Here, it is undisputed that Shutterstock knew as of April 1, 2021 that its exploitation of the Infringing Copy was infringing. Yet, it failed to advise TinEye, HelloRF, and StockFresh of this infringement until a time after July 14, 2022, and continued to make the Infringing Copy available to them via its API, which resulted in those TinEye and HelloRF displaying the Infringing Copy for over a year after Shutterstock's knowledge of the infringement, and materially contributed to those sites' infringement. Indeed, as discussed *supra*, Shutterstock also took extensive steps in its review of the Infringing Copy before making it available to its third-party partners. Shutterstock is thus contributorily liable.

### E.       Steinmetz has established Shutterstock's Section 1202 violation[45]

There is, at minimum, a genuine issue of material fact, as to whether Shutterstock is liable for violating 17 U.S.C. § 1202. Shutterstock violated 17 U.S.C. § 1202 by adding false copyright management information to the Infringing Copy in the form of a "shutterstock" watermark[46] and making multiple copies of that work. Section 1202(a) of the DMCA makes it unlawful to "knowingly, and with the intent to 'induce, enable, facilitate, or conceal infringement,' either 'provide' or 'distribute' ... false 'copyright management information' or 'CMI.'" *Aaberg v. Francesca's Collections, Inc.*, 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018), quoting 17 U.S.C. § 1202(a). A Section 1202(a) claim exists when "the defendant both knew that the CMI was false, and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement." *Trombetta v. Novocin*, 2020 WL 1304120, at *4 (S.D.N.Y. Mar. 19, 2020) (internal citations and quotation marks omitted). Shutterstock (a)

---

[45] Shutterstock argues that it did not violate Section 1202(b) of the DMCA, even though Steinmetz did not make a specific allegation that Shutterstock violated Section 1202(b) in his complaint. Steinmetz addresses Section 1202(a) in this brief.

[46] Shutterstock also incorporated a watermark with attribution to its contributor "ArunRaJpuT6621" in certain exemplars of the Infringing Copy, as reflected in **Ex. 10**.

"stripped" or removed the metadata from the Infringing Copy; (b) added false CMI, in the form of its corporate watermark[47] to said work to claim it as its own intellectual property[48]; and (c) distributed the false CMI with the intent to "conceal" Steinmetz's authorship and ownership and "enable and facilitate" infringement.[49]

As indicated *supra*, the Subject Photograph contained CMI identifying Steinmetz as its owner. Steinmetz Decl. ¶ 5, **Ex. 2**. And Shutterstock certainly knew, at least as of April 1, 2021, that the CMI on the Infringing Copy was false. Yet it failed to remove the watermarked Infringing Copy from either its own site or the sites of its partners, each of which it knew to be exhibiting the false CMI to the public. This violates this Section. See *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 378 (S.D.N.Y. 2019), aff'd, 970 F.3d 167 (2d Cir. 2020)(holding that "a false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement.").

Shutterstock knowingly added its watermark to the Infringing Copy. An infringer acts "with knowledge and intent in placing watermarks on the Copyrighted Works in order to conceal copyright infringement." *Michael Grecco Prods.*, 372 F. Supp. 3d at, 139. While, in most cases, scienter is more "appropriate for resolution by the trier of fact," here it is beyond dispute that Shutterstock knowingly added its watermark to the Infringing Copy and continued to distribute, and authorize the distribution of, the watermarked Infringing Copy after learning of the

---

[47] The addition of a "watermarked corporate name or symbol may refer to the author or copyright owner when displayed on a copyrighted work in connection with the marketing of that work for sale or license," so "such watermarks do constitute CMI for the purpose of stating a violation of § 1202(a). *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 138 (E.D.N.Y. 2019), citing 17 U.S.C. § 1202(c)(2)–(3), (7).

[48] Shutterstock concedes that it "puts a watermark on every piece of content displayed on its public-facing website in order to prevent third parties from using the content without a license." (Dkt. #51, pg. 21.)

[49] Shutterstock concedes that it added its own corporate watermark to "identif[y] Shutterstock as the source or distributor of the image." (Dkt. #51, pg. 23.)

infringement – this satisfies this requirement. *Id.*, citing *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 693 (2d Cir. 2009)(remaining citation omitted); *see also Shihab v. Complex Media, Inc.*, 2022 WL 3544149, at *4 (S.D.N.Y. Aug. 17, 2022)(scienter is satisfied based on "a defendant's awareness that distributing copyrighted material without wrongful CMI 'will conceal *his own* infringing conduct[.]'") (emphasis in original), citing *Mango*, 970 F.3d at 171. Here, at least as of April 1, 2021, Shutterstock's continued distribution and display of the Infringing Copy facilitated and concealed its infringement and violated Section 1202.

**IV.    Conclusion**

Shutterstock violated Steinmetz's copyrights and fails to establish any defense that would allow it to evade liability for its infringement. Its motion for summary adjudication makes clear that it failed even to review its own deposition testimony, public statements, and government records before filing, as its proffered arguments are readily rebutted by these materials. And while the two asserted defenses each comprise multi-factor tests, each factor of both tests favors Steinmetz.  This motion should be denied in its entirety and Steinmetz's motion should be granted.

Respectfully submitted,

Dated: September 16, 2022          By:     */s/ Scott Alan Burroughs*
New York, New York                         Scott Alan Burroughs, Esq.
                                           Laura M. Zaharia, Esq.
                                           DONIGER / BURROUGHS
                                           247 Water Street, First Floor
                                           New York, New York 10038
                                           scott@donigerlawfirm.com
                                           (310) 590-1820
                                           Attorneys for Plaintiff
                                           GEORGE STEINMETZ