UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE STEINMETZ,

           Plaintiff,

-against-

SHUTTERSTOCK, INC.,

           Defendant.

Case No. 1:21-cv-7100 (AKH)

## DECLARATION OF ARTUR ZAMBROWSKI

ARTUR ZAMBROWSKI declares as follows:

1. I am employed by defendant Shutterstock, Inc. ("Shutterstock") as an Intellectual Property Agent. I submit this declaration in support of Shutterstock's Opposition to plaintiff George Steinmetz's ("Plaintiff") Motion for Summary Judgment. The statements made below are true and accurate based on my own personal knowledge, including knowledge I gained as a result of my preparation to serve as Shutterstock's corporate witness at a deposition in this case.

2. To avoid duplication, I incorporate the statements that I made in my prior Declaration in Support of Shutterstock's Motion for Summary Judgment, dated September 2, 2022 (Dkt. No. 54) (referred to herein as my "Prior Declaration"), as if fully set forth herein.

**A.    Shutterstock's Contributor Platform**

3. As discussed in detail in my Prior Declaration (at ¶¶ 2-6), Shutterstock operates a "contributor platform" through which third-party users (*i.e.*, contributors) may upload and offer their content to the public, who may choose from Shutterstock's various licensing models (*e.g.*, standard per-image license, subscription license).

4. Shutterstock does not select, modify, supervise, curate, control, or play any major role in the images uploaded by contributors. The contributors decide what content to upload and fully direct what is uploaded. Shutterstock only determines whether the content uploaded at the direction of the user may violate Shutterstock's standards, which would result in a rejection of the user's uploaded content.

5. All of the content on the contributor platform is supplied by contributors, and is owned either by the contributor or by another third party who the contributor represents granted them the necessary permissions. Shutterstock generally does not own the copyrights in the content that is offered for license through its contributor platform. This is reflected in the Contributor Terms of Use, which expressly states, for example, that "[t]he copyrights in all Content remain with the copyright owner, and nothing in [Shutterstock's Terms of Service] shall be construed as a transfer of copyright to Shutterstock."

6. Shutterstock does offer its own, self-supplied content for license, but it does so through an entirely separate and distinct platform known as the "editorial platform." Where Shutterstock does create its own content or obtains content through its partnerships with prestigious companies, which have included, for example, Conde Nast, the Life Picture Collection, and National Geographic, Shutterstock offers this content under different platforms or brands from the contributor platform, including the editorial platform and the Offset platform.

7. I understand that Plaintiff has referred in his papers to statements that Shutterstock made about its contributor platform in a form filed with the Securities and Exchange Commission on May 14, 2012. In particular, Plaintiff has pointed out that Shutterstock stated that "[l]ess than 20% of contributor applicants who applied in 2011 were approved as contributors to shutterstock.com, and less than 60% of images uploaded by approved contributors in 2011 satisfied

our rigorous acceptance requirements." Shutterstock's processes related to third-party contributors and their content have completely changed since 2011.

8. For example, in 2011, someone who wanted to become a Shutterstock contributor had to apply by submitting a copy of their passport (or other official identification) and a sample of ten images, and would only be approved as a contributor if at least seven of those images met Shutterstock's standards. Approximately five years ago, in response to the increased use of imagery online, mindful of the changing laws and risks involving the maintenance and collection of personally identifying information (PII), and consistent with steps taken by other online licensing platforms, Shutterstock dropped the contributor application requirement entirely. Today, and at all times relevant to this case, Shutterstock allows anyone to sign up to be a contributor—and to instantly start uploading their content directly into Shutterstock's online marketplace—by registering an account online. The only reason a potential contributor would be rejected is if their information matches an account that had previously been terminated, which is relatively rare, and helps keep likely infringers off Shutterstock's website. Shutterstock does not recruit, vet, preapprove, or verify its contributors. Rather, it relies on the representations and promises they make to us, and Shutterstock has no tolerance for abuse or violation of these promises or any of Shutterstock's policies. Shutterstock will terminate violators swiftly, as it has no interest in any kind of fraud of any type or nature occurring on its platform.

