# EXHIBIT 15

```
1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
2       CASE NO. 1:21-CV-07100-AKH
        ------------------------------X
3       GEORGE STEINMETZ,
4                          Plaintiff,
5       vs.
6       SHUTTERSTOCK, INC. and
        DOES 1-10, inclusive,
7
                           Defendants.
8       ------------------------------X
9
10
11            30(b)(6) DEPOSITION VIA ZOOM OF
12             SHUTTERSTOCK, INC. by and through
13                  ARTUR ZAMBROWSKI
14                  July 14, 2022
15
16
17
18
19
20
21
22
23      Reported by:
24      SARA FREUND, CSR
25
```

                                              Page 1

1

2

3

4

5

6

7

8

9

10                          July 14, 2022

11                            10:00 a.m.

12

13

14

15

16

17

18                  30(b)(6) DEPOSITION VIA ZOOM OF

19     ARTUR ZAMBROWSKI, held on the above mentioned

20     date and time, before Sara Freund, a

21     Certified Shorthand Reporter and Notary

22     Public within and for the State of New York.

23

24

25

                                    Page 2

```
 1        A P P E A R A N C E S:

 2

 3        DONIGER/BURROUGHS LAW FIRM
               Attorneys for Plaintiff
 4             247 Water Street - first floor
               New York, New York 10038
 5        BY: SCOTT A. BURROUGHS, ESQ.
               LAURA M. ZAHARIA, ESQ.

 6

 7        MITCHELL SILBERBERG & KNUPP LLP
               Attorneys for Defendant
 8             437 Madison Avenue - 25th floor
               New York, New York 10022
 9        BY: ELEANOR M. LACKMAN, ESQ.
               SAMANTHA W. FRANKEL, ESQ.

10

11

12        ALSO PRESENT:

13        Andrew Raff - inhouse counsel, Shutterstock

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                    A. ZAMBROWSKI
 2         A.  No.
 3         Q.  In your work at Shutterstock, have
 4    you ever gone by a fake name online?
 5         A.  Yes.  I used an alias.
 6         Q.  What aliases have you used?
 7         A.  I've used [        ] for the most part of
 8    my career at Shutterstock.
 9         Q.  Have you used any other aliases?
10         A.  No.
11         Q.  Why do you use an alias?
12         A.  I use an alias just to stay
13    anonymous.  I do not want individuals
14    reaching out to me on social media platforms.
15    I don't want them to connect with me to try
16    to solve issues; I would rather them contact
17    Shutterstock directly.
18         Q.  Is that a decision you personally
19    made, or is that Shutterstock policy?
20         A.  That is something my team has
21    decided to do.
22         Q.  Who is on your team?
23         A.  My current IT team is Andrew Raff
24    and Heather Shimmin.
25         Q.  Can you spell those names for me?
```

**Redaction per Defendant's request.**                Page 10

```
 1                    A. ZAMBROWSKI

 2        A.  I don't know.

 3        Q.  Do you know why she left

 4   Shutterstock?

 5        A.  She got another opportunity, another

 6   challenge she wanted to tackle.

 7        Q.  Have you learned of any other reason

 8   why she left Shutterstock?

 9        A.  No.

10        Q.  Do you know where she works now?

11        A.  Yes.

12        Q.  Where does she work now?

13        A.  MMHMM is the name of the company,

14   M-M-H-M-M.

15        Q.  Do you know which office she's in,

16   if she's in an office?

17        A.  No.

18        Q.  So was it Ms. Patel that told you to

19   use a fake name when dealing with

20   Shutterstock business?

21             MS. LACKMAN:  Objection to the

22        extent it reveals privileged information.

23        I just want to be cautious.  You can

24        answer if you know yes or no; please

25        don't elaborate.  We'll take this one
```

Page 12

```
 1                    A. ZAMBROWSKI

 2         step at a time.

 3         A.  Yes.

 4         Q.  When she told you to use a fake name

 5    online, did she give you any other

 6    instructions?

 7         A.  No.

 8         Q.  When you were using a fake name on-

 9    line for Shutterstock business, who were you

10    communicating with?

11              MS. LACKMAN:  Objection, vague.

12         Q.  Go ahead.

13         A.  With various individuals, copyright

14    owners, models, contributors, customers.

15         Q.  Were some of the folks that you

16    communicated with when using the fake name

17    copyright holders who believed that

18    Shutterstock was displaying their work

19    without consent?

20              MS. LACKMAN:  Objection, vague.

21         Q.  Go ahead.

22         A.  Yes.

23         Q.  Is the Shutterstock policy regarding

24    using these fake names when dealing with

25    copyright holders in writing anywhere?
```

Page 13

July 14, 2022

```
 1                    A. ZAMBROWSKI
 2          A.   I do not know.
 3          Q.   Does Shutterstock work with a
 4     company named HelloRF?
 5          A.   I do not know.
 6          Q.   Does Shutterstock work with a
 7     company named TinEye?
 8              MS. LACKMAN:   Objection, vague.
 9          A.   I believe so.
10          Q.   How long has Shutterstock worked
11     with TinEye?
12          A.   I do not know.
13          Q.   Is Shutterstock currently working
14     with TinEye?
15          A.   I do not know.
16          Q.   Did Shutterstock distribute to
17     TinEye a copy of the photograph at issue in
18     this case?
19              MS. LACKMAN:   Objection, calls for a
20          legal interpretation, outside the scope.
21          Q.   Go ahead.
22          A.   TinEye does not obtain any content
23     from Shutterstock.
24          Q.   Has a Shutterstock photograph with
25     Shutterstock branding ever appeared on
```

Page 28

1                    A. ZAMBROWSKI

2      TinEye, to your knowledge?

3           A.  Yes.

4           Q.  How did that happen?

5                MS. LACKMAN:  Objection, calls for

6           speculation, outside the scope.

7           A.  Because TinEye is a reverse image

8      software that populated images found on the

9      web.

10          Q.  When it does that, does it ever

11     include Shutterstock branding?

12               MS. LACKMAN:  Objection, vague,

13          calls for speculation.

14          Q.  Go ahead.

15          A.  What type of branding?

16          Q.  Name and logo?

17          A.  Yes.

18          Q.  And does the TinEye page also

19     display advertising for Shutterstock in

20     connection with the image?

21               MS. LACKMAN:  Objection, vague,

22          outside the scope.

23          A.  Yes.

24          Q.  Do you know if TinEye displayed the

25     photograph at issue in this case?

Page 29

```
 1                    A. ZAMBROWSKI

 2         Q.  Go ahead.

 3         A.  I believe I answered that they're a

 4    reverse image platform.

 5         Q.  Other than what the company is, are

 6    you aware of anything related to the

 7    relationship between Shutterstock and TinEye?

 8             MS. LACKMAN:  Objection foundation.

 9         A.  I do not know.

10         Q.  Does Shutterstock take any action to

11    ensure that its photography shows up on

12    TinEye?

13         A.  I do not know.

14         Q.  Assuming that TinEye does display

15    Shutterstock photography, how does that

16    happen?

17             MS. LACKMAN:  Objection, very broad,

18         calls for speculation.  You can answer if

19         you know.

20         A.  Like I mentioned, they're a reverse

21    image search platform, they search the entire

22    worldwide web, so they will pull Shutterstock

23    imagery, Getty images or any which platform

24    or even personal blogs or websites that would

25    be populated there.
```

Page 33

```
 1                    A. ZAMBROWSKI
 2         Q.  So other than the fact that it's a
 3    search engine, do you know anything about how
 4    the Shutterstock photography shows up on
 5    TinEye?
 6              MS. LACKMAN:  Objection, asked and
 7         answered multiple times.
 8         Q.  Go ahead.
 9         A.  TinEye pulls any information on the
10    worldwide web based on the input we give it.
11         Q.  Does Shutterstock provide any input
12    or material that allows TinEye to pull
13    Shutterstock photography?
14         A.  Only to put in images that are
15    currently on Shutterstock.
16         Q.  What is that?
17         A.  I'm not sure of the question.
18              MS. LACKMAN:  And, again, it's going
19         outside the scope about how TinEye works.
20         Q.  When you say TinEye receives
21    something from Shutterstock to ensure that
22    the Shutterstock photography appears on
23    TinEye, what are you referring to?
24              MS. LACKMAN:  Objection, misstates
25         the testimony.
```

