UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE STEINMETZ,<br><br>                    Plaintiff,<br><br>      -against-<br><br>SHUTTERSTOCK, INC.,<br><br>                    Defendant. | Case No. 1:21-cv-7100 (AKH) |

### SHUTTERSTOCK, INC.'S COUNTERSTATEMENT TO PLAINTIFF'S RULE 56.1 STATEMENT OF FACTS AND ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, defendant Shutterstock, Inc. ("Shutterstock"), by and through its undersigned counsel, respectfully submits the following counterstatement to plaintiff George Steinmetz's ("Plaintiff") Rule 56.1 statement of facts (ECF Doc. No. 64):

| Plaintiff's Rule 56.1 Statement of Fact | Basis |
|---|---|
| 1.  Steinmetz is an accomplished photographer who has earned numerous awards for his photography, including three prizes from World Press Photo, and whose work has been displayed in myriad publications and exhibitions, including National Geographic, NY Times Magazine, and GEO Magazine. | Declaration of George Steinmetz ("Steinmetz Decl.") ¶¶2-3. |

**Shutterstock's Response:** Disputed and immaterial, to the extent Plaintiff's accomplishments relate to the alleged infringing image at issue in this action in connection with Plaintiff's alleged reputational damage. Shutterstock has prestigious partnerships with imagery suppliers—including National Geographic, the publication in or through which Plaintiff's images have appeared. Declaration of Artur Zambrowski, dated September 16, 2022 ("Zambrowski Opp. Decl."), ¶ 6. Records show that only two people looked at the image, and as such, Plaintiff's

alleged reputational damage is mere speculation. *See* Declaration of Eleanor M. Lackman, dated

September 2, 2022, ECF Doc. No. 55, ("Lackman MSJ Decl."), Ex. O, at pp. 150:13-151:8;

152:24-153:7; 154:14-20.

| 2. In 2013, Steinmetz created an original aerial photograph depicting his perspective of burning practices used to convert virgin areas of the Amazon Rainforest into farmland for growing corn and soy beans (the "Subject Photograph"). | Steinmetz Decl. ¶4, Ex. 1. |
|---|---|

**Shutterstock's Response:** Undisputed except that Steinmetz captured the Image

pursuant to an Assignment Photographer Agreement with National Geographic Society dated

April 12, 2013.  Lackman MSJ Decl., ¶ 3, Ex. P; *id.*, Ex. O, at pp. 32:21-33:24.

| 3. Steinmetz traveled at great expense to explore the deforestation of the Amazon to create this stunning work, which he then published in National Geographic. | Steinmetz Decl. ¶4, Declaration of Scott Burroughs ("Burroughs Decl.") ¶ 19; Ex. 28. |
|---|---|

**Shutterstock's Response:** Disputed and misleading to the extent that Steinmetz alleges

that the travel was at his own personal expense. Steinmetz captured the Image pursuant to an

Assignment Photographer Agreement with National Geographic Society dated April 12, 2013.

Lackman MSJ Decl., ¶ 3, Ex. P; *id.*, Ex. O, at pp. 32:21-33:24. As indicated in the

aforementioned Agreement, National Geographic covered and reimbursed Steinmetz for

expenses related to the assignment. *Id.* ¶ 3, Ex. P at 528.

| 4. The Subject Photograph contained metadata identifying Steinmetz as the copyright owner and author. | Steinmetz Decl. ¶5, Ex. 2. |
|---|---|

**Shutterstock's Response:** Disputed. The Contributor did not convey any copyright

management information to Shutterstock in connection with the Contributor Image and the

Contributor Image itself did not display or otherwise contain any such information when

Shutterstock received it.  *See* Zambrowski MSJ Decl., ¶ 30, Ex. K.  Plaintiff has presented no evidence to the contrary.  *See* Lackman MSJ Decl., Ex. O, at pp. 134:17-136:7.

| | |
|---|---|
| 5.   Steinmetz owns all copyrights in and to the Subject Photograph and duly registered the Subject Photograph with the Copyright Office. | Steinmetz Decl. ¶6; Ex. 3. |

**Shutterstock's Response:** Disputed. Plaintiff *claims* that the Image is validly registered with the U.S. Copyright Office, effective as of November 26, 2013 (Reg. No. VAu 1-169-689), but has refused to produce the correspondence with the U.S. Copyright Office related to such registration, notwithstanding that the registration specifically states that there was correspondence with the U.S. Copyright Office.  *See* Lackman MSJ Decl., ¶ 4, Ex. Q; *see also id.*, Ex. O, at pp. 50:23-53:19. Plaintiff also captured the Image pursuant to an Assignment Photographer Agreement with National Geographic Society dated April 12, 2013.  *Id.*, ¶ 3, Ex. P; *id.*, Ex. O, at pp. 32:21-33:24. There is no evidence demonstrating whether the Image was duly assigned to Steinmetz pursuant to Paragraph 16(a)-(b) of the Assignment Photographer Agreement with the National Geographic Society. *See id.*, Ex. P, at 534.

| | |
|---|---|
| 6.   Shutterstock, Inc. ("Shutterstock") is a for-profit company that owns and operates a commercial website that sells licenses and subscription packages allowing its paying customers to use and exploit Shutterstock's curated collection of photography. | Burroughs Decl. ¶ 9, Ex. 15 at 65:6-15. |

**Shutterstock's Response:** Disputed and misleading. Steinmetz cites to the testimony of Artur Zambrowski in support, however, the testimony cited does not support Steinmetz's statement. Instead, the testimony cited refers to termination of contributors for allegedly infringing images, not a description of Shutterstock's company. *See* Declaration of Scott Alan Burroughs, dated September 2, 2022, ECF Doc. No. 58 ("Burroughs Decl."), ¶ 9, Ex. 15 at 65:6-15. Shutterstock operates a leading global online marketplace for photographic images and other

content (such as video footage and music) at the website www.shutterstock.com. *See* Zambrowski MSJ Decl., ¶ 2. Undisputed that Shutterstock is a for-profit website that offers licenses to its own and third-party supplied images either on an "a-la-carte" or subscription basis, but immaterial. Disputed that contributor material, as relevant in this case, is "curated." Zambrowski Opp. Decl., ¶ 4.

| 7.  Shutterstock offers to its customers full-size photographs in high resolution as part of a subscription package, or individually, or at times as "trial" downloads. | Burroughs Decl. ¶¶9, 12, 17; Ex. 15 at 179:18 - 180:6; 163:18-23; Exs. 18, 24, 27. |
|---|---|

**Shutterstock's Response:** Undisputed that Shutterstock offers to its customers and licensees full-sized photographs in high resolution, but denied to the extent that any such "full size" photographs in high resolution are available to customers prior to purchase or signing up for a trial. Immaterial since the Contributor Image at issue was viewed a total of four times by a mere two unique visitors, and never licensed, so the full-size Image was never supplied to anyone. Zambrowski MSJ Decl., ¶¶ 37-39, Ex. M. Exhibits 18, 24, 27 of the Burroughs Decl.,, all of which Steinmetz relies upon, were not produced in this action and as such, should be precluded as evidence in support of Steinmetz's motion for summary judgment. They are nevertheless immaterial for the same reasons above.

| 8.  When visitors view an image on the Shutterstock website, they are first shown an image on a background that implores users to "Buy Now" or sign up for a "Free trial." | Burroughs Decl. ¶¶12, 17; Ex. 18, 24, 27. |
|---|---|

**Shutterstock's Response:** Disputed, misleading, and immaterial. Exhibits 18, 24, 27 of the Burroughs Decl., all of which Steinmetz relies upon, was not produced in this action and as such, should be precluded as evidence in support of Steinmetz's motion for summary judgment. Nevertheless, this statement is immaterial since the Contributor Image was never licensed and

Shutterstock did not earn any revenue therefrom. Zambrowski MSJ Decl., ¶¶ 37-39, Ex. M.

Plaintiff's full-sized Image has never been posted, displayed, or otherwise used on Shutterstock's

website. *See Id.*, ¶¶ 31-32; Lackman MSJ Decl., Ex. O, at pp. 30:2-9, 31:13-25.

| | |
|---|---|
| 9. Shutterstock also displays a button promising that the user can "Download for free" the photograph being offered, but clicking that button leads visitors to a page where they are required to sign up and, after a free trial period, pay for a subscription allowing download and exploitation of the Shutterstock photographs. | Burroughs Decl. ¶ 12, Ex. 18. |

**Shutterstock's Response:** Disputed, misleading, and immaterial. Exhibit 18 of the

Burroughs Decl., of which Steinmetz relies upon, was not produced in this action and as such,

should be precluded as evidence in support of Steinmetz's motion for summary judgment. It is

nevertheless immaterial since the Contributor Image at issue was viewed a total of four times by

a mere two unique visitors (presumably Plaintiff's counsel when identified and when preserving

a copy), the Contributor Image was never licensed and Shutterstock did not earn any revenue

therefrom. Zambrowski MSJ Decl., ¶¶ 37-39, Ex. M. The high-resolution, unwatermarked copy

of the Contributor Image was never posted, displayed, used on Shutterstock's Website, or

otherwise provided to anyone. *Id.*, ¶¶ 31-32, 38; Lackman MSJ Decl., Ex. O, at pp. 30:2-9,

31:13-25.

| | |
|---|---|
| 10. Shutterstock's clients and licensees pay a monthly rate (currently ranging from at least $29 to $199) to use all of Shutterstock's photography, which would have included the Infringing Copy, or an annual per-photograph rate (currently ranging from $29 to $229) to access, copy, and exploit Shutterstock photography. | Burroughs Decl. ¶¶ 12, 20; Ex. 18, See https://www.shutterstock.com/pricing (last visited Aug. 29, 2022); Plaintiff's Request for Judicial Notice ("RJN"). |

**Shutterstock's Response:** Undisputed that customers seeking images to license pay a

subscription fee or an a la carte rate depending on the customer's choices pertaining to their

needs. Otherwise disputed, misleading, and immaterial. Exhibit 18 of the Burroughs Decl., of

which Steinmetz relies upon, was not produced in this action and as such, should be precluded as evidence in support of Steinmetz's motion for summary judgment. It is nevertheless immaterial since the Contributor Image at issue was viewed a total of four times by a mere two unique visitors, the Contributor Image was never licensed and thus would not be "included" in the fee; as noted, Shutterstock did not earn any revenue therefrom. Zambrowski MSJ Decl., ¶¶ 37-39, Ex. M. The high-resolution, unwatermarked copy of the Contributor Image was never accessible or provided to anyone. *Id.*, ¶ 38.

| | |
|---|---|
| 11. A Shutterstock client can only access Shutterstock photographs that have been preapproved by Shutterstock, including Shutterstock's own photographs, as Shutterstock offers both types of photography to its clients as part of its general portfolio for the same price and as part of the same paid packages, and exploit Shutterstock photography. | Burroughs Decl. ¶ 9, Ex. 15 at 73:8-75:5. |

**Shutterstock's Response:** Disputed, misleading, confusing, and immaterial. The testimony which Steinmetz cites does not support this statement. Mr. Zambrowski testified that a visitor could "potentially" be served with a mix of images by outside contributors and images in which Shutterstock owns the copyright, not that it is "part of its general portfolio for the same price and as part of the same paid packages [to] exploit Shutterstock's photography." *See* Burroughs Decl. ¶ 9, Ex. 15 at 73:8-75:5.

Moreover, the statement is misleading. Shutterstock briefly reviews the images uploaded by contributors for technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website. Zambrowski MSJ Decl., ¶ 5. In other words, Shutterstock does not "preapprove" images but instead rejects images that appear to have obvious issues; the remainder generally pass through to the platform, in part because the contributors on Shutterstock's Contributor Platform, must comply with the Shutterstock "Terms

of Service," whereby the contributor represents and warrants that the content that it submits to Shutterstock does not infringe the copyright or any other rights of any third party. *Id.*, ¶ 8-9, Exs. A & B. Shutterstock does not select, curate, control, or otherwise substantially influence the images that contributors upload. *Id.*, ¶ 4.

