UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
:
GEORGE STEINMETZ, :
                           Plaintiff, : **ORDER AND OPINION**
v. : **GRANTING DEFENDANT'S**
: **MOTION AND DENYING**
SHUTTERSTOCK, INC., : **PLAINTIFF'S MOTION FOR**
: **SUMMARY JUDGMENT**
                           Defendant. :
: 21 Civ. 7100 (AKH)
------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Plaintiff George Steinmetz ("Plaintiff"), a professional photographer, brought this copyright infringement suit against Defendant Shutterstock, Inc. ("Defendant"), a company that operates a website which facilitates image licensing. On Defendant's contributor platform, third-party contributors can upload images to Defendant's website and make them available for licensing by other users of Defendant's website. When a user selects an image to license, Defendant pays the contributor a portion of the fees.

        In November 2021, a third-party contributor located in India uploaded a cropped version of an image captured and copyrighted by Plaintiff without Plaintiff's consent. In April 2021, Plaintiff issued a takedown notice, requesting that Defendant remove the image from its website. Defendant removed the image in May 2021.

        Plaintiff brought this suit in August 2021, alleging claims for direct and contributory copyright infringement, in violation of 17 U.S.C. § 106, and false copyright management information ("CMI"), in violation of 17 U.S.C. § 1202(a), seeking damages and injunctive relief.

1

Before me now are the parties' cross-motions for summary judgment on Plaintiff's claims (ECF Nos. 50, 54).

As to Plaintiff's copyright infringement claims, there is no dispute that the unconsented display and distribution of Plaintiff's image constitutes a violation of his exclusive rights under Section 106. However, under the so-called Safe Harbor provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, online service providers are statutorily immune from damages liability, if they satisfy the enumerated requirements. Thus, the sole question is whether Defendant is eligible for the Safe Harbor. I hold that it is, and because there are no genuine disputes of material fact as to whether Defendant has satisfied any of the statutory requirements, Defendant is entitled to summary judgement as a matter of law on Plaintiff's copyright infringement claims.

As to Plaintiff's false CMI claims under § 1202(a), Plaintiff must show that Defendant added false CMI to the image in issue, and provided or distributed the false CMI knowingly and with the intent to induce, enable, facilitate, or conceal infringement. Plaintiff has failed to introduce evidence to establish a prima facie claim. First, although Defendant adds a "Shutterstock" watermark to all images uploaded to its platform, this information is not false because it designates the source of the photograph if accessed or distributed from Defendant's website. Second, the watermark is not intended to induce, enable, facilitate, or conceal infringement. The purpose of the watermark is to prevent infringement. I hold that Defendant also is entitled to summary judgment as a matter of law on Plaintiff's false CMI claim.

For these reasons, and as further explained below, Defendant's motion is granted in full, and Plaintiff's motion is denied.

## BACKGROUND[1]

Plaintiff is a professional photographer, who in August 2013, pursuant to an Assignment Photographer Agreement with National Geographic Society, traveled to the Amazon Rainforest and created an image of the burning practices used to convert the Rainforest into farmland for crop production. He subsequently obtained a registration with the United States Copyright Office, effective November 26, 2013, Reg. No. VAu 1-169-689, giving him exclusive usage rights. The image was first published at least as early as 2017.

Defendant operates a website and online platform that that allows users to pay to license photographs. There are currently more than 415 million images available for license on Defendant's website with 200,000 images added every day. Defendant obtains images for license in at least two ways, one through a separate, self-supplied editorial platform in whose images Defendant owns the copyright, and the other through a contributor platform populated by images submitted by third parties and for which Defendant obtains only a license and nonexclusive right to distribute. Only the latter is at issue with respect to Plaintiff's image.