9. Also, unlike in 2011, Shutterstock no longer conducts any "rigorous" or "thorough" review of contributor-uploaded images. Shutterstock has changed its standards in the interest of accepting more content (*e.g.*, photos taken on mobile devices, which are far more common than in 2011 given the advancement of quality of mobile phone cameras) and as a necessity in light of the size of the platform. As discussed in detail in my Prior Declaration (at ¶¶ 8-11) and as noted above,

Shutterstock relies on its contributors' representations about their content because it could not possibly investigate whether the 200,000 images that contributors submit every day infringe other parties' copyrights. Shutterstock briefly reviews the images uploaded by contributors and their proposed titles and keywords for obvious technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website. The reviewers are not lawyers; they are hired for their ability to quickly judge whether an image is technically and visually acceptable. The reviewers spend about twenty seconds per image. While the reviewers may catch obvious intellectual property issues from time to time (*e.g.*, well-recognized brand names or copyrighted works "nested" within an image), this is not their main objective and they could not possibly verify the copyright status of every image. Unless the image has some obvious issue, it is approved. The scope of Shutterstock's review is consistent with industry practice.

10. Apart from Shutterstock's twenty-second review, the entire process triggered by the contributor's decision to upload an image to Shutterstock—from ingesting the image into the contributor platform to making the image available on Shutterstock's public-facing website to issuing any licenses for the image (which did not occur here)—is fully automated, with no involvement by any person at Shutterstock.

11. Shutterstock does not "strip" metadata from the contributor-supplied images. During the ingestion process, Shutterstock's system automatically separates the image data from any viruses or malicious code and metadata embedded in the images uploaded by contributors. Shutterstock's employees are not involved in this process. In any event, there was no "copyright management information" in the metadata associated with the image at issue when it was uploaded to Shutterstock's system.

12. Shutterstock's system automatically creates multiple small-sized, low-resolution copies (*i.e.*, thumbnails) of every contributor-supplied image posted to its website for license so that the potential customer can get a sense of how the image might look. This process is fully automated and is applied consistently across all contributor content.

**B.     Shutterstock's Copyright Policy**

13. As discussed in detail in my Prior Declaration (at ¶¶ 12-18), Shutterstock has adopted and follows a policy for terminating contributors who upload infringing content to Shutterstock's platform. The policy is set forth in the Contributor Terms of Use, which Shutterstock produced (in multiple versions) to Plaintiff during the course of this litigation (even though it is publicly available).

14. I understand that Plaintiff is claiming that I admitted during my deposition that Shutterstock did not have a designated DMCA agent. This is wrong and misstates my testimony. I did not fully understand the question, and believed Plaintiff's counsel was asking whether Shutterstock had one specific person designated as a DMCA agent. I said "no" because Shutterstock no longer designates a specific person as it had until 2021, but uses "DMCA Agent" instead. In any event, the Exhibit E and Exhibit F to my Prior Declaration establish, without question, that Shutterstock had a designated DMCA agent at all relevant times, and the contact information for its agent has been listed on Shutterstock's publicly-available website and in the Copyright Office's publicly-available "DMCA Designated Agent Directory."

15. As discussed in my Prior Declaration (at ¶¶ 12-18), Shutterstock does not tolerate abuse of its website or others' copyright rights and regularly terminates contributors' accounts due to infringing activity. Shutterstock keeps detailed records of each notice of infringement (or "DMCA takedown notice") that it receives, including the identity of the contributor responsible

5

for uploading the offending content, so that it may identify repeat infringers and take action where appropriate.

16. I am part of the team that reviews and responds to DMCA takedown notices. I use an alias (or, as Plaintiff improperly refers to it, a "fake name") in my correspondence related to DMCA takedown notices. The other members of my team do the same. We decided to do this for privacy purposes and also to ensure that the notices are submitted to Shutterstock through the proper channels (rather than by contacting us personally through personal social media accounts or other means). This has no impact on Shutterstock's ability to identify repeat infringers.

C. **The Contributor Image**

17. As discussed in detail in my Prior Declaration (at ¶¶ 26-30), the image at issue in this case (the "Contributor Image") was uploaded to Shutterstock's contributor platform by a third-party contributor, namely, "Arun Lodhi" who selected the username "ArunRaJpuT662" (the "Contributor").