Page 34

```
 1              A. ZAMBROWSKI
 2         MS. LACKMAN:  Objection, vague as to
 3      time, outside the scope.
 4      A.  I don't know.
 5      Q.  Do you know if the photograph at
 6   issue in this case appeared on any site other
 7   than Shutterstock due to involvement between
 8   that site and Shutterstock?
 9         MS. LACKMAN:  Objection, calls for
10      speculation.
11      A.  Can you repeat the question?  I'm
12   not sure I understand.
13      Q.  Sure.  Let me back up briefly.  The
14   photograph that's at issue in this case, did
15   it ever show up on Shutterstock?
16      A.  Yes.
17      Q.  Did Shutterstock display that
18   photograph and offer to license it to its
19   clients?
20         MS. LACKMAN:  Objection, calls for
21      legal interpretation, asked and answered.
22      Q.  Go ahead.
23      A.  Yes.
24      Q.  And other than that use of the image
25   on Shutterstock's website, are you aware of
```

Page 43

```
 1                    A. ZAMBROWSKI
 2     the photograph at issue appearing on any
 3     other website through involvement between
 4     that site and Shutterstock?
 5              MS. LACKMAN:  Objection, no
 6          foundation.
 7          A.  I don't know.
 8          Q.  Have you ever looked through your
 9     records to see if the photograph appeared on
10     any other sites due to a relationship between
11     that site and Shutterstock?
12          A.  Personally, I have not.
13          Q.  Do you know if anyone at
14     Shutterstock has?
15          A.  I do not know.
16          Q.  Looking again at Exhibit 1 here, did
17     you have any involvement with the selection
18     of payment, modification, incorporation or
19     publication of the Steinmetz photograph at
20     issue?
21              MS. LACKMAN:  Objection, compound,
22          subject to the same objection I made
23          earlier regarding scope.
24          A.  No.
25          Q.  Did you approve the Steinmetz
```

Page 44

```
 1                    A. ZAMBROWSKI
 2         complaint.
 3         Q.  Go ahead.
 4         A.  Could you describe what photograph?
 5         Q.  The photograph alleged to be used
 6    without consent by Shutterstock.
 7         A.  I'm still not sure I understand the
 8    question.  Can you rephrase it?
 9         Q.  Sure.  Are you aware that there is a
10    photographer who claims that Shutterstock
11    used his photograph without consent?
12         A.  Yes.
13         Q.  Who at Shutterstock approved the
14    publication of that photograph?
15              MS. LACKMAN:  Same objection,
16         compound, assumes -- there's just no
17         foundation.
18         A.  One of our viewers.
19         Q.  Do you know who?
20         A.  Personally, no.
21         Q.  Have you ever looked to find out who
22    that was?
23         A.  I've seen their name by looking up
24    this image in particular when we removed the
25    content.
```

Page 46

```
 1                    A. ZAMBROWSKI

 2         Q.  Do you recall what the name was?

 3         A.  No, I do not.

 4         Q.  When did you look in the system?

 5         A.  I don't remember.

 6         Q.  Was it in the last couple of weeks?

 7         A.  I do not remember.

 8         Q.  Was it within the last year?

 9         A.  I do not remember.

10         Q.  But it's Shutterstock's

11    understanding that someone at Shutterstock

12    approved the photograph at issue in this case

13    before it was displayed on the E-

14    Shutterstock website, correct?

15             MS. LACKMAN:  Objection, calls for a

16         legal interpretation.

17         A.  Correct.  It was reviewed by a

18    reviewer and determined to be visible on

19    Shutterstock's website.

20         Q.  Did you ever review such photography

21    before it's distributed or displayed on the

22    website?

23             MS. LACKMAN:  Objection, vague to as

24         to review.

25         A.  No.
```

Page 48

```
 1                    A. ZAMBROWSKI
 2          Q.  How many reviewers does Shutterstock
 3     currently have?
 4          A.  I do not know the exact number.
 5          Q.  More than ten?
 6          A.  I do not know.
 7          Q.  More than a hundred?
 8          A.  I do not know.
 9          Q.  Less than ten?
10          A.  I do not know.
11          Q.  Do you know if Shutterstock has any
12     reviewers?
13          A.  Yes.
14          Q.  How do you know that?
15          A.  We have a team of review
16     coordinators who manage reviewers.
17          Q.  And what do those reviewers do?
18          A.  The reviewers review content
19     uploaded to Shutterstock.
20          Q.  Why?
21               MS. LACKMAN:  Objection to the
22          extent it calls for disclosure of legal
23          information or legal advice.  If you have
24          an understanding that doesn't come from
25          counsel, you can answer.
```

Page 49

```
 1              A. ZAMBROWSKI
 2        A.   The reviewers review content for
 3    different types of technical issues, whether
 4    that be noise, subject matter.   They also
 5    review the contributor's uploaded
 6    descriptions and metadata, if there is any
 7    issues within those whether that be
 8    absurdities or curse words or language that's
 9    improper.
10        Q.   So, if, for example, there are curse
11    words that are improper, will Shutterstock
12    reject and not display the photographs?
13        A.   To the best of my knowledge, yes.
14        Q.   So is it fair to say that the re-
15    viewers will look at the uploaded photography
16    and decided which of that photography can go
17    on the website?
18             MS. LACKMAN:   Objection, misstates
19        testimony and foundation.
20        A.   Yes.   As we have a specific standard
21    we want to employ with our content being up-
22    loaded, it gives a better customer experience
23    instead of having any piece of content up-
24    loaded.
25        Q.   Do you have an estimation of what
```

Page 50

```
 1                    A. ZAMBROWSKI
 2       percentage of the content is rejected as
 3       violating the standards?
 4              MS. LACKMAN:  Objection, foundation,
 5           outside the scope.
 6       A.  I do not.
 7       Q.  Do you know if it's more than ten
 8       percent?
 9       A.  I do not know.
10       Q.  But you're certainly aware of
11       Shutterstock rejecting certain photographs,
12       correct?
13       A.  Correct.
14       Q.  And you said earlier there is a
15       standard.  Is that standard set out in a
16       written guideline or a written policy?
17              MS. LACKMAN:  Objection to the
18           extent misstates testimony.
19       A.  Yes.  All reviewers are trained
20       within -- and also we have internal reviewer
21       guidelines that display specific uses,
22       examples.
23       Q.  Can you describe for me what the re-
24       viewer guidelines are.
25       A.  It is a database that stores
```

Page 51

July 14, 2022

```
 1                    A. ZAMBROWSKI
 2      policies created by Shutterstock in order to
 3      train and teach our reviewers.
 4           Q.  Are the reviewers to reference those
 5      guidelines when deciding whether or not to
 6      approve a photograph for display on the
 7      Shutterstock site?
 8                MS. LACKMAN:  Objection, outside the
 9           scope.
10           A.  Correct.
11           Q.  Have you yourself ever seen these
12      guidelines?
13           A.  Yes.
14           Q.  Do you have a copy of those
15      guidelines?
16                MS. LACKMAN:  Objection, vague.
17           A.  I personally do not have a copy of
18      the guidelines as they are on an internal
19      website only accessible by certain
20      individuals.
21           Q.  Do you have access to the
22      guidelines?
23           A.  Yes.
24           Q.  When was the last time you looked at
25      the guidelines?
```

Page 52

```
 1                    A. ZAMBROWSKI
 2           A.  I do not know exactly.
 3           Q.  So is it fair to say as you sit here
 4      today that you don't recall taking any steps
 5      in response to that demand letter other than
 6      reviewing the demand letter?
 7              MS. LACKMAN:  Objection, misstates
 8           the testimony.
 9           Q.  Go ahead.
10           A.  No.  I definitely have talked with
11      my manager at that time and also individuals
12      on my team about how to approach this matter.
13           Q.  Who did you speak with?
14           A.  With Andrew Raff and Heather
15      Shimmin.
16           Q.  And you spoke with them in regard to
17      the claim that was set forth in the demand
18      letter that you referenced?
19           A.  To the best of my knowledge, yes.
20           Q.  And what was the substance of that
21      conversation?
22              MS. LACKMAN:  Objection to the
23           extent that it reveals communications and
24           advice with counsel.  Mr. Raff is
25           in-house attorney.
```

Page 57

```
 1                         A. ZAMBROWSKI
 2           Q.  Go ahead.
 3           A.  I do not know exactly.
 4           Q.  Do you recall anything about any of
 5      the conversations that you may have had at
 6      that time?
 7           A.  I do not remember.
 8           Q.  Do you recall doing anything else in
 9      response to the demand letter?
10              MS. LACKMAN:  Objection, foundation.
11           A.  I do not remember.
12           Q.  Do you know if the image is still on
13      Shutterstock's website today?
14           A.  It is not on Shutterstock's website
15      today.
16           Q.  How do you know?
17           A.  Because I took action and suspended
18      the content after the review with my team
19      about the documentation provided.
20           Q.  To your knowledge, does, quote,
21      suspending the content delete the content
22      from the Shutterstock system?
23              MS. LACKMAN:  Objection to the
24          extent misstates prior testimony.
25           A.  To the best of my knowledge, it is
```

Page 58

1                    A. ZAMBROWSKI

2        removed from any public facing, but it's kept

3        internally, so if anyone else tries to upload

4        that similar piece of content, we can flag it

5        instantly and reject that content from ever

6        being on Shutterstock.  Also, we have an

7        obligation to a contributor's TOS where the

8        content remains on our servers for a short

9        period of time.