The statement is nevertheless immaterial including because the Contributor Image at issue was viewed a total of four times by a mere two unique visitors, the Contributor Image was never licensed and Shutterstock did not earn any revenue therefrom. *Id.*, ¶¶ 37-39, Ex. M. The high-resolution, unwatermarked copy of the Contributor Image was never accessible or provided to anyone. *Id.*, ¶ 38.

| 12. Shutterstock's business is thus selling licenses and pre-paid packages of photography and the "breadth and quality of [Shutterstock's] content offerings are critical to [Shutterstock's] success." Per its "business model," Shutterstock "source[s] high-quality content from contributors, and license [sic] that content to customers worldwide." | Burroughs, Decl. 17; Ex. 24, See https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393 , pg. 7 of Shutterstock's U.S. S.E.C. Form 10-K(last visited September 1, 2022); RJN. |
|---|---|

**Shutterstock's Response:** Disputed and immaterial. Steinmetz cites a 126-page, unproduced Annual Report from over four years ago, and much of the language refers to other portions of Shutterstock's offering, such as its Premier service that features editorial and commercial (typically non-stock) content. Exhibit 24, on which Steinmetz also relies upon, was not produced in this litigation and as such, should be precluded as evidence in support of Steinmetz's motion for summary judgment. Even if it were, Exhibit 24 does not support Steinmetz's statement. Shutterstock's contributor platform brings together content creators and a vast network of contributors by providing readily-searchable content that Shutterstock's customers pay to license and by compensating contributors as their content is licensed.

Shutterstock's offerings include over 415 million images and more than 200,000 images are added every day. *See* Zambrowski MSJ Decl., ¶ 2.

The statement is nevertheless immaterial since the Contributor Image at issue was viewed a total of four times by a mere two unique visitors, the Contributor Image was never licensed and Shutterstock did not earn any revenue therefrom. *Id.*, ¶¶ 37-39, Ex. M. The high-resolution, unwatermarked copy of the Contributor Image was never accessible or provided to anyone. *Id.*, ¶ 38.

| | |
|---|---|
| 13. Virtually all of Shutterstock's photographs are sourced from a pre-approved network of verified contributors, each of which provide Shutterstock with photographs for Shutterstock's exclusive review and approval. | Burroughs Decl. ¶¶ 7, 9; Ex. 13; Ex. 15 at 46:13-18; 48:10-19. |

**Shutterstock's Response:** Disputed and immaterial. The evidence upon which Plaintiff relies on does not support the statement. Shutterstock does not have "verified contributors" nor does it generally use the term. Zambrowski Opp. Decl., ¶ 8. Moreover, while contributors must agree to certain terms in order to upload their images onto the Contributor Platform, aside from validating that users supply a working email address, Shutterstock's Contributor Platform does not "preapprove" any contributors. *Id.*

Steinmetz misunderstands the various aspects of Shutterstock's business. For example, one way Shutterstock obtains images for license is through a separate self-supplied, editorial platform. *Id.*, ¶ 6. There is no evidence supporting Steinmetz's statement that photographs from the contributor platform are "sourced from a pre-approved network of verified contributors." Shutterstock's approval process for the contributor platform is virtually automatic—brief (normally less than 20 seconds) reviews of the images uploaded by contributors are for technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website only.  Zambrowski MSJ Decl., ¶ 5; Zambrowski Opp. Decl., ¶¶ 9-10.

| | |
|---|---|
| 14. Shutterstock recruits these contributors and partners online and then reviews and approves their application before they can even submit photography, which photography must then be independently reviewed and approved. | Burroughs Decl. ¶ 21; https://www.sec.gov/Archives/ edgar/data/0001549346/00010 4746912005905/a2209364zs-1.htm#da47301_business, pg. 83 of Shutterstock's U.S. S.E.C.  Form S-1 (last visited September 1, 2022); RJN. |

**Shutterstock's Response:** Disputed and immaterial. Steinmetz relies on an unproduced S-1 form from over 10 years ago. Moreover, Steinmetz also relies on Exhibit 21, which was also not produced in this action.  While Shutterstock generally promotes its service as a reliable place for photographers, artists, videographers, and musicians to monetize their content, Shutterstock does not "recruit" specific contributors and partners for the contributor platform online, nor does the evidence cited support his assertion. Zambrowski Opp. Decl., ¶ 8.

Shutterstock's business model has an editorial and self-supplied platform, which is separate and distinct from the contributor platform at issue here. *Id.*, ¶ 6. Shutterstock does not "recruit" contributors nor is there any evidence in the record that demonstrates otherwise. *Id.*, ¶ 8. Via Shutterstock's contributor platform, anyone can sign up to become a Shutterstock contributor by registering an account through Shutterstock's website or mobile app, and once the individual signs up and agrees to the Contributor Terms of Service, the contributor can instantly start to upload their content directly into the Shutterstock online marketplace. *See* Zambrowski MSJ Decl., ¶¶ 3-4. There is thus no "application review" process. There are safeguards in place to prevent fraud, such as the delay in payment and other measures to disincentive people from infringing and uploading unauthorized content to make money. Zambrowski Opp. Decl., ¶ 8. While Shutterstock has standards for the submission of acceptable content, Shutterstock does not select, curate, control, or otherwise substantially influence the images that contributors upload and only briefly reviews the images uploaded by contributors for technical and quality issues

(*e.g.*, pornography, hate speech, photographs of people without model releases, and obvious

third-party trademarks or copyrights inside the image) prior to making them available for license

on its public-facing website. *See* Zambrowski MSJ Decl., ¶ 5.

| | |
|---|---|
| 15. Shutterstock informs its customers and licensees that it owns the right to display and license the photography on its site. | Burroughs Decl. ¶ 20; https://www.shutterstock.com/blog/protecting-your-content-what you-need-to-know-about licensing-your-copyright (last visited Aug. 29, 2022); see also https://submit.shutterstock.com/legal/terms  (last visited Aug. 29, 2022); RJN. |

**Shutterstock's Response:** Disputed in part, misleading, and immaterial. The website

cited in support (https://www.shutterstock.com/blog/protecting-your-content-whatyou-need-to-

know-about licensing-your-copyright) is not a Bates-stamped produced document, but also not a

working link. Moreover, the evidence on which Steinmetz relies upon contradicts his own

statement. The terms of service set forth in the cited webpage in which Steinmetz seeks the Court

to take judicial notice (https://submit.shutterstock.com/legal/terms) unambiguously state: "The

copyrights in all content remains with the copyright owner, and nothing in the TOS shall be

construed as a transfer of copyright to Shutterstock, subject to the licenses granted to

Shutterstock and Shutterstock's sublicensees."  The same evidence states that when a contributor

submits any "Content to Shutterstock, [they] grant to Shutterstock a worldwide, sublicensable,

non-exclusive right and license . . . to publicly display, sell, advertise, and market, any Content

uploaded by [them].").  *Id.* Pursuant to the Contributor Terms of Service, every contributor

represents and warrants that "the Content [that it submits to Shutterstock] does not infringe the

copyright or any other rights of any third party."  Zambrowski MSJ Decl., ¶ 9, Ex. B, § 14(g).

Similarly, the cited material (https://submit.shutterstock.com/legal/terms) specifically has the

same language. ("You agree that you are legally able to enter into this agreement, and that none

of the content you submit will violate any laws or infringe any third party's rights.").

| 16. Shutterstock also enters into licenses directly with its clients, who pay for photography usage rights, and receive standard usage terms such as duration, geographic region, and whether the image can be used on merchandise. | Burroughs Decl. ¶ 9; Ex. 15 at 46:13-18; 48:10-19, Burroughs Decl. ¶ 15; Ex. 20. |
|---|---|

**Shutterstock's Response:** Undisputed that customers (not "clients"), choose standard

licenses that permit them to make a set of uses depending on the license chosen, with no ongoing

royalty for such use (i.e., only an up-front fee). *See* Zambrowski MSJ Decl., ¶ 6. Moreover,

Exhibit 20 of the Burroughs Decl., was not produced in this action (and irrelevant in that it does

not relate to the Image in this litigation), and should not be considered as evidence in support of

Steinmetz's motion for summary judgment. Even if it were produced and relevant, Exhibit 20

does not support Steinmetz' statement that Shutterstock "enters into licenses directly with its

clients" since the document merely states that the letter "is to provide documentation that [the

customer] has licensed" a contributor image.

| 17. Shutterstock claims that it will only offer "images that are appropriately licensed for commercial and editorial use. [Its] review process is designed to ensure that every image is appropriately licensed for its intended use. | Burroughs Decl. ¶¶ 7, 24; Exs. 13, 24, https://www.sec.gov/ Archives/edgar/data/ 0001549346/000104 746912005905/a2209364zs- 1.htm#da47301_business , pg. 78, 86 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022); RJN. |
|---|---|

**Shutterstock's Response:** Disputed, misleading, and immaterial. Steinmetz relies on an

S-1 from over 10 years ago that was not produced in this action. Moreover, Steinmetz's

statement is entirely irrelevant to the image at issue. Shutterstock has more than one platform.

*See* Zambrowski Opp. Decl., ¶ 6. In any event, the referenced language refers only to the

difference between "editorial" and "commercial" use, and indicates that images containing identifiable people cannot be licensed for commercial use unless Shutterstock has verified that a model release is included.  This is not an issue here. Moreover, the remaining citations on which Steinmetz relies upon in support of this statement do not support his statement. Burroughs Decl. ¶¶ 7, 24; Exs. 13, (setting forth content reviewer guidelines for the Contributor Platform), Ex. 24 (an unproduced document from an unrelated case, setting forth "Shutterstock's Business Model").

| | |
|---|---|
| 18. Shutterstock does not make any photographs publicly viewable on its licensing site unless and until it first reviews and approves the photographs. | Burroughs Decl. ¶ 9; Ex. 15 at 49:17-50:13. |

**Shutterstock's Response:** Disputed as to "approval" and misleading. Steinmetz's cited testimonial support does not support the statement. The entirety of the testimony instead supports the undisputed fact that on Shutterstock's Contributor Platform, Shutterstock's reviewers briefly review the images uploaded by contributors for technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website. Zambrowski MSJ Decl., ¶ 5. If any such quality issues are found, Shutterstock will *reject* and not display the photograph. Burroughs Decl. ¶ 9; Ex. 15 at 49:17-50:13. ("Q: And what do those reviewers do? A: The reviewers review content uploaded to Shutterstock. Q: Why? . . . A: The reviewers review content for different types of technical issues, whether that be noise, subject matter. They also review the contributor's uploaded descriptions of metadata, if there is any issues within those whether that be absurdities or curse words or language that's improper. Q: So, if, for example, there are curse words that are improper, will Shutterstock reject and not display the photograph? A: To the best of my knowledge, yes.").  In other words, Shutterstock

rejects images that appear to have obvious issues. Everything else will generally pass through. Zambrowski MSJ Decl., ¶ 5.

| 19. This review process is thorough – Shutterstock uses its discretion to scrutinize the work's subject matter, commercial appeal, and technical quality before deciding whether to approve the work. | Burroughs Decl. ¶ 9; Ex. 15 at 49:17-50:13; 107:5 – 108:10. |
|---|---|

**<u>Shutterstock's Response:</u>** Disputed and misleading. The cited testimonial (and only) support does not support Steinmetz's statement, and is misleadingly taken out of context. Shutterstock's contributor platform review, which necessarily takes mere seconds, is by no means "thorough"—nor could it be given the nature and size of the platform, which, like other sites that allow for monetization of content (ranging from YouTube to Getty Images and beyond), is quite popular. Zambrowski Opp. Decl., ¶ 9. Shutterstock briefly reviews the images uploaded by contributors for technical and quality issues (*e.g.*, pornography, hate speech, photographs of people without model releases, and obvious third-party trademarks or copyrights inside the image) prior to making them available for license on its public-facing website. Zambrowski MSJ Decl., ¶ 5; Burroughs Decl. ¶ 9; Ex. 15 at 49:17-50:13. ("Q: And what do those reviewers do? A: The reviewers review content uploaded to Shutterstock. Q: Why? . . . A: The reviewers review content for different types of technical issues, whether that be noise, subject matter. They also review the contributor's uploaded descriptions of metadata, if there is any issues within those whether that be absurdities or curse words or language that's improper. Q: So, if, for example, there are curse words that are improper, will Shutterstock reject and not display the photograph? A: To the best of my knowledge, yes."). In other words, Shutterstock rejects images that appear to have obvious issues. Everything else is approved. *Id.* Moreover, Shutterstock testified that when looking for compliance restrictions, "Shutterstock is looking for any visible trademarks, any types of IP or copyright [*sic*] trademark within the content itself." at

Declaration of Eleanor Lackman, dated September 16, 2022 ("Lackman Opp. Decl."), Ex. C, at

101:3-108:10. Shutterstock's brief review thus looks only for obvious and immediately viewable

issues with the contributor's image; it could not possibly verify the copyright status of every

image, nor does it have a reason to given the extremely low instance of violations that occur.