On the contributor platform, third parties, or contributors, may upload images to a stock portfolio. These images are then available for customers or users of Defendant's website. If a user is interested in licensing a photograph, he may do so through a subscription fee or on an

---

[1] The following undisputed facts are drawn from the parties' respective Local Rule 56.1 Statements and Counterstatements of Undisputed Material Facts. *See* ECF Nos. 52, 64, 75, 77-2. Plaintiff has requested that I take judicial notice of various websites, including Defendant's own as well as SEC filings made in 2011 and 2018. I decline to do so. District courts may take judicial notice of adjudicative facts "not subject to reasonable dispute" when they "can be accurately and readily determined from sources whose accuracy cannot reasonably questioned." *See Gulf Ins. Co. v. Glasbrenner*, 343 B.R. 47, 63 (S.D.N.Y. 2006). The "facts" Plaintiff on Defendant's website do not fall within this rule. They include the very facts in dispute and are thus not subject to judicial notice under Fed. R. Evid. 201(b). Fed. R. Evid. 201(c) requires a court to take judicial notice of adjudicative facts when requested by a party but only when the court is supplied with the necessary information to ascertain whether the requirements of Rule 201(b) have been met. Plaintiff has not provided the "necessary information." It has not stated or shown that the facts on Defendant's website or in its SEC filings were true as of the date of the accused conduct. Plaintiff also invokes certain standards and policies but has not stated or shown that they applied to the services offered by Defendant and which allegedly give rise to its liability. *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 414–15 n.8 (E.D.N.Y. 2009).

a la carte basis. The contributor is then paid a licensing fee but does not obtain any royalties or any other fees on an ongoing basis.

Anyone can become a contributor by registering an account through Defendant's website or mobile app. In so doing, they must accept the Contributor Terms of Service ("CTOS"), which includes a representation that any content submitted will (or does) not infringe the copyright or any other rights of any third party. The CTOS also states that Defendant may suspend access and terminate a contributor's account if Defendant receives a copyright infringement complaint about the contributor's content.

As a contributor, an individual may submit and upload an image to be included in Defendant's stock portfolio. By so doing, the contributor does not transfer any rights to Defendant but instead conveys a license to Defendant to display, sell, advertise, and market the content. An uploaded image does not automatically become part of the portfolio, however. Defendant has a team that reviews images for technical and quality issues. Images may be rejected if they are of poor quality, *i.e.*, if they are low resolution or poorly composed, contain hate speech or pornography, or obviously infringe the copyrights of another (notwithstanding the representation required by contributors in accepting the CTOS). If not rejected, an image will become available for license through Defendant's portfolio. At this point, Defendant displays a low-resolution, watermarked copy of a contributor image on its public-facing website at a designated URL. Defendant only distributes an unwatermarked and high-resolution copy to a customer that has licensed it. Defendant also maintains backend, *i.e.*, nonpublic-facing, copies of uploaded images that it uses for purposes of policing infringement or to avoid having duplicate copies of the same image.

Defendant also has a DMCA policy on its website intended to respond to alleged copyright infringements. It sets forth the procedure for copyright owners to submit notices of copyright infringement. The name and contact information for Defendant's designated copyright agent is registered with the U.S. Copyright Office and listed in its public directory. If a copyright owner submits a takedown notice, Defendant investigates and responds to such notices, on average within 5.5 days of receipt. And in appropriate circumstances, *i.e.*, the case of repeat offenders, Defendant disables or terminates the account due to alleged infringement. Furthermore, Defendant does not advise or encourage users to conceal a work's copyright status, and in fact, utilizes specialized software to detect and reject potentially infringing material uploaded by contributors.

In addition to serving customers from and making uploaded images visible on its own website, Defendant also maintains relationships with advertising affiliates or resellers, including HelloRF and StockFresh. These affiliates use Shutterstock's API (its computer code) and integrate some of Defendant's website's functions, including searching and accessing Defendant's content library. By virtue of the API affiliate relationship, images contained in Defendant's portfolio may also be visible through third-party websites. The terms of the API agreements allow affiliates to resell directly from their own websites, but the actual content of their libraries are tied to Defendant's. Specific entities or affiliates are permitted to have cache thumbnails on their servers due to technological burdens but are supposed to refresh their cache routinely, so that their available portfolio aligns with Defendant's. However, even if an affiliate fails to refresh its cache, an image not available (or no longer available) for license directly from Defendant's website also is not available for license from any affiliate's website.

In addition to images being viewable through affiliated third-party websites, images in Defendant's portfolio may be visible on the website of TinEye, an unaffiliated company whose software "crawls" the internet, makes copies of thumbnails, and then relying on fair use, makes these thumbnails available and visible on its own site. But Defendant has not permitted TinEye to do so.