18. I understand Plaintiff has claimed that Shutterstock "carefully vetted" and "verified" the Contributor, and "worked with" the Contributor to obtain the Contributor Image. This is false. The Contributor created his account on November 26, 2019 and uploaded the Contributor Image to the contributor platform for license on the same day—all without any involvement by Shutterstock. Shutterstock's verification of Contributors consists of an automated process to confirm that the email address supplied by the Contributor is valid.

19. The Contributor Image was not specially reviewed for "content" or "commercial appeal." It was subject to the same twenty-second review for technical and quality issues as all of the other images uploaded to Shutterstock's contributor platform. Having found no obvious issues,

6

DocuSign Envelope ID: 20264965-D1D6-4031-AB70-9BDC41264FAE

the Contributor Image was approved, and then automatically passively stored and made available for license on Shutterstock's customer-facing website.

### D. Plaintiff's Takedown Notice

20. As discussed in detail in my Prior Declaration (at ¶¶ 31-36), upon review of Plaintiff's takedown notice, Shutterstock acted expeditiously to remove the Contributor Image from the one URL that Plaintiff identified and to de-index and withdraw it from licensing.

21. Plaintiff's takedown notice, dated April 1, 2021, is the only takedown notice that Plaintiff sent to Shutterstock regarding the Contributor Image. As mentioned, this notice identified ***one URL***, particularly, https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026, and Shutterstock removed the Contributor Image therefrom on May 11, 2021. Plaintiff never followed up with Shutterstock regarding his takedown notice or otherwise took issue with Shutterstock's response thereto on or prior to May 11, 2021.

22. I understand that Plaintiff is claiming that the Contributor Image was also displayed at "three different URLs" and on several third-party websites, *i.e.*, HelloRF, StockFresh, and TinEye (which I discuss further below). Plaintiff did not specifically notify Shutterstock of these purportedly infringing uses in his takedown notice or otherwise, and even if he did, Shutterstock would have had no obligation—and, in the case of the third-party websites, no practical ability—to take them down. Plaintiff did not ask Shutterstock to notify HelloRF, StockFresh, or TinEye regarding any use. In fact, by the time Plaintiff mentioned these third-party websites to Shutterstock, the Contributor Image was not visible in any form on any of these sites, with the exception of a thumbnail cached by TinEye without Shutterstock's approval.

23. I understand that Plaintiff is misconstruing my testimony—particularly, my use of the word "suspended"—this to mean that Shutterstock did not "remove" the Contributor Image on

7

May 11, 2021. As I explained during my deposition, I used the word "suspended" in this context to mean that the image was removed from Shutterstock's public-facing website where identified and withdrawn from licensing. In any event, the documents attached to my Prior Declaration establish, without question, that the Contributor Image was removed from the URL identified in the takedown notice (and also de-indexed and withdrawn from licensing) as of May 11, 2021. For example, the asset details for the Contributor Image (attached as Exhibit H to my Prior Declaration) indicate that it was removed per Plaintiff's DMCA takedown notice on May 11, 2021; and Shutterstock's email in response to Plaintiff's takedown notice (attached as Exhibit L to my Prior Declaration) indicates that the Contributor Image had been removed by May 11, 2021.

24. I understand that Plaintiff is also claiming that I conceded at my deposition that Shutterstock's "failure to ensure that the [Contributor Image] was not visible to the public was a violation of Shutterstock's DMCA policy." This is wrong and mischaracterizes my testimony. The testimony that Plaintiff is referring to relates to the small-sized, low-resolution, watermarked copies (*i.e.*, thumbnails) of the Contributor Image available on Shutterstock's edge cache servers. *First*, these thumbnails were never "visible to the public." Thumbnails are not linked to anything on Shutterstock's website and are not findable by the general public; only someone who had previously made a copy of the image on Shutterstock's site and was using a technological tool (or who had written down the asset ID number for removal and knew the format of Shutterstock's URLs) could find them. *Second*, Shutterstock's policy does not require it to remove thumbnails unless they are specifically identified by the *copyright owner*. If the copyright owner specifically identifies the thumbnails (*i.e.*, by providing the URLs)—which *Plaintiff did not do here*—Shutterstock does remove them, notwithstanding the fact that Shutterstock has no obligation to do

8

so and it requires an engineer to undertake a time-consuming, manual process.[1]

25. Plaintiff never followed up with Shutterstock regarding his takedown notice or otherwise took issue with the response thereto on or prior to May 11, 2021.