10           Q.  So is it fair to say that the

11       photograph alleged to be infringed in this

12       case is still on the Shutterstock system even

13       today?

14               MS. LACKMAN:  Objection, vague as to

15           system.

16           A.  Personally, I don't believe so, to

17       the best of my knowledge.

18           Q.  Is it Shutterstock's position that

19       its partners have also removed the photograph

20       that's claimed to be infringed in this case?

21               MS. LACKMAN:  Objection, no

22           foundation.

23           A.  What partners?

24           Q.  Any of the partner sites that we

25       referenced earlier.

Atkinson-Baker, A Veritext Company
(818) 551-7300          www.veritext.com

```
 1                    A. ZAMBROWSKI
 2        A.  Yes.  That's exactly what I just
 3   said.
 4        Q.  How long have you been using that at
 5   Shutterstock?
 6        A.  Personally, I've seen it in use my
 7   whole time at Shutterstock.
 8        Q.  And if it returns a match on this
 9   pixel comparison, what will Shutterstock do
10   in regards to the contributor?
11            MS. LACKMAN:  Objection, outside the
12        scope, vague.
13        A.  If there are matches that appear
14   that aren't within the same contributor up-
15   loading, we would reject that piece of
16   content, and if they are a repeat offender of
17   this type of action, we'll disable their
18   content and send them information of why
19   their account is disabled.
20        Q.  How many infringing photographs does
21   a contributor have to upload before they are
22   deemed a repeat offender by Shutterstock?
23            MS. LACKMAN:  Objection, misstates
24        the testimony, no foundation.
25        Q.  Go ahead.
```

Page 63

```
 1                    A. ZAMBROWSKI
 2          A.  It varies, between one and three.
 3          Q.  So is it fair to say that if a
 4      contributor uploaded three infringing
 5      photographs, they would be deemed a repeat
 6      offender?
 7              MS. LACKMAN:  Objection, no
 8          foundation, calls for a legal
 9          interpretation.
10          Q.  Go ahead.
11          A.  Correct.  We would review that
12      portfolio and determine to terminate the user
13      or not.
14          Q.  And what would you look at to
15      determine whether or not to terminate the
16      user?
17              MS. LACKMAN:  Objection to the
18          extent this calls for any understanding
19          that you have from counsel.
20          Q.  Go ahead.
21          A.  We would review what type of
22      contributor they are.  We have business units
23      that upload content that are authorized by
24      other individuals to store and upload their
25      content.  We also have aggregators who do
```

Page 64

```
 1                    A. ZAMBROWSKI
 2      similar work.  So we would have to make sure
 3      that these individuals are aware of what
 4      they're doing.
 5          Q.  What about for individuals?
 6              MS. LACKMAN:  Objection, vague.
 7          A.  For individuals, we would most
 8      likely terminate them.
 9          Q.  Is there any reason why you wouldn't
10      terminate a contributor who uploaded three or
11      more infringing images?
12              MS. LACKMAN:  Objection, calls for
13          speculation, calls for a legal
14          conclusion.
15          A.  Other than the reasons I previously
16      mentioned, no.
17          Q.  And is it the position of
18      Shutterstock that they will terminate the
19      user upon that number of infringing uploads
20      or that they'll suspend the user's account?
21              MS. LACKMAN:  Objection, compound,
22          calls for a legal interpretation,
23          misstates testimony.
24          Q.  Go ahead.
25          A.  I'm not sure what you mean by
```

Page 65

```
 1                    A. ZAMBROWSKI
 2      disabling an account and deleting an account?
 3              MS. LACKMAN:  Objection, calls for
 4          speculation, asked and answered.
 5          Q.  Go ahead.
 6          A.  It's just different terminology.
 7          Q.  So is it the same thing?
 8              MS. LACKMAN:  Objection, asked and
 9          answered, badgering.  Are you suggesting
10          my client should delete evidence, Scott?
11          Q.  Go ahead.
12          A.  I don't know.
13              (Whereupon, recess was taken.)
14              MR. BURROUGHS:  Let's go back on the
15          record.
16          Q.  And you understand, Artur, you're
17      still under oath?
18          A.  Yes, correct.
19          Q.  Did you get a chance to talk to your
20      counsel on the break?
21          A.  Yes.
22          Q.  And you're ready to testify again,
23      you can still give your best testimony?
24          A.  Correct.
25          Q.  Can you tell me in your own words,
```

Page 70

```
 1                    A. ZAMBROWSKI
 2        what does Shutterstock do?
 3                MS. LACKMAN:  Objection, vague.
 4            A.  Shutterstock is a content licensing
 5        platform.
 6            Q.  So is it fair to say that
 7        Shutterstock is in the business of licensing
 8        photography to third parties?
 9            A.  Correct.
10            Q.  And does Shutterstock receive
11        payment for those licenses?
12                MS. LACKMAN:  Objection, vague.
13            A.  Correct.
14            Q.  Does Shutterstock have a standard
15        fee that it charges or a single standard fee
16        that it charges or a range of fees that it
17        charges for licenses?
18                MS. LACKMAN:  Objection, compound.
19            A.  To the best of my knowledge, a range
20        of fees, depending on our obligation or the
21        demands.
22            Q.  Is it fair to say that the fees also
23        reflect the types of uses that Shutterstock
24        permits under the particular license?
25                MS. LACKMAN:  Objection to the
```

Page 71

```
 1                A. ZAMBROWSKI

 2        Q.  Does Shutterstock license out any

 3    photography that it owns the copyrights for?

 4        A.  Shutterstock was actually created by

 5    Jon Oringer, who uploaded his own content to

 6    be the first pieces of content to be able to

 7    be licensed.

 8        Q.  Other than Jon's content, does

 9    Shutterstock license out any of its own

10    photography?

11            MS. LACKMAN:  Objection, vague to

12        the extent it calls for a legal

13        interpretation.

14        Q.  Go ahead.

15        A.  To the best of my knowledge, we do

16    have some agreements where we've wholly owned

17    the pieces of content and licensed them to

18    personal contributor accounts.

19        Q.  Does Shutterstock distinguish in its

20    system between copyright artwork that it owns

21    and copyright artwork that its contributors

22    upload?

23            MS. LACKMAN:  Objection, foundation,

24        outside the scope.

25        A.  Could you rephrase the question?
```

Page 73

```
 1                      A. ZAMBROWSKI
 2          Q.  Sure.  Is there any way to know from
 3     looking in the Shutterstock system whether a
 4     particular piece of content is content for
 5     which Shutterstock owns the copyrights as
 6     opposed to a third party?
 7          A.  What system, internally, externally?
 8          Q.  Any system.
 9          A.  Externally, no.  The individuals
10     create user names based on their own
11     preferences and these user names are not
12     distinctive -- they could be, it could not be
13     I'm not a hundred percent certain.
14     Internally, yes, we can look at whoever it is
15     because we need to store that information.
16          Q.  So I'm a visitor to the Shutterstock
17     site and I'm looking for photographs of
18     sunsets, I'm widely served sunset photography
19     by outside contributors and sunset
20     photography for which Shutterstock owns the
21     copyrights?
22              MS. LACKMAN:  Objection, outside the
23        scope, calls for speculation.
24          A.  Potentially.
25          Q.  Is there any way for me to know as a
```

Page 74

```
 1                    A. ZAMBROWSKI
 2    viewer that a particular photograph is a
 3    Shutterstock owned photograph as opposed to a
 4    third-party photograph?
 5         A.   To the best of my knowledge, no.
 6         Q.   Does Shutterstock charge the same
 7    fees for third-party content and its own
 8    content?
 9              MS. LACKMAN:  Objection, outside the
10         scope.
11         A.   What fees?
12         Q.   License fees.
13         A.   As mentioned, they charge different
14    license fees depending on the license
15    obtained.
16         Q.   Understood.  But does that vary
17    based on whether or not it's third-party
18    content as opposed to Shutterstock owned
19    content?
20              MS. LACKMAN:  Objection, outside the
21         scope.
22         A.   To the best of my knowledge, no.
23         Q.   Going back to the time period that
24    Shutterstock maintains on its system a copy
25    of an allegedly infringing image, can you
```