Zambrowski Opp. Decl., ¶ 9. Further, the DMCA does not require it; *copyright owners* are

obligated to search for, identify, and report violations of their rights. *See* 17 U.S.C. § 512(m).

| 20. The review is wholly "subjective" to ensure that the work's "quality is up to par." | https://player.vimeo.com /video/134351620 (ShutterTalk Live: 5 Most Common Photo Rejection Reasons – and How to Avoid Them) (last visited September 1, 2022) |
|---|---|

**Shutterstock's Response:** Disputed and immaterial. The only evidence in which

Steinmetz relies upon is an unproduced, unauthenticated video on the platform "Vimeo." The

video also appears to be referencing events that occurred in 2014—over eight years ago with no

indication as to whether it applies to the current action.  While a human will decide whether an

image contains expressly impermissible material or is too blurry or of poor quality to post,

Shutterstock's contributor review process is a brief process that merely looks for obvious and

immediate issues with the contributor's image and approves everything else. Zambrowski Opp.

Decl., ¶ 9; Zambrowski MSJ Decl., ¶ 5. Whether it is "subjective" or if the work's "quality is up

to par" is irrelevant to the sole image at issue in this case, which was not rejected.

| 21. The photography on Shutterstock' site is vetted by its "specialized team of reviewers to ensure that it meets [Shutterstock's] standards of quality and licensability[,]" before it is published to Shutterstock's site and offered for license, and that contributors must meet Shutterstock's "robust quality standards." | Burroughs Decl. ¶ 21; See https://investor.shutterstock. com/static-files/8b795c10- 8df0-403b-811d- 1f39f8f34393 , pg. 7 (last visited September 1, 2022); RJN |
|---|---|

**Shutterstock's Response:** Disputed, immaterial, and misleading. Undisputed as to

"quality." The only document cited by Steinmetz, is an unproduced, unauthenticated copy of

Shutterstock's 2018 Annual Report, which contains a Form 10-K from 2018, a document that

Steinmetz deliberately chose not to question Shutterstock's witness during its deposition. This

document is from four years ago pertaining to a wide variety of content (including photographs,

videos, illustrations, designs and music) and does not reflect the volume of photography

contributors nor the process that existed when the image at issue was uploaded. Moreover, the

pin cite for the link cited to does not relate to or support Plaintiff's statement. "Quality" is also

vague and ambiguous, is nonetheless utterly irrelevant to any issues in this action. Shutterstock's

contributor review process is a brief process that merely looks for obvious and immediate issues

with the contributor's image and approves everything else. Zambrowski Opp. Decl., ¶ 9;

Zambrowski MSJ Decl., ¶ 5.

| | |
|---|---|
| 22. Shutterstock regularly rejects photographs for stylistic and aesthetic reasons, such as when Shutterstock dislikes a photograph's lighting, or blurriness, or composition or framing. | Burroughs Decl. ¶ 21; https://www.shutterstock.com/blog/rejection-reasons-poor-lighting-and-lighting-problems (last visited on September 1, 2022), https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Focus?language=en_US (last visited September 1, 2022), https://www.shutterstock.com/blog/rejection-reason-composition (last visited on September 1, 2022); https://support.submit.shutterstock.com/s/article/Why-was-mycontent- |

|  | rejected-for-Composition?language=en_US (last visited on September 1, 2022); RJN. |
|---|---|

**Shutterstock's Response:** Disputed, immaterial, and misleading as to the characterization that Shutterstock "regularly" rejects photographs of the stated nature. Undisputed as to "quality." The "evidence" on which Steinmetz relies upon to support this statement are all unproduced, unauthenticated documents all of which Steinmetz deliberately chose not to question Shutterstock's witness during its deposition. Shutterstock's contributor review process is a brief process that merely looks for obvious and immediate issues with the contributor's image and approves everything else that would not negatively impact other contributors who expect their quality content to coexist with similar quality content rather than spam, blurry images, offensive images, or other material that would defeat the point of the platform (comparable to gatekeeping that other platforms do). Zambrowski Opp. Decl., ¶ 9; Zambrowski MSJ Decl., ¶ 5. On request from its contributors, Shutterstock has provided information to them on how to be better at their craft, and Plaintiff has failed to explain what the issue is with this, factually or legally.

| 23. This rigorous process results in the rejection of most contributor applicants and images submitted to the platform: "[l]ess than 20% of contributor applicants who applied in 2011 were approved as contributors to shutterstock.com, and less than 60% of images uploaded by approved contributors in 2011 satisfied our rigorous acceptance requirements. | Burroughs Decl. ¶ 21; https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-.htm#da47301_business, pg. 77 of Shutterstock's SEC Form S-1 (last visited Sept. 1, 2022); RJN. |
|---|---|

**Shutterstock's Response:** Undisputed as to the statistics in the document from 2011, otherwise, disputed, immaterial, and misleading. The only "evidence" on which Steinmetz relies upon to support this statement is not a usable link and thus, does not support his statement. The

"evidence" is also an unproduced, unauthenticated document. Nevertheless, Shutterstock's

contributor platform—the platform that was used by a third-party contributor in connection with

the image at issue in this case—does not approve contributors. Shutterstock's processes have

changed since 2011. Zambrowski Opp. Decl., ¶¶ 7-9. Upon completion of the sign-up, which

also requires that the contributor agree to the "Contributor's Terms of Service," contributors can

instantly start to upload their content directly into the Shutterstock online marketplace.

Zambrowski MSJ Decl., ¶¶ 4, 8, 9, Exs. A & B. Shutterstock also prohibits contributors who

have violated Shutterstock's terms of service from signing up with the same email address or the

same payout information once the contributor's account has been frozen and then terminated.

Zambrowski Opp. Decl., ¶ 8.

| | |
|---|---|
| 24. Shutterstock regularly rejects photographs that it does not find valuable or otherwise up to its aesthetic and commercial standards. | Burroughs Decl. ¶ 9; Ex. 15 at 109:11-19. |

**Shutterstock's Response:** Disputed, immaterial, and misleading as to the

characterization that Shutterstock "regularly" rejects photographs of the stated nature. The

testimony on which Steinmetz relies upon in support of this statement agrees with counsel's

speculative statement that if the submitted contents are not in line with Shutterstock's guidelines,

Shutterstock will reject the content, not that it rejects content "it does not find valuable or

otherwise up to its aesthetic and commercial standards." *See* Burroughs Decl. ¶ 9; Ex. 15 at

109:11-19 (Q: And that holds true for all of the five bullet points we just discussed, if the

submitted contents aren't in line with Shutterstock's guidelines, Shutterstock will reject the

content, correct? . . . A: to the best of my personal knowledge, yes."). Shutterstock also testified

that it has "a certain threshold that [it] tries to uphold as to keep [its] contributors more engaged

and [its] customers happy," including the curtailment of "a number of things," such as "taking

the same frame and just rotating your camera over and over and uploading five through a

hundred of those same images," or "spam content." Lackman Opp. Decl., Ex. C, at 106:16-

109:19. This is consistent with the undisputed fact that Shutterstock's contributor review process

is a brief process that merely looks for obvious and immediate issues with the contributor's

image and approves everything else. Zambrowski Opp. Decl., ¶ 9; Zambrowski MSJ Decl., ¶ 5.

| | |
|---|---|
| 25. Shutterstock's entire business model depends on the "high quality" of the photography that it curates, and that quality is crucial to Shutterstock's business model. | Burroughs Decl. ¶9; Ex. 15 at 156:15 -157:3. |

**Shutterstock's Response:** Disputed and immaterial as to the characterization that

Shutterstock's "entire business model" depends on the said statement, which does not include the

word "curates" at all and entirely misrepresents how Shutterstock's Contributor Platform works.

Moreover, the testimonial support (and only support), is based on a mischaracterization of the

witness's individual testimony (as opposed to Shutterstock's 30(b)(6) testimony). Burroughs

Decl. ¶ 9; Ex. 15 at 156:15 -157:3. ("Q: And is it accurate that customers choose Shutterstock

because of the high quality licensed images that it offers to customers? . . . A: I personally would

say yes. Q: And part of that is because Shutterstock ensures that the photography that it displays

for license on its website is high quality, right? . . . A: I personally would agree with that.").

Moreover, this statement is entirely immaterial as it has nothing to do with the image at issue.

Undisputed that Shutterstock does not permit poor-quality content to pass through its

gatekeeping functions, as doing so would injure contributors and licensees alike. Zambrowski

Opp. Decl., ¶ 9.

| | |
|---|---|
| 26. Shutterstock advertises that "unlike the significant majority of free images available online, our rigorous vetting process enables us to provide confidence and indemnification to our users that the images in our library have been appropriately licensed for commercial or editorial use | Burroughs Decl. ¶ 21; https://www.sec.gov/Archives /edgar/data/0001549346/000 104746912005905/a2209364 zs-1.htm, pg. 1 ("Prospectus |

| | Summary") (last visited September 1, 2022); RJN. |
|---|---|

**Shutterstock's Response:** Undisputed that the document from 2011 includes the quoted language, but otherwise disputed as it applies to this case. Steinmetz relies on an S-1 from over 10 years ago that was not produced in this action and predates the creation of the Image in this case. While Shutterstock still employs processes with respect to its images available online, Shutterstock's processes have materially changed since 2011, as Plaintiff might have been told had Plaintiff produced the documents in discovery and asked a witness about them. Zambrowski Opp. Decl., ¶¶ 7-9. Moreover, Steinmetz's statement is entirely irrelevant to the image at issue. Shutterstock has more than one platform. *Id.*, ¶ 6. In any event, the referenced language refers only to the difference between "editorial" and "commercial" use, and indicates that images containing identifiable people cannot be licensed for commercial use unless Shutterstock has verified that a model release is included.  This is not an issue here. The image at issue here was submitted by a third-party contributor that agreed to and violated Shutterstock's Contributor Terms of Services (and was ultimately removed from the platform). Zambrowski MSJ Decl. ¶¶ 26, 27, Exs. H, I. 38. Following a brief review for technical and quality issues, under the Contributor Platform, Shutterstock's system passively stored and made the Contributor Image available for license through its website.  *Id.*, ¶ 28.

| 27. Shutterstock is solely responsible for reviewing, approving, and publishing the photographs to its publicly viewable licensing website | Burroughs Decl. ¶ 9; Ex. 15 at 107:5-108:10; 118:13-119:12. |
|---|---|

**Shutterstock's Response:** Disputed on the ground that "reviewing," "approving," and "publishing" are ambiguous. Undisputed that Shutterstock briefly reviews the images uploaded by contributors for technical and quality issues (*e.g.*, pornography, hate speech) prior to making them available for license on its public-facing website.  Zambrowski MSJ Decl., ¶ 5. In other

words, Shutterstock rejects images that appear to have obvious issues. Everything else is

approved. *Id.* Following a brief for technical and quality issues, Shutterstock's system passively

stores the contributor's image available for license through its website. *Id.*, ¶¶ 9-10, 28.