On November 26, 2019, a contributor located in India by the name of "Arun Lodhi" (the "Contributor"), signed up to be a contributor with the username "Arun RaJpuT6621." That same day, he uploaded a cropped version of Plaintiff's image. Although Plaintiff has offered evidence of metadata attached to his version of the image, when it was uploaded to Defendant's website, the image had no metadata identifying Plaintiff or anyone else as the author or owner. The image was not rejected and was assigned and made available on a public URL (https://www.shutterstock.com/image-photo/overview-forest-morning-time-by-drone-1571786026).

On April 1, 2021, Plaintiff notified Defendant that his image had been posted without his authorization on the above URL and requested that Defendant remove it. As of May 11, 2021, the Contributor's (or Plaintiff's) image was not visible on the public-facing URL or searchable on Defendant's website, but even if located through a backend copy, the image could not have been licensed by a customer.

Plaintiff filed this lawsuit on August 23, 2021. In September 2021, Plaintiff notified Defendant that copies of the infringing image remained on the website but did not, and in fact refused to, specify any URL where the image remained visible. Defendant undertook its own investigation and found several thumbnails in the edges of its caches servers, and by September 22, 2021, Defendant had completely removed all traces of the Contributor's

(Plaintiff's) image from its website. The metadata for the public-facing URL indicates that the image was viewed a total of four times by two distinct users and was never requested to be, or actually, licensed. In addition, although Defendant removed the image from its website in May 2021, and all traces by September 22, 2021, Plaintiff claims that the image remained available through July 2022 through HelloRF, StockFresh, and TinEye. He did not issue a takedown notice to those websites or otherwise directly request that they remove the image, nor has he named them as defendants in this suit.

Plaintiff claims that Defendant's copying, display, and distribution of his image, uploaded by the Contributor, violates his exclusive rights under Section 106, and that Defendant's use of a watermark constitutes false copyright management information in violation of Section 1202(a).

**DISCUSSION**

I.   Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence in the light most favorable to the party opposing summary judgment[,] . . . draw all reasonable inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. V. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). However, the nonmovant may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

II.  Analysis

    A.  DMCA Safe Harbor Provision

Under the DMCA, defendants who fall within the DMCA's Safe Harbor provisions, 17 U.S.C. § 512, cannot be held liable for copyright infringement. In order to be eligible for protection under the Safe Harbor provisions, a defendant must meet certain threshold requirements. These include that it must (1) be a "service provider" as defined by the statute; (2) have adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers; and (3) not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works. *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 743 (S.D.N.Y. 2011), *aff'd* 569 Fed. App'x 51 (2d Cir. 2014). If a defendant meets the threshold requirements, it must also meet additional specific conditions for protection under § 512(c). Subsection 512(c)(1) immunizes service providers from copyright infringement liability "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," so long as the service provider

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>
> (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is

claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1).

Because the Safe Harbor is an affirmative defense to liability, a defendant bears the burden of raising its entitlement to the protection. However, once a defendant has demonstrated that it has the status of service provider and has taken the necessary steps for eligibility, the burden of proof shifts to the plaintiff to prove that the defendant should be disqualified from invoking the safe harbor's protections because it has actual or red flag knowledge of infringing activity. If a plaintiff so establishes, the burden shifts back to the defendant to prove that after gaining the requisite mental state, it acted expeditiously to take down the infringing content. *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 95 (2d Cir. 2016).

Defendant satisfies both the threshold requirements and the specific requirements for the Safe Harbor. And although Plaintiff has offered evidence that Defendant had actual knowledge of infringement, by virtue of his takedown notice, Defendant has shown that it acted expeditiously to remove the infringing content from its own website (the only location over which it had control to do so). I therefore hold that Defendant is statutorily immune from liability.

1. Service Provider

Defendant is a "service provider" within the meaning of the statute. The DMCA includes two definitions of the term "service provider," only the second of which is relevant here (and which subsumes the first). A service provider means "a provider of online services or network access, or the operator of facilities therefor . . . ." 17 U.S.C. § 512(k)(1)(B). The definition is intended to incorporate a broad set of Internet entities, and courts have repeatedly held that defendants offering similar file-sharing-based services qualify as "service providers."