E. **Shutterstock's API and The Third-Party Websites That Integrate It**

26. I understand that Plaintiff makes much of Shutterstock's so-called "partners[hips]" with the third-party websites HelloRF, StockFresh, and TinEye. These websites are not Shutterstock's "partners" in any official, legal sense. To the extent that any of these websites use the word "partner" in relation to Shutterstock, it purely is marketing-speak. Notably, contrary to Plaintiff's assertion, Shutterstock does not have a "partnership agreement" with TinEye (or with HelloRF or StockFresh, either).

27. Shutterstock has no ownership in or control over StockFresh and/or TinEye. In the interest of full disclosure, Shutterstock has a small investment interest in HelloRF's parent company, ZCool. However, Shutterstock has no direct ownership interest in HelloRF, nor any control over HelloRF and its business operations.

28. Shutterstock does have some connection to HelloRF, StockFresh, and TinEye—in particular, these websites (like many other third-party websites) integrate Shutterstock's API into their own websites, albeit in somewhat different ways and pursuant to different terms. For background purposes, an "API," which stands for "application programming interface," is a

---

[1] One of the reasons Shutterstock keeps these thumbnails is to help flag any contributor-uploaded content that had been previously removed due to a notice of infringement. Additionally, contributors who want to try a different platform will ask for their content to be removed from the licensing platform but may require that thumbnails are retained for reference to assist with questions about payment and other issues having nothing to do with infringement. Accordingly, thumbnails are often vital to helping track information pertaining to the contributor as well as customers who licensed contributors' images.

9

software intermediary that allows two or more computer programs to communicate with each other with no human intervention. Shutterstock offers an API that provides access to its entire library of content (*i.e.*, the same library of content that is offered on Shutterstock's website), including the millions of contributor-supplied images available on Shutterstock's contributor platform. Shutterstock's API allows third parties to integrate the functionality of searching, accessing, licensing, and/or downloading the images in Shutterstock's library into their own websites. Shutterstock has more than 7,500 API integrations with various platforms, including Facebook, Apple, IBM, Microsoft, and Google. For ease of reference, I will use the term "API User Platform" to refer generally to any third-party website that integrates Shutterstock's API.

29. Shutterstock's API automatically provides API User Platforms with access to—*not copies of*—the images in Shutterstock's library. For example, if a user performs a keyword search for "beach" on an API User Platform, Shutterstock's API automatically allows the API User Platform to access all of the images in Shutterstock's library associated with the keyword "beach" and display them in the search results. The "display" links back to the copies of the beach-related images that exist in Shutterstock's library (*i.e.*, the same copies that would be displayed if the user had searched for "beach" directly on Shutterstock's website). If no one ever searched the API User Platform for these images, they would never be displayed there.

30. There are different types of API User Platforms. Some API User Platforms (*e.g.*, StockFresh, TinEye) merely drive referral traffic to Shutterstock's website. Continuing with the example above, if the user decided it wanted to license one of Shutterstock's beach-related images that it found on this type of API User Platform, it would be redirected to Shutterstock's website to complete the transaction, and the API User Platform would receive a commission if the user

10

purchases a subscription plan.[2] Other API User Platforms (*e.g.*, HelloRF) are resellers, which means the transaction is completed on their own website and there are more complicated royalty splits. Either way, the process it totally automatic, and in this case, the Contributor Image was never licensed through HelloRF, StockFresh, TinEye, or any other API User Platform anyway.

31. The API provides real-time access into Shutterstock's content library, thereby allowing the API User Platform to access whatever content has been added to Shutterstock's library of content (and thus its public-facing website) website, and also revoking access to any content that has been removed. When an image is removed, it becomes totally unavailable for license on Shutterstock's website and also through any of the API User Platforms. Shutterstock does not specifically notify its thousands of API User Platforms every time one of its more than 415 million images is removed from the library.