Page 75

```
 1                    A. ZAMBROWSKI

 2      Shutterstock photography have access to the

 3      copy of the photograph that's not public

 4      facing, that's maintained by Shutterstock

 5      forever?

 6              MS. LACKMAN:  Objection, calls for

 7          speculation, vague.

 8          A.  No, they do not.

 9              MS. LACKMAN:  Also misstates

10          testimony.  He testified -- just

11          misstates testimony.

12          Q.  In April of 2021, did Shutterstock

13      have a DMCA agent?

14              MS. LACKMAN:  Objection to the

15          extent it calls for a legal

16          interpretation.

17          A.  I'm not sure of the question.

18          Q.  Have you ever heard the term DMCA

19      agent before?

20          A.  Yes.

21          Q.  What's your understanding of that

22      phrase?

23          A.  I do not have an understanding.

24      I've seen the phrase before, though.

25          Q.  So as you sit here today, is it fair
```

Page 84

```
 1                    A. ZAMBROWSKI
 2      to say that you don't know whether or not
 3      Shutterstock had a DMCA agent in 2021?
 4             MS. LACKMAN:  Objection, misstates
 5          the testimony, asked and answered, calls
 6          for a legal interpretation.
 7          A.  I do not recall.
 8          Q.  Do you know if Shutterstock ever had
 9      a DMCA agent?
10          A.  Yes -- I believe so.
11          Q.  Do you know when that started?
12          A.  No, I do not.
13          Q.  Do you know if Shutterstock
14      currently has a DMCA agent?
15          A.  To the best of my knowledge, I
16      believe we do not.
17          Q.  How does Shutterstock generate
18      revenue aside from the licenses that we
19      discussed?
20             MS. LACKMAN:  Objection, outside the
21          scope, vague.
22          A.  I don't know.  I'm not a sales
23      individual.
24          Q.  Are you involved in making
25      photographs accessible to users of the site?
```

Page 85

```
 1                    A. ZAMBROWSKI
 2        the company?
 3             A.  I do not.
 4             Q.  Did Ms. Lee or Mr. Nash have roles
 5        similar to the roles you had as the
 6        contractor or agent?
 7                  MS. LACKMAN:  Objection, vague.
 8             A.  I do not know.
 9             Q.  How do you know that they also re-
10        viewed the DMCA notices?
11             A.  Because at the time, they were
12        working for the IP team with Sajal, and Sajal
13        was the individual who was training me to be
14        part of the team, and therein lies what their
15        responsibilities were.
16             Q.  Have you ever worked at Shutterstock
17        with an individual named Cash Hamm?
18             A.  Personally, no, I don't know.
19             Q.  You never heard that name before,
20        right?
21             A.  I don't believe so.
22             Q.  And Shutterstock, does it have any
23        photographers as employees?
24                  MS. LACKMAN:  Objection to the
25                  extent it calls for a legal
```

Page 89

```
 1                    A. ZAMBROWSKI
 2      Shutterstock's website.
 3           Q.  As you testified before,
 4      Shutterstock will accept some content and
 5      will reject other content, correct?
 6                MS. LACKMAN:  Objection.
 7           A.  Correct.
 8           Q.  And as you review these guidelines,
 9      and we're happy to scroll down again if you'd
10      like, do they accurately reflect
11      Shutterstock's policies and procedures?
12                MS. LACKMAN:  Objection to the
13           extent it calls for a legal
14           interpretation.
15           A.  To the best of my personal
16      knowledge, yes.
17           Q.  Let's look at the Review Guidelines
18      section, do you see that?
19           A.  Yes.
20           Q.  Are the five bullet points in that
21      section the five bullet points that
22      Shutterstock reviews content for in
23      contemplation of displaying material on its
24      website?
25           A.  To the best of my knowledge, yes.
```

Page 93

```
 1              A. ZAMBROWSKI
 2        Q.  So, for example, Shutterstock's re-
 3   viewers will review a particular photograph's
 4   lighting, focus and noise before deciding
 5   whether or not to publish it on the website,
 6   correct?
 7        A.  They would not only look at those
 8   factors; there are four other bullet points
 9   that they would review.
10        Q.  Understood.  But that's one area of
11   subject matter that they would review before
12   approval, correct?
13        A.  Correct.
14        Q.  And Shutterstock's team and
15   employees, before approving a photograph,
16   will look at the metadata, such as the title
17   and key words, before approving a photograph
18   for display on its site, correct?
19        A.  That is metadata that is inputted by
20   the contributor.
21        Q.  And what does it do when it reviews
22   the metadata before approving it for display
23   on its site?
24            MS. LACKMAN:  Objection, misstates
25        testimony.
```

Page 94

```
 1                    A. ZAMBROWSKI

 2        A.  Can you rephrase the question?

 3        Q.  Sure.  What does it look for in the

 4   metadata when it's deciding whether or not to

 5   approve it for use on the site?

 6            MS. LACKMAN:  Objection, vague.  Do

 7        you mean if the metadata is photographed?

 8        Q.  Go ahead.

 9            MS. LACKMAN:  If you understand.

10            (Simultaneous talk)

11        A.  To scope for relevance within the

12   metadata; so if you are submitting a picture

13   of a nine, you are not putting a bar in the

14   metadata.

15        Q.  Does Shutterstock maintain that

16   metadata when it makes the photograph

17   available for use on its website?

18            MS. LACKMAN:  Objection, vague.

19        Q.  What do you mean by maintain?

20        A.  Keep it.

21            MS. LACKMAN:  Same objection.

22        A.  That metadata is viewable within our

23   internal source and also when it is public.

24        Q.  So Shutterstock never removes the

25   metadata from the uploaded photograph when it
```

Page 95

1              A. ZAMBROWSKI

2    offers it for license on its website,

3    correct?

4         MS. LACKMAN:  Objection, no

5         foundation, vague, misstates the

6         testimony.

7         A.  No, that is incorrect.  All metadata

8    is stripped before uploading -- at the time

9    of uploading, the full metadata is stripped

10   from the content itself, and users are

11   advised to input their own metadata.  This is

12   just for consistency factors.  Not every

13   single piece of camera or piece of video

14   equipment has the same format.  Also, there

15   are times where they have location base

16   within that metadata.  We don't want

17   individuals to be -- to basically protect

18   individuals from being stalked or found out.

19        Q.  So is it fair to say that

20   Shutterstock strips or removes the metadata

21   from the photographs when they're uploaded to

22   the Shutterstock platform?

23        A.  To the best of my knowledge, yes.

24        MS. LACKMAN:  Objection, misstates

25        testimony.

Page 96

```
 1                    A. ZAMBROWSKI

 2          A.   I mentioned this one before, the

 3     external buildings, internal buildings,

 4     clothing, the branding.

 5          Q.   What will Shutterstock look for when

 6     deciding whether or not to display content

 7     based on there being, quote, unquote, similar

 8     content?

 9             MS. LACKMAN:  Objection, vague.  To

10          the extent there is legal analysis

11          wrapped up in this, please refrain to

12          discuss.  If there isn't, then you can

13          answer.

14          A.   It's the content that is taking the

15     same picture but rotating the camera slightly

16     and slightly and it's uploading every single

17     one of those.  It is offloading user

18     experience, in my personal opinion.

19          Q.   Shutterstock will make that decision

20     at its discretion and reject the content?

21             MS. LACKMAN:  Objection, misstates

22          the testimony.

23          A.   To the best of my personal

24     knowledge, yes.

25          Q.   Does Shutterstock have complete
```

Page 107

```
 1                    A. ZAMBROWSKI
 2      discretion of what gets published on its
 3      site?
 4              MS. LACKMAN:  Objection, calls for a
 5          legal interpretation, asked and answered.
 6          A.  To the best of my personal
 7      knowledge, yes, we have a certain threshold
 8      that we try to uphold as to keep our
 9      contributors more engaged and our customers
10      happy.
11          Q.  So when you're looking at content to
12      see if it violates your, quote, standing
13      policy, which would require rejection, what
14      are you looking for?
15              MS. LACKMAN:  Objection, outside the
16          scope, calls for speculation.
17          A.  That could be a number of things.
18      As I mentioned, taking the same frame and
19      just rotating your camera over and over and
20      uploading five through a hundred of those
21      same images.
22          Q.  So folks try to upload Spam content
23      on Shutterstock from time to time, correct?
24              MS. LACKMAN:  Objection, vague.
25          A.  To the best of my personal
```

Page 108

```
 1                    A. ZAMBROWSKI

 2        knowledge, yes.

 3             Q.  And Shutterstock will reject that

 4        Spam content, correct?

 5             A.  Correct.

 6             Q.  That Spam content never shows up on

 7        the Shutterstock website, correct?

 8                  MS. LACKMAN:  Objection, calls for

 9             speculation.

10             A.  Correct.

11             Q.  And that holds true for all of the

12        five bullet points that we just discussed, if

13        the submitted contents aren't in line with

14        Shutterstock guidelines, Shutterstock will

15        reject the content, correct?

16                  MS. LACKMAN:  Objection, calls for

17             speculation.

18             A.  To the best of my personal

19        knowledge, yes.

20             Q.  Are you aware of Shutterstock's

21        technical and metadata standards?

22                  MS. LACKMAN:  Objection, vague.  Can

23             you refer to a document?

24             Q.  Go ahead.

25             A.  I am not.
```