Shutterstock also places the responsibility on its contributors to confirm that they have the rights

to upload the images, and to ensure that they do not violate any of Shutterstock's policies.

Zambrowski Opp. Decl., ¶ 8.

| 28. Shutterstock has final say as to what it displays and licenses and can remove any photograph from its site at any time. | Burroughs Decl. ¶ 9; Ex. 15 at 119:14-120:4 |
|---|---|

**Shutterstock's Response:** Undisputed and immaterial, except that a contributor may also

decide not to make an image available for license or otherwise pull its content from the

Contributor Platform.  Zambrowski Opp. Decl., ¶ 4.

| 29. If Shutterstock does not subjectively believe that a particular photograph has aesthetic appeal and commercial value and is likely draw traffic, it will reject the photograph and that photograph will never appear on its site. | Burroughs Decl. ¶ 9; Ex. 15 at 49:17 - 50:13; 93:17 - 95:14. |
|---|---|

**Shutterstock's Response:** Disputed and immaterial. While Shutterstock's Contributor

Platform would be unsuccessful and useless to contributors and customers if it were full of

content that drowned out quality content for contributors and contained a host of material that

nobody would ever want to license, the testimonial evidence on which Steinmetz relies upon

does not support his statement. Shutterstock briefly reviews the images uploaded by contributors

for technical and quality issues (*e.g.*, pornography, hate speech, photographs of people without

model releases, and obvious third-party trademarks or copyrights inside the image) prior to

making them available for license on its public-facing website.  Zambrowski MSJ Decl., ¶ 5. In

other words, Shutterstock rejects images that appear to have obvious issues that do not comply

with Shutterstock's general quality standards, which include a basic threshold that images not be blurry, improperly cropped, or overly altered, for example. Aesthetic analyses are not otherwise conducted and there is no commercial analysis conducted as suggested. Everything else is approved. *Id.*; Zambrowski Opp. Decl., ¶ 9. Steinmetz also cites to testimony relating to approval of an image after reviewing metadata, which does not appear to support his statement. Burroughs Decl. ¶ 9; Ex. 15, 93:17 - 95:14. Mr. Zambrowski did not testify that Shutterstock would reject the photograph if it "does not subjectively believe that a particular photograph . . . is likely [sic] draw traffic." *Id.*, ¶ 9; Ex. 15, 93:17 - 95:14.

| | |
|---|---|
| 30. Once Shutterstock approves a photograph, it will create a dedicated "Asset Detail Page," which is a licensing page with details about the work, and offers the photograph for licensure to its customers. | Steinmetz Decl. ¶ 7; Ex. 4. |

**Shutterstock's Response:** Disputed to the extent that image screenshotted in Declaration of George Steinmetz, dated September 1, 2022, ECF Doc. No. 57 ("Steinmetz Decl."), ¶ 7; Ex. 4 is called an "Asset Detail Page," and that Shutterstock actively "approves" a photograph aside from its brief review for obvious issues, and immaterial. Zambrowski MSJ Decl., at Ex. H; Zambrowski MSJ Decl., ¶ 5. Shutterstock's system automatically does provide a landing page for every image uploaded by a contributor, which image is passively stored, and made available for licensing (not "licensure," as Shutterstock is not engaged in granting professional licenses such as to practice law or medicine, or to drive a car) through its website following a brief review for obvious technical and quality issues. *Id.*

| | |
|---|---|
| 31. Shutterstock worked with one of its carefully vetted and verified contributors, who was based in India and used the Shutterstock account name "ArunRaJpuT6621," to obtain an unauthorized copy of the Subject Photograph ("Infringing Copy"). | Burroughs Decl. ¶ 8; Ex. 23. |

**Shutterstock's Response:** Disputed. Shutterstock did not "work with" the contributor "ArunRaJpuT6621," to obtain the Contributor Image, nor was the contributor "carefully vetted," or a "verified contributor." Zambrowski Opp. Decl., ¶ 18. The contributor agreed to the Terms of Service, set up an account, and supplied the image, which passed Shutterstock's gatekeeping measures, and there was no prior communication between Shutterstock and this contributor other than the contributor's review and completion of forms. *Id.* The evidence Steinmetz cites also shows that the contributor registered and agreed to the terms of service instantaneously. Burroughs Decl. ¶ 8; Ex. 23. Thus, the evidence Steinmetz cites does not support his statement.

On Shutterstock's contributor platform, anyone can sign up to become a Shutterstock contributor by registering an account through Shutterstock's website or mobile app. Zambrowski MSJ Decl., ¶¶ 3-5. This online platform allows contributors to upload images to be offered for license on Shutterstock's website. *Id.*, ¶ 4. Upon completion of the sign-up, contributors can instantly start to upload their content directly into the Shutterstock online marketplace. *Id.* Shutterstock does not select, curate, control, or otherwise substantially influence the images that contributors upload. *Id.* Plaintiff has not sued the Contributor for copyright infringement. *See* Lackman MSJ Decl., Ex. O, at pp. 176:3-20.

| | |
|---|---|
| 32. The Infringing Copy is identical to the Subject Photograph aside from its cropping. And Shutterstock published and displayed at least four copies of the Infringing Copy on four different URLS on its publicly facing website. | Steinmetz Decl. ¶ 7; Burroughs Decl. ¶ 5; Exs. 4, 8, 9, 10. |

**Shutterstock's Response:** Disputed. By virtue of its cropping, the image cannot be characterized as "identical"—based on a plain view of the Contributor's Image compared to the Image, the Contributor's Image is a heavily cropped version of the Image.

For every image, the system automatically creates thumbnails that are stored on different URLs that are not linked back to the main platform for licensing. The contributor's image goes through an automated process that creates a set array of various sizes of the image so that the potential customer can get a sense of how it might look, but by using watermarking and other measures to protect the full-resolution, high quality version of the images from unauthorized use. Zambrowski Opp. Decl., ¶¶ 12, 32.

| 33. Shutterstock onboarded the Infringing Copy from its verified contributor and then reviewed the work for quality, subject matter, aesthetics, and the numerous other factors. | Burroughs Decl. ¶ 7-8, Exs. 13-14. |
|---|---|

**Shutterstock's Response:** Disputed but immaterial. The Contributor was not a "verified contributor," (as Shutterstock does not use that term) nor does Steinmetz's cited evidence support such characterization. Zambrowski Opp. Decl., ¶ 18. Rather, following a brief review of the image and proposed title and keywords for technical and quality issues, which takes approximately 20 seconds, Shutterstock's system passively stored and made the Contributor Image available for license through its website, and as such, does not "onboard" any images. Zambrowski MSJ Decl., ¶ 28; Zambrowski Opp. Decl., ¶ 19. The review process is outsourced to individuals not for their legal or intellectual property knowledge, only for technical expertise and to judge technical and visible qualities of the photographs. *Id.*, ¶ 9. Shutterstock's system ingests the image, which is automatically sent without metadata but with proposed keywords and title supplied by the contributor, to the review team. The review conducted is as described above and does not involve "subject matter," or "aesthetics" except to the extent that has been described herein. The statement is also disputed because the phrase "numerous other factors" is vague and ambiguous.

| 34. Shutterstock, after completing its review of the content and commercial appeal of the Infringing Copy, expressly approved the Infringing Copy. | Burroughs Decl. ¶5-6, Exs. 8-12. |
|---|---|

**Shutterstock's Response:** Disputed. The term "content" is vague and ambiguous. While there is some review of the "content" (i.e. if the image featured a person, it would be flagged), Shutterstock did not otherwise review the non-aesthetic "content" or "commercial appeal" of the Contributor Image. Zambrowski Opp. Decl., ¶¶ 9-10. Following a brief review for technical and quality issues, which takes approximately 20 seconds, Shutterstock's system passively stored and made the Contributor Image available for license through its website, i.e., it did not *reject* the Image. Zambrowski MSJ Decl., ¶ 28; Zambrowski Opp. Decl., ¶¶ 9-10. The review process is outsourced to individuals not for their legal or intellectual property knowledge, only for technical expertise and to judge technical and visible qualities of the photographs. *Id.* The statement is also disputed because the phrase "commercial appeal" is vague and ambiguous.

| 35. After approving the Infringing Copy, Shutterstock made its own copies of the Infringing Copy, added its logo to the copies to claim it as its own intellectual property, published these copies on its public website at its own Dedicated Asset Page as well as three other URLs, and began offering it to its customers in high-resolution as part of its licensing and subscription programs. | Burroughs Decl. ¶5-6, 9; Exs. 8-12, 15 at 43:17-23; 163:18-23. |
|---|---|

**Shutterstock's Response:** Disputed. Shutterstock does not "approve" any images and does not make any "copies" of images to claim it as its own intellectual property, nor does any of the evidence cited support Steinmetz's statement.

Once a contributor registers and agrees to the Contributor Terms of Service, the contributor can instantly upload their content directly into the Shutterstock online marketplace. Zambrowski MSJ Decl., ¶ 4. Following a brief review for technical and quality issues, which takes approximately 20 seconds, Shutterstock's system passively stored and made the

Contributor Image available for license through its website. *Id.*, ¶ 28; Zambrowski Opp. Decl.,

¶¶ 9-10, 28. In other words, the reviewer only reviews what is seen by the public, not to verify

anything with respect the Contributor's uploaded image given that the Contributor agrees to and

signs the Contributor Terms of Service upon registration. *Id.*, ¶¶ 8-10. The contributor's image

then goes through an automated process that creates various sizes of the image so that the

potential customer can get a sense of how it might look, but in a way that protects the full-

resolution, high quality version of the images from unauthorized use. *Id.*, ¶ 12.

There is no "logo" on the image and the images are not offered in high-resolution format.

In order to identify and offer the Contributor Image for license, Shutterstock displayed a low-

resolution, watermarked copy of the Contributor Image on its public-facing website at the URL

https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-

1571786026.  Zambrowski MSJ Decl., ¶ 28. Except with respect to very small thumbnails that

could not tolerate a watermark and still be perceptible, Shutterstock's system automatically places

a "Shutterstock" watermark on every image for license displayed on its website in order to prevent

third parties from using the image without obtaining a license.  *Id.*, ¶ 29; *see also* Lackman MSJ

Decl., Ex. O, at pp. 59:18-24 (testifying that Plaintiff uses visual watermarks on his photos "in

instances where [he is] concerned about it being reused without permission"). This is consistent

with industry practice.  *See* Zambrowski MSJ Decl., ¶ 29, Ex. J (examples of watermarks by Getty

Images, Adobe Stock, and Associated Press); *see also* Lackman MSJ Decl., Ex. O, at pp. 57:25-

58:10 (testifying watermark "generally is put on [a] picture . . . to identify the source of material

or to restrict it for use"). The "Shutterstock" watermark is intended and understood to identify the

source or distributor of the image, and not necessarily the author or copyright owner.  Zambrowski

MSJ Decl., ¶ 29; Lackman Decl., ¶2, Ex. O, at 58:4-59:24. ("Q: Do you know why Getty Images

uses this watermark [containing "Getty Images" and the name "Raymond "Roig"]? . . . A: No, I don't know. It looks like they're trying to identify themselves as agent and the photographer. . ."). Shutterstock only provides the unwatermarked, high-resolution copy of an image to a customer that has licensed it. Zambrowski MSJ Decl., ¶ 29; Ex. A ("Ownership of Content: The copyrights in all content remain with the copyright owner, and nothing in the TOS shall be construed as a transfer of copyright to Shutterstock").

| 36. Shutterstock also distributed copies of the Infringing Copy to third parties including TinEye, HelloRF (which Shutterstock owns in part), and StockFresh. | Burroughs Decl. ¶¶ 6, 18; Exs. 11-12, 21, 25, 26. |
|---|---|

**Shutterstock's Response:** Disputed. Shutterstock did not "distribute" any copies of the Contributor's Image to any entity, nor is it Shutterstock's practice to do so. Zambrowski Opp. Decl., ¶ 33. TinEye, HelloRF, and StockFresh are all referring third-parties, none of which Shutterstock has control over. *Id.*, ¶ 27. These entities are "advertising affiliates" or "resellers" with Shutterstock (some with differing agreement terms), in that they use Shutterstock's API, *i.e.*, specialized computer code integrating some of Shutterstock's functions, including searching, accessing, and licensing from Shutterstock's content library. *Id.*, ¶ 26. Through the API program, no images are "distributed"; rather, the API is a way for the third party to access Shutterstock's content, whether it be directly on the affiliate's website, or if redirected to the Shutterstock website. *Id.*, ¶¶ 28-30, 33. Shutterstock understands that, relying on fair use, TinEye makes copies of thumbnails from around the internet, leading to its dozens of billions of images, although TinEye is not permitted to do so under its terms with Shutterstock. *Id.*, ¶ 36. Plaintiff has not sued TinEye, HelloRF, or Stock Fresh nor have they ever sent notices to any of these entities, as is the responsibility of the copyright owner.