*See, e.g., Wolk*, 840 F. Supp. 2d at 744 (holding that Photobucket, a website that allows users to upload and share images, is a service provider under § 512(k)(1)(B)); *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010), *aff'd in relevant part* 676 F.3d 19 (2d Cir. 2012) (holding that YouTube, a website that allows users to upload video files free of charge and make them available for viewing, is a service provider for purposes of § 512(c)); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008) (treating Veoh.com, a website that allows users to upload and share video files, as a service provider).

Like Photobucket, Defendant offers an online platform for image sharing. It provides a forum, or the "facilities," that allows independent contributors to connect with and make their images available for licensing to users in need of content.

Plaintiff disputes that Defendant is a "service provider." It claims that rather than providing a service to others, Defendant engages in for-profit licensing for its own benefit. Plaintiff relies on *Agence French Presse v. Morel*, 934 F. Supp. 2d 547 (S.D.N.Y. 2013), for the principle that an online provider engaged in licensing cannot claim protection under the Safe Harbor. However, *Agency French Presse* is an outlier in the DMCA case law. Contrary to the broad reading given by almost every court confronted with similar services and circumstances, there the district court denied summary judgment to Getty Images, a website engaged in image licensing, finding that questions of fact remained as to whether Getty Images was, in fact, a service provider because, it reasoned, licensing services more closely resemble the mere sale of goods rather than facilitating users' activities online. *See id.* at 566. The district court distinguished the weighty case law, characterizing the services at issue as "doing something useful for other entities or individuals, such as providing a file hosting or file sharing platform[], rather than itself selling or licensing copyrighted material." *Id.* at 567 (collecting cases and describing the services provided).

10

*Agence French Presse* is not well-reasoned and thus does not constitute persuasive authority. The supposed limitation on Safe Harbor eligibility was grafted on by the district court, which reasoned that Congress must have intended the service provider language to have some limitation. It finds not support in the text of the statute. In addition, the district court's decision to draw a line at a profit-driven service provider stands at odds even with the cases it cited. For example, the court cited *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1099–1100 (W.D. Wash. 2004), where a district court held that Amazon was a service provider because it operates websites and provides retail and third party selling services to Amazon users. Of course, Amazon does not do this for free. It obtains a percentage of sales and also profits from advertising. In fact, Amazon's business model is quite similar to Defendant's. Like Amazon, Defendant offers an imaging marketplace, where contributors upload images for license (sale), customers view those images, and if they decide to license (purchase), both the contributor and Defendant receive a portion of the fees paid (whether pursuant to subscription or one-off purchases).

But even assuming that licensing sits at the outer bounds of the DMCA's Safe Harbor, and might under certain circumstances, like those in *Agence French Presse*, disqualify a defendant from protection under the Safe Harbor, those circumstances are not present here. In that case, Getty obtained images from Agence French Presse and the right to license the images itself; Getty additionally paid royalties to Agence French Presse in connection with licenses sold. *See Agence French Presse*, 934 F. Supp. 2d at 567–68. Getty's employees also actively engaged in licensing the content at issue, leading the district court to find that Getty was not merely acting as a passive host or online facilitator of access to images. *See id.* at 568.

Here, in contrast, Defendant's conduct was primarily passive—facilitating rather than performing the licensing. It is undisputed that the Contributor in India uploaded the image. Defendant did not enter into any specific agreements with the Contributor, nor obtain exclusive

11

rights, or pay royalties. And Defendant's limited role of reviewing uploaded images for objectionable content does not take Defendant beyond the realm of mere facilitator. Although prior to the takedown notice, the image *could* have been licensed, the undisputed evidence shows that it was not; in fact, there is no evidence that Defendant took any volitional action with respect to Plaintiff's image or in any way profited from having the image in its portfolio. To wit, whereas Getty was found to have licensed the images in issue to multiple parties, here, the metadata for the image's URL shows that between its uploading and takedown, the URL was accessed a total of four times by two unique users and generated no revenue whatsoever—in other words, no user or subscriber to Defendant's stock portfolio licensed or received a copy of the image.

In sum, the record evidence shows that Defendant is a service provider, and no reasonable finder of fact could otherwise conclude.