32. I understand that Plaintiff refers to Shutterstock's API Terms of Service, which provides that "[a]ny Content previewed by Users through the [API Customer] Platform . . . shall incorporate the Shutterstock watermark." This requirement simply ensures that the API User Platform does not remove or conceal the "Shutterstock" watermark that already exists on the images accessible via Shutterstock's API. As discussed in my Prior Declaration, consistent with industry practice, Shutterstock's system automatically adds a "Shutterstock" watermark to all of the images displayed for license on its website (except very small thumbnails) in order to lessen the risk of third parties using the images without a license. The same risk exists in the context of API User Platforms. Shutterstock also requires that the API User Platform to "include a

---

[2] TinEye can only be searched using an image file, not a keyword, but the result is the same. If a user searches TinEye for an image that is available on Shutterstock's website, it will be re-directed to Shutterstock's website, and TinEye will receive a commission if a customer purchases a subscription plan.

conspicuous attribution in substantially the following form: 'Powered by Shutterstock'" on their websites in order to promote the fact that they are using Shutterstock's technology.

33. Shutterstock did not "provide" or "distribute" any "copies" of the Contributor Image to HelloRF, StockFresh, and/or TinEye. Nor did Shutterstock "direct" them to display the Contributor Image on their websites. As explained above, that is not how Shutterstock's API works. Shutterstock merely made the Contributor Image (and illusions of other images) accessible to these third-party website through its API.

34. The Contributor Image was automatically unavailable through Shutterstock's API—and thus unavailable to HelloRF, StockFresh, TinEye, and every other API User Platform—within twenty-four hours of its removal from Shutterstock's website on May 11, 2021. As of May 11, 2021, the Contributor Image was not accessible to these third-party websites through Shutterstock's API. Thus, it would not show up in a search of their websites and, even if it did, it could not be licensed.

35. I understand that Plaintiff is claiming that Exhibit 21 to the Declaration of Scott Alan Burroughs, dated September 2, 2022 (Dkt. No. 58) ("Burroughs Declaration"), shows that "Shutterstock continued to display the [Contributor Image] on HelloRF . . . until at least July 14, 2022." This is wrong. As explained above, Shutterstock never "display[ed] the [Contributor Image] on HelloRF," but merely made it accessible via its API, and revoked such access in response to Plaintiff's takedown notice on May 11, 2021. It is not clear that the Contributor Image was ever displayed on HelloRF via Shutterstock's API, let alone on or after July 14, 2021. All that Exhibit 21 shows is a reverse-engineered searched image of a thumbnail of the Contributor Image that apparently remained on HelloRF's servers due to HelloRF's failure to refresh their cache, which they are permitted to do for technological reasons, but are supposed to refresh

12

routinely. Shutterstock permits HelloRF, a Chinese website, and a handful of other websites that integrate Shutterstock's API, to cache thumbnails on their servers due to the technological burdens involved in transmitting the images from Shutterstock's servers across the internet. While foreign websites are supposed to refresh their cache routinely, Shutterstock has no control over whether or when they do so. In any event, refreshed or not, the Contributor Image could not be licensed via HelloRF as of May 11, 2021.

36. I understand that Plaintiff is claiming that Exhibit 11 to the Burroughs Declaration shows that "Shutterstock continued to exploit the [Contributor Image] . . . to advertise Shutterstock's 15% off sale on TinEye until at least July 14, 2022." This is also wrong. As discussed in my Prior Declaration (at ¶ 45), this is preserved copy of a thumbnail of the Contributor Image, which TinEye created without Shutterstock's knowledge, participation, or consent. Shutterstock understands that, relying on fair use, TinEye makes copies of thumbnails from around the internet, leading to its dozens of billions of images, although TinEye is not permitted to do so under its terms with Shutterstock. Shutterstock does not control TinEye and cannot require it to expunge its records of what existed on the internet at a particular time. Moreover, as shown in the screenshots attached hereto as **Exhibit A**, the "15% off" advertising is a generic display of text that would result in searching for any image available on Shutterstock, pursuant to the terms of the parties' agreement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: September 16, 2022

_Artur Zambrowski_
Artur Zambrowski