Page 109

```
1                    A. ZAMBROWSKI
2         limit, Scott.  So any recollection of how
3         you know --
4              MR. BURROUGHS:  Are you finished?
5         If you want to add anything else, go
6         ahead, but if you're finished, the
7         witness can answer the question.
8         Q.  Go ahead.
9         A.  Could you rephrase the question?
10        Q.  Sure.  Given that you're not a re-
11        viewer, how do you know that Shutterstock
12        reviewers are thoroughly trained on
13        Shutterstock's technical and metadata
14        standards, as well as compliance policies?
15             A.  Because as I mentioned, our review
16        coordinators' main responsibility is
17        educating our reviewers on our technical and
18        metadata standards.  They are audited, they
19        are trained, they're given feedback
20        questions, they are reliant individuals.
21             Q.  Did they tell you, those
22        coordinators, that they trained the
23        reviewers?
24             MS. LACKMAN:  Objection.  This is
25        outside the scope as harassing.  Mr.
```

Page 113

```
 1                    A. ZAMBROWSKI
 2          Zambrowski, please don't answer the
 3          question.  This is badgering.  This is
 4          classic badgering.
 5          Q.  Are you going to take your
 6      attorney's advice?
 7              MS. LACKMAN:  You're asking a
 8          30(b)(6) witness how they know everything
 9          they know, the witness is working for the
10          company for five years.  That's
11          badgering, that's classic badgering.  I'm
12          really ready to call the judge if you're
13          going to continue going down this line.
14          Q.  Are you going to take your
15      attorney's advice?
16          A.  Yes, I am.
17          Q.  Did you ever personally see the
18      coordinators training the reviewers, as we've
19      discussed?
20              MS. LACKMAN:  Objection, harassment.
21          You can answer if you wish.
22          A.  In a personal capacity, yes, I have.
23          Q.  Other than what you told me so far,
24      do you have any other personal knowledge
25      relating to how the reviewers were trained on
```

Page 114

```
 1                    A. ZAMBROWSKI
 2           A.   To the best of my knowledge, yes.
 3           Q.   So is it Shutterstock that adds the
 4      watermark to third party content?
 5                MS. LACKMAN:  Objection, asked and
 6                answered, vague.
 7           A.   Yes, to the best of my knowledge.
 8           Q.   Looking at the bullet point below
 9      that, We reserve the right to remove any
10      previously accepted content submission; do
11      you see that?
12           A.   Correct.
13           Q.   Does that accurately reflect your
14      understanding that Shutterstock has complete
15      control over the content in its library?
16                MS. LACKMAN:  Objection, calls for a
17                legal conclusion, vague and calls for
18                legal interpretation.  You need to define
19                control.
20           Q.   Go ahead.
21                MS. LACKMAN:  If you understand the
22                question.
23           A.   Yes, that's correct, that goes with
24      any content where you upload content that
25      they fully reserve their rights to remove
```

Page 118

July 14, 2022

```
 1                    A. ZAMBROWSKI
 2      content submitted by an individual.
 3          Q.  The individual has no say whether or
 4      not Shutterstock accepts or removes the
 5      content, right?
 6              MS. LACKMAN:  Objection, vague.
 7          Q.  Let me rephrase the question.  The
 8      contributor of the content has no say in
 9      whether or not Shutterstock accepts or
10      removes the content, correct?
11              MS. LACKMAN:  Objection, vague.
12          A.  Individuals can appeal content being
13      removed through the HMCA counter notice.
14          Q.  But it's Shutterstock that has the
15      final say as to whether or not a photograph
16      is going to appear on its website?
17              MS. LACKMAN:  Objection, asked and
18          answered, calls for a legal conclusion.
19          A.  To the best of my personal
20      knowledge, yes.
21          Q.  In fact, can Shutterstock remove any
22      photograph from its website at any time for
23      any reason?
24              MS. LACKMAN:  Objection, vague, no
25          foundation.
```

Page 119

```
1                    A. ZAMBROWSKI

2          A.   For the contributor TRS, we make it

3     abundantly clear that we are able to remove

4     content for any reason.

5          Q.   And you ca do so even if a counter

6     notification is submitted, correct?

7               MS. LACKMAN:   Objection, calls for a

8          legal interpretation.   Actually, calls

9          for disclosure of legal information, it's

10         privileged.   Please don't answer.

11         Q.   You're going to accept your

12    attorney's advice there?

13         A.   Yes, I'm going to take my attorney's

14    advice.

15         Q.   It also indicates on this page that

16    you protect user content.   How do you do that

17    at Shutterstock?

18         A.   We protect user content by applying

19    a watermark on top of that content so it

20    cannot be easily obtained by any nefarious

21    individual.

22         Q.   Do you take any other steps?

23         A.   To the best of my personal

24    knowledge, no.

25         Q.   We're going to put in front of you a
```

Page 120

```
 1                    A. ZAMBROWSKI
 2         Q.  Are you aware of any third-party
 3    sites, like TinEye, including advertisements
 4    from Shutterstock without Shutterstock's
 5    direction or consent?
 6              MS. LACKMAN:  Objection, no
 7         foundation, misstates testimony.
 8         A.  To the best of my personal
 9    knowledge, I do not know.  I'm not a website
10    developer or an advertiser.
11         Q.  So is it more likely than not that
12    if there is a Shutterstock advertisement on
13    TinEye, that TinEye has a relationship with
14    Shutterstock?
15              MS. LACKMAN:  Objection, calls for
16         speculation, no foundation.
17         A.  I do not know from my personal
18    capacity.
19         Q.  Has Shutterstock ever reached out to
20    TinEye and advised TinEye to stop displaying
21    the image at issue in this case?
22              MS. LACKMAN:  Objection, no
23         foundation, not within the scope, asked
24         and answered.  I'm sure there are other
25         objections.
```

Page 128

```
 1                    A. ZAMBROWSKI
 2         A.  To the best of my personal
 3    knowledge, no.
 4         Q.  And has Shutterstock ever reached
 5    out to any third party and told them to
 6    remove the photograph at issue in this case
 7    from their website?
 8         A.  Can you define third party?
 9         Q.  Any party that's not Shutterstock.
10         A.  I'm afraid I don't understand the
11    question.  Could you rephrase that?
12         Q.  Sure.  Has Shutterstock ever
13    contacted any company other than Shutterstock
14    And advised them to remove the image that's
15    at issue in this case?
16            MS. LACKMAN:  Objection, no
17            foundation.
18         A.  To the best of my personal
19    knowledge, no.
20         Q.  I'll put a document in front of you
21    marked Steinmetz 47, which I believe is a
22    screenshot.  We're going to mark that next in
23    line.
24            (Whereupon, Exhibit 6 was
25            referenced.)
```

Page 129

```
 1                    A. ZAMBROWSKI

 2     photograph was displayed online via

 3     Shutterstock?

 4              MS. LACKMAN:  Objection.  What

 5          photograph?  Do you see a photograph?

 6          Maybe there is a different document that

 7          you have.

 8          Q.  Do you understand the question?

 9          A.  Please elaborate.

10          Q.  Sure.  Do you understand this

11     particular photograph at issue in this case,

12     correct, the one taken by George Steinmetz?

13              MS. LACKMAN:  Objection to the

14          characterization of photograph.

15          Q.  Do you understand?  We looked at it

16     earlier.  We can bring the exhibit back up

17     and refresh your recollection if you don't

18     remember.

19          A.  Yes, I recall that earlier image.

20          Q.  Other than the Shutterstock site,

21     what other websites did that image appear as

22     distributed via Shutterstock?

23              MS. LACKMAN:  Objection, outside the

24          scope, asked and answered.

25          A.  Personally, I do not know.
```

Page 132

```
 1                    A. ZAMBROWSKI
 2          Q.  If you wanted to figure that out,
 3     where would you look?
 4          A.  Personally, if I had to take an
 5     educated guess, I would contact the API team
 6     and see how those agreements are working and
 7     also where our content is being distributed
 8     in some capacity.
 9          Q.  Before your deposition today, you
10     didn't contact anyone on the API team or at
11     Shutterstock to see where the content at
12     issue in this case was distributed; isn't
13     that correct?
14          A.  Personally, I did not.
15          Q.  Did anybody, to your knowledge?
16          A.  To the best of my personal
17     knowledge, no one has.
18          Q.  So as we sit here today, no one at
19     Shutterstock, to your knowledge, has looked
20     to see where the image at issue in this case
21     was displayed online, correct?
22          MS. LACKMAN:  Objection.  The
23          question is outside the scope, so if you
24          happen to know, you can answer.
25          A.  I do not know.
```