On April 1, 2021, Plaintiff notified Shutterstock that his Image had been posted without his authorization "on [Shutterstock's] website at https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026" and requested, *inter alia*, that Shutterstock remove it.  Lackman MSJ Decl., Ex. W, at p. 1. This was the only notification and URL that Shutterstock received in connection with this image. Zambrowski Opp. Decl., ¶ 21.  The notice made no mention of third-party sites displaying the Image and except with respect to TinEye's calling up of a thumbnail from its database of 55 billion images in response to Plaintiff's counsel's search (which, as the exhibit shows, required retention of a copy of the Image that had been previously visible on the site), Plaintiff has no evidence that any version of the Image was displayed on these sites after the date of removal by Shutterstock from its platform.  As of May 11, 2021, the Contributor Image was not visible or searchable on Shutterstock's website and, even if it was somehow located through someone who had the underlying image and the tools to search (*i.e.*, a universe of Plaintiff and/or his counsel), it could not be "added to cart" or otherwise licensed by a customer.  Zambrowski MSJ Decl., ¶¶ 35-36, Exs. H, L. As such, if an image is suspended from Shutterstock's platform (as was here), that image is not available for license via any means, regardless of whether the prospective licensee comes from TinEye, HelloRF, StockFresh, or any other referring party. Zambrowski Opp. Decl., ¶ 31.

| | |
|---|---|
| 37. Shutterstock works with these partner sites by providing to them Shutterstock photography and directing them to display the photography, offer it for licensing, promote the Shutterstock brand, and direct viewers to Shutterstock's site. | Burroughs Decl. ¶¶ 6, 18; Exs. 11-12, 21, 25, 26. |

**Shutterstock's Response:** Disputed. The phrases "these partner sites," and "Shutterstock photography" are vague and ambiguous. The evidence upon which Steinmetz relies upon as support does not support this statement.

To the extent that Steinmetz is referring to TinEye, HelloRF, and StockFresh as "partner sites," they are not Shutterstock's partner sites. Zambrowski Opp. Decl., ¶ 26. Shutterstock does not "provide" any images nor does it "direct" them to display any images. *Id.*, ¶ 31. TinEye, HelloRF, and StockFresh are all referring third-parties, none of which Shutterstock has control over. *Id.*, ¶ 27. These entities are "advertising affiliates" or "resellers" with Shutterstock (some with differing agreement terms), in that they use Shutterstock's API, *i.e.*, specialized computer code integrating some of Shutterstock's functions, including searching, accessing, and licensing from Shutterstock's content library. *Id.*, ¶¶ 28-30. Through the API program, no images are "distributed"; rather, the API is a way for the third party to access Shutterstock's content, whether it be directly on the affiliate's website, or if redirected to the Shutterstock website. *Id.*, ¶ 31, 33. As such, if an image is suspended from Shutterstock's platform (as was here), that image is not available for license via any means, regardless of whether the prospective licensee comes from TinEye, HelloRF, StockFresh, or any other referring party. *Id.*

On April 1, 2021, Plaintiff notified Shutterstock that his Image had been posted without his authorization "on [Shutterstock's] website at https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026" and requested, *inter alia*, that Shutterstock remove it. Lackman MSJ Decl., Ex. W, at p. 1. This was the only notification and URL that Shutterstock received in connection with this image. *Id.*, ¶ 21. No URLs belonging to any of these so-called "partner sites" were provided, nor were any other URLs affiliated with Shutterstock's site provided. As of May 11, 2021, the Contributor Image was not visible or searchable on Shutterstock's website and, even if it was somehow located, it could not be "added to cart" or otherwise licensed by a customer. Zambrowski MSJ Decl., ¶¶ 35-36, Exs. H, L.

| | |
|---|---|
| 38. Each of these sites, using computer code (called "API") and a link provided by Shutterstock to the | Burroughs Decl. ¶¶ 9, 21; Ex. 15 at 160:10-17, |

28

| | |
|---|---|
| Shutterstock computer file for the Infringing Copy, further displayed the Infringing Copy on each of their sites and encouraged viewers to visit Shutterstock to purchase a license to use the Infringing Copy. | https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022); RJN. |

**Shutterstock's Response:** Disputed and immaterial. The phrase "each of their sites," and "encourage" are vague and ambiguous. To the extent that Steinmetz is referring to TinEye, HelloRF, and StockFresh, they are all referring third-parties, none of which Shutterstock has control over. Zambrowski Opp. Decl., ¶ 27. These entities are "advertising affiliates" or "resellers" with Shutterstock (some with differing agreement terms), in that they use Shutterstock's API, *i.e.*, specialized computer code integrating some of Shutterstock's functions, including searching, accessing, and licensing from Shutterstock's content library. *Id.*, ¶¶ 28-31. Through the API program, no images are "distributed"; rather, the API is a way for the third party to access Shutterstock's content, whether it be directly on the affiliate's website, or if redirected to the Shutterstock website. *Id.* ¶¶ 28-31, 33. As such, if an image is suspended from Shutterstock's platform (as was here), that image is not available for license via any means, regardless of whether the prospective licensee comes from TinEye, HelloRF, StockFresh, or any other referring party. *Id.*, ¶ 31. The reference to the API "and a link" makes no sense; the API allows for a prospective licensee to travel back to Shutterstock's site for license. *Id.*

As of May 11, 2021, the Contributor Image was not visible or searchable on Shutterstock's website and, even if it was somehow located, it could not be "added to cart" or otherwise licensed by a customer. Zambrowski MSJ Decl., ¶¶ 35-36, Exs. H, L. Thus, even if the image was offered or displayed at other websites (which can only be viewed via specific search) and redirecting it to Shutterstock, the image could not be offered for licensing. Zambrowski Opp. Decl., ¶ 31. When a user searches a third-party website that integrates Shutterstock's API, the images are culled up through links back to Shutterstock's content library.

*Id.*, ¶¶ 28-29. The images are not hosted on other sites or "distributed to them." *Id.*, ¶¶ 33, 35.

For HelloRF, which is permitted to make cache copies of thumbnails to avoid the technical and

cost challenges of transmitting thumbnails from Shutterstock's servers all the way to China, it is

supposed to refresh its cache routinely but Shutterstock cannot control how often it does so.  *Id.*

Thumbnails that preview the images (and are not linked to anything on the Shutterstock website)

are not findable by the general public without specific details and identification (or a copy of the

actual image previously on the Shutterstock website). *Id.*

Immaterial because the undisputed record demonstrates that the Contributor Image was

never licensed and Shutterstock did not earn any revenue therefrom (Zambrowski MSJ Decl., ¶¶

37-38, Ex. M) and the Contributor Image was viewed on Shutterstock's website at the identified

URL a total of four times by a mere two unique visitors; there were no views after the date of

Plaintiff's takedown notice.  *Id.*, ¶ 39, Ex. M. Also immaterial because the API falls within the

scope of the DMCA—it is pushed through at the direction and with the approval of the

contributor/user.

| | |
|---|---|
| 39. Shutterstock's API terms require its partners to "incorporate the Shutterstock watermark" when displaying Shutterstock-provided photography and include a conspicuous indication that the photograph is "Powered by Shutterstock. | Burroughs Decl. ¶ 21; https://www.shutterstock.com/developers/api-terms (last visited September 1, 2022); RJN. |

**Shutterstock's Response:** Disputed that API users are "partners" in the legal sense.

Zambrowski Opp. Decl., ¶ 26.  Otherwise, undisputed but immaterial because the watermark's

purpose is admittedly to help prevent theft. *See* Lackman MSJ Decl., Ex. O, at pp. 59:18-24

(testifying that Plaintiff uses visual watermarks on his photos "in instances where [he is]

concerned about it being reused without permission"). These requirements are to ensure that the

affiliates do not remove the watermark that already exists on the image or cropping the image in

a way that would remove the watermark, specifically designed to help protect, and maintain consistency in the content. Zambrowski Opp. Decl., ¶ 32.

When a user searches a third-party website that integrates Shutterstock's API, the images are culled up through links back to Shutterstock's content library. *Id.*, ¶¶ 28-29. The images are not hosted on other sites or "distributed to them." *Id.*, ¶ 31. The watermark is not added by the partner; it links back to Shutterstock's platform.  *Id.*, ¶¶ 29, 32.

| | |
|---|---|
| 40. Shutterstock, TinEye, and HelloRF all participate in this program and are Shutterstock partners. | Burroughs Decl. ¶¶ 6, 9, 18; Exs. 11-12, 21, 25, 15 at 177:25-179:17, 240:12-241:18. |

**Shutterstock's Response:** Disputed on the ground that the phrase "partners" is vague and ambiguous and calls for a legal conclusion. Undisputed, and immaterial, to the extent that the statement refers to "Partner" as defined in Shutterstock's API Terms of Service. Shutterstock uses the term "partner" in a marketing sense, not in the legal sense. Zambrowski Opp. Decl., ¶ 26.

| | |
|---|---|
| 41. Shutterstock has a partnership agreement with TinEye under which TinEye displays Shutterstock photography (including the Infringing Copy) alongside Shutterstock branding and advertisements. | Burroughs Decl. ¶ 9; Ex. 15 at 28:6 - 29:23. |

**Shutterstock's Response:** Disputed and immaterial. The deposition testimony Steinmetz relies on in support of this statement does not support it. Shutterstock "works with" a company named TinEye and does not have a "partnership agreement" with it. Zambrowski Opp. Decl., ¶ 26; Burroughs Decl. ¶ 9; Ex. 15, at 28:6-29:23. Shutterstock does not "work with" TinEye to affirmatively provide any content from Shutterstock. TinEye is a "reverse image software that populate[s] images found on the web." *Id.* Also disputed to the extent that the record reflects Shutterstock and TinEye having a "partnership agreement" in connection with the Contributor's

31

Image. TinEye is a referral traffic "affiliate" of Shutterstock, in that they use Shutterstock's specialized computer code integrating some of Shutterstock's functions, including searching, accessing, and licensing from Shutterstock's content library. Zambrowski Opp. Decl., ¶ 30. Through the API program, no images are "distributed"; rather, the API is a way for the affiliate third-party to access Shutterstock's content, whether it be directly on the affiliate's website, or if redirected to the Shutterstock website. *Id.*, ¶ 33.