    2.    Policy for Repeat Infringers

Defendant also has implemented a policy for repeat infringers that complies with the DMCA. The policy is set forth in the CTOS and puts contributors on notice that Defendant retains the right to limit access or terminate accounts for copyright infringement. Defendant also reasonably enforces its policy by enabling copyright owners to submit takedown notices and responding to such notices. Defendant keeps records to identify repeat infringers and regularly terminates contributors' accounts due to infringing activity, including in this case. This is sufficient to satisfy the repeat infringer prong. *See Wolk*, 840 F. Supp. 2d at 744 (finding requirement met where defendant had "a policy under which copyright holders can submit a take-down notice," posted it "on [its] website," and "remove[d] the infringing material" when appropriate); *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011) (finding requirement met where defendant had "a system for responding to takedown notices,"

did "not interfere with the copyright owners' ability to issue notices," and "terminate[d] users who repeatedly or blatantly infringe[d]").

3. Interference with Standard Technical Measures

Plaintiff claims that Defendant interfered with standard technical measures by stripping metadata. Defendant disputes that standard technical measures exist in this context, arguing that there is not a broad consensus that metadata is a "standard technical measure." However, I need not decide the question of whether metadata is an accepted standard technical measure because there is no record evidence showing that the image uploaded by the Contributor had metadata attached to it, and if it did, that Defendant stripped that metadata.

In support of his argument, Plaintiff offers a screenshot from Adobe Photoshop showing a version with metadata identifying him as the owner. However, he offers no evidence showing that the same metadata existed in the file uploaded to Defendant's website, nor any evidence that Defendant was aware of such metadata or that its software is capable of removing it.

3. Additional Requirements Under § 512(c)

In addition to meeting the threshold requirements for Safe Harbor, Defendant also satisfies the additional requirements under Section 512(c)(1).

a. Stored at the Direction of Users

The images are uploaded and "stored" within Defendant's portfolio at the direction of contributors. That Defendant reviews images before they can be published on its website does not disqualify Defendant from safe harbor. *See Viacom*, 676 F.3d at 35.

Plaintiff disputes that the images in Defendant's portfolio are stored by others, instead characterizing Defendant's relationships with contributors as partnerships. Plaintiff contends that Defendant recruits and vets its contributors and engages in a thorough review

13

process for every image submitted, aimed at deciding whether to approve the image for publication.

The record evidence does not support Plaintiff's characterization. The evidence shows that Defendant neither seeks out contributors nor curates the portfolio connected with its contributor platform. Instead, anyone can sign up to be a contributor, so long as they agree to the CTOS, and anyone can submit an image for licensing, subject only to a limited review for objectionable content for which it might be rejected. At bottom, the contributor platform is user-directed. The fact that Defendant has the ability to reject content does not make it ineligible for the Safe Harbor. The review process keeps out images that are either not valuable (high quality) to users or customers (a service of its own) or content that, if posted, would violate other laws, *i.e.*, pornography or hate speech, and possibly subject Defendant to liability under other laws. Furthermore, given that 200,000 images are added to the platform daily, no reasonable factfinder could conclude that Defendant engages in the type of thorough review and approval process suggested by Plaintiff and which might support a finding that the images were not stored at the direction of contributors (users).

          b.     Knowledge and Expeditious Removal

The evidence shows that when Defendant becomes aware of infringement, it acts expeditiously to remove it. With respect to Plaintiff, his April 2021 takedown notice specifically requested that Defendant remove his image from the public-facing website and cited the offending URL. Defendant did so. The DMCA did not require Defendant to do more. *See* 17 U.S.C. § 512(m) (disclaiming any affirmative obligation on service providers to ferret out infringement or otherwise police their websites).

Plaintiff disputes that Defendant acts or did act expeditiously to remove all copies of his image, citing both the lingering back-end copies on Defendant's website and the images

14

that remained visible on HelloRF, StockFresh, and TinEye. As to the copies on Defendant's website, no DMCA liability attaches for the delayed removal of these additional copies, even if as Defendant's Rule 30(b)(6) witness suggested, the failure to remove those copies at the outset violated Defendant's internal policies. Plaintiff never specified, and indeed when asked, refused to specify, the URLs where he was able to view his image. Because his "notice" did not comply with the DMCA, Defendant had no obligation to act. *See Viacom*, 718 F. Supp. 2d at 529 (finding no obligation to remove unless plaintiff provides "information reasonably sufficient to permit the service provider to locate the material," such as the URL).