Page 133

```
 1                  A. ZAMBROWSKI
 2        A.  We have a number of different
 3    licensing agreements that are now offered to
 4    customers.  A standard basic one allows
 5    specific usages.  An enhanced one is more
 6    compound, but our standard one is that would
 7    not include allowing the content to be used
 8    on merchandising, for example.
 9        Q.  Does Shutterstock offer plans that
10    allow for a certain number of downloads per
11    day or per week or per month?
12            MS. LACKMAN:  Objection, outside the
13        scope.
14        A.  Yes.
15        Q.  And is it accurate that customers
16    choose Shutterstock because of the high
17    quality licensed images that it offers to
18    customers?
19            MS. LACKMAN:  Objection, calls for
20        speculation.
21        A.  I personally would say yes.
22        Q.  And part of that is because
23    Shutterstock ensures that the photography
24    that it displays for license on its website
25    is high quality, right?
```

Page 156

```
 1                    A. ZAMBROWSKI

 2              MS. LACKMAN:  Objection, vague.

 3         A.  I personally would agree with that.

 4         Q.  I'm going to put a document in front

 5    of you marked as Exhibit 11.

 6              (Whereupon, Exhibit 11 was

 7         referenced.)

 8         Q.  And while she's putting that up,

 9    does Shutterstock's API serve up links to

10    JPEG files that it provides that API to third

11    parties?

12         A.  I'm sorry, I don't understand.

13         Q.  Have you worked at all with

14    Shutterstock's API?

15         A.  Personally, I did not.

16         Q.  Do you understand how Shutterstock's

17    API works?

18         A.  I basically know what it does but

19    nothing of the working mechanisms involving

20    how it's made.

21         Q.  What's your understanding of how

22    Shutterstock's API works?

23              MS. LACKMAN:  Objection, vague.

24         A.  My personal understanding of how API

25    works is it's a system in place that allows
```

                                            Page 157

```
 1                      A. ZAMBROWSKI
 2            MS. LACKMAN:  Objection to the term
 3       APA.
 4            MR. BURROUGHS:  API.
 5            MS. LACKMAN:  And outside the scope,
 6       no foundation.
 7       Q.  You understand the question?
 8       A.  No.  Could you repeat the question,
 9       please?
10       Q.  Does Shutterstock's API serve up
11       links to third parties that are connected
12       directly to the JPEG files of Shutterstock's
13       photography assets?
14            MS. LACKMAN:  Objection, vague,
15            outside the scope.
16       A.  To the best of my understanding,
17       yes.
18       Q.  Have you seen the material in
19       Exhibit 11 before?
20            MS. LACKMAN:  Objection.  Photos and
21            ownership can be confusing, but this is
22            way outside the scope.  This has got a
23            toxic stamp on it, I believe.  It's filed
24            on a different date.  So do you mean to
25            include this, or are we confused?
```

Page 160

```
 1                    A. ZAMBROWSKI
 2        Q.   What is your understanding of what
 3   SEO is?
 4        A.   I just understand that's search
 5   engine optimization.
 6        Q.   Does Shutterstock use SEO to
 7   increase visitors to its website?
 8             MS. LACKMAN:  Objection, outside the
 9        scope, no foundation, misstates what SEO
10        is.
11        A.   Yes.  Any website would use SEO.
12        Q.   Does it use data from the images up-
13   loaded by contributors as part of its SEO
14   campaign?
15             MS. LACKMAN:  Objection, no
16        foundation, outside the scope.
17        A.   I personally do not know.
18        Q.   Does Shutterstock offer high-res
19   images to its customers?
20             MS. LACKMAN:  Objection, vague as to
21        offer.
22        A.   Shutterstock downloads high-res
23   images.
24        Q.   What API does Shutterstock have,
25   what are they used for?
```

Page 163

```
 1                   A. ZAMBROWSKI
 2          Q.   Does this exhibit indicate to you if
 3      and when this image was locked?
 4             MS. LACKMAN:   Can you scroll down?
 5      I can't see the whole exhibit.
 6          A.   Yes, based on the resolved date,
 7      September 21, '22.
 8          Q.   And do you know if that was the
 9      first action taken in connection with the
10      image at issue in this case?
11             MS. LACKMAN:   Objection, vague.
12          A.   What action?
13          Q.   From this exhibit, it appears to be
14      the locking of the image.
15             MS. LACKMAN:   Objection.   Is there a
16      question?
17          A.   I don't understand.   Could you
18      rephrase the question?
19          Q.   Let's scroll back up.   Do you see
20      there where it indicates that the recipient
21      of this ticket should lock the image?
22          A.   Yes.
23          Q.   Was that the first action taken in
24      connection with the image at issue in this
25      case?
```

Page 172

```
 1                    A. ZAMBROWSKI
 2        A.  Yes, that's correct.
 3        Q.  And that Shutterstock blocked access
 4     to the public from the photograph at issue in
 5     this case at that time.
 6             MS. LACKMAN:  Objection, misstates
 7          testimony.
 8        Q.  Is that accurate?
 9        A.  Shutterstock blocked the capability
10     to be licensed from its portfolio.
11        Q.  It blocked public access to the
12     photograph?
13             MS. LACKMAN:  Objection, vague.
14        A.  Can you define public?
15             MS. LACKMAN:  Asked and answered.
16        Q.  Anybody outside Shutterstock.
17        A.  To the best of my knowledge, yes.
18        Q.  Do you recall that the takedown
19     notice was sent sometime in April 2021?
20        A.  That sounds about right.
21        Q.  Did Shutterstock give an explanation
22     as to why the image wasn't blocked between
23     April and September 2021?
24             MS. LACKMAN:  Objection, vague as to
25          the image.
```

Page 174

```
 1                    A. ZAMBROWSKI
 2          A.  As mentioned, I don't know what
 3     locking an image refers to or what that
 4     actually means.
 5          Q.  Did Shutterstock have any
 6     explanation as to why it didn't take any
 7     additional action, other than what you told
 8     me so far, with suspension between April of
 9     2021 and whenever this ticket was issued?
10               MS. LACKMAN:  Objection, misstates
11          testimony, misstates documents and our
12          records that are deliberately withheld
13          from the witness.
14          Q.  Go ahead.
15          A.  The document that was provided to me
16     in 2021 was the takedown notice or the
17     requirement for the takedown notice to
18     suspend content which is infringing on the
19     copyright holder.
20          Q.  So does Shutterstock have any other
21     explanation for why it waited until
22     September 2021 to take the action that's
23     reflected in this exhibit?
24               MS. LACKMAN:  Objection, vague,
25          compound.
```

Page 175

                        A. ZAMBROWSKI

 1

 2          A.   I do not know personally.

 3          Q.   Do you know if Shutterstock ever

 4     acted on the ticket that we're looking at in

 5     Exhibit 12?

 6               MS. LACKMAN:  Objection, asked and

 7          answered.

 8          A.   As I mentioned, it says completed

 9     activity.

10          Q.   So that leads you to believe it was

11     completed?

12          A.   Correct.

13          Q.   You may want to scroll down, but do

14     you know when the ticket was submitted?

15          A.   Yes.  It says it was created

16     September 21, 2020.

17          Q.   Let's scroll back up.  Do you know

18     who Jefferson Frazer is?

19          A.   Personally, I do not.

20          Q.   Have you worked with him on anything

21     at Shutterstock?

22          A.   Personally, I don't know.

23          Q.   The spelling for that is

24     J-E-F-F-E-R-S-O-N F-R-A-S-E-R, I believe.  Do

25     you have any reason to believe that

                                        Page 176

```
 1                    A. ZAMBROWSKI

 2        Shutterstock assigned another ID number other

 3        than this assigned number to the photograph

 4        at issue in this case?

 5             A.   Shutterstock assigned a Google ID to

 6        each individual content.  It does not modify

 7        the content ID, or asset ID as you put it.

 8             Q.   When you're referring to that number

 9        inhouse, what do you call it?

10             A.   Inhouse we refer to it as asset ID,

11        content ID, image ID, video ID.

12             Q.   For a photograph, do you use asset

13        ID?

14             A.   Asset ID or image ID.

15             Q.   And is it your testimony that

16        Shutterstock does not provide that asset ID

17        to third parties, like other websites?

18             A.   To the best of my personal

19        knowledge, yes.

20             Q.   Let's look at Exhibit 6.  We looked

21        at this one before, we'll put it back up on

22        the screen.  You recall looking at this site,

23        StockFresh?

24             A.   Yes.

25             Q.   The URL with the StockFresh name, do
```

                                        Page 177

1                    A. ZAMBROWSKI

2       you see a numerical sequence at the end of

3       the URL stream?

4            A.  Yes.

5            Q.  Does that appear to be the same

6       asset ID for the photograph at issue in this

7       case as reflected in the Shutterstock

8       database?

9            A.  Yes -- I believe so.

10           Q.  Do you know, does Shutterstock have

11      any idea where StockFresh could have attained

12      that asset ID other than through

13      Shutterstock?

14               MS. LACKMAN:  Objection, foundation.

15           A.  Personally, I believe they obtained

16      it through Shutterstock's API.

17           Q.  So is it Shutterstock's testimony

18      that Shutterstock serves up the asset ID

19      number through its API to third parties?

20               MS. LACKMAN:  Objection, lack of

21           foundation, misstates testimony.

22           A.  To the best of my personal knowledge

23      here, yes.

24           Q.  And then, would that asset ID number

25      appear with the Shutterstock photograph

                                   Page 178

```
1                   A. ZAMBROWSKI
2       that's referenced by that number?
3              MS. LACKMAN:  Objection, vague.
4          A.  It would only appear here if the
5       content is live on Shutterstock's platform.
6          Q.  But if it was live, it would appear
7       here?
8              MS. LACKMAN:  Objection, calls for
9          speculation.
10         A.  To the best of my personal
11      knowledge, yes.
12         Q.  And if it wasn't live, it wouldn't
13      appear on any of these third-party sites,
14      correct?
15             MS. LACKMAN:  Objection, misstates
16         testimony.
17         A.  Yes.
18         Q.  Does Shutterstock allow previews of
19      images to users?
20             MS. LACKMAN:  Objection, vague as to
21         previews.
22         A.  Can you rephrase, please?
23         Q.  Are you able to see the full image
24      without being logged in?
25         A.  Logged in as in what?
```

Page 179

```
 1                    A. ZAMBROWSKI

 2        Q.  Logged in as a licensee or a

 3   potential customer.

 4        A.  Customers and licensees are able to

 5   see full images that have the Shutterstock

 6   watermark.

 7        Q.  Does Shutterstock allow viewers to

 8   download images without purchasing one of the

 9   memberships that we talked about earlier?

10        A.  No.

11        Q.  Does Shutterstock offer any plug-ins

12   or add-ons that allow its customers to use

13   images on its site?

14            MS. LACKMAN:  Objection, vague.

15        A.  Can you define what type of plug-ins

16   you mean?  Is it like a Chrome extension?

17        Q.  Yes, Chrome extension would be one,

18   something for Microsoft Suite would be

19   another.  Any plug-ins or add-ons that

20   Shutterstock offers in connection with the

21   images.

22            MS. LACKMAN:  Vague, outside the

23        scope.

24        A.  I personally understand that we do

25   have a few plug-ins, but I do not know what
```

Page 180

```
1                    A. ZAMBROWSKI

2         Q.  More than a month?

3         A.  I don't recall.

4         Q.  Let me ask you, for Shutterstock,

5    what is a reasonable amount of time to

6    respond to a DMCA notice?

7             MS. LACKMAN:  Objection.  I'm going

8         to instruct the witness not to answer.

9         Calls for a legal interpretation.

10            MR. BURROUGHS:  We're just going to

11        indicate on the record that we'll be

12        moving to eliminate and exclude any

13        evidence of the Section 512 defense

14        because the witness is not being allowed

15        to answer questions on the 512 defense.

16            MS. LACKMAN:  You're asking the

17        witness to testify to what's a reasonable

18        period of time for removal under the law.

19        The witness is not a legal expert and

20        he's not designated as a legal expert,

21        nor is it a topic in your deposition

22        notice.  If you would like to point me to

23        a topic in your deposition notice that we

24        did not object to where it says the

25        witness will be testifying as to what a
```

Page 186

```
 1                    A. ZAMBROWSKI
 2          reasonable period is under the law to
 3          remove the image, to consult with someone
 4          to investigate and to remove, then we can
 5          have the witness testify to that, but I
 6          don't see that in any of your deposition
 7          notice, and I believe you're asking him
 8          for an interpretation of the law that he
 9          would understand only from conversations
10          with counsel, if he has any understanding
11          as to what this is.  You can make your
12          motion to eliminate.
13             MR. BURROUGHS:  I disagree.
14          Q.  But are you going to take your
15      attorney's advice and refuse to answer the
16      question?
17             MS. LACKMAN:  Mr. Burroughs, are you
18          going to tell me which topic this relates
19          to and where it says that he's supposed
20          to talk about the reasonableness of a
21          notice and the time and the response,
22          especially considering that you are not
23          showing him documents?  So if you want to
24          show me the notice that has to do with
25          that, then we can go into it, or we can
```

Page 187

```
1                     A. ZAMBROWSKI

2          concur off the record as to whether he

3          can give an answer to this question in a

4          way that doesn't reveal privileged

5          information.

6          Q.  Are you going to take your

7     attorney's advice and refuse to answer?

8          A.  I will take my attorney's advice.

9              (Whereupon, recess was taken.)

10             MR. BURROUGHS:  We're back on the

11         record.

12         Q.  Artur, you understand you're still

13    under oath?

14         A.  Yes.

15             MR. BURROUGHS:  I just want to clean

16         something up.  The cease and desist

17         letter we were looking at is to be marked

18         Exhibit 14.

19         Q.  You recall Shutterstock receiving

20    this demand letter, correct?

21         A.  Correct.

22         Q.  We're going to put a document in

23    front of you marked as Exhibit 15, STK 666.

24    Do you recognize this document?

25         A.  Yes.
```

Page 188

```
 1                    A. ZAMBROWSKI
 2         MS. LACKMAN:   The screenshot is a
 3       little challenging.   Do you mind
 4       scrolling back down?
 5         Q.  If you want to see a particular
 6     portion of the document, please let us know
 7     and we'll scroll to wherever you want to go
 8     in the document.
 9         A.  Yes, this is my acknowledgment to
10     the individual who submitted the cease and
11     desist that we've taken action.
12         Q.  And that's Julia?
13         A.  That's what it says.
14         Q.  Here you're going by the fake name
15     of [        ] right?
16         A.  It is an alias, correct.
17         Q.  It indicates that [      ] is on the IP
18     team at Shutterstock, Inc.; is that correct?
19         A.  Correct.
20         Q.  When did you respond to Julia in
21     connection with the cease and desist letter
22     that was marked as Exhibit 14?
23         A.  It's dated above, on May 11, 2021.
24         Q.  And what are you stating to Julia in
25     that response?  And of course, going through
```

**Redactions per Defendant's request.**                    Page 190

```
 1                    A. ZAMBROWSKI
 2      the copyright holder.  This was never
 3      identified within the cease and desist, let
 4      alone the cease and desist was not a standard
 5      DMCA notice.
 6           Q.  So it's your option that it doesn't
 7      violate those policies and guidelines; is
 8      that correct?
 9           A.  To the best of my personal
10      understanding, yes.
11           Q.  And Shutterstock maintaining a
12      publicly viewable copy of the image seen in
13      Exhibit 13 accords with Shutterstock's
14      guidelines and policies, doesn't it?
15               MS. LACKMAN:  Objection,
16           mischaracterizes the document,
17           mischaracterizes the law, calls for a
18           legal conclusion, asked and answered,
19           mischaracterizes the cease and desist
20           letter.
21           Q.  Go ahead.
22           A.  Could you repeat the question?
23           Q.  Sure.  Maintaining a public viewable
24      copy of the image that you see in Exhibit 13
25      complies with Shutterstock's guidelines and
```

Page 198

```
 1                    A. ZAMBROWSKI
 2      policies, doesn't it?
 3              MS. LACKMAN:  Objection,
 4          mischaracterizes the document,
 5          mischaracterizes the testimony, asked and
 6          answered, argumentative.
 7      Q.  Go ahead.
 8              MS. LACKMAN:  Assumes facts not in
 9          evidence.
10      A.  No, this does not.
11      Q.  Why not?
12              MS. LACKMAN:  Asked and answered.
13      A.  My personal understanding is that
14      the regular acknowledged JPEG form of this
15      content was asked to be removed by the cease
16      and desist/DMCA notice that was provided.
17          Q.  Is that your entire answer?
18          A.  Yes.
19          Q.  Is the image in Exhibit 13 an image
20      that Shutterstock keeps in, quote, unquote,
21      deep storage?
22              MS. LACKMAN:  Objection, vague as to
23          image.
24          A.  Yes, I believe so, to be used within
25      our MD5 system after review, so no other
```

Page 199

```
 1                    A. ZAMBROWSKI
 2    individual would be able to upload this type
 3    of content on any third-party sites.
 4        Q.  So is it fair to say that
 5    Shutterstock makes visible to the public the
 6    material saved in its, quote, unquote, deep
 7    storage?
 8            MS. LACKMAN:  Objection, asked and
 9        answered, mischaracterizes the testimony,
10        misstates the testimony, vague as to
11        time.
12        A.  No, it does not.  It does not make
13    these things public at all.
14        Q.  Well, the photograph we're looking
15    at in Exhibit 13 was viewable to the public
16    in September of 2021, months after receiving
17    the cease and desist letter, wasn't it?
18            MS. LACKMAN:  Objection, asked and
19        answered, no foundation, compound.
20        A.  The cease and desist letter never
21    identified specifically the JPEG form of this
22    piece of content.
23        Q.  And it's Shutterstock's position
24    that because it didn't, that Shutterstock had
25    no obligation to remove the material under
```

                              Page 200

```
 1                    A. ZAMBROWSKI
 2      its policies and guidelines, correct?
 3           A.   That would be under the DMCA, not
 4      Shutterstock's guidelines.
 5           Q.   What about under Shutterstock's
 6      guidelines?
 7                MS. LACKMAN:   Objection, outside the
 8           scope, calls for speculation, vague as to
 9           time.
10           Q.   Go ahead.
11           A.   I personally, under my own self,
12      believe that this might have been a glitch.
13      It should have been removed at the time it
14      was suspended.  A JPEG version is not easily
15      searchable, it's not easily obtainable.  It
16      has Shutterstock's watermark and trademark
17      visible within the content.
18           Q.   Does this one also include
19      additional watermarks and trademarks that we
20      haven't seen on the versions that we looked
21      at before?
22                MS. LACKMAN:   Objection as to
23           trademarks, calls for a legal conclusion.
24           A.   This also shows the contributor's
25      user name who uploaded the content.
```

Page 201

```
 1                    A. ZAMBROWSKI
 2         A.  As I mentioned this is not a static
 3     document, it is constantly modified and
 4     changed.  It does not hold any records.
 5         Q.  Did you look to see if you made a
 6     copy of the protocol sheet in connection with
 7     the infringement at issue in this case?
 8         A.  Yes, I have, but this is just so I
 9     don't interfere with anyone else's doing the
10     same type of protocol.  This is just to have
11     a copy for myself for my own editing
12     purposes.
13         Q.  Do you recall selecting the tab as
14     set forth in Exhibit 2 and including that
15     information?
16         A.  When?
17         Q.  At any time in connection with the
18     infringement at issue in this case.
19         A.  Personally, within this case, I do
20     not recall.
21         Q.  Do you recall filling in the
22     contributor display name and the other
23     information set forth in paragraph 3 of the
24     account termination protocol?
25         A.  Personally, I do not recall.
```

Page 214

```
 1              A. ZAMBROWSKI
 2         Q.  Do you recall completing step 4 of
 3     the termination protocol?
 4         A.  Personally, I do not recall.
 5         Q.  Do you recall completing step 5?
 6         A.  Personally, I do not recall.
 7         Q.  Step 6?
 8         A.  I do not recall.
 9         Q.  Step 7?
10         A.  I do not recall.
11         Q.  Step 8?
12         A.  I do not recall.
13         Q.  Do you know if anyone at
14     Shutterstock completed those steps in
15     connection with the infringement at issue in
16     this case?
17         A.  I believe the account was officially
18     terminated under Andrew Raff's advisement.
19         Q.  Do you recall Mr. Raff completing
20     the eight steps in the protocol?
21         A.  I do not recall.
22         Q.  Do you recall anyone at Shutterstock
23     completing the eight steps in the protocol?
24         A.  In regards to this case?
25         Q.  In regard to the infringement at
```

Page 215

```
1                    A. ZAMBROWSKI

2         issue in this case.

3              A.  No, I do not recall.

4              Q.  Have you gone back to look in

5         connection with this case or deposition to

6         see if anyone complied with the protocol

7         that's set forth in this exhibit?

8              A.  I personally do not recall.

9              Q.  And you haven't looked for evidence

10        or asked anybody about it in advance of

11        today's deposition, right?

12             A.  Correct.

13             Q.  I'm putting a document in front of

14        you marked Exhibit 18, STK 56 and 57.

15                  (Whereupon, Exhibit 18 was

16        referenced.)

17             Q.  Do you recognize this document?

18             A.  Yes.

19             Q.  What's this document?

20             A.  This is a contributor's Admin Mason

21        brief.

22             Q.  Do you understand that this document

23        refers to the account for the individual

24        Shutterstock account holder who uploaded the

25        photograph at issue in this case?
```

Page 216

```
 1                    A. ZAMBROWSKI
 2          A.  I personally don't know.
 3          Q.  You have no understanding as to the
 4     material in those sections, correct?
 5          A.  Personally, I do not.
 6          Q.  Do you understand that Exhibit 19
 7     relates to the approval of the image at issue
 8     in this case for display on the Shutterstock
 9     website?
10          A.  Yes.
11          Q.  Do you understand that L. Benetti,
12     whoever he or she is, on behalf of
13     Shutterstock reviewed the content and
14     approved it for display on the Shutterstock
15     website?
16          A.  Given the context of this document,
17     yes.
18          Q.  So does this document indicate to
19     you that Shutterstock reviewed the photograph
20     at issue in this case and approved it for
21     display and offering for license on its
22     website?
23          A.  Correct.
24          Q.  Who added the key words, if you
25     know?
```

Page 225

```
 1                    A. ZAMBROWSKI
 2      Shutterstock's website for a mobile unit?
 3              MS. LACKMAN:  Objection, asked and
 4          answered like six hours ago.
 5      Q.  Go ahead.
 6      A.  No, I don't believe so.
 7      Q.  Is affiliate traffic reflected on
 8      this document, meaning traffic of yours that
 9      used the photograph at issue on third-party
10      sites?
11              MS. LACKMAN:  Objection, asked and
12          answered.
13      A.  As a Shutterstock affiliate, when a
14      customer clicks license or use content on an
15      affiliate site, it transfers them back to
16      Shutterstock, so to answer your question,
17      yes.
18      Q.  But it doesn't reflect the traffic
19      to those websites.
20              MS. LACKMAN:  Objection, vague.
21      A.  As a personal understanding, they do
22      not.
23      Q.  Let's look at Exhibit 20, which is
24      STK 1 to 3.
25              (Whereupon, Exhibit 20 was
```

Page 234

```
 1                    A. ZAMBROWSKI
 2      can only assume so.
 3           Q.  Do you know if these terms have been
 4      amended at any time since the beginning of
 5      2021?
 6           A.  From my personal understanding, I do
 7      not know.
 8           Q.  But you understand that these API
 9      terms of service relate to these third-party
10      sites that use Shutterstock's API?
11           A.  Yes.
12           Q.  Does Shutterstock have any
13      relationship with a company named HelloRF?
14           A.  From my personal understanding, yes.
15           Q.  What's that relationship?
16               MS. LACKMAN:  Objection to the
17           extent it calls for a legal
18           interpretation.  If you have an
19           understanding.
20           Q.  Go ahead.
21               MS. LACKMAN:  I don't want to bind
22           you as a lawyer.  You can describe it if
23           you have an understanding.  I just want
24           to make sure that you're not a lawyer
25           giving a legal opinion.
```

Page 240

```
 1                    A. ZAMBROWSKI
 2          A.   My basic personal understanding is
 3     that it's an authorized partner of
 4     Shutterstock's.
 5          Q.   Does Shutterstock own the HelloRF
 6     company, in part?
 7               MS. LACKMAN:   Objection, calls for
 8          speculation.
 9          A.   Who is the parent company in
10     question?
11               MS. LACKMAN:   Outside the scope.
12          Q.   Have you ever heard of a company
13     called ZCool?
14          A.   Yes, I personally have.
15          Q.   Who is ZCool?
16          A.   From my personal basic
17     understanding, it's another Shutterstock
18     authorized partner.
19          Q.   Do you know if Shutterstock invested
20     in ZCool?
21               MS. LACKMAN:   Objection, vague.
22          A.   I personally do not know.
23          Q.   Your understanding, though, is that
24     there is some sort of partnership between the
25     two?
```

Page 241

1

2                    C E R T I F I C A T E

3        STATE OF NEW YORK)

4                      SS.:)

5        COUNTY OF KINGS  )

6

7            I, SARA FREUND, CSR, a Notary Public

8        within and for the State of New York, do

9        hereby certify:

10           THAT ARTUR ZAMBROWSKI, the witness whose

11       deposition is hereinbefore set forth, was

12       duly sworn by me and that such deposition is

13       a true record of the testimony given by such

14       witness.

15           I further certify that I am not related

16       to any of the parties to this action by blood

17       or marriage; and that I am in no way

18       interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto set

20       my hand on this 28th day of July, 2022.

21

22

23                          SARA FREUND, CSR

24

25

                                      Page 253