Moreover, the "branding and advertisement" that Plaintiff refers to is as generic display of text that would result in searching for any image available on Shutterstock pursuant to the API terms between Shutterstock and TinEye. *Id.*, ¶ 36. Shutterstock does not have any control over and is not a legal affiliate of TinEye. Zambrowski MSJ Decl., ¶ 45; *see also* Lackman MSJ Decl., Ex. O, at pp. 149:23-25. However, if an image is suspended from the Shutterstock website, it will not be available for licensing or use by the TinEye customer. Zambrowski Opp. Decl., ¶ 34.

| | |
|---|---|
| 42. Shutterstock used the Infringing Copy to advertise its 15% off sale on the TinEye website under this partnership. | Burroughs Decl. ¶ 6, Ex. 11. |

**Shutterstock's Response:** Disputed, misleading, and immaterial. Shutterstock's promotion is not tied to the Contributor's Image whatsoever, and is a generic display of text that would result in searching for any image available on Shutterstock. Shutterstock did not "use" the Contributor's Image to advertise any promotional sale on the TinEye website, nor does Burroughs Decl. ¶ 6, Ex. 11 support this statement. TinEye placed the ad.

| | |
|---|---|
| 43. TinEye, due to its use of the code and API provided by Shutterstock, can only display Shutterstock photographs that are "live" and hosted on Shutterstock's site. | Burroughs Decl. ¶ 9; Ex. 15 at 33:14 – 33:15. |

**Shutterstock's Response:** Disputed and immaterial, on the ground that the citation does not support Steinmetz's statement and appears to be an incomplete citation. Burroughs Decl. ¶ 9; Ex. 15 at 33:14 – 33:15 ("Q: Assuming that TinEye does display Shutterstock photograph, how does that. . ."). Steinmetz has offered no evidence that TinEye cannot display the images it has copied into its vast database of archived thumbnails. Indeed, it appears that like all other images that appear to be on its site, TinEye makes copies of images in thumbnail form regardless of location, and stores them permanently on its site, relying on fair use. Zambrowski Opp. Decl., ¶ 36. A person who clicks on the image on TinEye would be directed to an error page. *Id.*, ¶ 34.

| | |
|---|---|
| 44. Steinmetz's counsel sent a cease-and-desist demand to Shutterstock demanding that it cease all use of the Subject Photograph on April 1, 2021. | Burroughs Decl. ¶ 3, Ex. 6 |

**Shutterstock's Response:** Undisputed that Doniger Burroughs, on behalf of Steinmetz, sent a "DMCA notice," in recognition of Shutterstock's DMCA status, notifying Shutterstock that his Image had been posted without his authorization "on [Shutterstock's] website at https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026" and requested, *inter alia*, that Shutterstock remove it. Lackman MSJ Decl., Ex. W, at p. 1, but disputed to the extent that Steinmetz properly demanded that Shutterstock cease all use of Steinmetz's image pursuant to the DMCA given Steinmetz's counsel's failure to provide the URLs for all locations of the image as the DMCA requires. Burroughs Decl. ¶ 3, Ex. 6.

| | |
|---|---|
| 45. A Shutterstock employee, using the fake name "[redacted]" responded on May 11, 2021 and represented that the Infringing Copy had been removed. | Burroughs Decl. ¶¶ 4, 9; Exs. 7, 14, Ex. 15 at 57:3 – 58:11. |

**Shutterstock's Response:** Undisputed that a Shutterstock employee used an alias and responded on May 11, 2021 representing that the image located at the URL set forth in Steinmetz's April 1, 2021 letter from Doniger Burroughs had been removed.

| | |
|---|---|
| 46. [redacted]'s real name was Artur Zambrowski. Shutterstock's counsel and putative DMCA agent, Sejal Patel, instructed the employee to use this fake name when responding to cease-and-desist demands. | Burroughs Decl. ¶ 9; Ex. 15 at 10:3-8; 12:18-13:3 |

**Shutterstock's Response:** Undisputed that it is Shutterstock's typical practice, for privacy and process reasons, to have Shutterstock Employees responding to third-parties to use aliases when responding to business related inquiries, and immaterial. Zambrowski Opp. Decl., ¶ 16.

| | |
|---|---|
| 47. At the time [redacted] sent the message, Shutterstock had not investigated its partner's sites to confirm that they also removed the Infringing Copy. | Burroughs Decl. ¶ 9; Ex. 15 at 57:3 - 58:11 |

**Shutterstock's Response:** Disputed on the ground that the cited evidence does not support Steinmetz's statement, and the characterization that Shutterstock had any "partner sites." Burroughs Decl. ¶ 9; Ex. 15 at 57:3 - 58:11 (testimony relating to whether anything else was done other than removal of the image from the URL identified in the April 1, 2021 letter). Immaterial as it is not the responsibility of the defendant to enforce a plaintiff's copyright rights for it on its own site (except at the specific URL(s) expressly identified), much less other locations or sites that were never identified until discovery or in other "gotcha" ways. Shutterstock does not own or control the other sites that are misleadingly called "partner sites."

| | |
|---|---|
| 48. At [redacted] time he sent the message, Shutterstock had not investigated its partner's sites to confirm that they also removed the Infringing Copy | Burroughs Decl. ¶ 9; Ex. 15. 44:8-15. |

**Shutterstock's Response:** Disputed, misleading, and immaterial. The entirety of deposition testimony cited by Steinmetz in support of this statement states that the witness "personally" did not look to see if the Contributor's Image appeared on any other sites and that he did not know whether "anyone at Shutterstock" had. Burroughs Decl. ¶ 9; Ex. 15. 44:8-15. Immaterial as it is not the responsibility of the defendant to enforce a plaintiff's copyright rights

for it on its own site (except at the specific URL(s) expressly identified), much less other

locations or sites that were never identified until discovery or in other "gotcha" ways.

Shutterstock does not own or control the other sites that are misleadingly called "partner sites."

| | |
|---|---|
| 49. At most, at that time, Shutterstock only "suspended" only one of Shutterstock's copies of the Infringing Copy at this time, meaning that it suspended access to only the copy displayed on its Asset Detail Page, which offered the work part of its licensing packages, but maintained and contributed to display copies of the Infringing Copy on three other URLS on its publicly available website and another copy on its internal system. | Burroughs Decl. ¶¶ 5, 9; Exs. 8-10; 15 at 174:3-10 |

**Shutterstock's Response:** Undisputed that Shutterstock suspended the content located at

the URL "https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-

1571786026" in response to Steinmetz's April 1, 2021 letter identifying said URL, otherwise,

disputed. Disputed on the ground that the term "display" is vague and ambiguous.

As of May 11, 2021, the Contributor Image was not visible or searchable on

Shutterstock's website (including at the specified URL) and, even if it was somehow located, it

could not be "added to cart" or otherwise licensed by a customer.  Zambrowski MSJ Decl., ¶¶

35-36, Exs. H, L. The only copies of the Contributor's Image in existence were server copies of

watermarked images that could not be found by the general public, at URLs that were never

identified by the Plaintiff at any time prior to discovery or, in the case of the low-res and

watermarked edge server cache copies, not at all. Zambrowski Opp. Decl., ¶¶ 21-22, 24. As of

September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from

its website and servers, including the lingering thumbnails, and terminated the Contributor's

account.  Zambrowski MSJ Decl., ¶¶ 43-44. Immaterial on the ground that the Contributor Image

was never licensed and Shutterstock did not earn any revenue therefrom, *Id.*, ¶¶ 37-38, Ex. M,

and that the Contributor Image was viewed on Shutterstock's website at the identified URL a

total of four times by a mere two unique visitors; there were no views after the date of Plaintiff's

takedown notice. *Id.*, ¶ 39, Ex. M.

| 50. Shutterstock's copies of the Infringing Copy were not "locked," or removed from the publicly facing Shutterstock website until September 20 or 21, 2022 at the earliest. | Burroughs Decl. ¶ 5, Exs. 8-10; 15 at 172:2-7. |
|---|---|

**Shutterstock's Response:** Disputed. The available versions of the Contributor's Image

identified by the URL in Steinmetz's April 1, 2021 letter was removed from that URL as of May

11, 2021. It was not searchable anywhere else on Shutterstock's website, and the only copies of

the Contributor's Image in existence were server copies of the watermarked images that could

not be found by the general public, at URLs that were never identified by the Plaintiff at any

time. Zambrowski Opp. Decl., ¶ 24. As repeatedly stated, the Contributor's Image was never

seen by anyone outside of Shutterstock and the Contributor in high-resolution, unwatermarked

form but instead was available only in watermarked, thumbnail versions. While the non-public

facing watermarked copies of could potentially be found that would show the thumbnail on its

unique URL (only with the right tools, a copy of the already removed image or the specific id

number assigned to the image), and therefore these images are not displayed "to the public" nor

are they intended to be seen by the public, *Id.*, those server copies of the Contributor's Image and

those not identified by URL in Steinmetz's April 1, 2021, were removed on September 22, 2021

(not 2022) on its own volition. Lackman MSJ Decl., ¶ 12; *see also* Zambrowski MSJ Decl., ¶¶

41-44. This was prior to the filing of Plaintiff's First Amended Complaint on October 6, 2021,

which falsely stated that Shutterstock "continued to maintain and display" copies of Plaintiff's

Image on its website. First Amended Complaint, dated October 6, 2021, ECF Doc. No.14,

("FAC"), ¶ 19 (alleging "ongoing use" of thumbnail of Plaintiff's Image); *id.*, ¶ 20 (alleging

Shutterstock "continued to display" Plaintiff's Image "as of the date of the filing of the complaint").

| 51. Shutterstock continued to display and distribute three copies of the Infringing Copy to the public until at least September 20 or 21, 2021. | Burroughs Decl. ¶ 5, Exs. 8-10, 14. |
|---|---|

**Shutterstock's Response:** Disputed on the ground that the phrase "distribute" is vague and ambiguous. Nonetheless, Shutterstock did not distribute any of the images, nor were the edge cache copies, that Steinmetz never identified, displayed to the public as explained above.

The images in which Steinmetz refers to in his statement were thumbnails not identified in his April 1, 2021 letter. Lackman MSJ Decl., Ex. W, at p. 1. As of May 11, 2021, the Contributor Image was not visible or searchable on Shutterstock's website and, even if it was somehow located, it could not be "added to cart" or otherwise licensed by a customer. Zambrowski MSJ Decl., ¶¶ 35-36, Exs. H, L. The only copies of the Contributor's Image in existence were server copies of watermarked images that could not be found by the general public, at URLs that were never identified by the Plaintiff at any time. Zambrowski Opp. Decl., ¶¶ 21,24. As of September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from its website and servers, including the lingering thumbnails, and terminated the Contributor's account.  Zambrowski MSJ Decl., ¶¶ 43-44.

Immaterial on the ground that there was no distribution—the Contributor Image was never licensed and Shutterstock did not earn any revenue therefrom, *Id.*, ¶¶ 37-38, Ex. M, and that the Contributor Image was viewed on Shutterstock's website at the identified URL a total of four times by a mere two unique visitors; there were no views after the date of Plaintiff's takedown notice.  *Id.*, ¶ 39, Ex. M.

| 52. Shutterstock conceded that its failure to ensure that the Infringing Copy was not visible to the public was a violation of Shutterstock's DMCA policy. | Burroughs Decl. ¶ 9; Ex. 15 at 198:22 - 199:18. |
| --- | --- |

**Shutterstock's Response:** Disputed and misleading. First, the phrase "Shutterstock's DMCA policy" is vague and ambiguous. The testimony on which Steinmetz relies upon does not support this statement.

Shutterstock responded to Steinmetz's April 1, 2021 letter by removing the Contributor image on the URL that was identified by May 11, 2021. Zambrowski MSJ Decl., ¶¶ 35-36, Exs. H, L. By September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from its website and servers, including the lingering thumbnails (URLs that were not provided to Shutterstock), and terminated the Contributor's account, based on its own internal investigation. *Id.*, ¶¶ 40-44. Indeed, Shutterstock does not as default (and thus does not have a "policy" to) remove thumbnails unless specifically identified by the rights holder as required by the DMCA. Zambrowski Opp. Decl., ¶ 24. When a copyright owner identifies the thumbnails (which did not happen here), Shutterstock does remove them even if there is no legal reason to do so, and despite it presently being a manual process that involves the expenditure of material engineer time. *Id.*

| 53. Shutterstock continued to exploit the Infringing Copy beyond even that September 2021 date, continuing to exploit it to advertise Shutterstock's 15% off sale on TinEye until at least July 14, 2022. | Burroughs Decl. ¶ 6; Ex. 11. |
| --- | --- |

**Shutterstock's Response:** Disputed, misleading, and immaterial. Shutterstock never exploited the Contributor Image at issue. Zambrowski MSJ Decl., ¶¶ 37-38, Ex. M. TinEye, not Shutterstock, placed the ad. Anyone who tried to license the image would be taken to Shutterstock, where it would not be available for license as of May 11, 2021.  The Contributor Image was viewed on Shutterstock's website at the identified URL a total of four times by a

mere two unique visitors; there were no views after the date of Plaintiff's takedown notice.  *Id.*, ¶ 39, Ex. M. Shutterstock has no control over TinEye.  *See id.*, ¶ 45; *see also* Lackman MSJ Decl., Ex. O, at pp. 149:23-25. TinEye is a referral traffic "affiliate" of Shutterstock that, like every other of the millions of affiliates who direct traffic to online retailers such as Amazon and eBay (and thousands of others), gets no affiliate fee if the image does not lead to a license. Zambrowski Opp. Decl., ¶ 30. The image cannot be licensed after disabling, so TinEye would have no reason to use the Contributor's Image specifically for anything except its mission to archive every image that has ever been on the internet, which is advertised as the website's function. *See* Zambrowski MSJ Decl., ¶ 45, Ex. N.

   Plaintiff took no testimony from TinEye and did not subpoena them for documents, so they have no admissible evidence to show why TinEye continued to display the message except for the obvious conclusion that TinEye makes copies of images rather than dynamically refreshing them such that this would not appear. *See Id.*, ¶ 45, Ex. N. It would only appear if someone actually had a copy of the underlying source image, which was removed long ago.

| 54. Shutterstock continued to display the work on HelloRF, which it partly owns, until at least July 14, 2022, just weeks before this motion's filing | Burroughs Decl. ¶ 6; Ex. 21. |
|---|---|

  **Shutterstock's Response:** Disputed. Shutterstock did not "display" anything, to the extent the storage of a cached thumbnail might be considered a "display" (which it is not for reasons described below). The exhibit shows something that HelloRF did. As of September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from its website and servers, including the lingering thumbnails, and terminated the Contributor's account. Zambrowski MSJ Decl., ¶¶ 43-44. As such, Shutterstock did not continue to display the work. Shutterstock has no control over HelloRF. Zambrowski Opp. Decl., ¶¶ 27, 35. While

Shutterstock is a small investor in HelloRF's parent company, and as such, has no control over HelloRF. *Id.*, ¶ 27.

Exhibit 21 to the Burroughs Declaration appears to be a thumbnail version of the Contributor's Image—an image that was completely removed by Shutterstock on or before September 22, 2021 as a result of Shutterstock's own investigation (including images not identified by URL via Plaintiff's April 1, 2011 notice). Zambrowski MSJ Decl., ¶¶ 43-44.

HelloRF is known as a "reseller" of Shutterstock, which uses Shutterstock's specialized computer code integrating some of Shutterstock's functions, including searching, accessing, and licensing from Shutterstock's content library. Zambrowski Opp. Decl., ¶ 31. Once the image is removed from the Shutterstock website, however, it will not be available for licensing by any means, even if it the prospective licensee comes in from HelloRF because its access is to Shutterstock's content library. *Id.* HelloRF's API terms allow it to resell directly on its own website (with its own subscription terms, promotions, etc.), but is still tied to Shutterstock's actual content library. *Id.*, ¶¶ 31, 35. However, specific entities like ZCool (the corporate name for the site HelloRF), are permitted have cache thumbnails on their servers due to technological burdens (e.g., because it costs a lot of time and strain to transmit a portfolio of thumbnails of images from Shutterstock's servers over to China, where Shutterstock does not do business), and are supposed to refresh their cache routinely. *Id.*, ¶ 35. As such, the image in Exhibit 21 to the Burroughs Declaration is a reverse engineered searched image of a thumbnail that remained on HelloRF's servers due to failure to refresh their cache. *Id.* In any event, refreshed or not, when an image is suspended from the Shutterstock platform (and thus its content library), that image is not available for license via any means, regardless of whether the prospective licensee comes from TinEye, HelloRF, StockFresh, or any other referring party. *Id.*, ¶¶ 31-35.

| | |
|---|---|
| 55. Shutterstock concedes that it did not take any steps, or attempt to contact, TinEye, HelloRF, or its other partner sites, each of which had obtained the Infringing Copy directly from Shutterstock, to direct those partners to "lock" or remove the Infringing Copy. | Burroughs Decl. ¶ 9; Ex. 15 at 128:19 – 129:19; 132:20 – 133:17. |

**Shutterstock's Response:** Undisputed that Shutterstock did not contact its dozens of thousands of API users to tell them to delete any cached thumbnails that they might have made with or without permission. Steinmetz did not identify any URLs containing any such thumbnails, and Shutterstock does not control these parties. The obligation to enforce is on the copyright owner. Disputed that TinEye, HelloRF, and "other partner sites" (which is vague and ambiguous and refers to parties who are not "partners" in the legal sense), obtained the infringing copy from Shutterstock. Disputed that any of these entities are "partners" of Shutterstock. Zambrowski Opp. Decl., ¶ 26. TinEye, HelloRF, and StockFresh are all referring third parties, none of which Shutterstock has control over. *Id.*, ¶ 27. These entities obtained thumbnails from Shutterstock; TinEye made copies of a thumbnail without permission and HelloRF routinely refreshes its cache as explained above. *Id.*, ¶ 35. The HelloRF screenshot goes to an internal link to a cache copy and does not show any public display.

Immaterial to the extent that the statement insinuates that Shutterstock had an obligation to reach out to third parties to remove images under the DMCA. Undisputed that Plaintiff did not reach out to any of these parties to request the removal of the images at the particular URLs and—for inexplicable and unexplained reasons—still has not done so. *See also supra*, Response to ¶ 36. Any copies of the thumbnails that are preserved on these third-party sites are not within Shutterstock's control. Zambrowski Opp. Decl., ¶ 35-36.

| | |
|---|---|
| 56. As of July 14, 2022, Shutterstock also continued to maintain a copy of the Infringing Copy on its own, internal website but averred that that copy was for company purposes and not available to the public. | Burroughs Decl. ¶ 9; Ex. 15 at 58:12 – 59:9. |

**Shutterstock's Response:** Undisputed that Shutterstock keeps internal records but otherwise disputed, misleading, and immaterial. The testimonial evidence (and only evidence) upon which Steinmetz relies upon as support for this statement does not support his statement. As of September 22, 2021, Shutterstock completely removed all traces of the Contributor Image from its website and servers, including the lingering thumbnails, and terminated the Contributor's account.  Zambrowski MSJ Decl., ¶¶ 43-44. In other words, Shutterstock removes the image from being accessible through the public facing website but "it's kept internally, so if anyone else tries to upload that similar piece of content, [it] can flag it instantly and reject that content from ever being on Shutterstock." Burroughs Decl. ¶ 9; Ex. 15 at 58:12 – 59:9. Shutterstock does not routinely destroy records that might be required to address any issue that might arise in the future, including images that may be used to help block re-uploading of the same image. URLs that may be findable through the use of an image and technology are not linked to any portion of Shutterstock's site, are not otherwise searchable, and are essentially impossible for an average member of the general public to find.  Shutterstock does not intend for any cache copies to be visible to the public; the licensing site is where customers are supposed to go for images. *Id.*

| 57. Shutterstock has no policy as to how long it keeps an infringing work on its system. | Burroughs Decl. ¶ 9; Ex. 15 at 75:23 – 76:17. |
|---|---|

**Shutterstock's Response:** Disputed, misleading as to "policy" and "system," and immaterial. The evidence on which Steinmetz relies upon is not included in Exhibit 15 to the Burroughs Decl.

Shutterstock removes any allegedly infringing material from "any public facing," but "it's kept internally, so if anyone else tries to upload that similar piece of content, [it] can flag it

instantly and reject that content from ever being on Shutterstock." Burroughs Decl. ¶ 9; Ex. 15 at

58:12-59:9. The Shutterstock witness testified that he was unaware of how long Shutterstock

would maintain its internal, non-public facing copy of an allegedly infringing work in order to

flag any individual trying to re-upload that piece of content. Lackman Opp. Decl., Ex. C, at

76:23-76:17. Shutterstock has various document retention policies, a topic on which Plaintiff

sought no testimony.

| | |
|---|---|
| 58. Shutterstock does not have a DMCA agent and was unable to testify as to whether it followed its DMCA protocol in responding to Steinmetz's notice of infringement | Burroughs Decl. ¶ 9; Ex. 15 at 85:13-16, 214:5 - 216:12, |

**Shutterstock's Response:** Disputed and misleading. Shutterstock's witness testified that

there was "no DMCA Agent" because the name was changed from an individual, Sejal Patel, to

just "DMCA Agent," which is not a human being. Zambrowski Opp. Decl., ¶ 14. Any emails to

the recorded address went to a distribution list that included Shutterstock's compliance agents for

fast handling. *Id.* Disputed on the ground that the phrase "DMCA protocol" is vague and

ambiguous. The Shutterstock witness testified that the Contributor Account at issue was

terminated in response to Steinmetz's April 1, 2021 letter, and Steinmetz has no evidence to the

contrary. Burroughs Decl. ¶ 9; Ex. 15, 214:5 - 216:12.

| | |
|---|---|
| 59. Shutterstock received Steinmetz's notice of infringement on April 1, 2021 and the Infringing Copy remained online until at least July 14, 2022. Shutterstock has conceded, though, that its failure to "lock" or remove the Infringing Copy after receiving Steinmetz's notice of infringement was a "glitch" and that the Infringing Copy "should have been removed" from all publicly facing pages of Shutterstock's website and partner sites months earlier | Burroughs Decl. ¶ 9; Ex. 15 at 200:14 – 201:17. |

**Shutterstock's Response:** Undisputed that Shutterstock received a letter from

Steinmetz's counsel on or about April 1, 2021 that identified *any URL or other location* other

than the URL identified, which image was removed; disputed (and misleading) as to the

remaining allegations. Shutterstock has no control over any third-party websites and any copies

of the Contributor Image it makes. Zambrowski Opp. Decl., ¶¶ 27, 35-36. Misleading in that as

of September 22, 2021, Shutterstock completely removed all traces of the Contributor Image

from its own website and servers, including the lingering thumbnails, and terminated the

Contributor's account. Zambrowski MSJ Decl., ¶¶ 43-44. Misleading as to the selective clipping

of the witness's testimony, taken out of context.

The Shutterstock witness testified that it removed the image on the URL that was

identified in the April 1, 2021 letter from Steinmetz. Burroughs Decl. ¶ 9; Ex. 15 at 200:14 –

201:17. With respect to other versions of the image, which was not identified by URL in the

April 1, 2021 letter and not "public facing," the Shutterstock witness testified that under the

DMCA, it had no obligation to remove those image, even though it ultimately did by September

22, 2021. *Id.*; Zambrowski MSJ Decl., ¶¶ 43-44. Indeed, Shutterstock does not as default (and

thus does not have a "policy" to) remove thumbnails unless specifically identified by the rights

holder as required by the DMCA. Zambrowski Opp. Decl., ¶ 24. When a copyright owner

identifies the thumbnails (which did not happen here), Shutterstock does remove them even if

there is no legal reason to do so, and despite it presently being a manual process that involves the

expenditure of material engineer time. *Id.*

Shutterstock strives to remove all traces of any unauthorized content, even when there is

no legal obligation to do so, and is similarly working on a technological solution that would help

it do so in an automated fashion as opposed to manually, the manner by which it employs now.

*Id.* The witness's testimony in context indicates that only if a URL was identified and the image

remained visible on the Contributor Platform (which did *not* happen here), would there be a

situation involving a "glitch." Burroughs Decl. ¶ 9; Ex. 15 at 200:14 – 201:17; Zambrowski MSJ

Decl., ¶¶ 40-44.

| | |
|---|---|
| 60. Shutterstock's business has been riddled with allegations of copyright infringement similar to those at issue here and consumer fraud. Indeed, Shutterstock has been sued for copyright infringement at least nine times since 2019, far more than its competitors. | *See Tamara Williams v. Shutterstock, Inc.*, et al; 1-21-cv-05784 (E.D.N.Y); *McGucken v. Shutterstock, Inc.*, et al, 1:22-cv-00905 (S.D.N.Y.); *Cavanaugh v. Shutterstock, Inc.*, et al, 1-21-cv-03796 (S.D.N.Y.); *Itasca Images, LLC et al v. Shutterstock, Inc.*, et al, 0-21-cv-00287 (D.MN); Lickerish, Ltd. v. Shutterstock Inc., 1-20-cv-05384 (S.D.N.Y.); *Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583 (S.D.N.Y.); *Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al.*, 1-20-cv-03023 (S.D.N.Y.); *Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*, 2-20-cv-00787 (C.D.CA); *Michael Grecco Productions, Inc. v. Shutterstock, Inc., et al.*, 2-19-cv-01153 (CD.CA); RJN. |

**Shutterstock's Response:** Disputed and immaterial. Steinmetz's allegation that

Shutterstock has been sued "far more than its competitors" is unsupported by the evidence he

cites. None of the cited cases allege "consumer fraud." Immaterial in that the amount of times an

entity has been sued (based on mere allegations set forth in a Complaint), particularly an entity

with over 400 million images in its system, has no bearing or relevance to the issues in this

action, pertaining to a platform that has existed for nearly 20 years. Indeed, many of these cases

were not decided on their merits and are otherwise closed. *See Cavanaugh v. Shutterstock, Inc.*,

*et al*, 1-21-cv-03796 (S.D.N.Y.) (plaintiff withdrew suit after image had been removed before service was made); *Lickerish, Ltd. v. Shutterstock Inc.*, 1-20-cv-05384 (S.D.N.Y.) (Shutterstock identified source of image and plaintiff dropped case); *Grossman Enterprises LLC v. Hubbard Broadcasting, Inc., et al.*, 1-20-cv-03023 (S.D.N.Y.) (Shutterstock was indemnified party in case involving claimed unauthorized licensing of an image in a film); *Michael Grecco Productions, Inc. v. Rex Features, Ltd., et al.*, 2-20-cv-00787 (C.D. Cal.) (plaintiff sued over publicity stills that were owned by television studio, not plaintiff); *Michael Grecco Productions, Inc. v. Shutterstock, Inc., et al*., 2-19-cv-01153 (C.D. Cal.) (related case). The others remain ongoing and nearly all have a nexus to the misguided lawsuit brought here by a group of affiliated parties who seem to believe, falsely, that they can change the DMCA through litigation. *Tamara Williams v. Shutterstock, Inc*., et al; 1-21-cv-05784 (E.D.N.Y.) (case filed by Higbee, which shares clients with Doniger/Burroughs, including Eliot McGucken); *McGucken v. Shutterstock, Inc*., et al, 1:22-cv-00905 (S.D.N.Y.) (filed by Doniger/Burroughs); *Itasca Images, LLC et al v. Shutterstock, Inc*., et al, 0-21-cv-00287 (D. Minn.) (Doniger/Burroughs client); *Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583 (S.D.N.Y.) (claim that following termination of parties' agreement, certain images licensed during the term were online for a couple of extra days; plaintiff has admitted that it improperly registered hundreds of images, which it claimed in the complaint, including hundreds of images owned by Shutterstock staff photographers and third parties). There is no information on competitor lawsuits or any identification of who Plaintiff believes Shutterstock's competitors are, so there is no basis to evaluate the statement. The statement is thus unsupported.

| | |
|---|---|
| 61. In one of those actions, Shutterstock is alleged to have attempted to "exploit the COVID-19 pandemic to walk away from its contractual obligations" and infringed | *See Penske Media Corporation*, 1-20-cv-04583, Dkt. No. 29; RJN. |

| | |
|---|---|
| the plaintiff's rights in at least 2,300 photographs in doing so. | |

**Shutterstock's Response:** Disputed and immaterial. The *Penske* case involves a demand for money after the plaintiff materially breached the parties' agreement, and plaintiff's window-dressing infringement claim has turned out to reveal that the plaintiff registered with the Copyright Office *hundreds* of photographs that plaintiff now does not dispute belong to third parties or Shutterstock itself. *See Penske Media Corporation v. Shutterstock, Inc.*, 1-20-cv-04583 (S.D.N.Y.), ECF Doc. No. 106, at p. 2. Material only in that if a plaintiff cannot tell the difference between its own photographs and Shutterstock's photographs in a set of 2300, Shutterstock cannot be deemed to have knowledge of 400 million photographs.

| | |
|---|---|
| 62. Shutterstock has received no fewer than 260 complaints to the Better Business Bureau. | Burroughs Decl. ¶10, Ex. 16. |

**Shutterstock's Response:** Undisputed and immaterial. The evidence on which Steinmetz relies upon was not produced in this action. Burroughs Decl. ¶10, Ex. 16. The "evidence" also identifies comments from disgruntled customers unrelated to any copyright infringement issues (for example, nearly all relate to confusion from customers about subscriptions and pricing), a small fraction of its several million customers. *Id.* In any event, Exhibit 16 to the Burroughs Decl. shows that Shutterstock has an A+ Better Business Bureau® rating (compared to Amazon.com, which has an A- rating and has received 26, 596 complaints in the past three years). *Id.*

| | |
|---|---|
| 63. In the photography community, it is common knowledge that Shutterstock's entire business model is suspect | Burroughs Decl. ¶¶ 21; See, e.g., https://brutallyhonest microstock.com/2019/01/27/ update-why shutterstocks-copyright infringement-problems- shouldconcern-you/ ., |

|  | Shutterstock's conduct as addressed in this case is in line with its standard practices, https://www.sec.gov/Archives/edgar/data/0001549346/00010474691200 5905/a2209364zs-1.htm, pg. 15 (last visited September 1, 2022), https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm, pg. 19 (last visited September 1, 2022)(emphasis added); RJN. |
|--|--|

**Shutterstock's Response:** Disputed as unsupported, and immaterial. The statement calls for expert opinion. There has been no expert testimony in this case. Moreover, the phrases "photography community," and "suspect" are vague and ambiguous except in their desperation. This hearsay blog post in fact goes on about how Shutterstock is one of the good platforms, and notes that the writer trusts Shutterstock enough to have his images represented on the platform. *See* https://brutallyhonestmicrostock.com/2019/01/27/update-why-shutterstocks-copyright-infringement-problems-should-concern-you/ (in an updated post, stating that "Shutterstock is taking action," and that the blogger "must give them some credit as in the past week alone . . . they've systematically gone down on my list . . . Great job Shutterstock!"). Moreover, the comment from *one person on the internet* is hearsay and hardly indicative of the facts, which are that for nearly 20 years, Shutterstock's contributor platform is robust, trusted, and heralded as a leading platform for artists to make their works available to Shutterstock's large customer base. And boilerplate disclosures to the SEC are hardly evidence of a "suspect" business model; they

do not support the claim.  Indeed, the term "entire business model is suspect" or any similar term does not appear in the materials, making this an objectively and knowingly false misrepresentation of materials cited to the Court.

| | |
|---|---|
| 64. Shutterstock seems to agree, in part, with the foregoing, as it has admitted that it has "been subject to a variety of third-party infringement claims in the past and will likely be subject to similar claims in the future[,]" and that "policing our intellectual property rights is difficult, costly and may not always be effective. | Burroughs Decl. ¶ 21; https://www.sec.gov/ Archives/edgar/data/ 0001549346/000 104746912005905/ a2209364 zs-1.htm, pg. 15 (last visited September 1, 2022), https://www.sec.gov/Archives /edgar/data/0001549346/000 104746912005905/ a2209364zs-1.htm, pg. 19 (last visited September 1, 2022)(emphasis added); RJN. |

**Shutterstock's Response:** Undisputed that Shutterstock, like any technology company, has been subject to infringement claims, and that policing rights in Shutterstock's own intellectual property (which is extensive and includes purchased portfolios as well as content created by on-staff employees and contractors) is costly and not always effective, and immaterial and irrelevant to this action. Further, boilerplate statements made in SEC filings have no relevance to the Image, the contributor platform, or anything else relating to this action.

### ADDITIONAL MATERIAL FACTS[1]

65.     Shutterstock is an online service provider that operates a "contributor platform" which connects contributors' uploaded content to prospective customers.  *See* Def. SUF ¶¶ 1-6; Zambrowski Opp. Decl., ¶ 3.

---

[1] To avoid duplication, Shutterstock also relies on the facts set forth in its Rule 56.1(a) Statement filed in support of its Motion for Summary Judgment (Dkt. No. 52), which is cited herein as "Def. SUF."

66.     Shutterstock's system is primarily automated, except for human review of images and proposed titles and keywords for technical and other issues that would prevent inclusion on the platform.  *See* Def. SUF ¶¶ 5-10; Zambrowski Opp. Decl., ¶¶ 9-10.

67.     Plaintiff sent a "DMCA takedown notice" identifying one URL: https://www.shutterstock.com/imagephoto/overview-forest-morning-time-by-drone-1571786026. *See* Def. SUF ¶ 45; Lackman MSJ Decl., Ex. W; Zambrowski Opp. Decl., ¶ 21.

68.     At the URL, Shutterstock displayed a low-resolution, watermarked copy of the Contributor Image and small-sized thumbnails thereof on its customer-facing website for potential license.  *See* Def. SUF ¶ 39.

69.     The unwatermarked, high-resolution image was never displayed to anyone outside of Shutterstock.  *Id.*, ¶¶ 43, 53.

70.     Shutterstock removed and otherwise disabled the image from the specified URL. *Id.*, ¶¶ 50-51; Zambrowski Opp. Decl., ¶ 21; *see also* Pl. SUF ¶ 49.

71.     Plaintiff never identified any other URLs on sites that Shutterstock owns or controls, except in the First Amended Complaint, by which time the thumbnails at such locations had been removed through Shutterstock's own investigation.  *See* Def. SUF ¶¶ 58-64.

72.     Shutterstock does not own or control TinEye, HelloRF, or StockFresh.  *Id.*, ¶ 67; Zambrowski Opp. Decl., ¶ 27.

73.     Plaintiff did not ask Shutterstock to notify TinEye, HelloRF, or StockFresh regarding any use.  *Id.*, ¶ 24.

74.     Except with respect to a thumbnail cached by TinEye without Shutterstock's permission, by the time Plaintiff mentioned to Shutterstock the existence of a thumbnail of the

Contributor Image on these third-party sites, the thumbnail of the image was no longer visible on those sites.  *Id.*, ¶ 22.

DATED:  New York, New York
          September 16, 2022

MITCHELL SILBERBERG & KNUPP LLP


By:  /s/ Eleanor M. Lackman
     Eleanor M. Lackman (eml@msk.com)
     Elaine Nguyen (eln@msk.com)
     Samantha W. Frankel (swf@msk.com)
     437 Madison Ave., 25th Floor
     New York, New York 10022-7001
     Telephone: (212) 509-3900
     Facsimile: (212) 509-7239

     *Attorneys for Defendant Shutterstock, Inc.*