As to the copies that appeared on the third-party websites HelloRF and StockFresh, Defendant is not liable for their failure to refresh their cache. Defendant's affiliate relationships give it no control over third-party operations, and nothing in the record supports Plaintiff's position that Defendant directed those companies to continuing displaying the image. There is also no evidence that Plaintiff submitted a takedown notice to Defendant, HelloRF, or StockFresh, requesting that they remove the infringing copies appearing on third-party websites.

Finally, as to the image appearing on TinEye, Defendant has no relationship with TinEye authorizing the display of images in Defendant's portfolio. Defendant has no liability for TinEye's infringement (if TinEye's conduct does not constitute fair use). In addition, as with HelloRF and StockFresh, Plaintiff offers no evidence showing that it requested the image be removed from TinEye's cite, directed either at Defendant or TinEye.

    c.  No Right to Control Infringement or Financial Benefit

The undisputed facts show that Defendant had no right to control the initial infringing conduct by the Contributor. Defendant did not invite or request the Contributor to upload. The only ex ante control arguably possessed by Defendant was the ability to reject the image for publishing. But since § 512(m) disclaims any affirmative obligation to police

15

infringement, Defendant cannot be precluded from safe harbor simply because it failed to reject the image when initially uploaded. Instead, it had (and exercised) the power to cease the infringing activity by disabling the public-facing URL and precluding the image from being available for license. Neither of these is sufficient to establish a right to control within the meaning of the DMCA. *See Viacom*, 676 F.3d at 38 (explaining that the "right and ability to control" must "require[] something more than the ability to remove or block access to materials posted on a service provider's website"). The only other control Defendant had (and exercised) was the power to terminate the Contributor's account. In any event, none of the "control" possessed by Defendant rises to the level necessary to disqualify it from safe harbor. *See id.* (explaining that possession of the "right and ability to control" contemplates circumstances in which "a service provider exert[s] substantial influence on the activities of users").

In addition, there is no evidence of Defendant receiving any financial benefit. As noted above, the image was viewed a total of four times by two discrete users. There is no evidence that the image was licensed or even requested for license. Its mere existence in Defendant's portfolio of hundreds of millions of images is an insufficient basis for finding financial benefit.

        d.     DMCA Agent

Finally, Defendant has complied with the requirement that it have a designated DMCA agent and a process for receiving and responding to takedown notices. Its agent, or department, is listed with the U.S. Copyright Office, and as evidenced by Defendant's response to Plaintiff's takedown notice, the process works as contemplated by, and is fully compliant with, the DMCA.

In sum, Defendant has established that it meets both the threshold and specific requirements for Section 512(c)'s Safe Harbor. Plaintiff has not offered evidence rebutting that showing, and there is no genuine dispute of material fact as to whether Defendant is entitled to

safe harbor. Defendant is therefore entitled to summary judgment as a matter of law on Plaintiff's copyright infringement claims.

B. False CMI

In order to establish a claim under Section 1202(a), a plaintiff must show that a defendant (i) knowingly provided false CMI (ii) with the intent to induce, enable, facilitate, or conceal an infringement—the so-called double scienter requirement. 17 U.S.C. § 1202(a).

Plaintiff' CMI claim fails because neither required element is met. First, Defendant's use of a watermark does not constitute false CMI. It identifies Defendant as the source of an image downloaded from its portfolio or platform. Second, Plaintiff cannot establish that Defendant had any scienter, let alone double scienter. The evidence shows that Defendant incorporates or attaches its watermark to prevent, rather than to induce, enable, facilitate, or conceal, infringement. Because Plaintiff has failed to establish a prima facie case, Defendant is entitled to summary judgment as a matter of law on Plaintiff's false CMI claim.

## CONCLUSION

For the reasons provided above, Defendant's motion for summary judgment is granted in full, and Plaintiff's motion is denied. The Clerk of Court shall terminate the motions (ECF Nos. 50, 54), enter judgment in favor of Defendant with costs, and mark the case closed.

SO ORDERED.

Dated: September 19, 2022
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge